IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation, | CIVIL NO. 03-00706 (JMS/LEK) (Contract) |
| Plaintiff, | MEMORANDUM IN SUPPORT |
| v. | |
| OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation, | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................. 1

II.   UNDISPUTED FACTS .................................................................... 3

    A.    The City elected not to follow sole source procurement procedures for the UV equipment ......................................... 3

    B.    The Project UV specification is a "performance" specification – not a "design" specification ................................................ 3

    C.    Trojan's local representative successfully lobbied the City's designer, GMP, to list a Trojan system as the "basis of design" and to include language whose effect was to limit competition .......... 5

    D.    UTS' local representative requested pre bid approval for UTS as an equal to Trojan which the City granted over GMP's objection ...... 5

    E.    In reasonable reliance upon the City's December 9, 1999 approval letter, Bodell based its bid price for the UV equipment, "bid item 81," on a price quotation from UTS that was substantially lower than Trojan's price quotation ............................... 6

    F.    After the bid opening, Trojan's local representative complained and the City confirmed with Bodell that Bodell's price for bid item 81 was based on UTS and asked Bodell to determine the price reduction if bid item 81 were deleted from the Contract so that it could be rebid separately in order that the Trojan system could be installed in lieu of the UTS system ...................................... 8

    G.    Even though the City decided internally to delete bid item 81 and rebid it separately in order to acquire the Trojan system, for reasons that the City can't explain no one followed through with the necessary paperwork .................................................. 8

    H.    Trojan's local supplier successfully lobbied GMP and the City to reject Bodell's submittals of a UTS designed system notwithstanding the City's pre bid approval letter .............................. 9

    I.    The City's final rejection of the UTS submittals was based on UTS' purported failure to demonstrate that it met the experience requirement of the specification ......................................... 9

**TABLE OF CONTENTS**
(continued)

Page

J.      The City's interpretation of the experience requirement is so narrow that no UV equipment manufacturer other than Trojan could have satisfied it .......................................................................... 12

III.   LEGAL STANDARD ............................................................................ 12

IV.   ARGUMENT........................................................................................... 13

A.      Bodell's reliance upon the City's pre bid approval of UTS "for bidding purposes only" need only have been reasonable for Bodell to prevail on this motion ....................................................... 13

B.      Bodell's reliance upon the City's pre bid approval of UTS "for bidding purposes only" was reasonable............................................. 15

C.      Assuming, arguendo, that even after having been approved "for bidding purposes," UTS still needed to satisfy the experience requirement, UTS met the experience requirement as reasonably construed........................................................................................... 18

1.      The City's interpretation of the "experience" requirement in the specifications depends upon an unreasonably narrow construction of the words, "equipment type," that would render the preceding clause of the specification superfluous ............................................................................ 18

2.      The City's interpretation of the experience requirement is overly restrictive and contrary to the purpose of such clauses ................................................................................... 18

3.      The City's interpretation of the specification would render it a de facto sole source procurement in violation of HRS Ch. 103D ..................................................................... 19

4.      Even if the City's interpretation of the phrase, "equipment type," were deemed to be reasonable, it was nonetheless also reasonable for UTS to interpret the phrase more broadly which is legally all that is necessary for the bidder's interpretation to prevail ............................................. 22

V.     CONCLUSION ..................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

Addisu v. Fred Meyer, Inc., 198 F.3d 1130 (9th Cir. 2000) .................................... 18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................................... 18

Appeal of Blake Constr. Co., GSBCA No. 2075, 67-2 BCA ¶ 6411 (1967) ......... 19

Appeal of Crescent Comm. Corp. DOT, CAB No. 73-12, 74-1 BCA II
    (1974) ................................................................................................................. 19

Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272
    (9th Cir. 1992) ................................................................................................... 22

E. Amanti & Sons. Inc. v. Town of Danvers, 758 N.E.2d 153 (Mass. App.
    Ct. 2001) ...................................................................................................... 25, 27

Jamsar, Inc. v. United States, 442 F.2d 930 (Ct. Cl. 1971) .................................... 19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............. 18

N.J. v. New York, 523 U.S. 767 (1998) ................................................................... 21

Ring Constr. Corp. v. United States, 162 F. Supp. 190 (Ct. C 1958) .................... 19

CCTW&M v. United States, 452 F. Supp. 69 (D. N.J. 1978) ................................. 24

## STATUTES

FRCP Rule 56(c) ..................................................................................................... 18

Haw. Rev. Stat. § 103D-101 .................................................................................. 27

Haw. Rev. Stat. § 103D-306 ..................................................................................... 9

## MISCELLANEOUS

J. McBride & J. Wachtel, <u>Government Contracts</u> § 2.10 [3] (1996) (emphasis added) ........................................................................... 20

National Institute of Construction Law, Inc., <u>Construction and Design Law</u> § 13.1(g), at 7 (1989) ...................................................................... 19

<u>Restatement (2d) Contracts</u> § 212 cmt. b............................................. 20

Restatement (Second) of Contracts, §§ 202(4), 203 ............................... 21

Restatement (Second) of Contracts, § 203............................................. 22

17A Am. Jur. 2d. Contracts § 357 (1991)............................................... 21

78-1 BCA Ii 13,065 at 63,787-88 (1978)............................................... 19

Federal Rules of Civil Procedure ("FRCP") Rule 56(c) ....................... 5, 6

Haw. Admin. R. § 3-122-10 (emphasis added) ...................................... 24

Haw. Admin R. §§ 3-122-81, -82 ........................................................... 9

Restatment (Second) of Contracts, § 202 (1979)................................... 21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation, | CIVIL NO. 03-00706 (JMS/LEK) (Contract) |
| Plaintiff, | MEMORANDUM IN SUPPORT |
| v. | |
| OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

The gravamen of this diversity action by Plaintiff BODELL CONSTRUCTION COMPANY ("Bodell") against Defendant CITY AND COUNTY OF HONOLULU ("City") is that Bodell is entitled to additional compensation from the City as a result of having been directed to supply and install an ultra violet ("UV") disinfection system at the Wahiawa Wastewater Treatment Plant (the "Project") manufactured by Trojan Technologies, Inc. ("Trojan") that cost hundreds of thousands

of dollars more than the competing system, manufactured by UltraTech Systems, Inc. ("UTS"), that Bodell based its bid price on in reliance upon a letter from the City approving UTS, "for bidding purposes only." Initially, the City recognized that it would be unreasonable to expect Bodell to supply the Trojan system for the same price as the UTS system and asked Bodell to delete the UV equipment from its proposal so that this portion of the contract, "bid item 81," could be rebid. For reasons that remain a mystery, the City failed to follow through with the necessary paperwork. Instead, the City, despite having internally confirmed available funding, simply rejected Bodell's submittals of the UTS system and justified its decision by claiming that UTS lacked the necessary experience to meet the "Qualification Requirements" applicable to the UV equipment manufacturer under section 1.2 A of the UV equipment specification. Bodell submits that it only used UTS' price because of the City's approval letter and while the City may well have the prerogative to change its mind regarding whether UTS is an acceptable manufacturer, Bodell is nonetheless entitled to be compensated for the price difference the City indisputably induced Bodell to suffer by reason of the improvidently issued approval letter.

## II.   UNDISPUTED FACTS

### A.   The City elected not to follow sole source procurement procedures for the UV equipment

The Procurement Code of the State of Hawaii, consistently with the public procurement regimes of most jurisdictions, discourages "sole source" procurement as patently anti-competitive and requires detailed written documentation to be prepared to support any determination that only one source exists for any product or service. Haw. Rev. Stat. § 103D-306; Haw. Admin R. §§ 3-122-81, -82. The City requires any department that seeks sole source procurement to obtain the prior approval of its Department of Budget and Fiscal Services. Prior to the Project, the Department of Budget and Fiscal Services had already denied one request to sole source UV disinfection equipment. Ex. 33 at 22-26. Prior to the preparation of the bid specifications by Defendant Ohio Pacific Tech, Inc. fka GMP ASSOCIATES, INC. ("GMP"), the chief of the City's Division of Infrastructure Design and Engineering deliberately eschewed sole source procurement procedures for the UV equipment on the grounds that it would "cause bidding protests." Ex. 1.

**B.    The Project UV specification is a "performance" specification – not a "design" specification**

Importantly, the UV equipment specification was a "performance specification" in the sense that neither the plans nor the specifications included a design defining the number of UV lamps, the configuration of the lamps within the modules, etc. Instead, the specification included a UV dosage requirement and a desired kill rate for various microorganisms and left it to the manufacturer to design a system that would meet these standards. Exs. 3, 4; Cote Dec.; Ellner Dec. Notwithstanding the absence of any actual design in the specification, the specification also states, somewhat ambiguously, that "the contract drawings and specifications are based on System UV 4000™ medium pressure UV lamp technology manufactured by Trojan Technologies, Inc." and, "UV system shall be System UV 4000™, as manufactured by Trojan Technologies, Inc. *or equal.*" On its face the specification was therefore not a "sole source" specification because it allowed for the possibility of more than one manufacturer's product being acceptable.

GMP's specification, however, by stating that the design was based on a specific Trojan product, put the onus on all other UV equipment suppliers to hurriedly obtain pre bid approval in order for contractors to be allowed to use their prices. This is because the City's General Instructions to Bidders at § 1.13 (a) provides as follows:

> Where the invitation for bids specifies one or more
> manufacturer's brand names or makes of materials,
> devices, equipment or system as indicating a quality,
> style, appearance, or performance, or method of
> construction, the bidder's bid ***shall be based on either
> one of the specified brands, make or method, or on an
> alternate brand, make, or method, which has expressly
> been found to be equal or better by the Officer-in
> Charge.***

Ex. 2 (emphasis added).

C.    **Trojan's local representative successfully lobbied the City's
designer, GMP, to list a Trojan system as the "basis of design" and
to include language whose effect was to limit competition**

In a tale all too common but true, Trojan's local representative, Mike
Elhoff of Hawaii Engineering Services ("HES"), lobbied GMP to draft the
specification around Trojan to limit competition.  GMP complied and used a Trojan
standard specification on a diskette supplied by HES to Jay Stone of GMP, who
drafted the specification under the supervision of GMP's principal designer for the
Project, Lee Mansfield.  See Bodell's Concise Statement of Facts ("C. Stmt.") No.
5.  The most obvious wording from the Trojan specification designed to restrict
competition was the inclusion of the following two sentences in section 2.4 A. 3:

> The major axis of the UV lamps shall be horizontal and
> parallel to flow.  ***UV systems that operate with lamps
> placed perpendicular to the flow are unacceptable.***

Ex. 3 (emphasis added).  As explained in the attached Declaration of Sidney Ellner,

Trojan has used this tactic of lobbying municipalities to exclude the vertically

configured systems of its competitors since the 1980's.

**D.    UTS' local representative requested pre bid approval for UTS as an equal to Trojan which the City granted over GMP's objection**

   To open the door to the price competition that is the foundation of the

Procurement Code,[1] UTS, whose UV equipment had previously been approved for

installation at another City project, the Kailua Wastewater Treatment Plant, through

its local representative, Engineered Systems, requested pre bid approval for UTS

pursuant to the General Instructions to Bidders which the City granted, over GMP's

objection.  C. Stmt. No. 6.

---

[1] See HAR § 3-122-10:

     Purpose.  A specification is the basis for procuring a good, service, or construction item adequate and suitable for the State's needs in a cost effective manner. Purchasing agencies shall seek to procure standard commercial products, if practicable, and obtain the most advantageous process.  **All specifications shall see to promote overall competition, shall not be unduly restrictive, and provide a fair and equal opportunity for every supplier that is able to meet the State's needs.  In developing specifications, unique requirements should be avoided.**  (Emphasis added).

**E.**    **In reasonable reliance upon the City's December 9, 1999 approval letter, Bodell based its bid price for the UV equipment, "bid item 81," on a price quotation from UTS that was substantially lower than Trojan's price quotation**

The City's December 9, 1999 approval letter stated that UTS was

approved "for bidding purposes only."  It clarified as follows:

> Final approval is subject to review of the fabrication
> drawings, shop drawings, and meeting all the
> requirements of the contract documents.

Ex. 9.  The fact that final approval would still be subject to review of UTS drawings

and meeting "all the requirements of the contract documents" was expected

inasmuch as the specification, as discussed above, was a "performance"

specification rather than a "design" specification – it still being necessary that the

approved manufacturer submit a proposed system design that would fit in the

allotted space and meet the performance requirements of the specification.

The bid opening date (when bids were due) was December 16, 1999 --

only one week after the City's approval letter.  Bodell received the City's approval

letter from Engineered Systems along with a price of $267,500 for the UTS UV

system.  Bodell also received a price quote of $1,100,000 from HES on behalf of

Trojan.  Even after adjusting for differences in the inclusions and exclusions of

these two quotes, the UTS quote was substantially less than the Trojan quote.

Accordingly, in reliance upon the City's approval letter for UTS, Bodell used the

UTS price quote in its bid proposal to the City for the Project for "bid item 81,"

which included the "UV Disinfection Reactor Units . . . in place complete." C.

Stmt. No. 7.

     **F.**    **After the bid opening, Trojan's local representative complained
and the City confirmed with Bodell that Bodell's price for bid item
81 was based on UTS and asked Bodell to determine the price
reduction if bid item 81 were deleted from the Contract so that it
could be rebid separately in order that the Trojan system could be
installed in lieu of the UTS system**

     GMP and Trojan were apparently unaware of the City's December 9,

1999 approval letter and when they found out, Mike Elhoff of HES complained. In

response, the City held an internal meeting and decided that the approval letter was

"our error".[2] Guy Inouye of the City approached Bodell to determine if Bodell had

used UTS' price and whether Bodell could supply Trojan without a price

adjustment. When Bodell confirmed it had used UTS' price and that it could not

supply the Trojan system without a price adjustment, Bodell was asked to provide a

breakdown of Bodell's price for bid item 81 to evaluate how much of a price

reduction the City would get if this item were to be deleted from Bodell's contract.

The City's intent at that time was to rebid item 81 so that the desired Trojan system

would be acquired in lieu of the UTS system. C. Stmt. No. 8.

G.    **Even though the City decided internally to delete bid item 81 and rebid it separately in order to acquire the Trojan system, for reasons that the City can't explain no one followed through with the necessary paperwork**

Even though the City decided internally to delete bid item 81 and rebid it separately, and funds were identified as being available for this purpose, for reasons the City has been completely unable to explain, this never happened.  The task was assigned to Cyril Hamada, the City's staff engineer assigned to the Project, who was the individual who had originally recommended that the UTS pre bid approval be granted.  He claims not to recall having been asked to do this, and his superior, Guy Inouye testified, "[i]t's a mystery to me."  Ex. 33 at 133; C. Stmt. No. 9.

H.    **Trojan's local supplier successfully lobbied GMP and the City to reject Bodell's submittals of a UTS designed system notwithstanding the City's pre bid approval letter**

When the City failed to follow through with its plan to delete and rebid item 81 so that the Trojan system could be acquired in lieu of the UTS system, Mike Elhoff aggressively and successfully lobbied GMP and the City to reject the UTS submittals so that Trojan could still get the sale.  C. Stmt. No. 10.

I.    **The City's final rejection of the UTS submittals was based on UTS' purported failure to demonstrate that it met the experience requirement of the specification**

In December of 2000, after a number of failed attempts by Bodell to

---

[2] See paragraph number 5 of Ex. 15.

ImanageDB:615646.3

10

get a submittal of the UTS system approved, GMP verbally indicated that,

regardless of whether UTS could meet the performance requirements of the

specification, it could not satisfy the experience requirement and therefore its

submittal would be rejected.  This prompted a letter from counsel for Bodell to

GMP challenging the use of the experience requirement in this manner as "unduly

restrictive" in violation of HAR § 3-122-10.  Ex. 25.

 The experience requirement consists of the following two sentences in

Section 1.2 A. of the Specification under the heading, "Qualification Requirements":

> To be acceptable, the manufacturer shall be able to demonstrate to the satisfaction of the Engineer successful performance of the ***proposed system*** at a minimum of five (5) other wastewater locations in the United States.

> The manufacturer shall submit at least five (5) permanent wastewater installations using ***this equipment type***, in North America, disinfecting a peak flow of 5 MGD or greater for at least one (1) years.

Exhibit 3 (emphasis added).

 In order to use the experience requirement to disqualify UTS, the City and

its engineer, GMP, interpreted the phrase, "this equipment type" to mean only

***horizontal*** systems previously installed by UTS – which is the configuration of the

system its submittal was based upon.  An alternative interpretation of "this equipment

type" would be any system that utilizes the same basic components, viz., low pressure

UV lamps, ballasts, and circuitry. UTS has many "successful" installations of both its horizontal and vertical systems, but does not have 5 prior *horizontal* systems at plants disinfecting a peak flow of 5 MGD or greater. It has many such vertical systems.

Lee Mansfield, concerned after receiving the December 20, 2000 letter from Bodell's counsel regarding whether any UV manufacturer other than Trojan could meet the experience requirement if "equipment type" were to be read this narrowly, made an inquiry to Infilco Degremonte, Inc. ("IDI"), Trojan's principal competitor at the time, to find out if IDI would have been able to satisfy this requirement with horizontal installations. On January 4, 2001, he received an email response from IDI with a list of six installations purportedly by IDI of horizontal systems at plants disinfecting peak flows of 5 MGD or greater. According to Mansfield, this satisfied him that the experience requirement, as so interpreted, was not "too onerous." Ex. 35 at 240.

According to an "Ultra Tech Submittal Time Line" on GMP letterhead produced from the City's records, on January 17, 2001, or approximately two weeks after Mansfield "confirmed" that IDI could have met the experience requirement with horizontal installations:

> A meeting [was held] between GMP and the City's corporation council (sic) to review the status of the Ultra tech submittal and rejection by GMP. The City decided



> to reject the submittal by Ultra tech and proceed with the
> original specified equipment by Trojan.

Ex. 28.

The City's reliance upon UTS' alleged failure to satisfy the experience

requirement is evident in the City's May 19, 2003 letter rejecting Bodell's claim.

Ex. 29; C. Stmt. No. 11.

**J.    The City's interpretation of the experience requirement is so narrow that no UV equipment manufacturer other than Trojan could have satisfied it**

Ironically, five of the six installations listed in IDI's January 4, 2000

email to Mansfield were done not by IDI, but by Ultra Violet Purification Systems,

Inc. ("UVPS") before IDI even entered the business of UV disinfection. IDI did

not enter the business until 1992, when it purchased from Katadyne the remaining

assets of what had previously been UVPS. Mansfield conceded in his deposition

that the experience requirement could only be satisfied by prior installations done

by the manufacturer itself. Ex. 35 at 244; C. Stmt. No. 12. As confirmed in the

Declaration of Sidney Ellner, no other UV manufacturer could have satisfied the

experience requirement if limited to horizontal installations.

**III.    LEGAL STANDARD**

FRCP Rule 56(c) directs that summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The party opposing summary judgment has an affirmative obligation to set forth evidence "on which the jury could reasonably find for [the non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient." Id. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.    ARGUMENT

### A.    Bodell's reliance upon the City's pre bid approval of UTS "for bidding purposes only" need only have been reasonable for Bodell to prevail on this motion

It is well established that the risk of ambiguities in bid specifications is on the owner and its designers, and not upon contractors who bid based upon a reasonable interpretation of the language used. As a matter of law, the owner and designer of a construction project are liable for any damages caused by ambiguous specifications. National Institute of Construction Law, Inc., Construction and Design Law § 13.1(g),

at 7 (1989). Accord Jamsar, Inc. v. United States 442 F.2d 930, 934 (Ct. Cl. 1971) (referring to the "line of cases holding that if the government-drawn bid invitation is reasonably construed, that is the interpretation which will be adopted"); Ring Constr. Corp. v. United States 162 F. Supp. 190, 191 (Ct. C 1958) ("The specifications are ambiguous; they were written by the Government; the plaintiff's interpretation of them is reasonable and should prevail"). This rule applies even if the owner's interpretation is also reasonable. See, e.g., Appeal of Blake Constr. Co., GSBCA No. 2075, 67-2 BCA ¶ 6411 at 29,706 (1967) (citing authorities). Accord Appeal of Triple A Machine Shop, Inc. ASBCA No. 21561, 78-1 BCA Ii 13,065 at 63,787-88 (1978) ("We have found that the interpretation of each party was reasonable. . . . It is also well established that if Government-drafted contract language is ambiguous the contractor's reasonable construction of the language will be adopted unless evidence clearly established that the parties had another intention"); Appeal of Crescent Comm. Corp. DOT CAB No. 73-12, 74-1 BCA II 10,531 at 49,887 (1974) ("When the Government furnishes specifications which are [to more than one interpretation], and the contractor's interpretation is reasonable, the contractor's interpretation will be upheld.

It is also well established that a court must consider, before making a determination of whether a contract term is ambiguous, extrinsic evidence relating to "the meaning to be attached to it by a reasonably intelligent person conversant

with the subject covered by the specifications or document." J. McBride & J.

Wachtel, Government Contracts § 2.10 [3] (1996) (emphasis added). See also:

Restatement (2d) Contracts § 212 cmt. b ("Any determination of meaning or

ambiguity should only be made in light of the relevant evidence of the situation and

relations of the parties, the subject matter of the transaction, preliminary

negotiations and statements made therein, usages of trade, and the course of dealing

between the parties.") (Emphasis added).

**B.    Bodell's reliance upon the City's pre bid approval of UTS "for bidding purposes only" was reasonable**

    The City's pre bid approval of UTS was issued, over GMP's objection,

in response to a specific request made by UTS in accordance with the General

Instructions to Bidders and hence had ***no other purpose*** than to give comfort to

general contractors to whom UTS quoted prices that the City had determined UTS

to be "equal or better" to Trojan – the ***only*** brand listed in the specification. Had

the City ***not*** issued this letter, the specification would have ended up being a *de*

*facto* sole source specification even though sole source procurement procedures

were not followed.

    The intent and meaning of the clause, "approved for bidding purposes

only" is clearly evidenced by the conduct of the City, the course of performance of the

parties, and trade usage in public procurement construction contracts. RESTATMENT (SECOND) OF CONTRACTS, § 202 (1979). "It is hornbook contracts law that the practical construction of an ambiguous agreement revealed by later conduct of the parties is good indication of its meaning." N.J. v. New York, 523 U.S. 767, 830 (1998) (citing RESTATEMENT (SECOND) OF CONTRACTS, §§ 202(4), 203 and 17A AM. JUR. 2D. CONTRACTS § 357 (1991)). The record herein demonstrates by the City's conduct, that the City's representation that the UTS System was "approved for bidding purposes only" clearly meant that contractors bidding on the Project could use the UTS System price in their bid calculation, but if for some reason, the UTS System did not receive final approval, the contract could be modified—as either an increase in the total contract price or a reduction in the total price— to reflect the change in the cost of the UV system actually approved and installed. The City at all times—pre-bid, post-bid, and post contract execution—acted consistent with this interpretation of the words, "approved for bidding purposes only."

Additionally, if the words meant otherwise—that instead contractors bore the full burden of proving that the UTS System met all requirements of the Specification, and that if they based their bid price on the UTS System they assumed the risk of loss if the UTS System was later rejected and they would thus be required to supply a compliant system at no additional cost to the City—then the "approval" of the

UTS System was in essence not an "approval" at all. The words are rendered meaningless.

> In the interpretation of a promise or agreement or a term thereof… an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect.

RESTATEMENT (SECOND) OF CONTRACTS, § 203; see also Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272, 279 (9th Cir. 1992) (in reversing denial of motion for directed verdict, the Ninth Circuit held that proffered interpretation of contract would render language "useless", contrary to well settled rules of construction).

As explained in the attached Declarations of Sidney Ellner and Armand Cote, both of whom are conversant in the interpretation of pre bid approvals in public procurement projects, it was reasonable for Bodell to believe that the City's approval letter meant that Bodell was free to use UTS' price in its bid subject to submitting a design for a system that would fit in the allotted space and satisfy the performance requirements of the specifications. In this case, however, the City's rejection of the UTS system was not based on the failure to submit a design that would satisfy the performance requirements or fit in the allotted space. Instead, it was based on UTS allege failure to meet the manufacturer "Qualification Requirements," which

essentially pulled the rug out from under the whole purpose and function of the City's pre bid approval letter.

**C.**  **Assuming, arguendo, that even after having been approved "for bidding purposes," UTS still needed to satisfy the experience requirement, UTS met the experience requirement as reasonably construed**

1. The City's interpretation of the "experience" requirement in the specifications depends upon an unreasonably narrow construction of the words, "equipment type," that would render the preceding clause of the specification superfluous.

As explained in the Declaration of Sidney Ellner, the City's interpretation of the words "equipment type" to exclude vertically configured UV systems is too narrow. It would be reasonable, however, for a vendor to interpret those words so as to include vertical systems since both horizontal and vertical systems employ the same physical pieces of equipment but are simple oriented in a different direction relative to the flow of effluent. Further, if "equipment type" is restricted to horizontally configured systems, then the preceding clause is made superfluous because it is less restrictive than the second clause (because of no specified minimum peak flow rate) and therefore meaningless.

2. The City's interpretation of the experience requirement is overly restrictive and contrary to the purpose of such clauses

The Procurement Policy Board of the State of Hawaii has promulgated rules that regulate the preparation and use of bid specifications, which provide as

follows:

> § 3-122-10 <u>Purpose</u>.  A specification is the basis for procuring a good, service, or construction item adequate and suitable for the State's needs in a cost effective manner. Purchasing agencies shall seek to procure standard commercial products, if practicable, and obtain the most advantageous process.  **All specifications shall see to promote overall competition, shall not be unduly restrictive, and provide a fair and equal opportunity for every supplier that is able to meet the State's needs.  In developing specifications, unique requirements should be avoided.**

Haw. Admin. R. § 3-122-10 (emphasis added).

The purpose of an experience requirement in a procurement specification is to prevent the purchase of unproven or "fly-by-night" products for state projects. See <u>CCTW&M v. United States</u>, 452 F. Supp. 69, 78, (D. N.J. 1978) (affirming EPA Administrator finding that "[t]he experience requirement is 'to protect the user from untried equipment'" and affirming the EPA decision to rewrite specification and rebid contract for wastewater treatment plant because the experience requirement was written so only one manufacturer could meet it, and thus was anticompetitive and violative of the spirit of EPA Regulations).

3.    The City's interpretation of the specification would render it a *de facto* sole source procurement in violation of HRS Ch. 103D.

The language of the experience requirement originated with the Trojan spec that was drafted to limit competition. Not surprisingly, if the City's interpretation of the Specification is accepted, only the Trojan System could have met the Specification, resulting in the Specification being a sole source procurement in violation of HRS ch. 103D-306 and HAR §§ 3-122-81, -82.

Where a public procurement contract is a de facto sole source contract and violates a procurement code to the detriment of a contracting party, the party is entitled to damages. In E. Amanti & Sons. Inc. v. Town of Danvers, 758 N.E.2d 153 (Mass. App. Ct. 2001), the Massachusetts Court of Appeals affirmed an award of damages to a subcontractor, E. Amanti ("Amanti"), where the procurement specification for an engine exhaust system, "'[was] not a performance [i.e. competitive] specification because…[it was not] able to be satisfied by any manufacturer other than PlymoVent'" and Amanti was forced to purchase a more expensive PlymoVent system instead of a lower priced product.   758 N.E.2d at 157.  In E. Amanti, the specification at issue provided:

> Emergency Vehicle Exhaust System shall be as specified
> and manufactured by PlymoVent, or approved equal by the
> Fire Department.

758 N.E.2d at 155.

After the bid opening and award, Amanti sought approval to use a Carmon exhaust system. The town's architect initially agreed, but later rejected the request on the grounds that the Carmon system did not meet the "performance requirement" of the specification. Id. Amanti asserted that the town had failed to follow its rules for sole source procurement, and asked the town to identify alternative systems equivalent to the PlymoVent system. The town's architect informed Amanti that it had provided a performance-based specification, and gave Amanti the names of some manufacturers but without verifying that they would meet the specification. Amanti eventually supplied the more expensive PlymoVent system under protest, and filed suit to recover incurred additional costs. Id. at 156.

On Amanti's motion for summary judgment, the court found that only PlymoVent could satisfy the specifications and granted summary judgment to Amanti. The court stated that the town "'had a duty to disclose to bidders that PlymoVent was [a] sole source' and having failed in that duty, was liable to Amanti for lost profits." Id. at 157.

The City's Specification in this case, directing that the "UV system shall by System 4000$^{TM}$, as manufactured by Trojan Technologies, Inc., or equal" is virtually identical to the specification in E. Amanti. Likewise, if the City is correct in

its interpretation of the Specification experience requirements, only the Trojan System

could meet them, rendering the Specification a de facto sole source contract.

Thus, the City had the obligation to not only follow the sole source

procurement provisions of HRS § 103D-306, and HAR 3-122-81, but it also had the

duty to act in good faith and inform Bodell that the contract was sole source so that

Bodell could calculate its bid accordingly based on the Trojan System.  Haw. Rev. Stat.

§ 103D-101.  Because the City did not fairly give Bodell notice that only the Trojan

System was acceptable, the City approved the UTS System, and Bodell used the UTS

System as its cost basis in its bid, the City is liable to Bodell for its lost profits because

it was forced to provide the more expensive Trojan System.  Id. at 157.

> 4.    Even if the City's interpretation of the phrase, "equipment type,"
> were deemed to be reasonable, it was nonetheless also
> reasonable for UTS to interpret the phrase more broadly which
> is legally all that is necessary for the bidder's interpretation to
> prevail.

For all the reasons previously argued in section A of this Argument,

even if the City's interpretation of the phrase, "equipment type," were deemed to be

reasonable, it was nonetheless also reasonable for UTS to interpret the phrase more

broadly, so as to include its prior installations of vertically configured systems,

which is legally all that is necessary for the bidder's interpretation to prevail.

## V.   <u>CONCLUSION</u>

Accordingly, for all of the foregoing reasons, Bodell respectfully requests that the Motion be granted.

DATED:  Honolulu, Hawaii, January 9, 2006.

CADES SCHUTTE
A Limited Liability Law Partnership

DAVID SCHULMEISTER
KRISTIN S. SHIGEMURA
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY