# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BODELL CONSTRUCTION COMPANY, a Utah corporation,

Plaintiff,

v.

OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation; JOHN DOES 1-50; DOE CORPORATIONS 1-50,

Defendants.

CIVIL NO. 03-00706 (JMS/LEK)

**DECLARATION OF ARMAND A. COTE**

**DECLARATION OF ARMAND A. COTE**

I, ARMAND A. COTE, hereby declare as follows:

1. I am the manager of AAC & Associates, LLC through which I provide owner's representation and construction management services to various clients in connection with construction projects. I also provide expert witness services and documentation.

2. Attached hereto as Exhibit "1" is a copy of my resume. As stated therein, I have been involved in the construction industry since 1961 when I began my service in the United States Naval Civil Engineer Corps. I have extensive experience in construction project management having worked both as a project manager and officer for several large general contractors and as an owner's representative and as an owner-retained construction manager for numerous projects. I am familiar with all phases of construction contracting and management including but not limited to project estimating, bidding and scheduling.

3. In October of 2000, I was retained by Bodell Construction Company ("Bodell") which, at that time, was the prime contractor to the City & County of Honolulu (the "City") on a project (the "Project") involving modifications to the City's Wahiawa Wastewater Treatment Plant (the "Wahiawa Plant").

4. The issue that was confronting Bodell when I was first retained was that the City and its retained Construction Manager, GMP Associates, Inc. ("GMP"), were refusing to review and comment on Bodell's resubmittal of shop drawings and

other information from its supplier, Ultra Tech Systems, Inc. ("UTS"), relating to the ultraviolet disinfection ("UV") equipment being provided by Bodell under its contract for the construction of ~~for~~ the Wahiawa Plant. Bodell had used a quote from UTS in its bid to the City, relying upon a letter from the City, received during the pre-bid period, which stated that UTS was approved as an equal to the name brand specified in the Project specifications, Trojan Technologies ("Trojan"), "for bidding purposes only." In October of 2000, however, GMP had rejected Bodell's submittal in support of the UTS system and was directing Bodell to instead supply the Trojan system on the grounds that there was allegedly insufficient time remaining in the construction schedule to allow for a resubmittal and review of the UTS system and for a subsequent submittal of the Trojan system if the UTS resubmittal were found to be lacking.

5. Bodell believed that there was adequate time in its schedule to allow for a resubmittal of the UTS system, and asked me to review its schedule and provide an independent opinion on this point in an effort to persuade the City accept and review a resubmittal of the UTS system.

6. Accordingly, I met with Bodell's project manager, Gary Jeppson, at the Wahiawa Plant, I walked the site to verify the status of completion of the various construction activities that were ongoing and I reviewed Bodell's original construction schedule to validate the feasibility of the durations Bodell had originally assigned to the activities, which would be affected by the timing of the approval and the installation of the UV equipment. I was advised by Bodell that, if necessary, Bodell would accelerate the work by shifting to a seven day work week in order to prevent any impact on the scheduled completion date arising out of a delayed delivery date for the UV equipment.

7. I then generated a schedule using the Primavera Systems, Inc. scheduling software on my own computer to illustrate that Bodell was correct, i.e., there was sufficient time left in its schedule to allow for a resubmittal of the UTS UV equipment and then a later submittal of the Trojan UV equipment, if necessary.

8. Attached hereto as Exhibit "2" is a printout from my computer of one of the scenarios demonstrating this. This schedule, which is based on a seven day work week, shows that

a UTS resubmittal date of November 2, 2000 would allow sufficient time for another resubmittal after comments on December 5, 2000, approval by December 19, 2000, and completion and acceptance by the contract completion date of April 24, 2001.

9. Attached hereto as Exhibit "3" is a second printout from my computer. This schedule, which is also based on a seven day work week, shows that if a November 2, 2000 UTS resubmittal were to have been rejected without opportunity for resubmittal by November 20, 2000, and a Trojan submittal were to have then been made, there still remained sufficient time to order, receive shipment of and install the Trojan system by the contract completion date of April 24, 2001.

10. On October 30, 2000, I brought copies of these two printouts to the City's offices prepared to explain them to the City and GMP at a meeting that was scheduled on that date. When I arrived with representatives of Bodell and UTS at the City's offices, we were told that we could not participate in the meeting and we were all asked to leave. These two schedules

were included as enclosures, however, in a November 1, 2000 letter by Bodell's counsel to GMP that I was copied on.

11. I have been advised that the City did subsequently direct GMP to accept for review a UTS resubmittal and that, ultimately, the City did not make a final determination on whether the UTS UV equipment would be approved until January 22, 2001. Bodell then submitted a Trojan UV system that was approved and installed. Bodell did not work 7 day weeks, however, because the contract completion date was extended for other reasons and it was not necessary to work 7 day weeks in order to timely complete the UV equipment installation.

12. I have been asked by Bodell to validate, using the data from its actual construction of the Wahiawa plant, the schedules that I prepared and made available to the City on October 30, 2000, and I have done so.

13. Attached as Exhibit "4" is a printout which shows the actual dates for the same activities that are depicted on Exhibits "2" and "3." Exhibit "4" clearly validates the reasonableness of the time periods used on Exhibits "2" and "3"

and shows that Bodell actually completed the UV installation in less time than allowed for in Exhibits "2" and "3" even though Bodell did not accelerate by shifting to 7 day work weeks.

14. This is evident by comparing the time allowed in Exhibits "3" and "4" from the date of the Engineer's final rejection of the UTS submittal to the time of final acceptance of "Test Area A," which is the area in which the UV equipment is installed. Exhibit "3" projects that this will take from November 20, 2000 until on April 24, 2001 – a period of slightly more than five months – assuming a 7 day work week. Exhibit "4" shows that the actual duration from January 22, 2001, when the UTS resubmittal was finally rejected, to the completion of "Test Area A" on June 19, 2001 was slightly less than five months – even though Bodell worked 5 day weeks rather than accelerating. This proves that, as represented by Bodell to the City and GMP in October and November of 2000, there was no basis for the City to refuse to consider the UTS resubmittal for scheduling reasons.

15. I have also been asked to provide an opinion regarding whether it was reasonable for Bodell to have used UTS' bid price

for the UV equipment in reliance upon the City's pre bid approval of UTS as a substitute for the Trojan system referenced in the Project specifications. For the reasons explained below, it is my opinion that it was reasonable for Bodell to do so.

16. First, I have reviewed the UV equipment section of the Project specifications, a copy of which is attached hereto as Exhibit "5." This specification is a "performance" specification, meaning that the specification does not include an actual UV equipment design. Instead, the specification requires the equipment to be designed by the UV equipment manufacturer in accordance with certain "design critera" so as to be able to meet the "performance requirement" listed in section 2.3 of the specification. While 1.2A describes the "basis of design" to be the Trojan System UV 4000 medium pressure system, 2.1A states that the system shall be the Trojan 4000 system, "or equal." 2.1B further states that, in order for an alternate system to be acceptable, it must be able to fit in the available space and meet the performance requirements listed in 2.3.

17. Second, I reviewed the General Instructions to Bidders put out by the City, a copy of which is attached hereto as Exhibit "6." Section 1.13 addresses, "Brand names, models; substitutions." It establishes a procedure for qualifying brands as constituting an equal to a named brand before the bid opening.

18. Third, I reviewed the pre bid substitution request submitted for the UTS low pressure system, a copy of which is attached hereto as Exhibit "7."

19. Fourth, I reviewed the City's December 9, 1999 approval letter, a copy of which is attached hereto as Exhibit "8," which states that the substitution of the UTS system for the "specified Trojan system is approved for bidding purpose only. . . Final approval is subject to review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract documents." I have been advised that the bid opening date was December 16, 1999.

20. Fifth, I have been advised that the City changed its mind almost immediately after bid opening regarding whether UTS should be considered a qualified manufacturer, and

ultimately justified its final rejection of the UTS system, more than one year later, on UTS' alleged failure to demonstrate that it could meet the manufacturer "Qualification Requirements" set forth in 1.2A pertaining to prior installations of its equipment.

21. Based upon my experience as a general contractor in reviewing specifications and preparing bids, it is my opinion that it was reasonable for Bodell to interpret the City's December 9, 1999 letter as representing that UTS was a qualified manufacturer and authorizing Bodell to rely upon a price quote from UTS and to have its submittals of the UTS system approved provided that the UTS system complied with the design and performance requirements set forth in section 2.3 of the specification. The reasons for this opinion are as follows.

22. First, the General Instructions to Bidders (Exhibit "6") states that bidders must use the specified brand unless an alternate brand "has expressly been found to be equal or better by the Officer-in Charge." The City's December 9, 1999 approval letter states that the UTS system is approved "for

bidding purpose only." Unless this means that contractors bidding the Project can rely on the approval letter to use the UTS price quote in their bids, it means nothing at all. The fact that the letter reminds bidders that the UTS system is still subject to "review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract documents" does not change this. It would be reasonable, in my opinion, for contractors receiving this letter to interpret this qualification as meaning simply that the approval letter does not relieve the contractor of the requirements of submitting drawings and other information demonstrating that the UTS equipment will fit in the required space and meet the performance requirements of the specifications. Indeed, even Trojan, which is pre-qualified by being named in the specification, would have to design and submit drawings for a system would deliver the UV radiation dosages necessary to meet the performance requirements of the specifications. It would be reasonable, in other words, for contractors to interpret the approval letter as permitting them to rely upon the fact that the City has satisfied itself that UTS is a "qualified" manufacturer, along with Trojan – but that both

Trojan and UTS would still have to design and install a system that would meet the performance requirements of the specification.

23. Second, there is no point to the City issuing the approval letter unless this is what it means. The General Instructions to Bidders do not provide for an intermediate form of pre-bid approval. Either the alternate is approved for bidding purposes or it is not. Given that the approval letter is dated only one week before the bid opening date, it would not be reasonable to expect contractors to interpret the approval letter to mean that their use of UTS' price is still subject to the risk of the City changing its mind regarding whether UTS can meet the "Qualification Requirements" of 1.2A of the specification.

24. Based upon the foregoing, it is my opinion that it was reasonable for Bodell to believe when it submitted its bid that, if the City changed its mind regarding whether UTS was a qualified manufacturer of UV systems, and decided that Trojan was the only system that it would accept, that Bodell would be permitted to an increase in its contract price to compensate Bodell for the increased cost of supplying a Trojan system

rather than a UTS system. Otherwise, the statement in the approval letter that UTS was approved "for bidding purposes" is meaningless and misleading to contractors.

25. I have reviewed the City's comparison sheet showing other bidders' prices for the UV equipment, bid item 81, a copy of which is attached hereto as Exhibit "9." It shows that the second low bidder, Kiewit Pacific Co. ("Kiewit"), must have also used the UTS quote. Kiewit is a competent contractor and well qualified to perform projects of this nature. The fact that Kiewit also relied upon the City's approval letter and the UTS price quote further reinforces my opinion that it was reasonable for Bodell to do so.

26. I have reviewed the City's internal email from Guy Inouye to Myron Fujimoto and others dated December 30, 1999, a copy of which is attached hereto as Exhibit "10." This email references a discussion with Bodell confirming that its bid was based on the UTS quote and that the "specified" (presumably Trojan) equipment could not be supplied for the same price. It describes a procedure to be taken of deleting bid item 81 from Bodell's contract award and the City then purchasing the UV

equipment separately and supplying it to Bodell to install under a change order. This email indicates that the City personnel involved in this discussion at this time believed, consistently with the opinion I have stated herein, that Bodell was reasonable in expecting to be compensated if the City were to decide that, contrary to its approval letter, UTS was not a qualified UV system manufacturer.

27. I have reviewed the City's Management Team Meeting Notes dated January 10, 2000, a copy of which is attached hereto as Exhibit "11." These notes further describe the fact that the City had decided to delete the UV equipment. It states, "We eliminated equipment from package and will procure equipment by itself—this portion of bid based on our error." This further indicates that the City personnel in charge of this matter at this time believed, consistently with the opinion I have stated herein, that Bodell was justified in using the UTS price quote in reliance upon the City's approval letter and if the City preferred the Trojan system, it would have to pay the difference.

I declare under penalty of law that the foregoing is true and accurate.

DATED: Honolulu, Hawaii, 12/12/05.

ARMAND A. COTE