## MEMORANDUM IN SUPPORT

**INTRODUCTION**

The cross-claims brought by UltraTech Systems Inc. ("UTS") and Engineered Systems, Inc. ("ESI") against the defendants City and County of Honolulu ("City") and Ohio Pacific Tech, Inc. F/K/A GMP Associates, Inc., an Ohio Corporation ("GMP") arise from the collaboration and deliberate efforts undertaken by both defendants to interfere with UTS' and ESI's business relations and purposefully remove UTS' equipment from the Wahiawa Waste Water Treatment Plant ("WWTP") project. As a result, UTS lost hundreds of thousands of dollars in business as well as expenses in preparing and engineering the equipment submittals for the Wahiawa WWTP. In addition, UTS lost the residual income from replacement equipment which would have followed had there been no interference with its relationship (including the agreement it entered into) with the project's general contractor, Bodell Construction Company ("Bodell"). In addition, ESI, UTS' authorized representative, lost a significant commission and expended resources in the futile attempt to consecrate the agreement with Bodell when the City and GMP had previously determined that UTS' and ESI's efforts would fail.

After a public bid, Bodell was awarded the contract for the construction and installation of an ultraviolet disinfection ("U.V.") system at the Wahiawa WWTP. Its winning bid included the U.V. system designed and manufactured by UTS. Pursuant to being awarded the contract, both Bodell and UTS began to work on the engineering and equipment submittal plan for construction of the system. From the time the bids were first opened, the City and GMP knew that Bodell's winning bid included the UTS system, and the City and GMP realized that UTS began working with Bodell to meet the specifications. However, unbeknownst to UTS, an effort

was immediately begun by the City and GMP to remove the UTS system from the project, and have it replaced by a U.V. system manufactured by Trojan Technologies, Inc. ("Trojan").

To date, there has been no reasonable justification offered by the City or GMP concerning their conduct during the submittal and review process that led to the final rejection of UTS. The claim that UTS failed to meet the specifications as called for under the contract is without merit.

- UTS was qualified and approved during the pre-bid process;
- UTS was further accepted when Bodell's itemized bid, including the UTS system was accepted; and
- UTS was again accepted when the City executed a contract with Bodell in February of 2000, knowing that UTS system was part of the contract.

Despite these clear steps indicating that the City and GMP accepted UTS' system, the City and GMP ultimately refused to approve the UTS equipment, essentially concluding that UTS failed to meet the "experience requirement" in the specification. The evidence shows that this "experience requirement" was at best ambiguous and a reasonable interpretation shows that UTS more than met the requirement (assuming it even had to meet the requirement).

All other claims by the City and GMP that the UTS system did not meet the specification were deminimus, irrelevant, or inaccurate. It is obvious that a decision had been made in January of 2000 or earlier, days after the bid was awarded to Bodell, to do whatever was necessary to remove UTS from the project. The subsequent farce that was carried out by the City and GMP to convince Bodell and UTS to expend resources and to jump through the proverbial "hoops", only to later disqualify UTS on "experience" grounds was merely a red herring. This charade increased UTS' damages as it continued to try and meet the demands of the City and GMP, which would never be met, due to the defendant's pre-determination to utilize the Trojan system.

UTS was economically damaged in lost profits, in time and money spent trying to qualify in vain, and in lost profits that would follow from continuing to provide replacement lamps and equipment to the City after the U.V. system installation at Wahiawa. ESI was likewise damaged.

## BACKGROUND

### A. Trojan's stature emerges in the U.V. disinfection industry

Starting in the 1980's, Trojan, a Canadian based manufacturer, emerged to become the largest manufacturer of U.V. systems for wastewater disinfection. Trojan concentrated on supplying horizontal configured systems. Other manufacturers of U.V. disinfection equipment included Infilco Degremont, Inc. ("IDI"), Wedeco, and UTS.

Trojan became infamous for supplying sample specifications to plant designers which were based on Trojan's horizontal system. See S. Ellner Decl., Exhibit 27. These specifications included a provision that vertical systems were not acceptable. This language effectively excluded the competition from bidding on these projects. Nevertheless, since many of the wastewater plants are owned by governmental entities, the primary manufacturers in the industry have recognized the preference for competitive bids and have focused on performance rather than design in determining whether they can satisfy the governmental goals.

### B. The Honouliuli Project

While U.V. disinfection has been a viable technology since the 1960's, the City of Honolulu only began to explore this technology in the late 1990's when it undertook a project to install a wastewater treatment plant at Honouliuli. As in the Wahiawa project, the City retained the engineering firm, GMP, to draft the specifications for the WWTP. GMP's specifications were based on the Trojan 4000. Lee Mansfield, the principal of GMP in charge of both the

Honouliuli and Wahiawa projects, has admitted to having a long history and friendship with Mike Elhoff, Trojan's local representative in Hawaii. See, Exhibit 1, at pages 91-93.

The winning bid for the U.V. equipment at Honouliuli went to Trojan, but the project never materialized after IDI submitted a post-bid protest. IDI's objection not only caused the cancellation of the project, but prompted James Honke, the Chief of the City's Division of Infrastructure Design and Engineering, to issue a memo citing the City's <u>opposition</u> to using **proprietary** equipment. See, Exhibit "2". Specifically, Mr. Honke remarked, "We strongly discourage the use of proprietary equipment in the preliminary report." Mr. Honke's memo even makes reference to the problems at Honouliuli, noting that "the use of proprietary equipment will cause bidding protests". See, Exhibit 2 at ¶3. It became clear that the City could not afford to have a sole source proprietary system and a competitive bid would be required.

Despite the complaints received after basing the Honouliuli specifications on the Trojan system, the City, nevertheless, again based its specifications for the Wahiawa WWTP on the Trojan 4000.

### PERTINENT FACTUAL EVIDENCE

I.  **UTS AND ESI SHOULD BE AWARDED PARTIAL SUMMARY JUDGMENT ON COUNTS ONE AND TWO OF THEIR CROSS-CLAIMS AS THE CITY AND GMP INTENTIONALLY and/or NEGLIGENTLY INTERFERED WITH THE RELATIONSHIP BETWEEN UTS, ESI HAD WITH BODELL CONSTRUCTION COMPANY**

A.  **THE WAHIAWA WWTP PROJECT**

1.  GMP as an agent of the City, was committed to having the Trojan Technologies, Inc's. U.V. equipment installed at the Wahiawa WWTP project.

It has become obvious through the discovery disclosed during this litigation that Trojan's local representative, Mike Elhoff of Hawaii Engineering Systems ("HES"), along with Trojan, colluded with GMP (the City's engineer) to ensure that the Trojan 4000 was installed at

Wahiawa. In early 1999, Jay Stone acquired a copy of a Trojan specification and submitted this to his word processing department. See Exhibit "3". From the beginning of the design of the Wahiawa WWTP, GMP clearly evidenced an intent to have the Trojan system installed at Wahiawa, while creating a façade to meet Mr. Honke's expressed concern that there be no appearance of a sole source specification. The specification diskette was supplied to GMP by Mike Elhoff of HES. See Exhibit 32, page 233. Subsequently, Trojan's specification became the basis for the Wahiawa specification. It was drafted with the obvious intent of excluding competition, yet giving the appearance that it was not a "sole source" specification. However, the specification contained enough proprietary language that if read literally, without regard to the "alternative" availability, would result in a de facto sole source specification.

For example, Section 2.4, "Design, Construction and Materials," sub (a) (3) sets forth:

**The major axis of the U.V. lamps shall be horizontal and parallel to flow. U.V. systems that operate with lamps placed perpendicular to the flow are unacceptable.**

Trojan's common practice of deliberately drafting the language to exclude competition is transparent, yet GMP failed, either negligently or intentionally, to revise the specification to make it clear whether the specification was a "performance" or "design" specification, thus rendering the lamp orientation irrelevant. Since Trojan was offering only horizontal systems, this would seemingly eliminate Trojan's chief competitor, IDI (a supplier of vertical systems). But, if the specification was considered a "design specification", it would be a de facto sole source specification. If it is viewed as a "performance specification," then alternate systems should be acceptable, (which is addressed in paragraph 2.1B). Yet GMP, Trojan and its representative, sought to limit competition by intentionally or negligently drafting the specification ambiguously to convince competitors not to bid.

2.  **Requests for consideration by other manufacturers were ignored**

Despite the initial appearance of the job being specified around Trojan, another U.V. supplier, IDI, was communicating with GMP in August 1999, representing that its "vertical" low pressure system could fit in the space called for in the specification for the WWTP.[1]  Upon learning of this potential threat to Trojan, Jay Stone of GMP immediately emailed Mike Elhoff, asking him to determine if the Trojan low–pressure system could fit in the space provided, while informing him that another vendor had made the claim that their system could.  See e-mail from Jay Stone, attached as Exhibit 4.  It is odd that the City's designer would proceed in this fashion, unless it was trying to protect its relationship with Trojan.

Mr. Elhoff then worked with Trojan and GMP to exclude any challengers to Trojan. The bidding of City contracts is designed to be "competitive", yet, throughout the Wahiawa Project, the City's engineer, and the City itself, was dealing and communicating with Trojan's representative, to the detriment of other competitors and ultimately to the citizens of Honolulu.

The intimacy of the relationship between the City, GMP and HES can be seen through the constant correspondence between Elhoff of HES and GMP.  On August 18, 1999, GMP followed up with HES about IDI's claim that its system would be a viable alternate. This email, attached as Exhibit "5", included a chain of emails, one of which was between HES and Trojan, stating, "IDI is knocking on the door. Between Kailua, Kona Airport, and this, they are a thorn in our side".  Clearly, HES was not shy about hiding its anti-competitive spirit and intent from its friends and partners at GMP.

---

[1] Significantly, paragraph 2.1B of the specification (Exhibit 25) only required an alternate to meet two requirements to be acceptable: 1) The alternate system must be capable of meeting the specified performance requirements, operate in an open channel, be of modular design, use UV lamps with electronic ballasts, and incorporate a cleaning system; and 2) The alternate system must be suitable for installation in the limited available space at the site.

IDI's inquiry was totally ignored as GMP became satisfied that the project would fall to Trojan, provided the specification was drafted to appear as an open bid, yet it would contain enough restrictions to deter IDI. See Exhibit 6. Ultimately, the plan worked and IDI did not solicit this job.

**B.   UTS AND ESI SEEK PRE-BID APPROVAL FOR ITS UTS' U.V. SYSTEM**

On November 18, 1999, UTS's local representative, ESI, submitted UTS' technical specifications and product brochures to the City for advance approval as an "equal" to the Trojan System. This advance approval was needed for contractors to rely upon in using UTS' quote, a fact known to the City and GMP. It was understood that if approval was granted, the City was accepting the manufacturer as qualified as an alternate. UTS' request was routed to GMP for comment, who within 3 business days flatly rejected the request on the grounds that the information submitted was inadequate to "determine suitability", not withstanding the fact that the City had already approved a UTS system for use at Kailua. See Exhibit 7. 1

**1. Cyril Hamada, the City's Project Engineer, overrules GMP's denial of UTS submission**

Despite GMP's recommendation to reject the UTS submission, the project engineer at the City reviewed the UTS proposal, and decided to override GMP's rejection. This was well within his authority, especially since he had prior experience with UTS. In a memorandum written "To the Record", City Engineer Cyril Hamada of the City's Design Division, overruled GMP's denial of UTS's submission for pre-bid approval. His memorandum, attached hereto as Exhibit 8, notes that UTS should be allowed to bid provided they meet all the requirements, and notes "this is a case of de facto approval since these are the units that are being installed at Kailua WWTP."

Following Mr. Hamada's analysis, a letter was drafted by the City and sent to ESI on December 9, 1999, confirming that UTS was approved "for bidding purposes only". See, Exhibit 9. UTS' purpose for requesting the City to review its product information and technical

specifications was to get the City's approval, in writing, for contractors to use price quotations from UTS in the preparation of their bid proposals to the City, and ultimately, for the successful bidder to purchase and install a UTS U.V. disinfection system at Wahiawa. Since the specification was a "performance specification," the UTS system was therefore accepted, provided it could fit within the allotted space and meet the specified disinfection requirements.

2.  **Bodell Construction Company ("Bodell") wins bid for the design and construction of the Wahiawa WWTP using UTS' price quote.**

After receiving the City's approval letter, ESI sent a copy of UTS' scope of supply to several contractors, including Bodell. The materials submitted to Bodell by ESI included a copy of the City's December 9, 1999 letter. The price quote for the Trojan system, as submitted by HES, was substantially greater than UTS' offer. Bodell, as well as a number of other contractors, relied on the bid submitted by UTS, and ultimately was successful in being awarded the contract by the City.

3.  **Upon realizing that Bodell's winning bid was based on UTS' U.V. disinfection system, a systematic effort was begun by the City, GMP, and Trojan and its local representative, HES to eliminate UTS from the contract, and replace it with Trojan's U.V. disinfection system.**

As soon as the bids were opened on December 16, 1999, and Mike Elhoff at HES realized that the winning bid by Bodell did not include the Trojan system, he contacted Guy Inouye (Mr. Hamada's supervisor) to question what had gone wrong. This phone call was followed up by a fax from Jay Stone of GMP to Guy Inouye, attaching a copy of the prior rejection recommendation made to Mr. Inouye. See Exhibit 10. At Mr. Inouye's deposition, he stated that he was unaware of GMP's recommendation to reject the UTS system, and acknowledged that overruling GMP's recommendation had opened the City up to liability. See Exhibit 11 at pages 59-61.

On December 27, 1999, a meeting was held at the City with members of the design team and the City's Corporation Counsel. A decision was apparently made by the City to delete Bid Item 81 (the U.V. equipment) from the contract. This decision was explained in a December 30, 1999 post-meeting email from Guy Inouye. See Exhibit 12. The City explained their plan to exclude UTS and delete the U.V. disinfection units from the Basic Bid, and to then procure the system separately as "Government Furnished Equipment" (despite the prior inclination to avoid proprietary equipment).

The City took this action at the behest of HES and Trojan, evidenced in minutes of a January 10, 2000 "Management Team Meeting" which confirmed that the decision to delete the UTS system was made because "another vendor complained." See Exhibit 13. Furthermore, an email from Mike Elhoff to Trojan outlines how he met with the City "days after the bid opening". See Exhibit 14. This correspondence also notes that Mr. Elhoff told Mr. Bodell prior to bid opening that UTS would not be approved. How did Mike Elhoff know that UTS would not be approved? It is respectfully submitted that Mr. Elhoff must have held that belief because his friends and partners at GMP promised that UTS would not be approved.

Despite the City's December 9, 1999 approval of the UTS system, the City and GMP clearly had a strong desire to ensure that the Trojan system would be purchased and installed rather than the UTS U.V. system. This despite the fact that the Trojan system was approximately $600,000 to $800,000 more expensive than the UTS system.

The timing of this decision is interesting. Only days had passed since the bids were opened and Bodell was found to be the lowest bid. No time had passed in which there could be any substantive reasons found to not use the UTS system. The UTS submittal had yet to be prepared, let alone been reviewed or inspected -- nothing had transpired. Furthermore, the UTS