system was offered at a significant savings over the Trojan system. It is inexplicable why the City would be interested in spending taxpayer monies on a system which cost several times more than the UTS system and which would be significantly more expensive to operate.

**4.    The City never follows through on re-bidding the U.V. equipment**

After the January meeting, rather than purchase "Government Furnished Equipment" as mentioned at the City meeting, the City continued the charade and directed Cyril Hamada to prepare a re-bid of the U.V. disinfection equipment under bid Item #81. For reasons not illuminated during this litigation to date, this was never done. See, Exhibit 15.[2]

Despite its decision to delete the UTS equipment from the project, no steps were ever taken to follow through with finding a replacement, or officially informing Bodell or UTS that the UTS equipment was to be deleted and replaced. Rather, the City and GMP continued to allow UTS and Bodell to believe the UTS system could be used. Thus, both UTS and Bodell continued to expend time and resources planning and preparing to construct the equipment. Unbeknownst to UTS and Bodell, their time and effort was in vain, as the City and GMP had no intention of ever accepting the UTS system.

**5.    The contract was executed by the City and Bodell on February 25, 2000.**

Despite the fact that the City intended to delete UTS' U.V. disinfection system from the equipment and re-bid this portion of the contract (or purchase the "Government Furnished Equipment"), the contract, without change, was executed on February 25, 2000. Bid Item 81 remained intact, providing more reassurance to Bodell and UTS that the UTS system as pre-approved would be allowed. See, Exhibit 16.

---

[2] We note that the deposition of Cyril Hamada has not been concluded due to the fact that Mr. Hamada has yet to disclose additional documents which movants became aware of since his deposition commenced; and further, the City has not made Mr. Hamada available despite our numerous requests.

At this time, the City and GMP knew that Bodell was proceeding with the UTS system and the City executed the agreement without change or reservation. The City and GMP allowed UTS to rely upon the City's commitment, and UTS continued to expend monies on engineering and preparing to meet the specifications for the system to be installed at Wahiawa. Notably, there was no reason for UTS or Bodell to believe that UTS would not meet the specifications, as the City had proceeded with executing the contract without change.

6.    **GMP remained intent on disqualifying the UTS system from the Wahiawa project.**

A pre-construction site meeting was held on April 27, 2000 amongst the City, GMP and Bodell. At the meeting, Bodell indicated its intent to proceed with the UTS system. This was met with a statement from GMP's Jay Stone that the UTS system "would not meet the spec." Oddly, this statement was made before any review of the documents submitted by UTS.[3] See, Exhibit 17 and 18. Yet, the City still had not re-bid Item 81 or advised Bodell or UTS that Trojan would be used instead.

7.    **GMP requests a "pre-submittal" from UTS**

GMP then asked Bodell for a "presubmittal" of the UTS system "so that their sub-consultant could come up with knowledgeable questions". See Exhibit 17 at ¶6. GMP, however, did not employ a sub-consultant with respect to the U.V. disinfection equipment. See Exhibit 31 at pages 112 and 128-130. Rather, it was clear the "sub-consultant" GMP was referring to was Mike Elhoff at HES.[4]

The request for information from UTS was merely a way to get more ammunition for supporting a rejection of the UTS equipment. Over the course of the next month, a series of

---

[3] Interestingly, Mr. Stone had never previously reviewed UTS' technical information to be able to even make such a statement.
[4] Even Mr. Mansfield conceded that someone could have assumed that Mr. Elhoff was GMP's sub-consultant. See p. 130 of Mansfield deposition, Exhibit 31.

emails and faxes were exchanged between GMP and HES, discussing ways to reject the UTS equipment.

8.      **HES and Trojan, together with GMP and the City conspired to disqualify UTS**

GMP, upon receiving the pre-submittal package, immediately shared it with HES, who forwarded the materials to Trojan, despite the fact that the pre-submittal contained a confidentiality provision describing its contents as proprietary (and despite the fact that Trojan was one of UTS's chief competitors). The submittal package prepared by UTS specifically stated in prominent fashion:

> **The contents and drawings contained in this submittal package relate to proprietary subject matter. Any party assuming custody does so with the express understanding and agreement that neither receipt nor possession thereof confers or transfers any right to use, reproduce or disclose its contents or any part thereof, in any manner or for any purpose whatsoever. See Exhibit 34.**

This statement was clear as to its intent and was understood by GMP. See Exhibit 32, pages 401-402. GMP did not object to this designation, See Exhibit 31, pages 229-300. GMP apparently disregarded this warning and proceeded to share UTS confidential information with one of its chief competitors. In the engineering industry, it is understood that proprietary information, once received, is never to be released to any outside party, especially a competitor, without the express consent of the manufacturer. To do so implies collusion and a prior intent to damage.

The release of UTS' proprietary information was a clear violation of accepted standards in the engineering industry, and in violation of every canon of ethics relied on in the industry. See Rules of Practice, National Society of Professional Engineers Code of Ethics for Engineers et al.; Exhibit 30. The purpose for which the proprietary information was apparently released,

i.e. to allow UTS' competitors to criticize the submittal, is reprehensible.   It certainly does not meet the NSPE Fifth Fundamental Canon to "Avoid Deceptive Acts." See Exhibit 30.[5]

Evidence of the inappropriate relationship between HES, Trojan's representative, the City of Honolulu, and GMP can be seen in a series of emails discussing how HES could assist in criticizing UTS's submission.  After all, Mr. Elhoff and Trojan supplied the specification for just this reason.  Mike Elhoff's May 25, 2000 email to Trojan clearly sets forth the purpose of sharing UTS's information:

> **"Your assistance has been great in our effort to get UTS rejected".**
> **"I would like Ron's help with any ammunition regarding UTS, with respect to a database of UTS installations, 16-lamp module, and any competitive information you can provide from London. Please advise."** See Exhibit 19.

Over the next six months, the City, GMP, and HES repeatedly communicated and met to discuss their efforts to remove UTS from the bid.  These meetings and discussions are reflected in e-mails and faxes between the parties over the subsequent months:

- On May 31, 2000 Mike Elhoff sends an email to Trojan stating "I met with Lee and Jay @ GMP regarding the issues.  They want the following…"   (Exhibit 20).

- On June 1, 2000, Trojan sent Elhoff, who quickly forwarded it on to GMP, information that GMP had requested with respect to its review of the UTS pre-submittal.  The last paragraph of the cover memo states, "As far as the dose calculations on UTS's 1600 lamp system, please give me a call to discuss this issue." (Exhibit 21).

- On June 4, 2000, Mike Elhoff of HES provides to GMP a memo entitled, "Comments and Concerns on UTS Pre- Submittal". (Exhibit 22).

- On June 5, 2000 an email from Guy Inouye (a City employee) to other employees of the City notes that a meeting was held at the request of Mike Elhoff. The email states that "Mike" does not think an informal submittal is proper, that the UTS system does not meet the specifications called for; and that the approval was not proper. (Exhibit 23).

After reviewing these communications the following questions come to mind:

---

[5] Canon 4(f) of the American Society of Civil Engineers Code of Ethics specifically notes, "Engineers shall not use confidential information coming to them in the course of their assignments as a means of making personal profit if such action is adverse to the interest of their clients, employers or the public".

1) Why would the City release confidential information in violation of Hawaii's own rules on the release of trade secrets?

2) Why would the City and GMP be speaking with Trojan's representative long after the City executed a contract with Bodell knowing Bodell would be using the UTS system?

3) Why would Mike Elhoff, the representative of UTS' competitor, Trojan, have proprietary information of UTS to comment upon, let alone be given the opportunity to weigh in on the issue?

4) Why would Mike Elhoff's comments even be considered or have any merit with GMP or the City?

5) Why was GMP, the City-retained and paid engineer, soliciting the comments of HES, a manufacturer's representative of a different product?

6) Why was GMP acting on the comments and recommendations of HES to act against UTS, one of Trojan's competitors?

7) Why didn't the City and GMP approach Bodell or UTS about their concerns rather than going to HES and Trojan?

The answers seem clear. The City and GMP were working in concert to devise a way to reject UTS and compel Bodell to use the Trojan system without further and fairly compensating Bodell.

## 9. The City and its agent GMP impermissibly and inextricably released UTS' confidential and proprietary information

The City and GMP impermissibly and inextricably released this confidential and proprietary information to the local representative of a competitor for the purpose of soliciting assistance in rejecting the UTS system. This was a blatant intent to interfere with UTS' business relations with Bodell. At the very least, it was grossly negligent.

Basic tenets of an engineer's professional code of conduct forbid the sharing of proprietary and confidential information between competitors. See NSPE Code of Ethics, Exhibit 30. Yet, the City and GMP freely and quickly exchanged the information they requested and received from UTS, with its chief competitor, Trojan. The role of GMP as the City's

engineer and designer of the Wahiawa WWTP should have been to oversee the project and provide the engineering and mechanical expertise which the City's staff was lacking. What legitimate purpose could there possibly have been for GMP to collaborate with the Trojan representative, post –bid, and post-execution of the contract?

**10.    GMP "creates" reasons to reject UTS's proposal**

At GMP's direction, UTS, at considerable time and expense, drafted and made a formal submittal to GMP on August 31, 2000. See Exhibit 34. GMP rejected the submittal on September 11, 2000, specifying picayune matters to be addressed. These issues were immaterial and were addressed by further submittals. Submittal no. 30(a) was tendered on October 4, 2000 and returned by GMP without review on the same day. Submittal no. 30(b) was offered by Bodell on November 2, 2000, and returned by GMP without review on the same day. After threats of litigation by Bodell, the City agreed to receive the submittal. It was resubmitted on November 8, 2000, and rejected by GMP on November 28. Submittal no. 30(c) was given to GMP on December 19, 2000, and rejected by GMP on January 22, 2001. Interestingly, the City and GMP had already taken steps to procure the Trojan system in October, while this charade continued. See, letter from Bodell to Trojan confirming that GMP directed Bodell to provide the Trojan U.V. 4000 system and confirming discussions with Trojan. See Exhibit 33.

The reasons offered for GMP's rejection illustrated GMP's total lack of good faith. In one instance, GMP cited the fact that the crane for lifting the units out of the channel, the effluent weir and the rubber mats and grating for the walkways were being supplied by "other", rather than "by the UV supplier," as "unacceptable." See Exhibit 24. What possible good faith basis could GMP have had for insisting that the UTS supply the rubber mats for the walkway itself?

The critical focus of the project was the City's intent on meeting the Consent Decree with the State, which called for a clean-up of the outflow of the Wahaiwa WWTP that was going to Lake Wilson. UTS could meet this requirement.

Submittal after submittal was presented to GMP by Bodell. They were either rejected or returned without review. Nevertheless, UTS was able to address GMP's and the City's alleged "concerns," but to no avail. It was clear they wanted UTS out of the Project, and Trojan to supply its system.

**11.    The UTS system is ultimately rejected because of the experience requirement, rather than any legitimate performance concern.**

Both UTS and Bodell repeatedly responded to GMP's meaningless comments in an effort to comply. Finally, despite threats of litigation by Bodell, GMP finally rejected UTS' system based on its failure to meet the "experience requirement", rather than any legitimate concern over the ability of the UTS equipment to satisfy the performance aspects of the specification. UTS' horizontal low pressure system was rejected on the grounds that it did not meet the following portion of the experience requirement listed under 1.2A, "Qualification Requirements:"

> The manufacturer shall submit at least five (5) permanent wastewater installations using this *equipment type*, in North America, disinfecting a peak flow of 5 MGD or greater for at least one (1) year.
>
> See, Section 1.2A of Specification, found at Exhibit 25.

As noted above, this "experience" requirement was previously mooted when UTS was pre-qualified. Even if it was not interpreted in this fashion, UTS still would have met the requirement under a reasonable interpretation of this section. The City and GMP claim that UTS failed to meet the "experience" requirement because it did not have sufficient systems in operation using the proposed "equipment type". The list that UTS submitted, annexed hereto at

Exhibit 26, included numerous vertical systems that met the standard and at least one horizontal system of the specified flow rate.[6] The City improperly rejected UTS' vertical systems, claiming they were not of the same "equipment type" as the horizontal system mentioned. However, the equipment used for vertical and horizontal systems are the same. They use the same lamps, ballasts, logic controllers and other elements. There was no import to this difference and GMP and the City were well aware of this. Perhaps, this is why Mr. Hamada and the City pre-qualified UTS.

**12,     Ultimately, the UTS system was rejected, and Bodell was forced to purchase the Trojan system.**

After repeated attempts to have the UTS system approved, Bodell eventually was forced by the City to purchase the Trojan System reportedly to stay on course with the timeline of the Project [7]. Trojan had since redesigned its system, and was marketing a new version called "The New Trojan System U.V. 4000™". Despite the fact this system required a shallower effluent channel and had never been used before, the City and GMP approved the use of this system **immediately without hesitation**. There was a clear double standard that applied which enabled GMP to accomplish its goal.

It is clear from the actions of GMP and the City that they were insistent on using a Trojan system, despite the fact that they had previously approved the UTS system, that the Trojan system was significantly more expensive, and that UTS met the project specifications.

The conduct of GMP and the City throughout the bid process, the design phase and up through construction was clearly in bad faith. GMP and the City's actions constitute intentional

---

[6] UTS sold many more vertical systems as it believed that the vertical systems offered more benefits over the horizontal system. In fact, UTS would have preferred to offer the City a vertical system as it would clearly have saved more expense for the taxpayers.
[7] Bodell had obtained an independent consultant who confirmed there was time to build the UTS system. See Declaration of Armand Cote at Exhibit "27".

or, at the very least, negligent interference with contractual relations, and interference with UTS's prospective economic advantage.

C.     **LEGAL STANDARD**

Under the FRCP, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 ( c); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The party who opposes summary judgment has an affirmative obligation to set forth evidence "on which the jury could reasonably find for [the non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,587 (1986).

D.     **LEGAL AND FACTUAL SUPPORT FOR REQUEST FOR SUMMARY JUDGMENT**

**The case at bar meets the six-part test established by the Hawaii Court of Appeals and thus the City and GMP should be liable under Count One and Two of UTS and ESI's Cross-claims**

In order to be successful on a motion for summary judgment in support of a claim of intentional interference with prospective business relations, the movant must be able to plead and prove that an agreement existed, the defendant knew of this relationship, the defendant intentionally interfered with the relationship, the defendant had no justification, the interference caused the third party to not consummate the contract, and the defendant's interference caused the plaintiff damage.     See Kutcher v. Zimmerman, 87 Haw. 394 (Haw. Ct. App. 1998).

In Kutcher, the Intermediate Court of Appeals affirmed the lower court's finding in favor

of plaintiff, while also establishing a new six-part test that a plaintiff must plead and prove. The court held that a plaintiff alleging the tort of intentional interference with prospective contractual relations must plead and prove:

> (1) a prospective contractual relationship existed between the plaintiff and a third party;
> (2) the defendant knew of this relationship;
> (3) the defendant intentionally interfered with the relationship;
> (4) the defendant acted without proper justification;
> (5) the defendant's interference caused the third party to fail to consummate the prospective contract with the plaintiff; and
> (6) the defendant's interference caused damages to the plaintiff.

The case at bar meets this six part test.

It is abundantly evident that the defendants were aware of the relationship between UTS and Bodell within moments after the bids were opened. In fact, within two days of the bids being opened, Mike Elhoff of HES called to complain to the City. The City then confirmed with Bodell that it had relied on the UTS equipment in its bid. See Exhibit 12.

In typical fashion, Trojan supplied the specifications for the Trojan medium pressure system to the project engineer, GMP. Mike Elhoff used his relationship with Jay Stone, the project representative from GMP, to comment on and thwart any competition that posed a threat (IDI). When the City overruled GMP's rejection of UTS, approving UTS, Mike Elhoff was stunned and upset about the resulting award to Bodell and UTS. Mr. Elhoff called the City to address this "error." Thus began an almost year long charade of convincing UTS that it would be considered while in the background arranging for the Trojan system to be installed. While trying to get UTS rejected, GMP allowed UTS to continue to try to satisfy requirements that would never be met.

Ultimately, GMP and the City's interference resulted in UTS being rejected on baseless, inaccurate and unreasonable grounds, causing UTS and ESI significant damages. Thus, the six

part test in <u>Kutcher</u> has clearly been met. To further clarify this satisfaction of the <u>Kutcher</u> requirement:

1.    **A contractual relationship existed between UTS and Bodell**

After being awarded approval for bidding purposes, UTS submitted its proposal to various contractors bidding on the Wahiawa WWTP, including Bodell. As the UTS system was significantly less expensive than the Trojan system, Bodell opted to use the UTS equipment in an effort to be competitive. Bodell was successful in being awarded the bid. Bodell and UTS then entered into an agreement whereby UTS was to provide U.V. disinfection equipment, as offered when it submitted its approval letter, price and scope of supply to Bodell.

Work began immediately by both Bodell and UTS to prepare for the design and construction of the equipment to be used at the WWTP. Bodell committed to UTS to purchase a system for this project. Relying on this agreement, UTS engaged engineers to assist in preparing the equipment submittal and acted upon Bodell's commitment.

2.    **The City and GMP knew that Bodell had relied on the UTS U.V. system and yet continued to interfere with Bodell and UTS' relationship by putting roadblocks in UTS' path.**

The City and GMP knew or should have known that its approval of the UTS U.V. system as an "equal" to the Trojan System "for bidding purposes" would induce contractors to rely on the City's approval and therefore use UTS' system in their bid calculations. After the Contract was awarded, both the City and GMP were immediately aware that Bodell's winning bid was based on the UTS equipment price, as Mike Elhoff called to complain, and the City then called Bodell to confirm that their bid was based on UTS' equipment. See Exhibit 12.

The City has openly admitted that it granted UTS approval for bidding purposes and that Bodell's use of the UTS equipment was in reliance on the letter issued by the City. The approval letter issued by the City is clear on its face ("UltraTech is approved for bidding purposes"). The December 9th letter was issued one week prior to bid date, clearly indicating that contractors