could rely on the City's pre-approval of the UTS system. Had the City or GMP had questions, they certainly had time to address them with UTS before bids were submitted. It would not be reasonable to expect that contractors would rely on the approval letter if the City's approval could later be revoked on a whim. See Exhibit 27 at p.12.

The City's awareness of Bodell and UTS' relationship is also evidenced by an email from Guy Inouye, dated December 30, 1999, which references a discussion with Bodell, noting that the "specified" (Trojan) equipment could not be supplied for the same price. This correspondence clearly illustrates:

1) The City, who prohibited the use of "sole source specifications" is indicating that the "specified" equipment was supposed to be the Trojan system;

2) The City realizes the Trojan system is significantly more costly than the UTS equipment, yet wants to go ahead and purchase it with taxpayer monies;

3) The City acknowledges that the UTS equipment was approved for bidding purposes, was reasonably relied on by Bodell, and it was reasonable for Bodell to be compensated if the UTS equipment was not used and the City insisted on a different manufacturer.

Even more significantly, the City's Management Team Meeting Notes, explaining why the City had decided to delete the U.V. equipment. The notes indicate "we eliminated equipment from package and will procure equipment by itself—this portion of bid based on our error." Exhibit 13. The City is describing Cyril Hamada's well-thought out reasons for approving the UTS' equipment as a mistake. But rather than rectify this supposed "mistake", they ignore it. The City never follows through on re-bidding this portion of the contract, but rather, goes forward and executes the contract with Bodell in February of 2000, and then leaves it to their friends at GMP to devise ways to disqualify UTS.

The timing of these decisions and comments must be noted. Nothing had transpired between Bodell being awarded the contract and the City deciding it would purchase the U.V. equipment separately. No further information had been requested of UTS, no further reviews of the UTS equipment had been conducted – nothing had occurred! It is more than obvious that the City's change of heart was due to external pressures.

3. **The City and GMP allowed UTS and Engineered Systems Inc. to continue to expend time and money meeting the contract in vain.**

In January of 2000, UTS and Bodell were not aware of the conspiracy that had grown around them. In fact, the City's failure to re-bid the project, followed by going forward with the execution of the contract with Bodell, reassured Bodell and UTS that the UTS system was acceptable. The City clearly abandoned any intent to remove UTS from the bid through the proper channels, and led Bodell and UTS to believe that the UTS system would be accepted. However, as the within papers discuss, it has become clear throughout the course of this litigation that the City and GMP had no intention of ever allowing UTS to supply the U.V. equipment at the Wahiawa WWTP.

To UTS' and ESI's great loss, they continued throughout the year 2000 to expend time, money, and man-power in an effort to prepare to build the U.V. equipment and to conform with the project specifications. The City and GMP allowed UTS to undertake these efforts, knowing that they had no intention of approving UTS' equipment. From December 1999, when the decision to remove UTS from the contract was made, to January 2001, when UTS was formally rejected, the City and GMP allowed UTS and ESI to work in vain. Rather than removing UTS prior to executing the contract with Bodell in February 2000, and rather than informing UTS or Bodell directly that the City had made a "mistake" and would never allow for the use of UTS' equipment, the City and GMP continued the charade of having UTS jump through one hoop after another in a futile effort to conform with the hurdles that GMP created through its collaboration with Trojan and HES.

4.  **The City and GMP intentionally interfered with the relationship between UTS and Bodell.**

Despite the knowledge that Bodell had a valid and binding contract with the City for the Project which utilized the UTS system, GMP continued to refuse to approve UTS' system although the decision was based on inaccurate, irrelevant and deminimus grounds.

Consistent with the common law, Haw. Rev. Stat. § 103D-101 provides that all parties involved in the negotiation, performance, or administration of state contracts shall act in good faith. Movants suggest that the defendants did not act in good faith and clearly were intent on using only the Trojan System.

GMP failed to perform an objective, good faith review of Bodell's submittals of the UTS U.V. system and, falsely advised the City that the UTS U.V. system did not meet Specifications.[8] The City ratified these actions by GMP, and participated in many of them.

GMP directed Bodell to instead supply the Trojan System for the Project. GMP and the City knew or should have known that their actions were certain or substantially certain to cause the City to breach its Contract with Bodell, by rejecting the UTS U.V. system, and in turn Bodell would refuse to honor its order with UTS.

GMP's insistence on the utilization of a Trojan System, despite knowledge that the City had already approved the UTS U.V. system as an "equal" for bidding purposes, was without proper justification. GMP's actions were intentional, not necessary to protect the City's interest, not in furtherance of the City's best interests, and were instead designed to further GMP's goals and/or injure UTS. GMP's and the City's actions constitute intentional interference with contractual relations, interference with UTS's prospective economic advantage, and as a result, UTS has been damaged in an amount to be proven at trial.

---

[8] GMP's "analysis" was often based on incorrect information supplied by HES.

5. **The City and GMP have no justification for intentionally interfering with UTS and Bodell's business relationship.**

The City and GMP ultimately rejected the UTS equipment citing that it did not meet the "experience" requirements called for under the contract. As noted above, the City facially frowned on sole-source specifications. Nevertheless, GMP clearly based the specifications for the WWTP on the Trojan 4000 system. Regardless, the project U.V. specification is a "performance" specification and not a "design" specification. See Aff. of Greg Ellner at Exhibit 29 and Decl. of Sid Ellner, at Exhibit 27.

As opined by Bodell's expert, the words "equipment type" in the City's specifications could be interpreted to mean either a horizontal or vertical system. Both systems use the same equipment and design, the only difference is the orientation and configuration of the equipment.

The State of Hawaii's Procurement Policy Board has established rules that regulate the preparation and use of bid specifications which provide as follows:

> § 3-122-10 Purpose.   A specification is the basis for procuring a good, service, or construction item adequate and suitable for the State's needs in a cost effective manner. Purchasing agencies shall seek to procure standard commercial products, if practicable, and obtain the most advantageous process. *All specifications shall seek to promote overall competition, shall not be unduly restrictive, and provide a fair and equal opportunity for every supplier that is able to meet the State's needs. In developing specifications, unique requirements should be avoided.*
> Haw. Admin. R. §3-122-10 (emphasis added).

The intent of this rule is to avoid the purchase by the government of unproven, "fly-by-night" products for state projects. See, CCTW&M v. United States, 452 F. Supp. 69, 78, (D. N.J. 1978) (affirming EPA Administrator finding that "[t]he experience requirement is 'to protect the user from untried equipment'", and affirming the EPA decision to rewrite the specification because as written it was anticompetitive and in violation of the spirit of the EPA because only one manufacturer could meet it).

UTS was clearly approved by the language of the City's letter, in addition to the City's further actions, (e.g. execution of the Contract with Bodell; failure to re-bid Item 81). Even if the approval letter from the City was rendered meaningless, UTS still met the requirements called for under the specification.

**6.    The City and GMP's repeated interference with Bodell and UTS's relationship resulted in UTS ultimately being denied acceptance after spending tens of thousands of dollars and months of work to get approval for its equipment which GMP and the City never intended to grant.**

UTS and ESI lost the sale of the UTS system that would have resulted in either a $267,500 sale (vertical system) or a $417,000 sale (horizontal system) and a significant commission for ESI. In addition, UTS spent tens of thousands of dollars, and UTS and ESI spent hundreds of man hours in work for this project, none of which has been reimbursed.

Moreover, after this debacle, word was spread through Hawaii that UTS was no longer in business which precluded additional sales. See Exhibit 29. Significantly, UTS also lost the ability to supply the City with replacement lamps and parts for the system, which would have totaled tens of thousands of dollars ever year.

As stated above, the conduct of the City, and GMP, acting as an agent of the City, meets the six-part test established by <u>Kutcher.</u> The defendants were intent from before the bid even went out, to having Trojan supply the equipment for the Wahiawa WWTP. When their carefully laid plans were interfered with and UTS was inadvertently included in the winning bid, the defendants then undertook a deliberate campaign to deviously and illegally rid the contract of the UTS equipment, and have it replaced by the Trojan system, which was ultimately successful. UTS and ESI have been severely damaged monetarily, and have had their reputations impugned in Hawaii and across the country, resulting in lost work and profits. Most significantly, as a result of the City and GMP intentionally providing HES with UTS' pre-submittal package, UTS'

confidential proprietary information was leaked into the U.V. disinfection community where competitors can reap the benefits of UTS' proprietary information, hard work and trade secrets.

## II. GMP'S CLAIMS AGAINST ULTRATECH SHOULD BE DIMISSED AS THEY ARE BASELESS AND WITHOUT MERIT

In the original complaint filed in this action, plaintiff Bodell, by way of Count IV of its pleading, alleged that GMP intentionally interfered with the contractual relationship existing between Bodell and UTS. Bodell outlines GMP's knowledge with respect to the contract that existed between Bodell and UTS, and alleged that GMP's failure to perform an objective good faith review of Bodell's submittals of the UTS equipment was intentional, unnecessary, and not in furtherance of the City's best interests.

By way of a cross-claim dated March 29, 2004, GMP alleges that if Plaintiff (Bodell) was damaged, the damages were caused by the negligence of UTS. Further, that if GMP were negligent in any manner, its negligence was not the proximate cause of Bodell's damages.

Bodell did not assert a claim of negligence against GMP. As such, GMP's cross-claim against UTS is moot. Furthermore, there can be no contribution for GMP's intentional conduct. GMP interfered with the contractual relationship that existed between Bodell and UTS. Contribution would only applicable if the primary defendant is found liable for something done by UTS.

Furthermore, as noted at length above, the UTS rejection was clearly due the collusion and deliberate efforts of the City, GMP, and HES, who together conspired to rid the Project of the UTS system and replace it with the Trojan system.

III. **THE CITY'S CLAIM AGAINST ULTRA TECH AND ENGINEERED SYSTEMS INC. SHOULD BE DISMISSED AS BASELESS AND WITHOUT MERIT**

The City asserts a cross claim against both UTS and ESI for negligent misrepresentation. The claim alleges that UTS/ESI, through its representation to the City that the UTS system could meet the specifications, induced the City to grant meritless approval to the UTS U.V. equipment. This claim is completely lacking in any sort of evidence or support.

Hawaii courts apply the Restatement (Second) of Torts (1977) to claims for negligent misrepresentation. In order to prevail on a claim for negligent misrepresentation under the Restatement of Torts, plaintiff must establish that 1) Defendant provided information in the course of their business, profession or employment, 2) the information was false, 3) the information was supplied as guidance for Plaintiff in deciding whether to provide services; 4) Defendants failed to exercise reasonable care or competence in obtaining or communicating the information. See, UCSF-Stanford Health Services vs. Hawaii Management Services 58 F. Supp.2d 1162 (D. Hawaii 1999). See also, Restatement (Second) of Torts (1977) §552. The City has failed to prove these elements.

A. **The Pre-Bid Substitution Request Offered To The City Was Made In Good Faith and Was Accurate**

On November 18, 1999, Paul Scott of ESI submitted a pre-bid substitution request to the City for the purpose of having UTS' equipment approved for the Project. See Exhibit 7. The materials forwarded included six sets of technical specifications, brochures, and variances. The correspondence noted that the substitution request was being made on behalf of UTS' low-pressure system. The City referred this substitution request to GMP, who promptly rejected it, on the basis that the request did not include enough information. Exhibit 7.

GMP did not reject the submission claiming that UTS/ESI had provided false information, but rather that there was not enough information with which to reach a decision. We expect that GMP would have recommended that the City reject the submission regardless of what UTS had submitted. As illustrated by GMP's refusal to even respond to the request submitted by manufacturer IDI, GMP had its own motives for taking the deliberate action (or inaction) that it did.

The City alleges that they were harmed by relying on the negligent misrepresentations of UTS/ESI, who claimed that they would be able to meet the specification. In particular, the City claims that UTS and ESI represented they could meet the "experience requirement." In this regard, the manufacturer of the UV system was required to submit documentation of "at least five (5) permanent wastewater installations using this type, in North America, disinfecting a peak flow of 5 million gallons per day or greater for at least one (1) years."

The cover letter submitted by ESI to the City stated, "Ultratech will meet the *intent of the specifications* with respect to the *disinfection requirements*. The Ultratech system will fit into the channel shown on the drawings." In support, ESI/UTS supplied a list of installations which UTS had supplied in North America disinfecting a peak flow of 5 million gallons per day or greater. Moreover, as discussed above, the experience requirement was met. At best, the specification was ambiguous. At worst, it was unintelligible. Either way, the contractor is entitled to construe the ambiguities in a reasonable manner. Such a review clearly indicates UTS met the requirement.

C. **Cyril Hamada's Decision To Approve UTS Was Based on His Own Independent Review of the Relevant Documents.**

The City alleges that Cyril Hamada approved UTS for bidding purposes only after being reassured by Greg Ellner of UTS, that UTS would meet the specifications. However, when Cyril

Hamada was asked why he overruled GMP's denial of the UTS system, Mr. Hamada drafted a correspondence outlining his multiple reasons for approving UTS. The email, dated October 30, 2000, attached hereto as Exhibit 35, lays out Mr. Hamada's thought process for approving the UTS system. He notes that after reviewing the specifications, he found the following:

1) the specification allowed for substitution;
2) both the Trojan medium pressure and the UltraTech low pressure system met Title 22 or Hawaii R-1 quality water.
3) he was assured by vendor that space limitations and experience requirements would not be a problem; and
4) the Honouliuli job had the Trojan model as a design, however in that case the City approved the substitution request for low pressure units (because their engineer, Fischer & Porter repeatedly reiterated the benefits of a low pressure system).

Therefore, Cyril Hamada concluded:

> *Since the UTS system meets Title 22, and since we approved a LP (low pressure) system for Honouliuli, and since Ultratech was approved for Kailua WWTP, and since it purportedly fits in the allocated space, and since there might be some benefit to the City, it was my decision to approve the substitution request.*

Mr. Hamada listed numerous reasons why the UTS system was approved, yet the City maintains that Cyril Hamada was induced into approving the UTS system through negligent claims made by ESI and UTS. Nothing could be further from the truth.

The City has not met its burden as delineated by the Restatement of Torts and Stanford. See, Id. The information provided by ESI and UTS was patently true, and the City did not rely solely on the information provided by cross-claim defendants in arriving at their decision to approve UTS for bidding purposes. As evidenced by Cyril Hamada's email (Exhibit 35), he had good cause to approve UTS based on their experience at Kailua, the superiority of the low-pressure system, the bid materials submitted by UTS, and lastly, due to the fact that the **specification allowed for substitution**. The City's claims are therefore without merit and must be denied.

## V. CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant the within motion, granting judgment to cross-claim plaintiffs UTS and ESI, and denying the cross-claims of Defendants GMP and the City, and for such other, further and different relief as this Court deems just and proper.

Dated: February 17, 2006

                Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: _____
Adam R. Bialek
*Attorneys for Cross-Claim Defendant/ Cross-Claim Plaintiff*
**ULTRA TECH SYSTEMS, INC.**
*And Special Counsel to Third Party Defendant/ Cross-Claim Plaintiff Engineered Systems, Inc. For This Motion*
3 Gannett Drive
White Plains, New York 10604
Tel: (914) 323-7000
Fax: (914) 323-7001
File No. 08167.00001

Of Counsel:

Kirsten Bennett-O'Rourke, Esq.

Adrian Rosehill, Esq.
Gerson & Hieneman
1001 Bishop Street, Suite 780
Honolulu, Hawaii 96813