1    UNITED STATES DISTRICT COURT
     DISTRICT OF HAWAII                     CERTIFIED COPY
2    - - - - - - - - - - - - - - - - - - - X

     BODELL CONSTRUCTION COMPANY, a Utah
3    Corporation,

4              Plaintiff,

5         -against-                    Case No.
                                       03-00706
6    OHIO PACIFIC TECH, INC. Fka
     GMP ASSOCIATES, INC., an Ohio  HG-LEK
7    corporation; CITY AND COUNTY
     OF HONOLULU; ULTRA TECH
8    SYSTEMS, INC., a foreign
     corporation,
9
               Defendants.
10
     - - - - - - - - - - - - - - - - - - - X
11

12   HELD AT:    Wilson, Elser, Moskowitz,
                 Edelman & Dicker, LLP
13               3 Gannett Drive
                 White Plains, New York  10604
14               September 1st, 2004
                 10:30 a.m.
15

16             VOLUME I

17        Deposition of GREG ELLNER, a

18   non-party witness, held pursuant to Subpoena,

19   held at the above time and place before a

20   Notary Public of the State of New York.

21   ATKINSON-BAKER, INC.
       COURT REPORTERS
22   330 North Brand Boulevard, Suite 250
     Glendale, California 91203
23   (800) 288-3376

24        Lisa M. Prentice, Reporter

25   FILE NO.: 9E06DC4

Exhibit "K"

1

1

2   their ultimately were responses.

3       Q.   Now, with respect to the

4   horizontal system I think you indicated earlier

5   it was already, quote, a conforming system?

6       A.   Yes.

7       Q.   But you were asking Dr. Sakaji to

8   nonetheless confirm that?

9       A.   Yes.

10      Q.   With regard to the vertical system

11  you refer to their being pages that follow that

12  pertain to requested approval of the forty lamp

13  vertical module, so that was additional

14  information that was being provided?

15      A.   Yes.

16      Q.   I'm going to hand you what's been

17  marked Exhibit 23, which purports to be a July

18  27th, 2000 fax transmission cover sheet from

19  you to Gary Jeppson at Bodell.  Could you look at

20  Exhibit 23, please?  Here you appear to be

21  describing a scenario in which you're

22  submitting both the horizontal and the vertical

23  configurations for the Wahiawa project.  With

24  regard to the horizontal you believe that you

25  already have Title 22 approval or compliance

1

2  established, but you're still waiting for

3  approval for the vertical system; is that

4  right?

5       A.   Yes.

6       Q.   So, it was your intention that

7  once the vertical system was approved in

8  California then you wanted to pursue substituting

9  the vertical for the horizontal;

10  is that right?

11      A.   More or less.

12      Q.   Now, the second paragraph of the

13  letter you state, quote, going in to this project

14  it was obvious that submittal approval would be a

15  fight, the sentence goes on, do you see that

16  part?

17      A.   Yes.

18      Q.   What were you referring to there when

19  you said going in to the project it was obvious

20  that submittal approval would be a fight?

21      A.   Dealing with GMP.

22      Q.   What about dealing with GMP made

23  it obvious going in to the project that submittal

24  approval would be a fight?

25      A.   Our representative informed us

1

2    that GMP is not very reasonable to deal with

3    and will push their interpretation of the spec to

4    whatever they want as opposed to what it really

5    is.

6         Q.    That would have been Paul Scott?

7         A.    Yes.

8         Q.    Other than Paul Scott telling you

9    that, did you have any other reason to believe

10   that the submittal approval process would be a

11   fight?

12        A.    Some previous dealings with Lee

13   Mansfield.

14        Q.    Lee Mansfield was at that time

15   with GMP?

16        A.    I believe so.

17        Q.    And you had some prior dealings with

18   him which made you think that the

19   submittal approval process would be a fight?

20        A.    Yes.

21        Q.    Could you just briefly explain

22   what those were?

23        A.    Another project which we

24   delivered, Kailua, Lee Mansfield sat as a

25   review board and some of his comments we felt

1

2  were very unreasonable.

3      Q.   On the second page of Exhibit 23 the

4  second paragraph you refer apparently to a GMP

5  letter of June 29th, and below that I'm quoting

6  from your letter now, quote, we can provide a

7  list of installations, we assume that GMP will

8  hang their hats on 1.2.A, which requires five

9  installations using equipment of this type and

10  North America treating five MGD for one year, GMP

11  will attempt to shoot us down as not having five

12  horizontal system installations, do you see that

13  part of Exhibit 23?

14      A.   Yes.

15      Q.   Can you explain the context of

16  that comment?

17      A.   Going through the specifications

18  we so clearly met all other areas of the

19  specification, this is where we thought that

20  GMP would take a stand.

21      Q.   What was it that you were

22  anticipating that they would argue, could you tie

23  it back to the specification, explain what you

24  anticipated they would argue?

25      A.   That our installations don't meet

1

2   their interpretation of experience.

3        Q.   Because they weren't horizontal?

4        A.   Yes.

5        Q.   Could you look at what's been marked

6   Exhibit 33, it purports to be an August 31st,

7   2000 letter from you to Richard Sakaji of the

8   California Department of Health Services, have

9   you seen that letter before?

10       A.   Yes.

11       Q.   Is this a copy of a letter that

12  was actually sent by you?

13       A.   Yes.

14       Q.   What was the context and

15  circumstances that led to this letter being sent?

16       A.   After a face-to-face meeting with Dr.

17  Sakaji this was an information which he requested

18  so we could secure compliance

19  approval vis a vis Title 22.

20       Q.   For the vertical?

21       A.   Yes.  I want to clarify one thing,

22  the word interim is used in this because Title 22

23  was changing in the future, and it was

24  common knowledge to us that the Title 22 approval

25  would be for the regulations that were in force

1

2  Bodell's attorney, Mr. Schulmeister, were asked

3  to leave; is that correct?

4      A.   Yes.

5      Q.   That would have been late October of

6  2000; is that right?

7      A.   That's right.

8      Q.   I hand you now what's been marked

9  Exhibit 46.  Have you had a chance to look at

10 Exhibit 46?

11     A.   Yes.

12     Q.   Exhibit 46 purports to be a letter

13 from the Department of Health Services in

14 California to you dated October 23rd, 2000,

15 although it appears to be a document printed from

16 your computer and it's a signed copy; is that

17 correct?

18     A.   Yes

19     Q.   Exhibit 46 does, though, appear to

20 have on the first page the letterhead of the

21 California Department of Health Services; is that

22 right?

23     A.   That is correct.

24     Q.   How did it come about that you

25 were able to print this from your computer with

1

2    the California --

3         A.    It was sent to me as an e-mail.

4         Q.    As a PDF file?

5         A.    Don't recall.

6         Q.    You don't recall what format it

7    was sent?

8         A.    No.

9         Q.    What does Exhibit 46 represent in

10   terms of the purpose and function of this letter?

11        A.    Approval and compliance of the Ultra

12   Tech vertical system for Title 22.

13        Q.    I see there are some limitations

14   on it.

15        A.    One limitation.

16        Q.    What is the limitation?

17        A.    That Title 22 is in the process of

18   being rewritten, and this approval was for

19   Title 22 as it standed at that time and is not to

20   be construed as future approval for the evolving

21   Title 22.

22        Q.    I believe you testified earlier that

23   back in '99 you had the understanding that Trojan

24   had a conditional approval in

25   California; is that right?

1

2          A.    That is correct.

3          Q.    And how would the approval of the

4    Ultra Tech vertical system that is manifested

5    in Exhibit 46 compare to what you understood

6    Trojan's approval of its 4000 medium pressure

7    system to have been?

8          A.    The Ultra Tech approval, the only

9    condition is that it is fully approved per the

10   regs as they are today, and the condition was

11   just noting that they will be changing in the

12   near future.  I can't comment on what

13   conditions were applicable to the Trojan

14   system.  Also, this approval is based on actual

15   data, not theoretical calculations.

16         Q.    You're referring to Exhibit 46?

17         A.    Exhibit 46.

18         Q.    Was there actual sampling and testing

19   that was done using a vertical Ultra Tech system?

20         A.    Yes.

21         Q.    And this letter comments on what the

22   results of that test is?

23         A.    Yes.

24         Q.    And gives the conditional

25   approval; is that correct?

1

2          A.    Yes.    It, also, indicates, this is

3    from my memory, that the Ultra Tech system was

4    more efficient than previously approved

5    vertical systems of other manufacturers.

6               MR. SCHULMEISTER:   Let's go off

7          the record.

8               (Discussion off the record.)

9               MR. SCHULMEISTER:   Mark these.

10               (Whereupon, Plaintiff's Exhibits

11          58 and 59 were marked for Identi-

12          fication.)

13          Q.    Do you have Exhibit 58 in front of

14    you?

15          A.    Yes.

16          Q.    Exhibit 58 purports to be, the first

17    page is a transmittal sheet from GMP Associates

18    regarding a submittal 30C for ultraviolet

19    disinfection with a stamp on the first page

20    showing rejected, the stamp is dated December

21    19th, 2000; is that right?

22          A.    I see a date December 19th on the

23    cover sheet.  I see a date December 12th --

24          Q.    On the second page?

25          A.    Right.

1

2  to submitting the substitution request?

3          MR. BIALEK:  Objection as to form.

4      A.  Yes.

5      Q.  Did you, yourself, review Section

6  11376?

7      A.  Yes.

8      Q.  Now, in regards to Section 1.2B

9  you testified that that section specified that

10 the contract drawings and specifications were

11 based upon a Trojan medium pressure system,

12 correct?

13     A.  Correct.

14         MR. BIALEK:  Objection as to form.

15     Q.  You, also, indicated that you took a

16 look at Section 2.4, Subsection B3, I think Mr.

17 Schulmeister asked you about the language

18 to that section which specifies the horizontal

19 system, correct?

20     A.  Yes.

21     Q.  So, you understood that the

22 Section 2.4A3 specifically referenced a

23 horizontal system, correct?

24     A.  Yes.

25     Q.  And, in fact, the submittals

1

2  submitted in regards to the substitution

3  request by Ultra Tech and Bodell were all based

4  upon this horizontal system?

5          MR. BIALEK:  Objection.

6          MR. SCHULMEISTER:  I object to the

7      form.

8      A.   No.

9          MR. SCHULMEISTER:  Foundation.

10     Q.   So, your understanding is that in

11  submitting the submittals to GMP and the city

12  that both vertical and horizontal were submitted?

13     A.   Yes.

14         MR. BIALEK:  Objection as to form.

15     Q.   And how many submittals were

16  submitted in regards to the substitution request?

17         MR. SCHULMEISTER:  Let me object.

18         MR. BIALEK:  Object to the form.

19         MR. SCHULMEISTER:  When you say

20     substitution, there's a chance for

21     confusion.

22         MR. OGOMORI:  I'll clear it up.

23     Q.   Whenever I talk about substitution

24  requests, I'm going to refer to the

25  substitution requests in regards to the UV

1

2  equipment that Ultra Tech and Bodell submitted,

3  okay?

4        MR. BIALEK:   Objection as to the

5        form.

6        MR. SCHULMEISTER:   I'm going to

7        object to that.  We've already got all

8        this testimony about the substitution

9        that was pre-bid, and I think that after

10       that it was submittal.  You're going to

11       creat an ambiguity in the record, and I'm

12       going to object to the form of all those

13       questions.

14       MR. OGOMORI:   I'll clear it up.

15       Q.   Would you agree that Section 2.4

16  requires that the UV lamps be horizontal and

17  parallel to the flow?

18       A.   No.

19       Q.   In looking at Section 2.4A3 would you

20  agree that it states that the major axis of the

21  UV lamp shall be horizontal and parallel to the

22  floor.

23       MR. BIALEK:   Objection as to form.

24       Are you asking him whether the words that

25       you just said are on that page?

1
2          MR. OGOMORI:  Yes.

3     A.   The words which you said are on

4  the page.

5     Q.   Would you agree that the words on the

6  page in regards to Section 2.4A3 states

7  that UV systems that operate with lamps placed

8  perpendicular to the floor are unacceptable,

9  would you agree that it states that?

10         A.    That it states that, would I agree

11  that it states that?

12         Q.   Yes.

13              MR. BIALEK:  That the words are on

14         the page.

15         A.   Yes.

16         Q.   I'm going to show you what has

17  previously been marked as Exhibit Number 3.

18  This is a letter that purports to be drafted by

19  Paul Scott, and it's dated November 18th, 1999.

20  In this letter Paul Scott requested approval to

21  substitute the Ultra Tech UV system for the

22  Trojan or specified system, correct?

23         A.   Yes.

24         Q.   Did you review this letter before

25  today?

1

2　request submitted by Ultra Tech?

3　　　A.　I would think so and equipment

4　requirements.

5　　　Q.　Was it your understanding that

6　Paul Scott had, also, been communicating with

7　city officials regarding the substitution

8　requests?

9　　　A.　Yes.

10　　　Q.　At that time did you indicate to Mr.

11　Hamada that Ultra Tech system met the project

12　specifications requirements?

13　　　A.　We indicated that we meet the intent

14　of the specifications with respect to

15　the disinfection requirements and that we will

16　fit in to the channel as shown on the drawings,

17　Exhibit 3.

18　　　Q.　Let me show you what we marked as

19　Exhibit 66, it's B00098.

20　　　　　(Whereupon, Plaintiff's Exhibit 66

21　　　was marked for Identification.)

22　　　Q.　Taking a look at what's been

23　marked Plaintiff's Exhibit 66, which purports

24　to be a letter from James Honke of the city to

25　Paul Scott dated December 9th, 1999, would you

1
2  agree that the letter states, based on the
3  materials submitted your request to substitute
4  Ultra Tech UV disinfection system for the
5  specified Trojan is approved for bidding purposes
6  only?
7            MR. BIALEK:  Objection as to form.
8       A.   Yes.
9       Q.   Would you agree that the letter
10  states, quote, final approval is subject to
11  review of the fabrication shop drawings and
12  meeting all the requirements of the contract
13  documents?
14            MR. BIALEK:  Objection as to form.
15       A.   Yes.
16       Q.   And you reviewed this letter at or
17  around the time of December 9th, 1999?
18       A.   Yes.
19       Q.   This was provided to you by
20  Engineered Systems?
21       A.   Yes.
22       Q.   Based upon this letter was it your
23  understanding that the city's approval was for
24  bidding purposes only?
25            MR. BIALEK:  Objection as to form.

1

2      A.    That's a very nebulous question. What

3   is bidding purposes?

4      Q.    What is your understanding of bidding

5   purposes only?

6      A.    My understanding is that my

7   product is subject to the specifications and

8   contract documents whether it's listed by name or

9   otherwise.

10      Q.    So, your understanding was that

11   any equipment needed to meet the requirements

12   of the contract documents?

13      A.    Including our equipment and the

14   Trojan equipment.

15      Q.    Would you agree that any approval to

16   use equipment is subject to review of fabrication

17   drawings, shop drawings and, again, meeting all

18   the requirements of the contract documents?

19          MR. BIALEK:   Objection as to form.

20      A.    All legal and valid requirements

21   of the contract documents.

22      Q.    Along with the submission of

23   fabrication drawings and shop drawings?

24      A.    Yes.

25      Q.    In fact, drawings were submitted

1

2    by Ultra Tech in regards to the substitution

3    request, correct?

4            MR. SCHULMEISTER:  Objection to

5        form.

6        A.   I don't recall.

7        Q.   You're not sure if fabrication

8    drawings were submitted to Ultra Tech?

9            MR. SCHULMEISTER:  Objection to

10       form.  When you say substitution request

11       --

12       A.   There's a pre-bid substitution and a

13   post-bid substitution, so which one are we

14   referring to here?

15       Q.   In regards to pre-bid substitution

16   requests.

17       A.   No drawings were provided.

18       Q.   In regards to post contract execution

19   substitution requests --

20       A.   I don't recall but --

21           MR. BIALEK:  Let him finish his

22       question.

23       Q.   You're not sure if --

24           MR. SUTTON:  Repeat the question.

25           MR. BIALEK:  Finish the question.

1

2      Q.    Let me say something that might clear

3  this up, since she's taking down everything I

4  would appreciate it if you wait until I'm

5  finished asking the question before you start

6  answering it.  Okay?

7      A.    Yes.

8      Q.    In regards to any post bidding

9  substitution requests were any drawings submitted

10  by Ultra Tech?

11          MR. BIALEK:  Objection as to form.

12      A.    It is my understanding that Ultra

13  Tech submitted drawings as part of the approval

14  process equipment submittals.  I do not recall if

15  drawings were submitted specifically for the

16  purpose of a post bid substitution request.

17      Q.    You're saying that you believe

18  that drawings were submitted as part of submittal

19  30 through 30C?

20          MR. BIALEK:  Objection as to form.

21      A.    That is correct.

22      Q.    When I'm talking about 30 to 30C, I'm

23  talking about a specific substitution request

24  relating to the Ultra Tech's UV system?

25      A.    I don't believe the 30 through 30C

1
2  are substitution requests.  I believe those are
3  equipment submittals, shop drawings and
4  descriptive information.
5        Q.   In conjunction with the submittal
6  process, correct?
7        A.   Submittal process.
8        Q.   And in conjunction with the final
9  approval to use the Ultra Tech UV system?
10            MR. BIALEK:  Objection as to form.
11            MR. SCHULMEISTER:  Objection as to
12       form.
13       A.   In order to secure approval.
14       Q.   Let me show you what has been
15  previously marked as Exhibit 7, Exhibit 7
16  purports to be a letter from Ultra Tech dated
17  December 10th, 1999.  Have you reviewed Exhibit
18  7?
19            MR. BIALEK:  Now or in the past?
20            MR. OGOMORI:  Now.
21       A.   Yes.
22       Q.   You prepared this document, correct?
23       A.   Yes.
24       Q.   Is there anything in this document
25  that is not accurate?

172

1

2                           C E R T I F I C A T E

3

4        STATE OF NEW YORK      )
                                )ss.:
5        COUNTY OF WESTCHESTER)

6

7                    I, LISA M. PRENTICE, a Shorthand
         Reporter and Notary Public within and for the
8        State of New York, do hereby certify:

9

10                   That GREG ELLNER, the witness
         whose deposition is hereinbefore set forth, was
         duly sworn by me, and that such deposition is a
11       true record of the testimony given by the
         witness.

12

13                   I further certify that I am not
         related to any of the parties to this action by
14       blood or marriage, and that I am in no way
         interested in the outcome of this matter.

15

16                   IN WITNESS WHEREOF, I have
         hereunto set my hand this 13th day of September,
17       2004.

18

19

20       _____

21            LISA M. PRENTICE
              SHORTHAND REPORTER

22

23

24

25

```
 1    UNITED STATES DISTRICT COURT
      DISTRICT OF HAWAII
 2    - - - - - - - - - - - - - - - - - - - - - X
      BODELL CONSTRUCTION COMPANY, a Utah
 3    Corporation,

 4           Plaintiff,
                                     Case No.
 5        -against-                  03-00706
      OHIO PACIFIC TECH, INC. Fka
 6    GMP ASSOCIATES, INC., an Ohio
      HG-LEK corporation; CITY AND COUNTY
 7    OF HONOLULU; ULTRA TECH
      SYSTEMS, INC., a foreign
 8    corporation,

 9           Defendants.
      - - - - - - - - - - - - - - - - - - - - - X
10

11    HELD AT:     Wilson, Elser, Moskowitz,
                   Edelman & Dicker, LLP
12                 3 Gannett Drive
                   White Plains, New York  10604
13                 September 2nd, 2004
                   10:15 a.m.
14

15                    VOLUME II

16              Continued Deposition of GREG

17    ELLNER, a non-party witness, held pursuant to

18    Subpoena, held at the above time and place before

19    a Notary Public of the State of New York.

20              Lisa M. Prentice, Reporter

21

22    ATKINSON-BAKER, INC.
      COURT REPORTERS
23    330 North Brand Boulevard, Suite 250
      Glendale, California 91203
24    (800) 288-3376

25    FILE NO.: 9E07630
```

CERTIFIED COPY

1

2    the Ultra Tech UV System?

3         A.   I really don't recall.

4         Q.   Take a look at what has been marked

5    as Exhibit 12, that is a memo from you to Bodell

6    Construction dated April 13th, 2000.

7         A.   These aren't in order.  Here's 12.

8         Q.   Do you recognize this memo dated

9    April 13th, 2000?

10        A.   Yes.

11        Q.   It's on Ultra Tech Systems

12   letterhead?

13        A.   Yes.

14        Q.   This was printed off your computer?

15        A.   Yes.

16        Q.   And you drafted this memo?

17        A.   Yes.

18        Q.   Now, in the second paragraph of

19   Exhibit 12 the first line states, the UV System

20   which we bid for Wahiawa at a not too exceed

21   price of $417,500 was a horizontal UV System

22   which will fit in the UV channel with minor

23   modification, do you see that?

24        A.   Yes.

25        Q.   What minor modification were you

1
2    talking about?

3          A.    Slight -- variations in channel depth
4    and width.

5          Q.    When you say a slight variation, are
6    you referring to a variation from the project's
7    plans?

8          A.    Yes.

9          Q.    In this first sentence of the second
10   paragraph of Exhibit 12 you state that UV System
11   which Ultra Tech bid, for Wahiawa project I take
12   it?

13         A.    Yes.

14         Q.    Was the horizontal UV System
15   manufactured by Ultra Tech?

16         A.    We did horizontal and vertical.

17         Q.    But this memorandum is referring to
18   the horizontal UV System, correct?

19               MR. BIALEK:    Objection.

20         A.    This paragraph refers to the
21   horizontal system.

22         Q.    And it provides a price of $417,500?

23         A.    Yes.

24         Q.    Did you ever review Bodell's bid
25   proposal?

1

2      A.   No.

3      Q.   Do you know if Bodell incorporated

4  this $417,500 price in to their bid proposal?

5      A.   I do not.

6      Q.   Now, take a look at Exhibit 12,

7  Paragraph Three, it reads, quote, it has been our

8  intention all along to substitute a vertical UV

9  System for the horizontal system and offer you a

10  substantial savings by doing so, do you see that?

11      A.   I see that.

12      Q.   What were you referring to as far as

13  your intention all along?

14      A.   The vertical product is a better

15  product, which will save the City and County of

16  Honolulu considerable funds while operating,

17  maintaining that product, so it was in the good

18  of public, it's in the good of the customer's

19  interest, which is one of the things we try to do

20  all the time, and at this particular time we did

21  not have the Title 22 approval, it was pending,

22  so once the Title 22 approval was received it's a

23  better situation for all parties to go with the

24  vertical system, that was what our intentions

25  were.

1

2          Q.   Prior to receiving this Title 22

3     certification Ultra Tech had been focusing upon

4     the horizontal UV System?

5          A.   No.

6          Q.   Well, at that point were you

7     focussing on both?

8          A.   Correct.

9          Q.   But you understood that without the

10    Title 22 certification the vertical UV System

11    would not be approved?

12              MR. SCHULMEISTER:  Objection as to

13         form.

14              MR. BIALEK:  I'll join.

15         A.   There is no such thing as a Title 22

16    certification.  What our understanding was was

17    that prior to commissioning of the equipment

18    Title 22 compliance had to be secured,

19    commissioning meaning delivery and start up of

20    the equipment.

21         Q.   You testified yesterday that you had

22    reviewed that Section 11376 of the

23    specifications, correct?

24         A.   Yes.

25         Q.   And in Section 2.4 of that Section

1

2  11376 there's a reference to a requirement that

3  the UV System be the type of horizontal type of a

4  system, correct?

5         MR. BIALEK:   Objection.

6         A.    Specification has alternate

7  provisions in Section 2.1B, which says to be

8  acceptable alternate UV systems must and we are

9  going to interject the word meet the following

10 requirements, capable of meeting the specified

11 performance requirements, operate in an open

12 channel, be of modular design, use lamps with

13 electronic ballasts and incorporate a cleaning

14 system, UV systems shall meet the hydraulic

15 profile shown in the contract drawings, any cost

16 resulting from changes due to the use of an

17 alternate system shall be borne by the

18 contractor, if structures and equipment need to

19 be modified to meet the hydraulic requirements of

20 the plan, all costs shall be borne by the

21 contractor, contractor shall submit design

22 calculations showing that the hydraulic profile

23 shown in the contract drawings will be met, both

24 of the Ultra Tech Systems offered for sale fully

25 comply with all the requirements in 2.1B whether

1

2      Q.   Now, as part of submittal 30C did

3  Ultra Tech ever provide testing data on the Ultra

4  Tech horizontal UV System done by an independent

5  third party?

6      A.   No.

7           MR. SCHULMEISTER:   Objection as to

8      form.

9      Q.   In regards to Exhibit 78,

10 specifically Page 661, B00661, do you see that?

11     A.   I do.

12     Q.   Ultra Tech provided information on

13 ten installations that were using the Ultra Tech

14 UV systems, right?

15     A.   Correct.

16     Q.   And these Ultra Tech UV systems would

17 be only vertical systems?

18     A.   That is correct.

19     Q.   And behind this sheet B00661 was the

20 independent data in regards to these ten

21 installations?

22     A.   So I understand.

23     Q.   Starting on B00662 through 665 would

24 be the information that would be pertinent to

25 Broomfield, Colorado?

236

1

2          A.    That is correct.

3          Q.    On that face sheet on B00662 it says

4    here thirty day geometric mean permit?

5          A.    Correct.

6          Q.    In this information provided within

7    B00662 through B00665 was there any information

8    relating to a seven day moving median?

9          A.    Not that I am aware of.

10         Q.    It did not include this information?

11         A.    That's my understanding.

12         Q.    In regards to the Cinco Ranch, Texas,

13   starting on B00666 through 668, the face sheet

14   indicates that thirty day geometric mean permit?

15         A.    That's what's written.

16         Q.    Did this information that is included

17   in regards to Cinco Ranch, Texas, did that

18   include seven day median information?

19         A.    It did not.

20         Q.    Did it include a seven day moving

21   median information?

22         A.    No, but I'd like to know what that

23   is.

24              THE WITNESS:   Can we go off the

25         record?

1
2          MR. BIALEK:  No.  Do you know what
3      he's talking about with the seven day
4      moving?
5          THE WITNESS:  I know what he's
6      talking about as far as the information.
7          MR. BIALEK:  Do you know what a
8      seven day moving median is?
9          THE WITNESS:  No.
10          MR. BIALEK:  How can you answer
11      the question whether it's been provided
12      or not?
13          THE WITNESS:  Because there's no
14      seven day information provided.
15      Q.   As part of submittal 30C did Ultra
16  Tech ever provide third party validation and test
17  data demonstrating that the system being provided
18  will not have an adverse affect on surrounding
19  plants and equipment?
20      A.   Ultra Tech did.
21      Q.   Who was the test prepared by?
22      A.   If I can review the document, there's
23  the electrical testing company, the name escapes
24  me.
25          MR. SCHULMEISTER:  That's part of

1

2    systems?

3          A.    Yes.

4          Q.    What was that?

5          A.    That was one of the previous exhibits

6    dated August of 2000 where we're showing Bodell

7    that we have interpreted their purchase order for

8    $417,500.

9          Q.    Did you write back to Bodell after

10   you received this purchase order, which is

11   Exhibit 84, did you write them anything to

12   respond to this purchase order as far as the

13   amount?

14         A.    That was a document I referred to.

15         Q.    It's one of the documents that came

16   from your computer?

17         A.    Yes, it already was an exhibit.

18         Q.    Let's see if we can locate that, you

19   think it was sometime in August?

20         A.    Yes.

21         Q.    Take a look at Exhibit 27.

22               MR. BIALEK:   Off the record.

23               (Discussion off the record.)

24         Q.    Let's take a look at 23, 27 and 84,

25   23 is dated July 27th, 2000, it's a fax from

1

2    Ultra Tech to Bodell on July 27th, 2000, where in

3    that letter is there a reference to the purchase

4    price?

5         A.    Third paragraph.

6         Q.    Could you read the reference?

7         A.    We're going on the basis that your

8    order is currently for a horizontal UV System and

9    the purchase price is not to exceed $417,000.

10         Q.    Did you ever obtain from Bodell

11    Construction a revised purchase order for

12    $417,000?

13         A.    Not that I recall.

14         Q.    As far as this purchase order, which

15    is Exhibit 84, page B227, did you ever sign and

16    return that purchase order?

17         A.    Not that I recall.

18         Q.    Did you consider that the purchase

19    order, which is Exhibit 84, B227, was not

20    correct?

21         A.    Was not correct?

22         Q.    Let me rephrase that.

23              Why didn't you sign that purchase

24    order?

25              MR. BIALEK:  Objection.

328

C E R T I F I C A T E

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF WESTCHESTER)


        I, LISA M. PRENTICE, a Shorthand
Reporter and Notary Public within and for the
State of New York, do hereby certify:


        That GREG ELLNER, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me, and that such deposition is a
true record of the testimony given by the
witness.


        I further certify that I am not
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.


        IN WITNESS WHEREOF, I have
hereunto set my hand this 13th day of September,
2004.



        _____
            LISA M. PRENTICE
          SHORTHAND REPORTER