1  UNITED STATES DISTRICT COURT
   DISTRICT OF HAWAII                **CERTIFIED COPY**
2  - - - - - - - - - - - - - - - - - - - - X
   BODELL CONSTRUCTION COMPANY, a Utah
3  Corporation,

4          Plaintiff,

5      -against-                    Case No.
                                    03-00706
6  OHIO PACIFIC TECH, INC. Fka
   GMP ASSOCIATES, INC., an Ohio    HG-LEK
7  corporation; CITY AND COUNTY
   OF HONOLULU; ULTRA TECH
8  SYSTEMS, INC., a foreign
   corporation,

9
           Defendants.
10
   - - - - - - - - - - - - - - - - - - - - X
11

12 HELD AT:    Wilson, Elser, Moskowitz,
                Edelman & Dicker, LLP
13              3 Gannett Drive
                White Plains, New York  10604
14              September 1st, 2004
                10:30 a.m.
15

16          VOLUME I

17      Deposition of GREG ELLNER, a

18 non-party witness, held pursuant to Subpoena,

19 held at the above time and place before a

20 Notary Public of the State of New York.

21 ATKINSON-BAKER, INC.
     COURT REPORTERS
22   330 North Brand Boulevard, Suite 250
     Glendale, California 91203
23   (800) 288-3376

24          Lisa M. Prentice, Reporter

25 FILE NO.: 9E06DC4

Exhibit "N"

1

1

2   their ultimately were responses.

3        Q.   Now, with respect to the

4 horizontal system I think you indicated earlier

5 it was already, quote, a conforming system?

6        A.   Yes.

7        Q.   But you were asking Dr. Sakaji to

8 nonetheless confirm that?

9        A.   Yes.

10        Q.   With regard to the vertical system

11 you refer to their being pages that follow that

12 pertain to requested approval of the forty lamp

13 vertical module, so that was additional

14 information that was being provided?

15        A.   Yes.

16        Q.   I'm going to hand you what's been

17 marked Exhibit 23, which purports to be a July

18 27th, 2000 fax transmission cover sheet from

19 you to Gary Jeppson at Bodell.  Could you look at

20 Exhibit 23, please?  Here you appear to be

21 describing a scenario in which you're

22 submitting both the horizontal and the vertical

23 configurations for the Wahiawa project.  With

24 regard to the horizontal you believe that you

25 already have Title 22 approval or compliance

1

2  established, but you're still waiting for

3  approval for the vertical system; is that

4  right?

5        A.   Yes.

6        Q.   So, it was your intention that

7  once the vertical system was approved in

8  California then you wanted to pursue substituting

9  the vertical for the horizontal;

10 is that right?

11       A.   More or less.

12       Q.   Now, the second paragraph of the

13 letter you state, quote, going in to this project

14 it was obvious that submittal approval would be a

15 fight, the sentence goes on, do you see that

16 part?

17       A.   Yes.

18       Q.   What were you referring to there when

19 you said going in to the project it was obvious

20 that submittal approval would be a fight?

21       A.   Dealing with GMP.

22       Q.   What about dealing with GMP made

23 it obvious going in to the project that submittal

24 approval would be a fight?

25       A.   Our representative informed us

1
2  that GMP is not very reasonable to deal with
3  and will push their interpretation of the spec to
4  whatever they want as opposed to what it really
5  is.
6         Q.    That would have been Paul Scott?
7         A.    Yes.
8         Q.    Other than Paul Scott telling you
9  that, did you have any other reason to believe
10 that the submittal approval process would be a
11 fight?
12        A.    Some previous dealings with Lee
13 Mansfield.
14        Q.    Lee Mansfield was at that time
15 with GMP?
16        A.    I believe so.
17        Q.    And you had some prior dealings with
18 him which made you think that the
19 submittal approval process would be a fight?
20        A.    Yes.
21        Q.    Could you just briefly explain
22 what those were?
23        A.    Another project which we
24 delivered, Kailua, Lee Mansfield sat as a
25 review board and some of his comments we felt

1

2    were very unreasonable.

3         Q.    On the second page of Exhibit 23 the

4    second paragraph you refer apparently to a GMP

5    letter of June 29th, and below that I'm quoting

6    from your letter now, quote, we can provide a

7    list of installations, we assume that GMP will

8    hang their hats on 1.2.A, which requires five

9    installations using equipment of this type and

10   North America treating five MGD for one year, GMP

11   will attempt to shoot us down as not having five

12   horizontal system installations, do you see that

13   part of Exhibit 23?

14        A.    Yes.

15        Q.    Can you explain the context of

16   that comment?

17        A.    Going through the specifications

18   we so clearly met all other areas of the

19   specification, this is where we thought that

20   GMP would take a stand.

21        Q.    What was it that you were

22   anticipating that they would argue, could you tie

23   it back to the specification, explain what you

24   anticipated they would argue?

25        A.    That our installations don't meet

1

2   their interpretation of experience.

3        Q.   Because they weren't horizontal?

4        A.   Yes.

5        Q.   Could you look at what's been marked

6   Exhibit 33, it purports to be an August 31st,

7   2000 letter from you to Richard Sakaji of the

8   California Department of Health Services, have

9   you seen that letter before?

10       A.   Yes.

11       Q.   Is this a copy of a letter that

12  was actually sent by you?

13       A.   Yes.

14       Q.   What was the context and

15  circumstances that led to this letter being sent?

16       A.   After a face-to-face meeting with Dr.

17  Sakaji this was an information which he requested

18  so we could secure compliance

19  approval vis a vis Title 22.

20       Q.   For the vertical?

21       A.   Yes.  I want to clarify one thing,

22  the word interim is used in this because Title 22

23  was changing in the future, and it was

24  common knowledge to us that the Title 22 approval

25  would be for the regulations that were in force

1

2  Bodell's attorney, Mr. Schulmeister, were asked

3  to leave; is that correct?

4         A.    Yes.

5         Q.    That would have been late October of

6  2000; is that right?

7         A.    That's right.

8         Q.    I hand you now what's been marked

9  Exhibit 46.  Have you had a chance to look at

10  Exhibit 46?

11         A.    Yes.

12         Q.    Exhibit 46 purports to be a letter

13  from the Department of Health Services in

14  California to you dated October 23rd, 2000,

15  although it appears to be a document printed from

16  your computer and it's a signed copy; is that

17  correct?

18         A.    Yes

19         Q.    Exhibit 46 does, though, appear to

20  have on the first page the letterhead of the

21  California Department of Health Services; is that

22  right?

23         A.    That is correct.

24         Q.    How did it come about that you

25  were able to print this from your computer with

1
2     the California --
3           A.    It was sent to me as an e-mail.
4           Q.    As a PDF file?
5           A.    Don't recall.
6           Q.    You don't recall what format it
7     was sent?
8           A.    No.
9           Q.    What does Exhibit 46 represent in
10    terms of the purpose and function of this letter?
11          A.    Approval and compliance of the Ultra
12    Tech vertical system for Title 22.
13          Q.    I see there are some limitations
14    on it.
15          A.    One limitation.
16          Q.    What is the limitation?
17          A.    That Title 22 is in the process of
18    being rewritten, and this approval was for
19    Title 22 as it standed at that time and is not to
20    be construed as future approval for the evolving
21    Title 22.
22          Q.    I believe you testified earlier that
23    back in '99 you had the understanding that Trojan
24    had a conditional approval in
25    California; is that right?

1

2          A.    That is correct.

3          Q.    And how would the approval of the

4   Ultra Tech vertical system that is manifested

5   in Exhibit 46 compare to what you understood

6   Trojan's approval of its 4000 medium pressure

7   system to have been?

8          A.    The Ultra Tech approval, the only

9   condition is that it is fully approved per the

10  regs as they are today, and the condition was

11  just noting that they will be changing in the

12  near future.  I can't comment on what

13  conditions were applicable to the Trojan

14  system.  Also, this approval is based on actual

15  data, not theoretical calculations.

16         Q.    You're referring to Exhibit 46?

17         A.    Exhibit 46.

18         Q.    Was there actual sampling and testing

19  that was done using a vertical Ultra Tech system?

20         A.    Yes.

21         Q.    And this letter comments on what the

22  results of that test is?

23         A.    Yes.

24         Q.    And gives the conditional

25  approval; is that correct?

1

2          A.    Yes.   It, also, indicates, this is

3    from my memory, that the Ultra Tech system was

4    more efficient than previously approved

5    vertical systems of other manufacturers.

6              MR. SCHULMEISTER:   Let's go off

7         the record.

8              (Discussion off the record.)

9              MR. SCHULMEISTER:   Mark these.

10              (Whereupon, Plaintiff's Exhibits

11         58 and 59 were marked for Identi-

12         fication.)

13         Q.    Do you have Exhibit 58 in front of

14   you?

15         A.    Yes.

16         Q.    Exhibit 58 purports to be, the first

17   page is a transmittal sheet from GMP Associates

18   regarding a submittal 30C for ultraviolet

19   disinfection with a stamp on the first page

20   showing rejected, the stamp is dated December

21   19th, 2000; is that right?

22         A.    I see a date December 19th on the

23   cover sheet.  I see a date December 12th --

24         Q.    On the second page?

25         A.    Right.

1

2  to submitting the substitution request?

3          MR. BIALEK:  Objection as to form.

4      A.    Yes.

5      Q.    Did you, yourself, review Section

6  11376?

7      A.    Yes.

8      Q.    Now, in regards to Section 1.2B

9  you testified that that section specified that

10  the contract drawings and specifications were

11  based upon a Trojan medium pressure system,

12  correct?

13     A.    Correct.

14          MR. BIALEK:  Objection as to form.

15     Q.    You, also, indicated that you took a

16  look at Section 2.4, Subsection B3, I think Mr.

17  Schulmeister asked you about the language

18  to that section which specifies the horizontal

19  system, correct?

20     A.    Yes.

21     Q.    So, you understood that the

22  Section 2.4A3 specifically referenced a

23  horizontal system, correct?

24     A.    Yes.

25     Q.    And, in fact, the submittals

1

2  submitted in regards to the substitution

3  request by Ultra Tech and Bodell were all based

4  upon this horizontal system?

5          MR. BIALEK:  Objection.

6          MR. SCHULMEISTER:  I object to the

7      form.

8      A.  No.

9          MR. SCHULMEISTER:  Foundation.

10     Q.  So, your understanding is that in

11 submitting the submittals to GMP and the city

12 that both vertical and horizontal were submitted?

13     A.  Yes.

14         MR. BIALEK:  Objection as to form.

15     Q.  And how many submittals were

16 submitted in regards to the substitution request?

17         MR. SCHULMEISTER:  Let me object.

18         MR. BIALEK:  Object to the form.

19         MR. SCHULMEISTER:  When you say

20     substitution, there's a chance for

21     confusion.

22         MR. OGOMORI:  I'll clear it up.

23     Q.  Whenever I talk about substitution

24 requests, I'm going to refer to the

25 substitution requests in regards to the UV

1
2  equipment that Ultra Tech and Bodell submitted,
3  okay?
4          MR. BIALEK:   Objection as to the
5      form.
6          MR. SCHULMEISTER:   I'm going to
7      object to that.  We've already got all
8      this testimony about the substitution
9      that was pre-bid, and I think that after
10     that it was submittal.  You're going to
11     creat an ambiguity in the record, and I'm
12     going to object to the form of all those
13     questions.
14         MR. OGOMORI:   I'll clear it up.
15     Q.    Would you agree that Section 2.4
16  requires that the UV lamps be horizontal and
17  parallel to the flow?
18     A.    No.
19     Q.    In looking at Section 2.4A3 would you
20  agree that it states that the major axis of the
21  UV lamp shall be horizontal and parallel to the
22  floor.
23         MR. BIALEK:   Objection as to form.
24     Are you asking him whether the words that
25     you just said are on that page?

137

1
2           MR. OGOMORI:  Yes.
3      A.   The words which you said are on
4  the page.
5      Q.   Would you agree that the words on the
6  page in regards to Section 2.4A3 states
7  that UV systems that operate with lamps placed
8  perpendicular to the floor are unacceptable,
9  would you agree that it states that?
10      A.   That it states that, would I agree
11  that it states that?
12      Q.   Yes.
13           MR. BIALEK:  That the words are on
14      the page.
15      A.   Yes.
16      Q.   I'm going to show you what has
17  previously been marked as Exhibit Number 3.
18  This is a letter that purports to be drafted by
19  Paul Scott, and it's dated November 18th, 1999.
20  In this letter Paul Scott requested approval to
21  substitute the Ultra Tech UV system for the
22  Trojan or specified system, correct?
23      A.   Yes.
24      Q.   Did you review this letter before
25  today?

172

C E R T I F I C A T E

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF WESTCHESTER)


        I, LISA M. PRENTICE, a Shorthand
Reporter and Notary Public within and for the
State of New York, do hereby certify:


        That GREG ELLNER, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me, and that such deposition is a
true record of the testimony given by the
witness.


        I further certify that I am not
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.


        IN WITNESS WHEREOF, I have
hereunto set my hand this 13th day of September,
2004.



        LISA M. PRENTICE
        SHORTHAND REPORTER

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF HAWAII
 2   - - - - - - - - - - - - - - - - - - - X
     BODELL CONSTRUCTION COMPANY, a Utah
 3   Corporation,

 4        Plaintiff,
                                  Case No.
 5      -against-                 03-00706
     OHIO PACIFIC TECH, INC. Fka
 6   GMP ASSOCIATES, INC., an Ohio
     HG-LEK corporation; CITY AND COUNTY
 7   OF HONOLULU; ULTRA TECH
     SYSTEMS, INC., a foreign
 8   corporation,

 9        Defendants.
     - - - - - - - - - - - - - - - - - - - X
10

11   HELD AT:     Wilson, Elser, Moskowitz,
                  Edelman & Dicker, LLP
12                3 Gannett Drive
                  White Plains, New York  10604
13                September 2nd, 2004
                  10:15 a.m.
14

15               VOLUME II

16          Continued Deposition of GREG

17   ELLNER, a non-party witness, held pursuant to

18   Subpoena, held at the above time and place before

19   a Notary Public of the State of New York.

20          Lisa M. Prentice, Reporter

21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   330 North Brand Boulevard, Suite 250
     Glendale, California 91203
24   (800) 288-3376

25   FILE NO.: 9E07630
```

CERTIFIED COPY

1

2   the Ultra Tech UV System?

3        A.    I really don't recall.

4        Q.    Take a look at what has been marked

5   as Exhibit 12, that is a memo from you to Bodell

6   Construction dated April 13th, 2000.

7        A.    These aren't in order.  Here's 12.

8        Q.    Do you recognize this memo dated

9   April 13th, 2000?

10       A.    Yes.

11       Q.    It's on Ultra Tech Systems

12   letterhead?

13       A.    Yes.

14       Q.    This was printed off your computer?

15       A.    Yes.

16       Q.    And you drafted this memo?

17       A.    Yes.

18       Q.    Now, in the second paragraph of

19   Exhibit 12 the first line states, the UV System

20   which we bid for Wahiawa at a not too exceed

21   price of $417,500 was a horizontal UV System

22   which will fit in the UV channel with minor

23   modification, do you see that?

24       A.    Yes.

25       Q.    What minor modification were you

1
2   talking about?
3        A.   Slight -- variations in channel depth
4   and width.
5        Q.   When you say a slight variation, are
6   you referring to a variation from the project's
7   plans?
8        A.   Yes.
9        Q.   In this first sentence of the second
10  paragraph of Exhibit 12 you state that UV System
11  which Ultra Tech bid, for Wahiawa project I take
12  it?
13       A.   Yes.
14       Q.   Was the horizontal UV System
15  manufactured by Ultra Tech?
16       A.   We did horizontal and vertical.
17       Q.   But this memorandum is referring to
18  the horizontal UV System, correct?
19            MR. BIALEK:   Objection.
20       A.   This paragraph refers to the
21  horizontal system.
22       Q.   And it provides a price of $417,500?
23       A.   Yes.
24       Q.   Did you ever review Bodell's bid
25  proposal?

1

2     A.    No.

3     Q.    Do you know if Bodell incorporated

4  this $417,500 price in to their bid proposal?

5     A.    I do not.

6     Q.    Now, take a look at Exhibit 12,

7  Paragraph Three, it reads, quote, it has been our

8  intention all along to substitute a vertical UV

9  System for the horizontal system and offer you a

10  substantial savings by doing so, do you see that?

11     A.    I see that.

12     Q.    What were you referring to as far as

13  your intention all along?

14     A.    The vertical product is a better

15  product, which will save the City and County of

16  Honolulu considerable funds while operating,

17  maintaining that product, so it was in the good

18  of public, it's in the good of the customer's

19  interest, which is one of the things we try to do

20  all the time, and at this particular time we did

21  not have the Title 22 approval, it was pending,

22  so once the Title 22 approval was received it's a

23  better situation for all parties to go with the

24  vertical system, that was what our intentions

25  were.

1

2          Q.    Prior to receiving this Title 22

3    certification Ultra Tech had been focusing upon

4    the horizontal UV System?

5          A.    No.

6          Q.    Well, at that point were you

7    focussing on both?

8          A.    Correct.

9          Q.    But you understood that without the

10   Title 22 certification the vertical UV System

11   would not be approved?

12             MR. SCHULMEISTER:   Objection as to

13         form.

14             MR. BIALEK:   I'll join.

15         A.    There is no such thing as a Title 22

16   certification.  What our understanding was was

17   that prior to commissioning of the equipment

18   Title 22 compliance had to be secured,

19   commissioning meaning delivery and start up of

20   the equipment.

21         Q.    You testified yesterday that you had

22   reviewed that Section 11376 of the

23   specifications, correct?

24         A.    Yes.

25         Q.    And in Section 2.4 of that Section

1

2    11376 there's a reference to a requirement that

3    the UV System be the type of horizontal type of a

4    system, correct?

5              MR. BIALEK:   Objection.

6        A.    Specification has alternate

7    provisions in Section 2.1B, which says to be

8    acceptable alternate UV systems must and we are

9    going to interject the word meet the following

10   requirements, capable of meeting the specified

11   performance requirements, operate in an open

12   channel, be of modular design, use lamps with

13   electronic ballasts and incorporate a cleaning

14   system, UV systems shall meet the hydraulic

15   profile shown in the contract drawings, any cost

16   resulting from changes due to the use of an

17   alternate system shall be borne by the

18   contractor, if structures and equipment need to

19   be modified to meet the hydraulic requirements of

20   the plan, all costs shall be borne by the

21   contractor, contractor shall submit design

22   calculations showing that the hydraulic profile

23   shown in the contract drawings will be met, both

24   of the Ultra Tech Systems offered for sale fully

25   comply with all the requirements in 2.1B whether

1

2        Q.    Now, as part of submittal 30C did

3   Ultra Tech ever provide testing data on the Ultra

4   Tech horizontal UV System done by an independent

5   third party?

6        A.    No.

7              MR. SCHULMEISTER:    Objection as to

8        form.

9        Q.    In regards to Exhibit 78,

10  specifically Page 661, B00661, do you see that?

11       A.    I do.

12       Q.    Ultra Tech provided information on

13  ten installations that were using the Ultra Tech

14  UV systems, right?

15       A.    Correct.

16       Q.    And these Ultra Tech UV systems would

17  be only vertical systems?

18       A.    That is correct.

19       Q.    And behind this sheet B00661 was the

20  independent data in regards to these ten

21  installations?

22       A.    So I understand.

23       Q.    Starting on B00662 through 665 would

24  be the information that would be pertinent to

25  Broomfield, Colorado?

1

2      A.    That is correct.

3      Q.    On that face sheet on B00662 it says

4  here thirty day geometric mean permit?

5      A.    Correct.

6      Q.    In this information provided within

7  B00662 through B00665 was there any information

8  relating to a seven day moving median?

9      A.    Not that I am aware of.

10     Q.    It did not include this information?

11     A.    That's my understanding.

12     Q.    In regards to the Cinco Ranch, Texas,

13  starting on B00666 through 668, the face sheet

14  indicates that thirty day geometric mean permit?

15     A.    That's what's written.

16     Q.    Did this information that is included

17  in regards to Cinco Ranch, Texas, did that

18  include seven day median information?

19     A.    It did not.

20     Q.    Did it include a seven day moving

21  median information?

22     A.    No, but I'd like to know what that

23  is.

24         THE WITNESS:   Can we go off the

25         record?

1

2          MR. BIALEK:  No.  Do you know what

3     he's talking about with the seven day

4     moving?

5          THE WITNESS:  I know what he's

6     talking about as far as the information.

7          MR. BIALEK:  Do you know what a

8     seven day moving median is?

9          THE WITNESS:  No.

10          MR. BIALEK:  How can you answer

11     the question whether it's been provided

12     or not?

13          THE WITNESS:  Because there's no

14     seven day information provided.

15     Q.   As part of submittal 30C did Ultra

16 Tech ever provide third party validation and test

17 data demonstrating that the system being provided

18 will not have an adverse affect on surrounding

19 plants and equipment?

20     A.   Ultra Tech did.

21     Q.   Who was the test prepared by?

22     A.   If I can review the document, there's

23 the electrical testing company, the name escapes

24 me.

25          MR. SCHULMEISTER:  That's part of

328

1

2                        C E R T I F I C A T E

3

4          STATE OF NEW YORK      )
                                  )ss.:
5          COUNTY OF WESTCHESTER)

6

7                    I, LISA M. PRENTICE, a Shorthand
       Reporter and Notary Public within and for the
8          State of New York, do hereby certify:

9

10                   That GREG ELLNER, the witness
       whose deposition is hereinbefore set forth, was
       duly sworn by me, and that such deposition is a
11         true record of the testimony given by the
       witness.

12

13                   I further certify that I am not
       related to any of the parties to this action by
14         blood or marriage, and that I am in no way
       interested in the outcome of this matter.

15

16                   IN WITNESS WHEREOF, I have
       hereunto set my hand this 13th day of September,
17         2004.

18

19

20         _____

21                   LISA M. PRENTICE
                 SHORTHAND REPORTER

22

23

24

25