**EXHIBIT 27**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation; JOHN DOES 1-50; DOE CORPORATIONS 1-50,<br><br>Defendants. | CIVIL NO. 03-00706 (JMS/LEK)<br><br>DECLARATION OF SIDNEY ELLNER |

### DECLARATION OF SIDNEY ELLNER

I, SIDNEY ELLNER, hereby declare as follows:

1. I reside in Bedford, New York and am currently retired except for occasional consulting relating to my experience and expertise in the field of ultraviolet ("UV") disinfection of water. I have been engaged by Bodell Construction Company ("Bodell") to provide expert opinions in this case pertaining to the UV

ImanageDB:624595.2

specification for the Wahiawa Wastewater Treatment Plant and related issues.

2. Attached as Exhibit "1" hereto is a copy of my resume.

3. I graduated from the University of Connecticut in 1954 with a Bachelor of Science degree following which I served as an officer and pilot in the United States Air Force and then, in 1957, joined Ultra Violet Purification Systems, Inc. ("UVPS"), which was founded by my father, George Ellner, in 1933. I became the Chief Executive Officer of UVPS in 1964 and remained in that position until my retirement in 1991.

4. As summarized in my resume, while the CEO of UVPS, UVPS pioneered the development of UV disinfection equipment for wastewater applications. For example, UVPS engineered and designed the first open channel wastewater system (in Suffern, N.Y.) in the mid 1960's, and UVPS worked with the City of Madison, Wisconsin to establish the specifications for the first 100 million gallon per day wastewater UV system in the mid 1980's.

5. I also developed while at UVPS numerous innovations relating to the UV disinfection of wastewater and obtained a number of patents which are summarized in my resume. During

my tenure as CEO of UVPS, UVPS played a major role in the creation and development of the UV wastewater disinfection industry, and was involved in the design, fabrication and installation of numerous UV wastewater disinfection systems throughout the United States, both public and private.

6. The UV disinfection systems developed by UVPS included systems in which the UV lamps were configured horizontally perpendicular to flow, horizontally parallel to flow and vertically perpendicular to flow. We eventually concentrated on systems with the lamps configured vertically, perpendicular to flow, because this configuration had more advantages. We continued to design and install horizontal sytems as well, however, because vertical systems require a minimum channel depth, which is not always available.

7. Because the large scale UV disinfection of wastewater was a new industry in the 1980's, engineers responsible for designing wastewater treatment plants generally had not either had the opportunity for formal education in the design of UV equipment or any experience in drafting design specifications for UV disinfection equipment. Accordingly, we sought to inform them through seminars and assist them in the drafting of specifications,

we encouraged them to use performance specifications. As other companies entered the industry, there was a trend towards the preparation by manufacturers of sample specifications that were biased in favor of their own products and, in order to compete in this environment, all manufacturers were essentially forced to do the same.

8. In the latter half of the 1980's, Trojan Technologies ("Trojan"), out of Canada, emerged as the principal competitor of UVPS. Trojan elected to concentrate on horizontally configured systems and to market them to municipalities and their engineers as having technical advantages over the vertical systems that UVPS was promoting. It became a standard marketing ploy for Trojan to provide sample specifications to plant designers based on Trojan's horizontal system and to include a provision explicitly stating that systems with the lamps oriented perpendicular to flow were not acceptable. The purpose was solely to exclude UVPS (and any other supplier) from being able to bid its more efficient systems in competition with Trojan's horizontally configured systems.

9. During the 1980's, UV systems were all based on low pressure UV lamps. It was not until the 1990s that Trojan

developed its proprietary medium pressure UV systems that require fewer lamps and less space but are vastly less efficient than low pressure UV systems in that they require much more power to produce the same level of UV intensity. The "pressure" in UV lamps refers to mercury vapor pressure. This practice by Trojan of lobbying engineers to exclude vertically configured systems preceded its introduction of medium pressure systems to the market.

10. Another practice that developed in the 1980's was the lobbying of specification writers by UV manufacturers, particularly Trojan, to insert experience requirements tailored to prior installations of its own equipment which would operate to exclude the systems of its competitors. This is one of the reasons that the federal Environmental Protection Agency, which frequently subsidizes improvements to municipal wastewater treatment plants, adopted regulations designed to curb this practice and provide for bonding in lieu of satisfying the overly stringent experience requirements that were stifling competition among equipment suppliers.

11. A few years prior to my retirement in 1991, the ownership of UVPS was sold to Bradford White Corporation, who then sold it to a Swiss company, Katadyne. Shortly after my retirement, in 1992, the assets of what had been UVPS were sold by Katadyne to Infilco Degremonte, Inc. ("IDI"), a company that up until then had been in the water treatment business, but not the UV disinfection of wastewater. IDI subsequently continued marketing principally vertically configured UV disinfection systems, with designs and technology developed by UVPS. IDI, along with a relatively new arrival in the industry, Wedeco, are currently the principal competitors of Trojan. There are also a number of smaller manufacturers including UTS, which was founded by my son, Greg Ellner, along with two other individuals. Greg Ellner initially learned about the business of UV disinfection while employed at UVPS.

12. I have been asked to review the UV disinfection equipment specification drafted by GMP Associates ("GMP") for the City and County of Honolulu (the "City") for the Wahiawa Wastewater Treatment Plant (the "Plant") and various documents relating to its preparation and its interpretation by GMP and the

City in relation to the UV equipment bid by Ultra Tech Systems, Inc. ("UTS") and submitted by Bodell for approval prior to installation, which submittals were rejected by GMP and the City. I have done so, and my opinions regarding the specification and its interpretation are as follows.

13. First, the specification, a copy of which is attached hereto as Exhibit "2," is primarily a "performance" specification, rather than a "design" specification. This is because it does not specify the critical design elements of any UV equipment design -- the number and spacing of the UV lamps. Instead, in section 2.3, it establishes "design criteria" and sets a "performance requirement" but leaves to the manufacturer the responsibility of determining how many lamps in what arrangement it will take to satisfy the performance requirement.

14. Secondly, even though it is a performance specification, it nonetheless contains elements that would normally only be found in a design specification. These are contained in section 2.4, "Design, Construction and Materials." Particularly noteworthy is 2.4 A. 3. which states:

> The system shall be designed for complete

immersion of the UV lamps including both electrodes and the full length of the lamp in the effluent. Both lamp electrodes shall operate at the same temperature and be cooled by the effluent. The major axis of the UV lamps shall be horizontal and parallel to flow. UV systems that operate with lamps placed perpendicular to the flow are unacceptable.

15. The foregoing paragraph is similar to language that Trojan has used in sample specifications it has provided to plant designers since the 1980's to exclude the vertical systems of its competitors. Indeed, I have been provided a copy of the Trojan sample specification supplied to GMP for the Plant, a copy of which is attached hereto as Exhibit "3," and note that the foregoing paragraph (along with most of the rest of the specification) was taken by GMP from the Trojan sample specification.

16. In my opinion, there is no legitimate design, engineering or operational reason — other than the unavailability of adequate channel depth, which was not the case on this project — for a UV disinfection equipment performance specification to exclude vertically configured lamps. What matters is the spacing and the number of lamps – regardless of whether they are configured vertically or horizontally. If a designated UV dosage or microbial kill

rate is desired, a performance specification should simply specify the parameters and leave to the manufacturer design issues such as the orientation, number and spacing of the lamps.

17. While the specification names Trojan's System UV 4000 under the "Products" heading of Part 2, it does not purport to be a "sole source" specification because it states that:

> UV system shall be System UV 4000™, as manufactured by Torjan Technologies, Inc. **or equal**. (Emphasis added).

18. The specification goes on to list, in 2.1 B., the requirements that alternate systems must meet — essentially the performance requirement of 2.3 and being able fit in the available space on site. The specification does not, however, expressly state that alternate systems need not comply with the "Design, Construction and Materials" requirements of 2.4 although this could be implied from the failure of 2.1 B to reference 2.4 as being among the requirements that alternate systems must meet. In this regard, the specification is poorly written and ambiguous regarding what elements of 2.4, if any, must be satisfied by an alternate system. In my opinion, this stems from GMP's lack of knowledge in UV equipment design and inappropriate inclusion of design

elements it obtained from Trojan with a performance specification that, in theory, leaves the design elements to the system manufacturer.

19.  I have also reviewed the General Instructions to Bidders issued by the City with regard to the Plant, a copy of which is attached hereto as Exhibit "4," with regard to the prequalification procedure for alternates to listed brands, the request for pre bid approval of the UTS system, a copy of which is attached hereto as Exhibit "5," and the City's approval letter, a copy of which is attached hereto as Exhibit "6." I have been asked for my opinion regarding whether it was reasonable for Bodell to use the price quote it obtained from UTS in reliance upon the City's December 9, 1999 approval letter.

20.  In my opinion, it was reasonable for Bodell and any of the other bidders to use UTS' price quote for its UV disinfection system in reliance upon the City's approval letter for the following reasons.

21.  First, the approval letter states that the UTS UV system is approved "for bidding purposes only." While I have never seen that phrase used before, I have been involved with the bidding of numerous UV systems to numerous municipalities and I cannot

conceive of what this might mean other than that Bodell would be entitled to rely upon the approval letter to utilize the UTS price in its bid. That seems to be the entire purpose of the prebid qualification procedure and if this were not so, then the letter has no value to bidders and could only serve to mislead them.

22. Second, the letter is qualified with the following statement:

> Final approval is subject to review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract documents.

Because the specification is a performance specification, any prebid qualification of UTS as an approved manufacturer would obviously not change the fact that UTS would still have to design and submit drawings for a system that would fit in the available space and satisfy the performance requirement of the specification. Thus, even if the letter did not contain this qualification, it would be implied. Bodell would nonetheless be entitled to rely on the fact that the City had determined that UTS, like Trojan, was a qualified manufacturer whose price could be relied upon subject to UTS, or Trojan, designing and submitting a system that could meet the

performance requirements of the specification.

23. It is my understanding based upon my review of the documents and other information provided to me that GMP and the City ultimately rejected the UTS submittal of a horizontal low pressure system on the grounds that UTS did not demonstrate that it satisfied the following portion of the experience requirement listed under 1.2 A., "Qualification Requirements:"

> The manufacturer shall submit at least five (5) permanent wastewater installations using this equipment type, in North America, disinfecting a peak flow of 5 MGD or greater for at least one (1) years.

Specifically, I have been advised that the list of prior installations submitted by UTS to satisfy this requirement included many vertical systems but only one horizontal system of the specified flow rate and that the City and GMP refused to consider UTS' vertical systems to be of the same "equipment type" as the horizontal system submitted for the Plant.

24. First, it is my opinion that the phrase "equipment type" as used in the specification is broad enough to include UTS' vertical low pressure systems. The technology is the same; the equipment

is the same, consisting of the same lamps, ballasts, sensors, intensity monitors and alarm systems. Only the orientation of the lamps is different – but as previously explained, this does not affect the performance of the system. In my opinion, therefore, it was manifestly unreasonable for GMP and the City to exclude vertical systems from its evaluation of UTS' experience.

25.   Secondly, it is my understanding that the specification was not represented to bidders to be a "sole source" specification but rather a performance specification in which performance and price, based on competitive bidding, not features of the design peculiar to the design of a single manufacturer, would be the basis of selection. But if the manufacturer qualification requirement is restricted to manufacturers who had, as of the bid date, installed only horizontal systems at the specified number of plants with the specified flow rates, Trojan is the only manufacturer who would qualify. This effectively would turn the specification into a sole source specification based on a design feature of Trojan that is neither listed in the performance requirement of 2.2 B. nor in the requirements for alternate systems set forth in 2.1 B. of the specification. At a minimum, the specification is ambiguous

regarding what is meant by "this equipment type," and it was reasonable for UTS to interpret it to include vertically oriented UV systems.

26. It is my understanding that GMP's design principal for the Plant, Lee Mansfield, testified that he made an inquiry with Art Shapiro of IDI just prior to the City's final rejection of the UTS submittal to determine whether IDI could have met the experience requirement if interpreted to be restricted to horizontal systems. He was apparently faxed a list of installations by Mr. Shapiro that purportedly convinced him that IDI had at least 6 such systems with the minimum flow rate of 5 MGD (million gallons per day). A copy of the referenced fax is attached hereto as Exhibit "7."

27. I have reviewed the IDI list. Five of the six installations on that list were systems that were designed, manufactured and installed by UVPS while I was still its president and before the assets of UVPS were sold to IDI. Further, it is my understanding that IDI, after it acquired the assets of UVPS, concentrated on the design and manufacture of vertical systems rather than horizontal systems for the same reasons that UVPS had previously. Based on my knowledge of the industry, Trojan is the only manufacturer in

existence at the time of this bid that had installed at least five horizontal UV systems at plants in North America with a peak flow rate of 5 MGD or greater. Therefore, unless "this equipment type" as used in 2.1 A. is interpreted to mean UV wastewater disinfection equipment generally, without regard to lamp orientation, the specification was a *de facto* sole source specification that no manufacturer other than Trojan could have met.

28. I have also been asked for my opinion regarding whether the list of prior installations required in 2.1 A. is a "feature" of the UV equipment as that word is used in section 1.13(b) of the General Instructions to Bidders (Exhibit "4," attached) that should have been listed as a "variance" from the specified equipment. In my opinion it is not. In my opinion, a reasonable bidder would interpret the word "feature" to refer to the physical features of the equipment. This is reinforced by the requirement that the request for substitution be accompanied by "technical brochures" sufficient to explain the variant features. Technical brochures typically

12/12/2005  00:14    9142053031                    SID                              PAGE  01

address the physical features of the equipment — not a list of prior installations.

I declare under penalty of law that the foregoing is true and accurate.

DATED: Bedford, New York  11 December 2005

*Sidney Ellner*
SIDNEY ELLNER