ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 23 2006

at ___10___ o'clock and ___30___ min. ___A___ M
SUE BEITIA, CLERK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation, | ) | Civil No. 03-00706 (JMS/LEK) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM IN SUPPORT |
| | ) | |
| OHIO PACIFIC TECH, INC. f/k/a GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; UTS SYSTEMS, INC., a foreign corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

1103825.1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation, | ) Civil No. 03-00706 (JMS/LEK) |
| | ) |
| Plaintiff, | ) |
| | ) CROSS-CLAIM DEFENDANT/CROSS- |
| v. | ) CLAIM PLAINTIFF ULTRATECH |
| | ) SYSTEMS, INC., and THIRD PARTY |
| OHIO PACIFIC TECH, INC. f/k/a GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; UTS SYSTEMS, INC., a foreign corporation, | ) DEFENDANT/CROSS-CLAIM PLAINTIFF |
| | ) ENGINEERED SYSTEMS, INC. Motion for |
| | ) Partial Summary Judgment Against the City and |
| | ) County of Honolulu and Ohio Pacific Tech f/k/a |
| | ) GMP Associates, Inc., on UTS' and ESI'S |
| Defendants. | ) Cross Complaints and Dismissing the Cross- |
| | ) Claims Brought Against UTS and ESI by the |
| | ) City and GMP |
| | ) |
| | ) |
| | ) |
| | ) |

**CROSS-CLAIM DEFENDANT/CROSS-CLAIM PLAINTIFF ULTRA TECH SYSTEMS INC., and THIRD PARTY DEFENDANT/CROSS-CLAIM PLAINTIFF ENGINEERED SYSTEMS INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS OHIO PACIFIC TECH, INC., f/k/a GMP ASSOCIATES, INC., and THE CITY AND COUNTY OF HONOLULU**

Cross-Claim Defendant/Cross-Claim Plaintiff UltraTech Systems Inc. ("UTS") and

Third-Party Defendant/Cross-Claim Plaintiff Engineered Systems Inc. ("ESI") hereby move this

Honorable Court pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 56(c) for an Order

granting:

I.       Partial Summary Judgment in favor of Cross-Claim Defendant/Cross-Claim Plaintiff UltraTech Systems Inc. on Counts One and Two of its Cross-Claim dated December 15, 2004 against the City and County of Honolulu (the "City"), and Ohio Pacific Tech, Inc., f/k/a GMP Associates Inc., ("GMP");

II.      Partial Summary Judgment in favor of Third-Party Defendant Engineered Systems, Inc., on Counts One and Two of its Cross-Complaint dated May 25, 2005 against the City and County of Honolulu (the "City") and Ohio Pacific Tech, Inc., f/k/a GMP Associates Inc. ("GMP");

II.      Dismissal of the cross-claims brought by GMP against UltraTech Systems Inc., by way of GMP's cross-claim dated March 29, 2004;

III.     Dismissal of the cross- claims brought by the City against UltraTech Systems Inc. and Engineered Systems Inc. by way of the City's cross-claims dated October 12, 2004; and

IV.     For such other further and different relief as the Court deems just and proper.

This Motion is brought pursuant to Rules 7 and 56 of the Federal Rules of Civil Procedure ("FRCP") and Rule 56.1 of the Local Rules of Practice for the United States District Court of the District of Hawaii, and is based upon the memorandum attached hereto, the Concise Statement of Facts, Exhibits, Declarations, and Affirmations filed concurrently herewith, the records and files herein, and such other matters as may be presented to the Court at the hearing on the Motion.

1103825.1

DATED:      White Plains, New York
            February 17, 2006

                          Yours, etc.,

            WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

                    By:   _____
                          Adam R. Bialek
                          *Attorneys for Cross-Claim Defendant/*
                          *Cross-Claim Plaintiff*
                          **ULTRA TECH SYSTEMS, INC.**
                          *And Special Counsel to Third Party Defendant/*
                          *Cross-Claim Plaintiff Engineered Systems, Inc.*
                          *For This Motion*
                          3 Gannett Drive
                          White Plains, New York 10604
                          Tel: (914) 323-7000
                          Fax: (914) 323-7001
                          File No. 08167.00001

## TABLE OF CONTENTS

INTRODUCTION

BACKGROUND.................................................................... 3

    A.   The U.V. disinfection industry...............................................3
    B.   The Honouliuli Project.......................................................3

PERTINENT FACTUAL EVIDENCE.........................................4

**I.    UTS AND ESI SHOULD BE AWARDED PARTIAL SUMMARY JUDMGMENT ON COUNTS ONE AND TWO OF THEIR CROSS-CLAIMS AS THE CITY AND GMP INTENTIONALLY AND/OR NEGLIGENTLY INTERFERED WITH THE BUSINESS RELATIONSHIP BETWEEN UTS, ESI, AND BODELL CONSTRUCTION COMPANY. .................................................4**

    A.   THE WAHIAWA WWTP PROJECT.....................................4

        1.   GMP as an agent of the City, was committed to having the Trojan Technologies, Inc.'s U.V. equipment installed at the Wahiawa WWTP project............................................................................4

        2.   Requests for consideration by other manufacturers were ignored...........6

    B.   ULTRATECH SYSTEMS, INC. ("UTS") AND ENGINEERED SYSTEMS, INC. ("ESI") SEEK PRE-BID APPROVAL FOR UTS' U.V. SYSTEM...........7

        1.   Cyril Hamada overrules GMP's denial of UTS' substitution request.......7

        2.   Bodell Construction Company ("Bodell") was awarded Contract No. F-97110 (the "Contract") for the design and construction of the Wahiawa WWTP...............................................................................

        3.   Upon realizing that Bodell's winning bid was based on UTS' U.V. disinfection system, a systematic effort was begun by the City, GMP, and Trojan and its local representative, Hawaii Engineering Services ("HES") to eliminate UTS from the contract, and replace it with Trojan's disinfection system. ...........................................................8

        4.   The City never follows through on re-bidding the U.V. equipment........10

        5.   The contract was executed by the City and Bodell on February 25, 200..10

6.    GMP remained intent on disqualifying the UTS system from the Wahiawa
      project. ...............................................................................................11

7.    GMP requests a "pre-submittal" from UTS......................................11

8.    Hawaii Engineering Services ("HES"), Trojan, together with GMP and the
      City conspire to disqualify UTS..............................................12

9.    The City and its agent GMP impermissibly and inextricably released
      UTS' confidential and proprietary information......................  14

10.   GMP "creates" reasons to reject UTS' proposal............................15

11.   The UTS system is ultimately rejected because of the experience
      requirement, rather than any legitimate performance concern.............16

12.   Ultimately, the UTS system was rejected, and Bodell was forced to
      purchase the Trojan system.....................................................17


C.    LEGAL STANDARD..................................................................18

D.    LEGAL AND FACTUAL SUPPORT FOR REQUEST FOR SUMMARY
      JUDGEMENT........................................................................  18

1.    A contractual relationship existed between UTS and Bodell...............20

2.    The City and GMP knew that Bodell had relied on the UTS U.V. and yet
      continued to interfere with Bodell and UTS' relationship by delaying the
      Project and putting roadblocks in UTS' path................................20

3.    The City and GMP allowed UTS and ESI to continue
      to expend time and money meeting the contract deadlines in vain........ 22

4.    The City and GMP intentionally interfered with the relationship between
      UTS and Bodell....................................................................23

5.    The City and GMP have no justification for intentionally and/or
      negligently interfering with UTS and Bodell's business relationship......24

6.    The City and GMP's repeated interference with Bodell and UTS's
      relationship resulted in UTS ultimately being denied acceptance after
      spending tens of thousands of dollars and months of work to get
      approval for its equipment which GMP and the City never intended to
      grant...............................................................................25

II.    **GMP'S CLAIMS AGAINST ULTRATECH SYSTEMS, INC. SHOULD BE DIMISSED AS THEY ARE BASELESS AND WITHOUT MERIT**..................26

III.   **THE CITY'S CLAIM AGAINST ULTRATECH SYSTEMS, INC. AND ENGINEERED SYSTEMS INC. ("ESI") SHOULD BE DISMISSED AS BASELESS AND WITHOUT MERIT**.......................................................27

     A.    The Pre-Bid Substitution Request Offered To The City Was Made In Good Faith and Was Accurate......................................................................27

     B.    Cyril Hamada's Decision To Approve UTS Was Based on His Own Independent Review of the Relevant Documents.................................28

IV.    **CONCLUSION**....................................................................................30

## TABLE OF AUTHORITIES

### CASES

Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000)....................................18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)..........................................18

CCTW&M v. United States, 452 F. Supp. 69, 78, (D. N.J. 1978)...................................24

Kutcher v. Zimmerman, 87 Haw. 394 (Haw. Ct. App. 1998) ........................................18

Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,587 (1986) ...............…...18


UCSF-Stanford Health Services vs. Hawaii Management Services, 58 F. Supp.2d 1162; (D. Hawaii 1999) ...........................................................................................................27

### STATUTES

Fed. R. Civ. P. 56 ( c) ........................................................................…..............18

Haw. Rev. Stat. §103D-101 ........................................................................…..23

Haw. Admin. R. §3-122-10 ..................................................................…...........24

### MISCELANEOUS

Restatement (Second) of Torts (1977) §552 ...............................................….27

## MEMORANDUM IN SUPPORT

## INTRODUCTION

The cross-claims brought by UltraTech Systems Inc. ("UTS") and Engineered Systems, Inc. ("ESI") against the defendants City and County of Honolulu ("City") and Ohio Pacific Tech, Inc. F/K/A GMP Associates, Inc., an Ohio Corporation ("GMP") arise from the collaboration and deliberate efforts undertaken by both defendants to interfere with UTS' and ESI's business relations and purposefully remove UTS' equipment from the Wahiawa Waste Water Treatment Plant ("WWTP") project. As a result, UTS lost hundreds of thousands of dollars in business as well as expenses in preparing and engineering the equipment submittals for the Wahiawa WWTP. In addition, UTS lost the residual income from replacement equipment which would have followed had there been no interference with its relationship (including the agreement it entered into) with the project's general contractor, Bodell Construction Company ("Bodell"). In addition, ESI, UTS' authorized representative, lost a significant commission and expended resources in the futile attempt to consecrate the agreement with Bodell when the City and GMP had previously determined that UTS' and ESI's efforts would fail.

After a public bid, Bodell was awarded the contract for the construction and installation of an ultraviolet disinfection ("U.V.") system at the Wahiawa WWTP. Its winning bid included the U.V. system designed and manufactured by UTS. Pursuant to being awarded the contract, both Bodell and UTS began to work on the engineering and equipment submittal plan for construction of the system. From the time the bids were first opened, the City and GMP knew that Bodell's winning bid included the UTS system, and the City and GMP realized that UTS began working with Bodell to meet the specifications. However, unbeknownst to UTS, an effort

was immediately begun by the City and GMP to remove the UTS system from the project, and have it replaced by a U.V. system manufactured by Trojan Technologies, Inc. ("Trojan").

To date, there has been no reasonable justification offered by the City or GMP concerning their conduct during the submittal and review process that led to the final rejection of UTS. The claim that UTS failed to meet the specifications as called for under the contract is without merit.

- UTS was qualified and approved during the pre-bid process;
- UTS was further accepted when Bodell's itemized bid, including the UTS system was accepted; and
- UTS was again accepted when the City executed a contract with Bodell in February of 2000, knowing that UTS system was part of the contract.

Despite these clear steps indicating that the City and GMP accepted UTS' system, the City and GMP ultimately refused to approve the UTS equipment, essentially concluding that UTS failed to meet the "experience requirement" in the specification. The evidence shows that this "experience requirement" was at best ambiguous and a reasonable interpretation shows that UTS more than met the requirement (assuming it even had to meet the requirement).

All other claims by the City and GMP that the UTS system did not meet the specification were deminimus, irrelevant, or inaccurate. It is obvious that a decision had been made in January of 2000 or earlier, days after the bid was awarded to Bodell, to do whatever was necessary to remove UTS from the project. The subsequent farce that was carried out by the City and GMP to convince Bodell and UTS to expend resources and to jump through the proverbial "hoops", only to later disqualify UTS on "experience" grounds was merely a red herring. This charade increased UTS' damages as it continued to try and meet the demands of the City and GMP, which would never be met, due to the defendant's pre-determination to utilize the Trojan system.

UTS was economically damaged in lost profits, in time and money spent trying to qualify in vain, and in lost profits that would follow from continuing to provide replacement lamps and equipment to the City after the U.V. system installation at Wahiawa.  ESI was likewise damaged.

## BACKGROUND

**A.    Trojan's stature emerges in the U.V. disinfection industry**

Starting in the 1980's, Trojan, a Canadian based manufacturer, emerged to become the largest manufacturer of U.V. systems for wastewater disinfection.  Trojan concentrated on supplying horizontal configured systems.  Other manufacturers of U.V. disinfection equipment included Infilco Degremont, Inc. ("IDI"), Wedeco, and UTS.

Trojan became infamous for supplying sample specifications to plant designers which were based on Trojan's horizontal system. See S. Ellner Decl., Exhibit 27.  These specifications included a provision that vertical systems were not acceptable.  This language effectively excluded the competition from bidding on these projects.  Nevertheless, since many of the wastewater plants are owned by governmental entities, the primary manufacturers in the industry have recognized the preference for competitive bids and have focused on performance rather than design in determining whether they can satisfy the governmental goals.

**B.    The Honouliuli Project**

While U.V. disinfection has been a viable technology since the 1960's, the City of Honolulu only began to explore this technology in the late 1990's when it undertook a project to install a wastewater treatment plant at Honouliuli.  As in the Wahiawa project, the City retained the engineering firm, GMP, to draft the specifications for the WWTP.  GMP's specifications were based on the Trojan 4000.  Lee Mansfield, the principal of GMP in charge of both the

Honouliuli and Wahiawa projects, has admitted to having a long history and friendship with Mike Elhoff, Trojan's local representative in Hawaii. See, Exhibit 1, at pages 91-93.

The winning bid for the U.V. equipment at Honouliuli went to Trojan, but the project never materialized after IDI submitted a post-bid protest. IDI's objection not only caused the cancellation of the project, but prompted James Honke, the Chief of the City's Division of Infrastructure Design and Engineering, to issue a memo citing the City's <u>opposition</u> to using **proprietary** equipment. See, Exhibit "2". Specifically, Mr. Honke remarked, "We strongly discourage the use of proprietary equipment in the preliminary report." Mr. Honke's memo even makes reference to the problems at Honouliuli, noting that "the use of proprietary equipment will cause bidding protests". See, Exhibit 2 at ¶3. It became clear that the City could not afford to have a sole source proprietary system and a competitive bid would be required.

Despite the complaints received after basing the Honouliuli specifications on the Trojan system, the City, nevertheless, again based its specifications for the Wahiawa WWTP on the Trojan 4000.

## PERTINENT FACTUAL EVIDENCE

**I.    UTS AND ESI SHOULD BE AWARDED PARTIAL SUMMARY JUDGMENT ON COUNTS ONE AND TWO OF THEIR CROSS-CLAIMS AS THE CITY AND GMP INTENTIONALLY and/or NEGLIGENTLY INTERFERED WITH THE RELATIONSHIP BETWEEN UTS, ESI HAD WITH BODELL CONSTRUCTION COMPANY**

**A.    THE WAHIAWA WWTP PROJECT**

1.    GMP as an agent of the City, was committed to having the Trojan Technologies, Inc's. U.V. equipment installed at the Wahiawa WWTP project.

It has become obvious through the discovery disclosed during this litigation that Trojan's local representative, Mike Elhoff of Hawaii Engineering Systems ("HES"), along with Trojan, colluded with GMP (the City's engineer) to ensure that the Trojan 4000 was installed at

Wahiawa. In early 1999, Jay Stone acquired a copy of a Trojan specification and submitted this to his word processing department. See Exhibit "3". From the beginning of the design of the Wahiawa WWTP, GMP clearly evidenced an intent to have the Trojan system installed at Wahiawa, while creating a façade to meet Mr. Honke's expressed concern that there be no appearance of a sole source specification. The specification diskette was supplied to GMP by Mike Elhoff of HES. See Exhibit 32, page 233. Subsequently, Trojan's specification became the basis for the Wahiawa specification. It was drafted with the obvious intent of excluding competition, yet giving the appearance that it was not a "sole source" specification. However, the specification contained enough proprietary language that if read literally, without regard to the "alternative" availability, would result in a de facto sole source specification.

For example, Section 2.4, "Design, Construction and Materials," sub (a) (3) sets forth:

**The major axis of the U.V. lamps shall be horizontal and parallel to flow. U.V. systems that operate with lamps placed perpendicular to the flow are unacceptable**.

Trojan's common practice of deliberately drafting the language to exclude competition is transparent, yet GMP failed, either negligently or intentionally, to revise the specification to make it clear whether the specification was a "performance" or "design" specification, thus rendering the lamp orientation irrelevant. Since Trojan was offering only horizontal systems, this would seemingly eliminate Trojan's chief competitor, IDI (a supplier of vertical systems). But, if the specification was considered a "design specification", it would be a de facto sole source specification. If it is viewed as a "performance specification," then alternate systems should be acceptable, (which is addressed in paragraph 2.1B). Yet GMP, Trojan and its representative, sought to limit competition by intentionally or negligently drafting the specification ambiguously to convince competitors not to bid.

**2.      Requests for consideration by other manufacturers were ignored**

Despite the initial appearance of the job being specified around Trojan, another U.V. supplier, IDI, was communicating with GMP in August 1999, representing that its "vertical" low pressure system could fit in the space called for in the specification for the WWTP.[1]    Upon learning of this potential threat to Trojan, Jay Stone of GMP immediately emailed Mike Elhoff, asking him to determine if the Trojan low–pressure system could fit in the space provided, while informing him that another vendor had made the claim that their system could.  See e-mail from Jay Stone, attached as Exhibit 4.  It is odd that the City's designer would proceed in this fashion, unless it was trying to protect its relationship with Trojan.

Mr. Elhoff then worked with Trojan and GMP to exclude any challengers to Trojan. The bidding of City contracts is designed to be "competitive", yet, throughout the Wahiawa Project, the City's engineer, and the City itself, was dealing and communicating with Trojan's representative, to the detriment of other competitors and ultimately to the citizens of Honolulu.

The intimacy of the relationship between the City, GMP and HES can be seen through the constant correspondence between Elhoff of HES and GMP.  On August 18, 1999, GMP followed up with HES about IDI's claim that its system would be a viable alternate.  This email, attached as Exhibit "5", included a chain of emails, one of which was between HES and Trojan, stating, "IDI is knocking on the door. Between Kailua, Kona Airport, and this, they are a thorn in our side".   Clearly, HES was not shy about hiding its anti-competitive spirit and intent from its friends and partners at GMP.

---

[1]  Significantly, paragraph 2.1B of the specification (Exhibit 25) only required an alternate to meet two requirements to be acceptable: 1) The alternate system must be capable of meeting the specified performance requirements, operate in an open channel, be of modular design, use UV lamps with electronic ballasts, and incorporate a cleaning system; and 2) The alternate system must be suitable for installation in the limited available space at the site.

IDI's inquiry was totally ignored as GMP became satisfied that the project would fall to Trojan, provided the specification was drafted to appear as an open bid, yet it would contain enough restrictions to deter IDI. See Exhibit 6. Ultimately, the plan worked and IDI did not solicit this job.

**B.    UTS AND ESI SEEK PRE-BID APPROVAL FOR ITS UTS' U.V. SYSTEM**

On November 18, 1999, UTS's local representative, ESI, submitted UTS' technical specifications and product brochures to the City for advance approval as an "equal" to the Trojan System. This advance approval was needed for contractors to rely upon in using UTS' quote, a fact known to the City and GMP. It was understood that if approval was granted, the City was accepting the manufacturer as qualified as an alternate. UTS' request was routed to GMP for comment, who within 3 business days flatly rejected the request on the grounds that the information submitted was inadequate to "determine suitability", not withstanding the fact that the City had already approved a UTS system for use at Kailua. See Exhibit 7. 1

**1. Cyril Hamada, the City's Project Engineer, overrules GMP's denial of UTS submission**

Despite GMP's recommendation to reject the UTS submission, the project engineer at the City reviewed the UTS proposal, and decided to override GMP's rejection. This was well within his authority, especially since he had prior experience with UTS. In a memorandum written "To the Record", City Engineer Cyril Hamada of the City's Design Division, overruled GMP's denial of UTS's submission for pre-bid approval. His memorandum, attached hereto as Exhibit 8, notes that UTS should be allowed to bid provided they meet all the requirements, and notes "this is a case of de facto approval since these are the units that are being installed at Kailua WWTP."

Following Mr. Hamada's analysis, a letter was drafted by the City and sent to ESI on December 9, 1999, confirming that UTS was approved "for bidding purposes only". See, Exhibit 9. UTS' purpose for requesting the City to review its product information and technical

specifications was to get the City's approval, in writing, for contractors to use price quotations from UTS in the preparation of their bid proposals to the City, and ultimately, for the successful bidder to purchase and install a UTS U.V. disinfection system at Wahiawa. Since the specification was a "performance specification," the UTS system was therefore accepted, provided it could fit within the allotted space and meet the specified disinfection requirements.

**2.    Bodell Construction Company ("Bodell") wins bid for the design and construction of the Wahiawa WWTP using UTS' price quote.**

After receiving the City's approval letter, ESI sent a copy of UTS' scope of supply to several contractors, including Bodell. The materials submitted to Bodell by ESI included a copy of the City's December 9, 1999 letter. The price quote for the Trojan system, as submitted by HES, was substantially greater than UTS' offer. Bodell, as well as a number of other contractors, relied on the bid submitted by UTS, and ultimately was successful in being awarded the contract by the City.

**3.    Upon realizing that Bodell's winning bid was based on UTS' U.V. disinfection system, a systematic effort was begun by the City, GMP, and Trojan and its local representative, HES to eliminate UTS from the contract, and replace it with Trojan's U.V. disinfection system.**

As soon as the bids were opened on December 16, 1999, and Mike Elhoff at HES realized that the winning bid by Bodell did not include the Trojan system, he contacted Guy Inouye (Mr. Hamada's supervisor) to question what had gone wrong. This phone call was followed up by a fax from Jay Stone of GMP to Guy Inouye, attaching a copy of the prior rejection recommendation made to Mr. Inouye. See Exhibit 10. At Mr. Inouye's deposition, he stated that he was unaware of GMP's recommendation to reject the UTS system, and acknowledged that overruling GMP's recommendation had opened the City up to liability. See Exhibit 11 at pages 59-61.

On December 27, 1999, a meeting was held at the City with members of the design team and the City's Corporation Counsel. A decision was apparently made by the City to delete Bid Item 81 (the U.V. equipment) from the contract. This decision was explained in a December 30, 1999 post-meeting email from Guy Inouye. See Exhibit 12. The City explained their plan to exclude UTS and delete the U.V. disinfection units from the Basic Bid, and to then procure the system separately as "Government Furnished Equipment" (despite the prior inclination to avoid proprietary equipment).

The City took this action at the behest of HES and Trojan, evidenced in minutes of a January 10, 2000 "Management Team Meeting" which confirmed that the decision to delete the UTS system was made because "another vendor complained." See Exhibit 13. Furthermore, an email from Mike Elhoff to Trojan outlines how he met with the City "days after the bid opening". See Exhibit 14. This correspondence also notes that Mr. Elhoff told Mr. Bodell prior to bid opening that UTS would not be approved. How did Mike Elhoff know that UTS would not be approved? It is respectfully submitted that Mr. Elhoff must have held that belief because his friends and partners at GMP promised that UTS would not be approved.

Despite the City's December 9, 1999 approval of the UTS system, the City and GMP clearly had a strong desire to ensure that the Trojan system would be purchased and installed rather than the UTS U.V. system. This despite the fact that the Trojan system was approximately $600,000 to $800,000 more expensive than the UTS system.

The timing of this decision is interesting. Only days had passed since the bids were opened and Bodell was found to be the lowest bid. No time had passed in which there could be any substantive reasons found to not use the UTS system. The UTS submittal had yet to be prepared, let alone been reviewed or inspected -- nothing had transpired. Furthermore, the UTS

system was offered at a significant savings over the Trojan system. It is inexplicable why the City would be interested in spending taxpayer monies on a system which cost several times more than the UTS system and which would be significantly more expensive to operate.

**4.      The City never follows through on re-bidding the U.V. equipment**

After the January meeting, rather than purchase "Government Furnished Equipment" as mentioned at the City meeting, the City continued the charade and directed Cyril Hamada to prepare a re-bid of the U.V. disinfection equipment under bid Item #81. For reasons not illuminated during this litigation to date, this was never done. See, Exhibit 15.[2]

Despite its decision to delete the UTS equipment from the project, no steps were ever taken to follow through with finding a replacement, or officially informing Bodell or UTS that the UTS equipment was to be deleted and replaced. Rather, the City and GMP continued to allow UTS and Bodell to believe the UTS system could be used. Thus, both UTS and Bodell continued to expend time and resources planning and preparing to construct the equipment. Unbeknownst to UTS and Bodell, their time and effort was in vain, as the City and GMP had no intention of ever accepting the UTS system.

**5.      The contract was executed by the City and Bodell on February 25, 2000.**

Despite the fact that the City intended to delete UTS' U.V. disinfection system from the equipment and re-bid this portion of the contract (or purchase the "Government Furnished Equipment"), the contract, without change, was executed on February 25, 2000. Bid Item 81 remained intact, providing more reassurance to Bodell and UTS that the UTS system as pre-approved would be allowed. See, Exhibit 16.

---

[2] We note that the deposition of Cyril Hamada has not been concluded due to the fact that Mr. Hamada has yet to disclose additional documents which movants became aware of since his deposition commenced; and further, the City has not made Mr. Hamada available despite our numerous requests.

At this time, the City and GMP knew that Bodell was proceeding with the UTS system and the City executed the agreement without change or reservation.   The City and GMP allowed UTS to rely upon the City's commitment, and UTS continued to expend monies on engineering and preparing to meet the specifications for the system to be installed at Wahiawa.   Notably, there was no reason for UTS or Bodell to believe that UTS would not meet the specifications, as the City had proceeded with executing the contract without change.

6.    **GMP remained intent on disqualifying the UTS system from the Wahiawa project.**

A pre-construction site meeting was held on April 27, 2000 amongst the City, GMP and Bodell.   At the meeting, Bodell indicated its intent to proceed with the UTS system.   This was met with a statement from GMP's Jay Stone that the UTS system "would not meet the spec." Oddly, this statement was made <u>before</u> any review of the documents submitted by UTS.[3]   See, Exhibit 17 and 18.   Yet, the City still had not re-bid Item 81 or advised Bodell or UTS that Trojan would be used instead.

7.    **GMP requests a "pre-submittal" from UTS**

GMP then asked Bodell for a "presubmittal" of the UTS system "so that their sub-consultant could come up with knowledgeable questions".   See Exhibit 17 at ¶6.  GMP, however, did not employ a sub-consultant with respect to the U.V. disinfection equipment.   See Exhibit 31 at pages 112 and 128-130.   Rather, it was clear the "sub-consultant" GMP was referring to was Mike Elhoff at HES.[4]

The request for information from UTS was merely a way to get more ammunition for supporting a rejection of the UTS equipment.   Over the course of the next month, a series of

---

[3] Interestingly, Mr. Stone had never previously reviewed UTS' technical information to be able to even make such a statement.

[4] Even Mr. Mansfield conceded that someone could have assumed that Mr. Elhoff was GMP's sub-consultant. See p. 130 of Mansfield deposition, Exhibit 31.

emails and faxes were exchanged between GMP and HES, discussing ways to reject the UTS equipment.

**8.    HES and Trojan, together with GMP and the City conspired to disqualify UTS**

GMP, upon receiving the pre-submittal package, immediately shared it with HES, who forwarded the materials to Trojan, despite the fact that the pre-submittal contained a confidentiality provision describing its contents as proprietary (and despite the fact that Trojan was one of UTS's chief competitors).    The submittal package prepared by UTS specifically stated in prominent fashion:

> **The contents and drawings contained in this submittal package relate to proprietary subject matter. Any party assuming custody does so with the express understanding and agreement that neither receipt nor possession thereof confers or transfers any right to use, reproduce or disclose its contents or any part thereof, in any manner or for any purpose whatsoever. See Exhibit 34.**

This statement was clear as to its intent and was understood by GMP.  See Exhibit 32, pages 401-402.  GMP did not object to this designation, See Exhibit 31, pages 229-300.  GMP apparently disregarded this warning and proceeded to share UTS confidential information with one of its chief competitors.   In the engineering industry, it is understood that proprietary information, once received, is never to be released to any outside party, especially a competitor, without the express consent of the manufacturer.  To do so implies collusion and a prior intent to damage.

The release of UTS' proprietary information was a clear violation of accepted standards in the engineering industry, and in violation of every canon of ethics relied on in the industry. See Rules of Practice, National Society of Professional Engineers Code of Ethics for Engineers et al.; Exhibit 30.  The purpose for which the proprietary information was apparently released,

i.e. to allow UTS' competitors to criticize the submittal, is reprehensible.   It certainly does not meet the NSPE Fifth Fundamental Canon to "Avoid Deceptive Acts." See Exhibit 30.[5]

Evidence of the inappropriate relationship between HES, Trojan's representative, the City of Honolulu, and GMP can be seen in a series of emails discussing how HES could assist in criticizing UTS's submission.  After all, Mr. Elhoff and Trojan supplied the specification for just this reason.  Mike Elhoff's May 25, 2000 email to Trojan clearly sets forth the purpose of sharing UTS's information:

> **"Your assistance has been great in our effort to get UTS rejected".**
> **"I would like Ron's help with any ammunition regarding UTS, with respect to a database of UTS installations, 16-lamp module, and any competitive information you can provide from London. Please advise."**  See Exhibit 19.

Over the next six months, the City, GMP, and HES repeatedly communicated and met to discuss their efforts to remove UTS from the bid.  These meetings and discussions are reflected in e-mails and faxes between the parties over the subsequent months:

- On May 31, 2000 Mike Elhoff sends an email to Trojan stating "I met with Lee and Jay @ GMP regarding the issues. They want the following…"    (Exhibit 20).
- On June 1, 2000, Trojan sent Elhoff, who quickly forwarded it on to GMP, information that GMP had requested with respect to its review of the UTS pre-submittal.  The last paragraph of the cover memo states, "As far as the dose calculations on UTS's 1600 lamp system, please give me a call to discuss this issue." (Exhibit 21).
- On June 4, 2000, Mike Elhoff of HES provides to GMP a memo entitled, "Comments and Concerns on UTS Pre- Submittal". (Exhibit 22).
- On June 5, 2000 an email from Guy Inouye (a City employee) to other employees of the City notes that a meeting was held at the request of Mike Elhoff. The email states that "Mike" does not think an informal submittal is proper, that the UTS system does not meet the specifications called for; and that the approval was not proper. (Exhibit 23).

After reviewing these communications the following questions come to mind:

---

[5] Canon 4(f) of the American Society of Civil Engineers Code of Ethics specifically notes, "Engineers shall not use confidential information coming to them in the course of their assignments as a means of making personal profit if such action is adverse to the interest of their clients, employers or the public".

1) Why would the City release confidential information in violation of Hawaii's own rules on the release of trade secrets?

2) Why would the City and GMP be speaking with Trojan's representative long after the City executed a contract with Bodell knowing Bodell would be using the UTS system?

3) Why would Mike Elhoff, the representative of UTS' competitor, Trojan, have proprietary information of UTS to comment upon, let alone be given the opportunity to weigh in on the issue?

4) Why would Mike Elhoff's comments even be considered or have any merit with GMP or the City?

5) Why was GMP, the City-retained and paid engineer, soliciting the comments of HES, a manufacturer's representative of a different product?

6) Why was GMP acting on the comments and recommendations of HES to act against UTS, one of Trojan's competitors?

7) Why didn't the City and GMP approach Bodell or UTS about their concerns rather than going to HES and Trojan?

The answers seem clear. The City and GMP were working in concert to devise a way to reject UTS and compel Bodell to use the Trojan system without further and fairly compensating Bodell.

## 9. The City and its agent GMP impermissibly and inextricably released UTS' confidential and proprietary information

The City and GMP impermissibly and inextricably released this confidential and proprietary information to the local representative of a competitor for the purpose of soliciting assistance in rejecting the UTS system. This was a blatant intent to interfere with UTS' business relations with Bodell. At the very least, it was grossly negligent.

Basic tenets of an engineer's professional code of conduct forbid the sharing of proprietary and confidential information between competitors. See NSPE Code of Ethics, Exhibit 30. Yet, the City and GMP freely and quickly exchanged the information they requested and received from UTS, with its chief competitor, Trojan. The role of GMP as the City's

engineer and designer of the Wahiawa WWTP should have been to oversee the project and provide the engineering and mechanical expertise which the City's staff was lacking. What legitimate purpose could there possibly have been for GMP to collaborate with the Trojan representative, post –bid, and post-execution of the contract?

**10.    GMP "creates" reasons to reject UTS's proposal**

At GMP's direction, UTS, at considerable time and expense, drafted and made a formal submittal to GMP on August 31, 2000. See Exhibit 34. GMP rejected the submittal on September 11, 2000, specifying picayune matters to be addressed. These issues were immaterial and were addressed by further submittals. Submittal no. 30(a) was tendered on October 4, 2000 and returned by GMP <u>without review</u> on the same day. Submittal no. 30(b) was offered by Bodell on November 2, 2000, and returned by GMP <u>without review</u> on the same day. After threats of litigation by Bodell, the City agreed to receive the submittal. It was resubmitted on November 8, 2000, and rejected by GMP on November 28. Submittal no. 30(c) was given to GMP on December 19, 2000, and rejected by GMP on January 22, 2001. Interestingly, the City and GMP had already taken steps to procure the Trojan system in October, while this charade continued. See, letter from Bodell to Trojan confirming that GMP directed Bodell to provide the Trojan U.V. 4000 system and confirming discussions with Trojan. See Exhibit 33.

The reasons offered for GMP's rejection illustrated GMP's total lack of good faith. In one instance, GMP cited the fact that the crane for lifting the units out of the channel, the effluent weir and the rubber mats and grating for the walkways were being supplied by "other", rather than "by the UV supplier," as "unacceptable." See Exhibit 24. What possible good faith basis could GMP have had for insisting that the UTS supply the rubber mats for the walkway itself?

The critical focus of the project was the City's intent on meeting the Consent Decree with the State, which called for a clean-up of the outflow of the Wahaiwa WWTP that was going to Lake Wilson. UTS could meet this requirement.

Submittal after submittal was presented to GMP by Bodell. They were either rejected or returned without review. Nevertheless, UTS was able to address GMP's and the City's alleged "concerns," but to no avail. It was clear they wanted UTS out of the Project, and Trojan to supply its system.

## 11. The UTS system is ultimately rejected because of the experience requirement, rather than any legitimate performance concern.

Both UTS and Bodell repeatedly responded to GMP's meaningless comments in an effort to comply. Finally, despite threats of litigation by Bodell, GMP finally rejected UTS' system based on its failure to meet the "experience requirement", rather than any legitimate concern over the ability of the UTS equipment to satisfy the performance aspects of the specification. UTS' horizontal low pressure system was rejected on the grounds that it did not meet the following portion of the experience requirement listed under 1.2A, "Qualification Requirements:"

> The manufacturer shall submit at least five (5) permanent wastewater installations using this *equipment type*, in North America, disinfecting a peak flow of 5 MGD or greater for at least one (1) year.

> See, Section 1.2A of Specification, found at Exhibit 25.

As noted above, this "experience" requirement was previously mooted when UTS was pre-qualified. Even if it was not interpreted in this fashion, UTS still would have met the requirement under a reasonable interpretation of this section. The City and GMP claim that UTS failed to meet the "experience" requirement because it did not have sufficient systems in operation using the proposed "equipment type". The list that UTS submitted, annexed hereto at

Exhibit 26, included numerous vertical systems that met the standard and at least one horizontal system of the specified flow rate.[6] The City improperly rejected UTS' vertical systems, claiming they were not of the same "equipment type" as the horizontal system mentioned. However, the equipment used for vertical and horizontal systems are the same. They use the same lamps, ballasts, logic controllers and other elements. There was no import to this difference and GMP and the City were well aware of this. Perhaps, this is why Mr. Hamada and the City pre-qualified UTS.

**12,     Ultimately, the UTS system was rejected, and Bodell was forced to purchase the Trojan system.**

After repeated attempts to have the UTS system approved, Bodell eventually was forced by the City to purchase the Trojan System reportedly to stay on course with the timeline of the Project[7]. Trojan had since redesigned its system, and was marketing a new version called "The New Trojan System U.V. 4000™". Despite the fact this system required a shallower effluent channel and had never been used before, the City and GMP approved the use of this system **immediately without hesitation**. There was a clear double standard that applied which enabled GMP to accomplish its goal.

It is clear from the actions of GMP and the City that they were insistent on using a Trojan system, despite the fact that they had previously approved the UTS system, that the Trojan system was significantly more expensive, and that UTS met the project specifications.

The conduct of GMP and the City throughout the bid process, the design phase and up through construction was clearly in bad faith. GMP and the City's actions constitute intentional

---

[6] UTS sold many more vertical systems as it believed that the vertical systems offered more benefits over the horizontal system. In fact, UTS would have preferred to offer the City a vertical system as it would clearly have saved more expense for the taxpayers.
[7] Bodell had obtained an independent consultant who confirmed there was time to build the UTS system. See Declaration of Armand Cote at Exhibit "27".

or, at the very least, negligent interference with contractual relations, and interference with UTS's prospective economic advantage.

## C.    **LEGAL STANDARD**

Under the FRCP, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 ( c); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The party who opposes summary judgment has an affirmative obligation to set forth evidence "on which the jury could reasonably find for [the non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,587 (1986).

## D.    **LEGAL AND FACTUAL SUPPORT FOR REQUEST FOR SUMMARY JUDGMENT**

**The case at bar meets the six-part test established by the Hawaii Court of Appeals and thus the City and GMP should be liable under Count One and Two of UTS and ESI's Cross-claims**

In order to be successful on a motion for summary judgment in support of a claim of intentional interference with prospective business relations, the movant must be able to plead and prove that an agreement existed, the defendant knew of this relationship, the defendant intentionally interfered with the relationship, the defendant had no justification, the interference caused the third party to not consummate the contract, and the defendant's interference caused the plaintiff damage.    See Kutcher v. Zimmerman, 87 Haw. 394 (Haw. Ct. App. 1998).

In Kutcher, the Intermediate Court of Appeals affirmed the lower court's finding in favor

of plaintiff, while also establishing a new six-part test that a plaintiff must plead and prove. The court held that a plaintiff alleging the tort of intentional interference with prospective contractual relations must plead and prove:

    (1) a prospective contractual relationship existed between the plaintiff and a third party;
    (2) the defendant knew of this relationship;
    (3) the defendant intentionally interfered with the relationship;
    (4) the defendant acted without proper justification;
    (5) the defendant's interference caused the third party to fail to consummate the prospective contract with the plaintiff; and
    (6) the defendant's interference caused damages to the plaintiff.

The case at bar meets this six part test.

It is abundantly evident that the defendants were aware of the relationship between UTS and Bodell within moments after the bids were opened. In fact, within two days of the bids being opened, Mike Elhoff of HES called to complain to the City. The City then confirmed with Bodell that it had relied on the UTS equipment in its bid. See Exhibit 12.

In typical fashion, Trojan supplied the specifications for the Trojan medium pressure system to the project engineer, GMP. Mike Elhoff used his relationship with Jay Stone, the project representative from GMP, to comment on and thwart any competition that posed a threat (IDI). When the City overruled GMP's rejection of UTS, approving UTS, Mike Elhoff was stunned and upset about the resulting award to Bodell and UTS. Mr. Elhoff called the City to address this "error." Thus began an almost year long charade of convincing UTS that it would be considered while in the background arranging for the Trojan system to be installed. While trying to get UTS rejected, GMP allowed UTS to continue to try to satisfy requirements that would never be met.

Ultimately, GMP and the City's interference resulted in UTS being rejected on baseless, inaccurate and unreasonable grounds, causing UTS and ESI significant damages. Thus, the six

part test in <u>Kutcher</u> has clearly been met.  To further clarify this satisfaction of the <u>Kutcher</u> requirement:

### 1.    A contractual relationship existed between UTS and Bodell

After being awarded approval for bidding purposes, UTS submitted its proposal to various contractors bidding on the Wahiawa WWTP, including Bodell.  As the UTS system was significantly less expensive than the Trojan system, Bodell opted to use the UTS equipment in an effort to be competitive.  Bodell was successful in being awarded the bid.  Bodell and UTS then entered into an agreement whereby UTS was to provide U.V. disinfection equipment, as offered when it submitted its approval letter, price and scope of supply to Bodell.

Work began immediately by both Bodell and UTS to prepare for the design and construction of the equipment to be used at the WWTP.  Bodell committed to UTS to purchase a system for this project.  Relying on this agreement, UTS engaged engineers to assist in preparing the equipment submittal and acted upon Bodell's commitment.

### 2.    The City and GMP knew that Bodell had relied on the UTS U.V. system and yet continued to interfere with Bodell and UTS' relationship by putting roadblocks in UTS' path.

The City and GMP knew or should have known that its approval of the UTS U.V. system as an "equal" to the Trojan System "for bidding purposes" would induce contractors to rely on the City's approval and therefore use UTS' system in their bid calculations.  After the Contract was awarded, both the City and GMP were immediately aware that Bodell's winning bid was based on the UTS equipment price, as Mike Elhoff called to complain, and the City then called Bodell to confirm that their bid was based on UTS' equipment. See Exhibit 12.

The City has openly admitted that it granted UTS approval for bidding purposes and that Bodell's use of the UTS equipment was in reliance on the letter issued by the City.  The approval letter issued by the City is clear on its face ("UltraTech is approved for bidding purposes").  The December 9th letter was issued one week prior to bid date, clearly indicating that contractors

could rely on the City's pre-approval of the UTS system. Had the City or GMP had questions, they certainly had time to address them with UTS before bids were submitted. It would not be reasonable to expect that contractors would rely on the approval letter if the City's approval could later be revoked on a whim. See Exhibit 27 at p.12.

The City's awareness of Bodell and UTS' relationship is also evidenced by an email from Guy Inouye, dated December 30, 1999, which references a discussion with Bodell, noting that the "specified" (Trojan) equipment could not be supplied for the same price. This correspondence clearly illustrates:

1) The City, who prohibited the use of "sole source specifications" is indicating that the "specified" equipment was supposed to be the Trojan system;

2) The City realizes the Trojan system is significantly more costly than the UTS equipment, yet wants to go ahead and purchase it with taxpayer monies;

3) The City acknowledges that the UTS equipment was approved for bidding purposes, was reasonably relied on by Bodell, and it was reasonable for Bodell to be compensated if the UTS equipment was not used and the City insisted on a different manufacturer.

Even more significantly, the City's Management Team Meeting Notes, explaining why the City had decided to delete the U.V. equipment. The notes indicate "we eliminated equipment from package and will procure equipment by itself—this portion of bid based on our error." Exhibit 13. The City is describing Cyril Hamada's well-thought out reasons for approving the UTS' equipment as a mistake. But rather than rectify this supposed "mistake", they ignore it. The City never follows through on re-bidding this portion of the contract, but rather, goes forward and executes the contract with Bodell in February of 2000, and then leaves it to their friends at GMP to devise ways to disqualify UTS.

The timing of these decisions and comments must be noted. Nothing had transpired between Bodell being awarded the contract and the City deciding it would purchase the U.V. equipment separately. No further information had been requested of UTS, no further reviews of the UTS equipment had been conducted – nothing had occurred! It is more than obvious that the City's change of heart was due to external pressures.

**3.    The City and GMP allowed UTS and Engineered Systems Inc. to continue to expend time and money meeting the contract in vain.**

In January of 2000, UTS and Bodell were not aware of the conspiracy that had grown around them. In fact, the City's failure to re-bid the project, followed by going forward with the execution of the contract with Bodell, reassured Bodell and UTS that the UTS system was acceptable. The City clearly abandoned any intent to remove UTS from the bid through the proper channels, and led Bodell and UTS to believe that the UTS system would be accepted. However, as the within papers discuss, it has become clear throughout the course of this litigation that the City and GMP had no intention of ever allowing UTS to supply the U.V. equipment at the Wahiawa WWTP.

To UTS' and ESI's great loss, they continued throughout the year 2000 to expend time, money, and man-power in an effort to prepare to build the U.V. equipment and to conform with the project specifications. The City and GMP allowed UTS to undertake these efforts, knowing that they had no intention of approving UTS' equipment. From December 1999, when the decision to remove UTS from the contract was made, to January 2001, when UTS was formally rejected, the City and GMP allowed UTS and ESI to work in vain. Rather than removing UTS prior to executing the contract with Bodell in February 2000, and rather than informing UTS or Bodell directly that the City had made a "mistake" and would never allow for the use of UTS' equipment, the City and GMP continued the charade of having UTS jump through one hoop after another in a futile effort to conform with the hurdles that GMP created through its collaboration with Trojan and HES.

4.    **The City and GMP intentionally interfered with the relationship between UTS and Bodell.**

Despite the knowledge that Bodell had a valid and binding contract with the City for the Project which utilized the UTS system, GMP continued to refuse to approve UTS' system although the decision was based on inaccurate, irrelevant and deminimus grounds.

Consistent with the common law, Haw. Rev. Stat. § 103D-101 provides that all parties involved in the negotiation, performance, or administration of state contracts shall act in good faith. Movants suggest that the defendants did not act in good faith and clearly were intent on using only the Trojan System.

GMP failed to perform an objective, good faith review of Bodell's submittals of the UTS U.V. system and, falsely advised the City that the UTS U.V. system did not meet Specifications.[8] The City ratified these actions by GMP, and participated in many of them.

GMP directed Bodell to instead supply the Trojan System for the Project. GMP and the City knew or should have known that their actions were certain or substantially certain to cause the City to breach its Contract with Bodell, by rejecting the UTS U.V. system, and in turn Bodell would refuse to honor its order with UTS.

GMP's insistence on the utilization of a Trojan System, despite knowledge that the City had already approved the UTS U.V. system as an "equal" for bidding purposes, was without proper justification. GMP's actions were intentional, not necessary to protect the City's interest, not in furtherance of the City's best interests, and were instead designed to further GMP's goals and/or injure UTS. GMP's and the City's actions constitute intentional interference with contractual relations, interference with UTS's prospective economic advantage, and as a result, UTS has been damaged in an amount to be proven at trial.

---

[8] GMP's "analysis" was often based on incorrect information supplied by HES.

5.    **The City and GMP have no justification for intentionally interfering with UTS and Bodell's business relationship.**

The City and GMP ultimately rejected the UTS equipment citing that it did not meet the "experience" requirements called for under the contract.  As noted above, the City facially frowned on sole-source specifications.  Nevertheless, GMP clearly based the specifications for the WWTP on the Trojan 4000 system.  Regardless, the project U.V. specification is a "performance" specification and not a "design" specification.  See Aff. of Greg Ellner at Exhibit 29 and Decl. of Sid Ellner, at Exhibit 27.

As opined by Bodell's expert, the words "equipment type" in the City's specifications could be interpreted to mean either a horizontal or vertical system.  Both systems use the same equipment and design, the only difference is the orientation and configuration of the equipment.

The State of Hawaii's Procurement Policy Board has established rules that regulate the preparation and use of bid specifications which provide as follows:

> § 3-122-10  Purpose.    A specification is the basis for procuring a good, service, or construction item adequate and suitable for the State's needs in a cost effective manner.  Purchasing agencies shall seek to procure standard commercial products, if practicable, and obtain the most advantageous process.  *All specifications shall seek to promote overall competition, shall not be unduly restrictive, and provide a fair and equal opportunity for every supplier that is able to meet the State's needs.  In developing specifications, unique requirements should be avoided.*
> Haw. Admin. R. §3-122-10 (emphasis added).

The intent of this rule is to avoid the purchase by the government of unproven, "fly-by-night" products for state projects.  See, CCTW&M v. United States, 452 F. Supp. 69, 78, (D. N.J. 1978) (affirming EPA Administrator finding that "[t]he experience requirement is 'to protect the user from untried equipment'", and affirming the EPA decision to rewrite the specification because as written it was anticompetitive and in violation of the spirit of the EPA because only one manufacturer could meet it).

UTS was clearly approved by the language of the City's letter, in addition to the City's further actions, (e.g. execution of the Contract with Bodell; failure to re-bid Item 81). Even if the approval letter from the City was rendered meaningless, UTS still met the requirements called for under the specification.

**6.    The City and GMP's repeated interference with Bodell and UTS's relationship resulted in UTS ultimately being denied acceptance after spending tens of thousands of dollars and months of work to get approval for its equipment which GMP and the City never intended to grant.**

UTS and ESI lost the sale of the UTS system that would have resulted in either a $267,500 sale (vertical system) or a $417,000 sale (horizontal system) and a significant commission for ESI. In addition, UTS spent tens of thousands of dollars, and UTS and ESI spent hundreds of man hours in work for this project, none of which has been reimbursed.

Moreover, after this debacle, word was spread through Hawaii that UTS was no longer in business which precluded additional sales. See Exhibit 29. Significantly, UTS also lost the ability to supply the City with replacement lamps and parts for the system, which would have totaled tens of thousands of dollars ever year.

As stated above, the conduct of the City, and GMP, acting as an agent of the City, meets the six-part test established by Kutcher. The defendants were intent from before the bid even went out, to having Trojan supply the equipment for the Wahiawa WWTP. When their carefully laid plans were interfered with and UTS was inadvertently included in the winning bid, the defendants then undertook a deliberate campaign to deviously and illegally rid the contract of the UTS equipment, and have it replaced by the Trojan system, which was ultimately successful. UTS and ESI have been severely damaged monetarily, and have had their reputations impugned in Hawaii and across the country, resulting in lost work and profits. Most significantly, as a result of the City and GMP intentionally providing HES with UTS' pre-submittal package, UTS'

confidential proprietary information was leaked into the U.V. disinfection community where competitors can reap the benefits of UTS' proprietary information, hard work and trade secrets.

## II.   GMP'S CLAIMS AGAINST ULTRATECH SHOULD BE DIMISSED AS THEY ARE BASELESS AND WITHOUT MERIT

In the original complaint filed in this action, plaintiff Bodell, by way of Count IV of its pleading, alleged that GMP intentionally interfered with the contractual relationship existing between Bodell and UTS. Bodell outlines GMP's knowledge with respect to the contract that existed between Bodell and UTS, and alleged that GMP's failure to perform an objective good faith review of Bodell's submittals of the UTS equipment was intentional, unnecessary, and not in furtherance of the City's best interests.

By way of a cross-claim dated March 29, 2004, GMP alleges that if Plaintiff (Bodell) was damaged, the damages were caused by the negligence of UTS. Further, that if GMP were negligent in any manner, its negligence was not the proximate cause of Bodell's damages.

Bodell did not assert a claim of negligence against GMP. As such, GMP's cross-claim against UTS is moot. Furthermore, there can be no contribution for GMP's intentional conduct. GMP interfered with the contractual relationship that existed between Bodell and UTS. Contribution would only applicable if the primary defendant is found liable for something done by UTS.

Furthermore, as noted at length above, the UTS rejection was clearly due the collusion and deliberate efforts of the City, GMP, and HES, who together conspired to rid the Project of the UTS system and replace it with the Trojan system.

**III.    THE CITY'S CLAIM AGAINST ULTRA TECH AND ENGINEERED SYSTEMS INC. SHOULD BE DISMISSED AS BASELESS AND WITHOUT MERIT**

The City asserts a cross claim against both UTS and ESI for negligent misrepresentation. The claim alleges that UTS/ESI, through its representation to the City that the UTS system could meet the specifications, induced the City to grant meritless approval to the UTS U.V. equipment. This claim is completely lacking in any sort of evidence or support.

Hawaii courts apply the Restatement (Second) of Torts (1977) to claims for negligent misrepresentation. In order to prevail on a claim for negligent misrepresentation under the Restatement of Torts, plaintiff must establish that 1) Defendant provided information in the course of their business, profession or employment, 2) the information was false, 3) the information was supplied as guidance for Plaintiff in deciding whether to provide services; 4) Defendants failed to exercise reasonable care or competence in obtaining or communicating the information. See, UCSF-Stanford Health Services vs. Hawaii Management Services 58 F. Supp.2d 1162 (D. Hawaii 1999). See also, Restatement (Second) of Torts (1977) §552. The City has failed to prove these elements.

**A.    The Pre-Bid Substitution Request Offered To The City Was Made In Good Faith and Was Accurate**

On November 18, 1999, Paul Scott of ESI submitted a pre-bid substitution request to the City for the purpose of having UTS' equipment approved for the Project. See Exhibit 7. The materials forwarded included six sets of technical specifications, brochures, and variances. The correspondence noted that the substitution request was being made on behalf of UTS' low-pressure system. The City referred this substitution request to GMP, who promptly rejected it, on the basis that the request did not include enough information. Exhibit 7.

GMP did not reject the submission claiming that UTS/ESI had provided false information, but rather that there was not enough information with which to reach a decision. We expect that GMP would have recommended that the City reject the submission regardless of what UTS had submitted.  As illustrated by GMP's refusal to even respond to the request submitted by manufacturer IDI, GMP had its own motives for taking the deliberate action (or inaction) that it did.

The City alleges that they were harmed by relying on the negligent misrepresentations of UTS/ESI, who claimed that they would be able to meet the specification.  In particular, the City claims that UTS and ESI represented they could meet the "experience requirement." In this regard, the manufacturer of the UV system was required to submit documentation of "at least five (5) permanent wastewater installations using this type, in North America, disinfecting a peak flow of 5 million gallons per day or greater for at least one (1) years."

The cover letter submitted by ESI to the City stated, "Ultratech will meet the *intent of the specifications* with respect to the *disinfection requirements*.  The Ultratech system will fit into the channel shown on the drawings."  In support, ESI/UTS supplied a list of installations which UTS had supplied in North America disinfecting a peak flow of 5 million gallons per day or greater.  Moreover, as discussed above, the experience requirement was met.  At best, the specification was ambiguous.  At worst, it was unintelligible. Either way, the contractor is entitled to construe the ambiguities in a reasonable manner.  Such a review clearly indicates UTS met the requirement.

## C.    Cyril Hamada's Decision To Approve UTS Was Based on His Own Independent Review of the Relevant Documents.

The City alleges that Cyril Hamada approved UTS for bidding purposes only after being reassured by Greg Ellner of UTS, that UTS would meet the specifications.  However, when Cyril

Hamada was asked why he overruled GMP's denial of the UTS system, Mr. Hamada drafted a correspondence outlining his multiple reasons for approving UTS. The email, dated October 30, 2000, attached hereto as Exhibit 35, lays out Mr. Hamada's thought process for approving the UTS system. He notes that after reviewing the specifications, he found the following:

1) the specification allowed for substitution;

2) both the Trojan medium pressure and the UltraTech low pressure system met Title 22 or Hawaii R-1 quality water.

3) he was assured by vendor that space limitations and experience requirements would not be a problem; and

4) the Honouliuli job had the Trojan model as a design, however in that case the City approved the substitution request for low pressure units (because their engineer, Fischer & Porter repeatedly reiterated the benefits of a low pressure system).

Therefore, Cyril Hamada concluded:

> Since the UTS system meets Title 22, and since we approved a LP (low pressure) system for Honouliuli, and since Ultratech was approved for Kailua WWTP, and since it purportedly fits in the allocated space, and since there might be some benefit to the City, it was my decision to approve the substitution request.

Mr. Hamada listed numerous reasons why the UTS system was approved, yet the City maintains that Cyril Hamada was induced into approving the UTS system through negligent claims made by ESI and UTS. Nothing could be further from the truth.

The City has not met its burden as delineated by the Restatement of Torts and Stanford. See, Id. The information provided by ESI and UTS was patently true, and the City did not rely solely on the information provided by cross-claim defendants in arriving at their decision to approve UTS for bidding purposes. As evidenced by Cyril Hamada's email (Exhibit 35), he had good cause to approve UTS based on their experience at Kailua, the superiority of the low-pressure system, the bid materials submitted by UTS, and lastly, due to the fact that the **specification allowed for substitution**. The City's claims are therefore without merit and must be denied.

## V.     CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant the within motion, granting judgment to cross-claim plaintiffs UTS and ESI, and denying the cross-claims of Defendants GMP and the City, and for such other, further and different relief as this Court deems just and proper.

Dated: February 17, 2006

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By:

Adam R. Bialek
*Attorneys for Cross-Claim Defendant/*
*Cross-Claim Plaintiff*
**ULTRA TECH SYSTEMS, INC.**
*And Special Counsel to Third Party Defendant/*
*Cross-Claim Plaintiff Engineered Systems, Inc.*
*For This Motion*
3 Gannett Drive
White Plains, New York 10604
Tel: (914) 323-7000
Fax: (914) 323-7001
File No. 08167.00001

Of Counsel:

Kirsten Bennett-O'Rourke, Esq.

Adrian Rosehill, Esq.
Gerson & Hieneman
1001 Bishop Street, Suite 780
Honolulu, Hawaii 96813

## CERTIFCATE OF SERVICE

STATE OF NEW YORK      }
                        } ss.:

COUNTY OF WESTCHESTER    }

I, Debra Cummings, being duly sworn, deposes and says:

I am not a party to the action, am over the age of 18 years of age and reside in Westchester County, New York.

On February 17, 2006, I served the within **Memorandum of Law in Support** by depositing a true copy thereof enclosed in a postpaid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

**TO:**

CADES SCHUTTE
1000 Bishop Street, 12th Floor
Honolulu, Hawaii 96813-4216
Attn.:  David Schulmeister, Esq.

OFFICE OF CORPORATION COUNSEL –
HONOLULU
City and County of Honolulu
530 S. Kings Street, Suite 110
Honolulu, Hawaii 96813
Attn:   Carrie K. Okinaga, Esq.
          Maile R. Chun, Esq.

KOBAYASHI, SUGITA & GODA
999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813
Attn:  Ronald T. Ogomori, Esq.

SAKAI IWANAGA SUTTON,
ATTORNEYS AT LAW
201 Merchant Street
City Financial Tower, Suite 2307
Honolulu, Hawaii 96813
Attn: Richard C. Sutton, Jr., Esq.

1104681.1

GERSON & HIENEMAN
1001 Bishop Street, Suite 780
Honolulu, Hawaii 96813
Attn.: Adrian Rosehill, Esq.


Debra Cummings


Sworn to before me this
17th day of February, 2006

Notary Public


JARRET A. KAHN
Notary Public, State of New York
No. 02KA6042180
Qualified in New York County
Commission Expires May 15, 2006

1104681.1