ORIGINAL

Adrian Rosehill (3868)
STUBENBERG & DURRETT
Davies Pacific Center
841 Bishop Street, Suite 2115
Honolulu, Hawaii 96813
Attorneys for Engineered Systems, Inc.

James D. Boughey (HSB No. 6546)
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
525 Market Street
San Francisco, California 94105-2725
Attorneys for UltraTech Systems, Inc.

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 1 2 2006

at 10 o'clock and 40 min. A M
SUE BEITIA, CLERK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>OHIO PACIFIC TECH, INC. f/k/a GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>            Defendants.<br><br>-AND RELATED ACTIONS- | Civil No. 03-00706 (JMS/LEK)<br><br>AFFIRMATION IN OPPOSITION BY CROSS-CLAIM DEFENDANT/CROSS-CLAIM PLAINTIFF ULTRATECH SYSTEMS, INC., and THIRD-PARTY DEFENDANT/CROSS-CLAIM PLAINTIFF ENGINEERED SYSTEMS, INC. TO DEFENDANT/COUNTERCLAIMANT OHIO PACIFIC TECH CORPORATION INC., f/k/a GMP ASSOCIATES' MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE |

1145060.1

This affirmation is respectfully submitted in opposition to Defendant Counterclaimant Ohio Pacific Tech Corporation, Inc., f/k/a GMP Associates, Inc.'s ("GMP") Motion for Summary Judgment against Cross-Claim Plaintiff/Defendant UltraTech Systems, Inc. ("UTS") and Third Party Defendant/Cross-Claim Plaintiff Engineered Systems Inc. ("ESI").

## PRELIMINARY STATEMENT

GMP seeks an order dismissing the claims brought against it by UTS and ESI. GMP's arguments fail when evaluated against not only the facts, but the theories of liability that exist. Throughout this litigation, is has become abundantly clear, that GMP had a pre-determined motive to disapprove the UTS system for use at the Wahiawa project. GMP was ill-equipped to design the Wahiawa wastewater treatment plant for the City, and instead opted to partner with an established manufacturer in the ultraviolet disinfection industry, Trojan Technologies, Inc. ("Trojan"). However, GMP's reliance upon Trojan was not only improper but also misplaced as it was not in the best interest of the City. While it became apparent that GMP failed to act in the best interests of the residents of Honolulu, rather than proceed with correcting the problem, GMP compounded it by embarking on a course designed to ensure that the Trojan system would be installed regardless of the means. From its initial arbitrary rejection of the UTS equipment in November 1999, to its disclosure and sharing of UTS' confidential and proprietary information with UTS' chief competitor, to the failure to properly and accurately evaluate the UTS system, GMP exhibited a course of improper and unjustifiable conduct. The improper and unethical relationship between GMP and Hawaii Engineering Services, ("HES"), the local Trojan representative, led to UTS and ESI suffering damages with respect to not only the Wahiawa project, but to their business reputations as well. Moreover, it was the devious, improper means that GMP undertook to fulfill its plan that caused damage and are actionable.

2

1145060.1

## ARGUMENT

### I.

### GMP ACTED IMPROPERLY IN ITS REVIEW OF THE UTS U.V. EQUIPMENT AND INTENTIONALLY INTERFERED WITH THE RELATIONSHIP BETWEEN UTS/ESI AND BODELL WITH RESPECT TO THE WAHIAWA PROJECT

GMP was retained by the City to design the upgrade to the Wahiawa Wastewater Treatment Plant. However, GMP was ill-prepared to undertake such an effort, or GMP was negligent in the manner in which it carried out its duties. Jay Stone of GMP was charged with the duty to prepare the specifications for Wahiawa. However, Mr. Stone had limited training and experience with ultraviolet disinfection of wastewater. See, Deposition of Jay Stone, annexed hereto as Exhibit "A" at pages 380-383. Rather than admit his shortcomings or seek external expertise, Mr. Stone instead sought the assistance of Mike Elhoff and his colleagues at Trojan. While approaching a market leader in UV technology seemed to be an appropriate course to take, Mr. Stone apparently did not realize that the City was not interested in a sole source specification and certainly was not participating in the process to secure a sole source product.

Mr. Stone contacted Mr. Elhoff and obtained a diskette containing Trojan's sample specification. See, Stone Deposition at pps. 232-233. While the sample specification was clearly intended for a user to purchase a Trojan system, GMP tried to make it appear as if it was an open bid. In one sense, GMP will argue that the specification allowed for alternates, but as the record herein clearly shows, this was a charade. Either GMP negligently drafted/modified the specification, or GMP was taking deliberate steps to eliminate the competition.

GMP then took intentional affirmative steps to prevent, impede and ultimately disapprove the use of UTS' U.V. equipment for use at the Wahiawa project. The actions of GMP caused

3

UTS and ESI to suffer damages in the form of lost profits, lost expenses, lost time, loss of proprietary information, and damage to their business reputation.

1.   **A contractual relationship existed between UTS and Bodell**

GMP attempts to argue that UTS/ESI's claim for intentional interference with a contract cannot succeed because a contract did not exist between Bodell and UTS. Not only is this claim inaccurate, as a contract did exist between Bodell and UTS, but applying GMP's rationale, all claims brought by GMP against UTS must be dismissed.

After being awarded approval by the City over GMP's arbitrary rejection of its substitution request, UTS submitted its proposal to various contractors bidding on the Wahiawa WWTP, including Bodell, who ultimately was successful in being awarded the bid. Bodell and UTS then entered into an agreement whereby UTS was to provide U.V. disinfection equipment, as offered when it submitted its approval letter, price and scope of supply to Bodell.

Work began immediately by both Bodell and UTS to prepare for the design and construction of the equipment to be used at Wahiawa. Bodell committed to UTS to purchase a system for this project. Relying on this agreement, UTS engaged engineers to assist in preparing the equipment submittal and acted upon Bodell's commitment. Both Bodell and UTS continued to work throughout the year 2000 to prepare for the project, to maintain compliance with the contract and the schedule. Both UTS/ESI spent countless hours and financial resources trying to ensure compliance with the design specifications drafted by GMP and the City before ultimately being rejected in January 2001.

**Leroy Humke's Testimony is Misconstrued and Irrelevant**

GMP incorrectly relies on the testimony of Bodell employee, Leroy Humke, in arguing that no contract existed between Bodell and UTS. A review of his deposition testimony indicates that Mr. Humke stated with respect to purchase orders,

Q:   What does a purchase order do?
A:   It forms an agreement.
Q:   Did you ever get a signed one [purchase order] from UltraTech?

4

A:   I have no knowledge of that.

Not only is GMP's argument misleading, in that it suggests that Mr. Humke affirmatively testified that no contract existed, which is clearly not the case, the opinion of Mr. Humke that a purchase order forms an agreement is meaningless. The actions of both Bodell and UTS in retaining engineers, designing and implementing the U.V. system, spending time and money towards fulfilling the contract, all evidence the fact that an agreement was formed by Bodell and UTS with respect to the Wahiawa project.

In sum, UTS and Bodell can show that there was an offer, acceptance (at the very least through detrimental reliance), and consideration. An agreement was in place. GMP's argument that the written instrument was never fully executed is irrelevant and can be explained if necessary. It is not necessary, since the actions of Bodell and UTS prove there was an agreement. There must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract. The Uniform Commercial Code is in accord. Under Haw. Rev. Stat. § 490:1-201(11), (3), a contract is reached from the bargain of the parties in fact as found in their language *or by implication from their conduct and the surrounding relevant circumstances* (emphasis added) Earl M. Jorgensen Co. v. Mark Constr., 56 Haw. 466 (Haw. 1975). Here there was a meeting of the minds and both Bodell and UTS acted upon the expectation of delivering the UTS system.

**UTS/ESI Have Met Every Element of Their Claims for Intentional Interference with Prospective Contractual Relations Against GMP**

As set forth in UTS/ESI's motion for summary judgment, the Intermediate Court of Appeals of Hawaii has established a six-part test that a plaintiff must plead and prove to be successful on a claim for intentional interference with a contract.[1] See, Kutcher v. Zimmerman,

---

[1] In order to be successful on a motion for summary judgment in support of a claim of intentional interference with prospective business relations, the movant must be able to plead and prove (1) that an agreement existed, (2) the defendant knew of this relationship, (3) the defendant intentionally interfered with the relationship, (4) the defendant had no justification, (5) the interference caused the third party to not consummate the contract, and (6) the defendant's interference caused the plaintiff damage

5

957 P2d 1076, 87 Haw. 394; (Haw. Ct. App. 1998). GMP argues that UTS/ESI must demonstrate "intent" and "legal malice" on the part of GMP in order to make out this claim.

In the case at bar, the intent and malice on the part of GMP is evident from every action GMP took from the beginning of its involvement with the Project. From their intentional steps to hide the sole source specification, to the initial and arbitrary rejection of the UTS substitution request, to the egregious act of sharing UTS' proprietary information, to the countless errors committed by GMP in evaluating UTS' submittals, to ultimately January 2001 when GMP was finally successful in ridding the Project of UTS, GMP acted with deliberate intent and the legal malice required.

**GMP Violated Ethical Codes of Conduct by Sharing UTS Confidential and Proprietary Information**

At the end of April 2000, at a pre-construction meeting, GMP clearly set forth its intent that UTS would never be approved. It is clearly noted in the minutes of the April 27, 2000 meeting that: "the review of the UTS system revealed that the system would be too large for the space provided and the purchase and high-energy costs [of the Trojan system] would be offset by a better system" GMP then asked that a proposal be sent to them by UTS "so that their sub-consultant could come up with knowledgeable questions (i.e. Mike Elhoff). See, memo annexed hereto as Exhibit "B". Nevertheless, GMP induced both Bodell and UTS to continue on their journey to cover up GMP's and the City's intent to use the Trojan system. Upon receiving the pre-submittal package from UTS, GMP immediately shared it with HES, the local representative of UTS' chief competitor, Trojan, despite the fact that the pre-submittal contained a clear and unambiguous notation that the material was confidential and proprietary. The submittal package prepared by UTS specifically stated in prominent fashion:

> *The contents and drawings contained in this submittal package relate to proprietary subject matter. Any party assuming custody does so with the express understanding and agreement that neither receipt nor possession thereof confers or transfers any*

6

1145060.1

*right to use, reproduce or disclose its contents or any part thereof, in any manner or for any purpose whatsoever.* See Exhibit 34 of UTS/ESI Motion for Summary Judgment ("MSJ").

This statement was clear as to its intent, it was understood by GMP and GMP did not object to this designation. Nor did GMP ever contact UTS to discuss the contents of the package. However, GMP apparently disregarded this confidentiality warning and proceeded to share UTS' confidential information with one of its chief competitors. In the engineering industry, it is understood that proprietary information, once received, is never to be released to any outside party, especially a competitor, without the express consent of the manufacturer. To do so implies collusion and a prior intent to damage. See, Exhibit 30 of UTS/ESI's Motion for Summary Judgment[2].

The release of UTS' proprietary information was a clear violation of accepted standards in the engineering industry, and in violation of every canon of ethics relied on in the industry. The purpose for which the proprietary information was apparently released, i.e. to allow UTS' competitors to criticize the submittal, is reprehensible.

**GMP Colluded With The City and HES to Replace the UTS System With the Trojan Equipment**

Evidence of the inappropriate relationship between HES, Trojan's representative, the City of Honolulu, and GMP can be seen in a series of emails discussing how HES could assist in criticizing UTS's submission. Mike Elhoff's May 25, 2000 email to Trojan clearly sets forth the purpose of sharing the UTS information:

> **"Your assistance has been great in our effort to get UTS rejected".**
> **"I would like Ron's help with any ammunition regarding UTS, with respect to a database of UTS installations, 16-lamp module, and any competitive information you can provide from London. Please advise."** See Exhibit 19 of UTS/ESI MSJ.

---

[2] Where not specifically annexed hereto, all references to exhibits found in "UTS/ESI's MSJ", are found in the original motion papers submitted by UTS and ESI in February 2006.

7

1145060.1

Over the next six months, the City, GMP, and HES repeatedly communicated and met to discuss their efforts to remove UTS from the bid. These meetings and discussions are reflected in e-mails and faxes between the parties over the subsequent months:

- On May 31, 2000 Mike Elhoff sent an email to Trojan stating "I met with Lee and Jay @ GMP regarding the issues. They want the following…" (Exhibit 20 to MSJ).
- On June 1, 2000, Trojan sent Elhoff, who quickly forwarded it on to GMP, information that GMP had requested with respect to its review of the UTS pre-submittal. The last paragraph of the cover memo states, "As far as the dose calculations on UTS's 1600 lamp system, please give me a call to discuss this issue." (Exhibit 21 to MSJ).
- On June 4, 2000, Mike Elhoff of HES provides to GMP a memo entitled, "Comments and Concerns on UTS Pre- Submittal". (Exhibit 22 to MSJ).
- On June 5, 2000 an email from Guy Inouye (a City employee) to other employees of the City notes that a meeting was held at the request of Mike Elhoff. The email states that "Mike" does not think an informal submittal is proper, that the UTS system does not meet the specifications called for; and that the approval was not proper. (Exhibit 23 to MSJ).

The release of UTS' proprietary information was not only a clear violation of accepted standards in the engineering industry, but clearly makes out the "intentional", "malicious" and "improper" conduct required by the Courts.

The conduct of GMP complies with the prerequisites noted in the case law cited to by GMP in their moving papers. GMP's acts are a clear example of the improper conduct which the cases cited by GMP rely on when explaining the standard which plaintiff must meet to make out a case for intentional interference with prospective relations. *See*, Robert's Hawaii School Bus v. Laupahoehoe Transportation Co. Inc., 91 Hawaii 224, 982 P.2d 853 (1999); Locricchio v. Legal Services Corp. 833 F.2d 1352, 1358 (9th Cir. 1987); and Leigh Furniture and Carpet Co. v. Isom, 657 P.2d 293, 308 (Utah 1982).

1145060.1

## II.

## GMP WAS NEGLIGENT IN DRAFTING THE SPECIFICATIONS OF THE CONTRACT AND AS SUCH UTS/ESI'S CLAIM AGAINST GMP SHOULD BE GRANTED

The negligence claims brought by UTS and ESI against GMP for its negligent drafting of the specifications and its negligent analysis of the UTS submittals should be granted. It is not merely the ambiguous drafting of the specifications which UTS and ESI seek relief for, but rather for the unfair and arbitrary review which the UTS equipment was given at the hands of GMP.

After the pre-submittal was released for GMP to gain ammunition to attempt to defeat UTS' efforts to supply the UV equipment for the project, GMP solicited HES' and Trojan's help in understanding the UTS submittal and the calculations that were performed. GMP was ill-prepared to evaluate the UTS submittal. It lacked the expertise and experience to do so. Rather, GMP negligently attempted to interpret the faulty specification it prepared for the City, and negligently evaluated UTS' submittal. Jay Stone, rather than make inquiry to UTS or retain an impartial expert to assist, engaged the cooperation of UTS' prime competitor whose interest was solely in having UTS rejected so it could supply the job. Then, Mr. Stone negligently performed calculations to attempt to determine whether the UTS system would meet the performance requirements under the project specifications. See, Stone deposition at pages 426-435.

HES/Trojan provided GMP with several areas of inquiry to question UTS. GMP, however, never independently verified the information being provided by HES/Trojan. Although GMP clearly knew that HES/Trojan had a strong interest in having UTS rejected, GMP failed to take any action to confirm the veracity of HES'/Trojan's observations.

Subsequent to the initial review and critique, at GMP's direction, UTS, at considerable time and expense, drafted and made a formal submittal on August 31, 2000. GMP rejected the

submittal on September 11, 2000, specifying picayune matters to be addressed. These issues (initially identified by HES/Trojan) were immaterial to the project and were addressed by further submittals.

Submittal no. 30(a) was tendered on October 4, 2000 and returned by GMP <u>without review</u> on the same day. Submittal no. 30(b) was offered by Bodell on November 2, 2000, and returned by GMP <u>without review</u> on the same day. After threats of litigation by Bodell, the City agreed to receive the submittal. It was resubmitted on November 8, 2000, and rejected by GMP on November 28. Submittal no. 30(c) was given to GMP on December 19, 2000, and rejected by GMP on January 22, 2001. Interestingly, the City and GMP had already taken steps to procure the Trojan system in October, while this charade continued. See, Exhibit 33 of UTS/ESI MSJ.

The critical focus of the project was the City's intent on meeting the Consent Decree with the State, which called for a clean-up of the outflow of the Wahaiwa WWTP that was going to Lake Wilson. UTS could meet this requirement. However, submittal after submittal was presented to GMP by Bodell. They were either rejected or returned without review. Nevertheless, UTS was able to address GMP's and the City's alleged "concerns," but to no avail. It was clear they wanted UTS out of the Project, and Trojan to supply its system.

**The UTS system is ultimately rejected because of the experience requirement, rather than any legitimate performance concern.**

Both UTS and Bodell repeatedly responded to GMP's meaningless comments in an effort to comply. Finally, despite threats of litigation by Bodell, GMP finally rejected UTS' system based on its failure to meet the "experience requirement", rather than any legitimate concern over the ability of the UTS equipment to satisfy the performance aspects of the specification. UTS' horizontal low pressure system was rejected on the grounds that it did not meet the following portion of the experience requirement listed under 1.2A, "Qualification Requirements:"

The manufacturer shall submit at least five (5) permanent wastewater installations using this *equipment type*, in North America, disinfecting a peak flow of 5 MGD or greater for at least one (1) year.

See, Section 1.2A of Specification, found at Exhibit 25.

As noted above, this "experience" requirement was previously mooted when UTS was pre-qualified by the City. Even if it was not interpreted in this fashion, UTS still would have met the requirement under a reasonable interpretation of this section. The City and GMP claim that UTS failed to meet the "experience" requirement because it did not have sufficient systems in operation using the proposed "equipment type". The list that UTS submitted, included numerous vertical systems that met the standard and at least one horizontal system of the specified flow rate. GMP improperly rejected UTS' vertical systems, claiming they were not of the same "equipment type" as the horizontal system mentioned. However, the equipment used for vertical and horizontal systems are the same. They use the same lamps, ballasts, logic controllers and other elements. There was no import to this difference and GMP and the City were well aware of this. Perhaps, this is why Mr. Hamada and the City pre-qualified UTS. GMP did not reject the submission claiming that UTS/ESI had provided false information, but rather that there was not enough information with which to reach a decision. We expect that GMP would have recommended that the City reject the submission regardless of what UTS had submitted.

If there was any confusion concerning the experience requirement, it was GMP's failure to properly draft a specification that would clearly set forth a reasonable requirement, yet not lead to a sole source specification. Here, either the specification was unclear, or it was an improper sole source specification. GMP cannot avoid this issue.

**UTS and ESI's Claims For Negligence Against GMP Should Stand**

GMP attempts to make the argument that UTS and ESI's claims are barred as there was no contract between GMP and UTS or ESI. GMP relies on a series of cases which discuss the relationship between design professionals, and parties with whom a contract has been entered. GMP further claims that these negligence claims should be dismissed as the economic loss rule would preclude recover. This is inaccurate.

First, GMP neglects to understand the true nature of the negligence claim. GMP not only negligently drafted the specification, but its entire handling of the UV project was poor from the outset. GMP negligently relied upon a pre-packaged specification for the Trojan product; it negligently modified the Trojan specification; it negligently reviewed the UTS pre-bid substitution request; it negligently reviewed each UTS submittal and explanation; it negligently performed calculations used in its analysis; it negligently released confidential trade secrets; and it negligently handled the submittal approval process. While many of these actions involved intentional acts, many also included acts that can be characterized as negligent or grossly negligent. GMP did many of these acts knowing that UTS was part of the Bodell contract.

Despite GMP's claims to the contrary, this is not a case subject to the economic loss rule. First, this is not just a case of economic loss, UTS has clearly asserted a claim that GMP has damaged its reputation (i.e. its person), and has caused injury to property (e.g. its trade secrets). Second, the economic loss rule as cited to in Bronster v. United States Steel Corporation et al., 82 Haw. 32, 919 P.2d 294 (1996), does not encompass the claims asserted here. This is not a product liability case. It is a case where GMP, through its negligent and intentional acts, induced UTS to expend time, money and resources to chase a project which GMP never intended to be awarded to anyone but Trojan. During the course of carrying out its plan, it negligently and

1145060.1

intentionally committed certain actions which caused UTS significant economic, personal and property damage. As such, GMP's motion must be denied.

In this instance, the theory of recovery is that the defendant negligently reviewed the UTS' submittals; negligently performed its job in unjustly critiquing the UTS system with the intention of having it replaced by the Trojan system (at a greater cost to the taxpayers); and damaging the reputation of UTS in the U.V. disinfection community. Many of the cases relied upon by the defendant involve claims of product liability in respect to design defects, where the losses suffered were caused by defective products, not misguidance or misdirection in the performance of services. See, Bronster, supra, citing John Martin Co. v. Morse/Diesel, Inc., 819 S.W.2d 428 (Tenn. 1991). See also, MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916). The question here is not one of harm to person or property, but of economic loss.

Bronster distinguishes between claims brought for negligent misrepresentation, and claims brought for negligence in design or manufacturing. Here, as in Bronster, the claim of negligence is based on the lack of reasonable care (or negligence) in reviewing the UTS submissions, sharing UTS' proprietary information with the competition, and convincing the City that UTS did not meet the specifications when they clearly did. The court in Bronster explains this distinction when it writes, "the State seeks damages not for USX's acts or omissions in its design or manufacture…, but for USX's actions and/or omissions in its promotions, recommendations, investigations and/or opinions regarding the use of weathering steel". See, Bronster, supra at 25.

Lastly, the Bronster court points out that these issues have been raised in other jurisdictions. For example, in McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Management, 87 Ohio App. 3d 613, 622 N.E.2d 1093 (Ohio Ct. App. 1993), the Ohio Court of Appeals noted: Those courts which apply the economic loss rule to bar recovery in tort claims

13

for negligent misrepresentation fail to take into account the express wording of Section 552, which provides that "one who, . . . in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information . . ." The above strict and narrow interpretation of the tort of negligent misrepresentation fails to take into account those circumstances where the supplier of false information has a pecuniary interest in the transaction at hand and also fails to realize that "pecuniary loss" is by its very definition "economic loss." See, Black's Law Dictionary (6 Ed. 1990) 1131; see, also, Harrell [v. Crystal], 81 Ohio App. 3d [515,] 523, 611 N.E.2d [908,] 913 [(Ohio 1992)], recognizing recovery for pecuniary damages.

Thus, the Hawaii Supreme Court in Bronster has examined the applicability of the economic loss doctrine in cases such as the one at bar, and determined that it does not bar recovery where the negligence causes of action are for acts of negligent misrepresentation which were relied on and consequently caused damages (economic or otherwise). As GMP has clearly acted negligently in the numerous ways outlined above, and has caused UTS and ESI damages in the form of lost profits, loss of proprietary information, and damage to their reputation, UTS and ESI should succeed on their claim for negligence against GMP.

## V.   CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court deny the motion of GMP in all respects, and grant judgment to cross-claim plaintiffs UTS and ESI, against counterclaimant Ohio Pacific Tech Corporation, Inc., f/k/a GMP Associates, Inc., and for such

1145060.1

other, further and different relief as this Court deems just and proper.

Dated: April 12, 2006

                                    Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: _____/s/ Adrian Rosehill_____
Adrian Rosehill
*Attorneys for Third-Party Defendant/ Cross-Claim Plaintiff*
**ENGINEERED SYSTEMS, INC.**
*And Special Counsel to Third-Party Defendant/Cross-Claim Plaintiff*
**UltraTech Systems, Inc.**
*For This Motion*
Stubenberg & Durrett
Davies Pacific Center
841 Bishop Street, Suite 2115
Honolulu, Hawaii 96813

Of Counsel:

Adam R. Bialek, Esq.
Kirsten Bennett-O'Rourke, Esq.

15

1145060.1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>      Plaintiff,<br><br>   v.<br><br>OHIO PACIFIC TECH, INC. f/k/a GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>      Defendants.<br>------------------------------------------------------<br>      -AND RELATED ACTIONS-<br>------------------------------------------------------ | Civil No. 03-00706 (JMS/LEK)<br><br>**CERTIFICATE OF SERVICE** |

### **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this date, a true and correct copy of the foregoing document was duly served on the parties listed below, at their last known address by hand delivery or by U.S. mail, postage prepaid, addressed as follows:

   TO:    BERT T. KOBAYASHI, JR., ESQ.
             RONALD T. OGOMORI, ESQ.
             GEORGE GUSMAN, ESQ.
             Kobayashi, Sugita & Goda
             999 Bishop Street, Suite 2600
             Honolulu, Hawaii 96813

             and

             CARRIE K. OKINAGA, ESQ.
             Corporation Counsel
             MAILE R. CHUN, ESQ.
             Deputy Corporation Counsel
             City and County of Honolulu
             Honolulu Hale
             530 South King Street, Rm. 110
             Honolulu, Hawaii 96813

             Attorneys for Defendant, Third-Party Plaintiff

1145060.1

and Counter-Claim Defendant
CITY AND COUNTY OF HONOLULU


RICHARD C. SUTTON, JR., ESQ.
Sakai Iwanaga & Sutton
201 Merchant Street
City Financial Tower, Suite 2307
Honolulu, Hawaii 96813

Attorney for Defendant and Cross-Claim Defendant
OHIO PACIFIC TECH, INC., fka
GMP ASSOCIATES, INC.


DAVID SCHULMEISTER, ESQ.
KRISTIN S. SHIGEMURA, ESQ.
Cades Schutte
1000 Bishop Street, Suite 1200
Honolulu, Hawaii 96813
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY


DATED: Honolulu, Hawaii; April 12, 2006.


_____
ADRIAN W. ROSEHILL
Attorneys for Third-Party Defendant/
Cross-Claim Plaintiff
**ENGINEERED SYSTEMS, INC.**
*And Special Counsel to Third-Party*
*Defendant/Cross-Claim Plaintiff*
*UltraTech Systems, Inc.*
*For This Motion*
Stubenberg & Durrett
Davies Pacific Center
841 Bishop Street, Suite 2115
Honolulu, Hawaii 96813

Of Counsel:

Adam R. Bialek, Esq.
Kirsten Bennett-O'Rourke, Esq.