# DEPOSITION OF JAY STONE VOL II TAKEN ON 03-02-05

***Page 224 to Page 464***

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

**EXHIBIT "A"**

Page 232

MR. SCHULMEISTER: Okay. We needed another document.

MR. BIALEK: I'm looking. I didn't see it either.

(Off-the-record discussion was held.)

MR. SCHULMEISTER: Mark this one next, please.

Q. Can you take a look at what's been marked Exhibit 9 to your deposition. Tell me when you've had a chance to review it.

(Plaintiff's Exhibit No. 9 was marked for identification.)

THE WITNESS: (Witness complies.)

I have looked at Exhibit 9.

BY MR. SCHULMEISTER:

Q. Okay. Is that document familiar to you?

A. Yes, it's familiar to me.

Q. All right. It purports to be a Word Processing Request.

Is this a GMP form?

A. This is a form that was used when I was working at GMP.

Q. GMP?

A. Yes.

Q. All right. Did you prepare -- did you fill out this form?

A. My name is listed under "submitted by" on the first

Page 233

page.

Q. Okay. The JMKS?

A. Those are my initials.

Q. All right. And under the "special instructions" it says, "Reformat attached vendor specs to match GMP spec format. Hard copy of vendor spec attached. Diskette with vendor spec attached."

Did I read that correctly?

A. Yes, you did.

Q. That's your handwriting?

A. It appears to be my handwriting.

Q. Okay. And if we move to the attachment, this is a hard copy printout of a Trojan System UV4000 Standard Specification, is that correct?

A. That's what is stated on the first page of the attachment.

Q. Okay. So does this refresh your recollection that when the -- when GMP prepared the ultraviolet disinfection equipment specification for Wahiawa that it did in fact start from a diskette received from Trojan or it's manufacturer's representative containing the Trojan System UV4000 Standard Specification?

MR. SUTTON: Object to form.

THE WITNESS: Yes, it does.

BY MR. SCHULMEISTER:

Page 234

Q. Okay. And is that what happened?

A. It appears to be so.

Q. Okay. So you couldn't quite remember that yesterday.

A. Yes.

Q. But now looking at this it's refreshed your memory that that's what happened, right?

A. Yes, it appears to be so.

Q. Okay.

(Off-the-record discussion was held.)

MR. SCHULMEISTER: No. 10.

(Plaintiff's Exhibit No. 10 was marked for identification.)

MR. SCHULMEISTER: No. 10, Adam, is 02304.

MR. BIALEK: What's the date on it?

MR. SCHULMEISTER: May 19th, '99.

Q. Okay. Could you take a look at what's been marked Exhibit 10 to deposition, please?

A. I have looked at Exhibit 10.

Q. Okay. This purports to be a facsimile transmittal from you to Michael Elhoff dated May 19th, 1999, is that correct?

A. The document states it's a facsimile transmittal, and the date on the document is May 19th, 1999.

Q. And is that your initials next to your name?

Page 235

A. That appears to be my initials.

Q. Okay. And then the "remarks" section says, "Please update me on the status of the alternative system investigation. Please provide design and cost data and a low-pressure low-output UV3000 system, and low-pressure high-output system to meet the design criteria faxed to you April 20th, 1999", is that correct?

A. That is the statement on the document.

Q. Now, May of 1999 would have been relatively earlier in your involvement in the Wahiawa project design, correct?

A. That would be a fair assessment.

Q. Okay. And so does this refresh your memory that early on that you were -- that you engaged in an alternative system investigation with respect to the ultraviolet disinfection equipment for the Wahiawa reuse project?

A. It refreshes my memory that I requested the information stated on the document.

Q. Okay. And do you remember why you called Mr. Elhoff for this information?

A. I don't remember why I called him for the information.

Q. At that point were -- was GMP open to designing the -- strike that.

At that point was GMP open to having the basis of design be possibly a low-pressure low-output system, or a

Page 380

A. I don't know if I ever knew.
Q. Did you ever investigate it?
A. I remember saying I don't remember if I did.
Q. So you don't remember whether you investigated whether there was an uninterrupted power supply need at Wahiawa, and you don't remember if you investigated whether there was a time lag after a medium-pressure bulb loses power; is that correct?
MR. SUTTON: Object to the form, asked and answered.
THE WITNESS: That's what I answered previously.
BY MR. BIALEK:
Q. Tell me your background in connection with medium-pressure bulbs from a research point of view.
A. I don't have a background from a research point of view.
Q. Do you know how long it takes for a low-pressure bulb to go back on line after power is lost?
A. I don't know.
Q. Do you know whether there is a difference in the amount of time it takes for a low pressure bulb to go back on versus a medium-pressure bulb?
A. I wouldn't know because I don't know either information.
Q. Well, do you know generally whether there is a difference?

Page 381

A. I don't know if there is a difference.
Q. Do you know how a medium-pressure bulb works?
A. I know energy goes into a bulb.
Q. And?
A. And UV radiation is expelled from the bulb.
Q. Do you know the difference, from an engineering point of view, between a medium-pressure bulb and a low-pressure bulb?
A. I know one was higher output than the other in terms of energy.
Q. Other than that?
A. I know they are constructed different configurations.
Q. No, I'm just talking about the bulb.
A. That is the bulb.
Q. Okay. Go ahead.
A. Yeah. I know low-pressure bulbs are much longer than medium-pressure bulbs. Medium-pressure bulbs tend to be thicker and shorter. I know medium-pressure bulbs tend to be hotter in terms of temperature than low-pressure bulbs.
Q. Does the temperature of the medium-pressure bulb bear any significance in the amount of time it takes for a medium-pressure bulb to turn back on after it loses power?
A. I don't know.
Q. Is that something you feel like you once knew or you

Page 382

never knew?
A. I don't recall if I knew at one time or another.
Q. Did you ever hear of any shutdowns at Wahiawa after the system went on line, the Trojan System went on line?
A. I didn't hear of a shutdown.
Q. Did you have an understanding as to what would happen with the effluent if power was lost to the ultraviolet system that was put into place at Wahiawa?
A. If power was lost, the effluent would enter the reservoir.
Q. And did you understand that that was acceptable under the Consent Decree?
A. I don't recall if I understood that or not.
Q. Had you read the Consent Decree before preparing the specs?
A. I don't remember if I did.
Q. Did anyone tell you what was required under the Consent Decree before preparing the specs or approving the specs?
A. I remember discussing the requirements of the Consent Decree.
Q. And was there any provision in the Consent Decree that allowed for undisinfected effluent to enter the reservoir?
A. I don't remember. I don't remember that.

Page 383

Q. Did you think it was important to avoid having undisinfected effluent enter the reservoir?
MR. SUTTON: Object to the form.
THE WITNESS: What do you mean by "avoid," avoid having un --
BY MR. BIALEK:
Q. Avoid, stop, not have it go in, prevent it from going in, doing everything in your power not to have undisinfected effluent enter the reservoir or Lake Wilson.
A. I remember the design was tasked to make -- to include disinfection as part of the reuse facility.
Q. Are you aware people fish in Lake Wilson?
A. Am I aware they fish in Wahiawa Reservoir.
Q. You are aware they fish in the reservoir?
A. Yes.
Q. Were you aware at the time that you were designing the specification that people fish in the reservoir?
A. Yes.
Q. In designing the specification for the UV system, did GMP build in any safeguards to prevent undisinfected effluent entering into the reservoir in the event of a power outage?
A. I remember there was a standby or emergency generator on site.
Q. Are you -- were you aware as to how long it would

Page 424

irregularities in the vendor's calculations.
A. Yes.
Q. And you noted certain irregularities were discovered, right?
A. Yes.
Q. Would there have been any importance of reporting an irregularity unless it had an impact on the effectiveness of the system or of the lamp?
MR. SUTTON: Object to the form.
THE WITNESS: Can you repeat the question, please?
BY MR. BIALEK:
Q. Sure. What was the importance of listing the irregularities in vendor's calculations in this report? It's a new question, by the way.
A. To state the irregularities that were discovered.
Q. No importance other than to state irregularities? So if there was a typo you could have put that in, too?
A. It's possible I could have put that in.
Q. Well, looking at the irregularities that you noted --
A. Um-hum.
Q. -- were these just nominal irregularities, or did you attach some significance to these irregularities?
A. I don't remember at the time if I did attach significance to the irregularities.

Page 425

Q. Well, look at it now.
Do you think you did?
A. I may have, yes.
Q. Well, is the size of the quartz sleeve important in determining the dosage?
A. I believe it would go to calculation of reactor volume, maybe.
Q. What about intensity?
A. Yes, that would be the energy input or output, depending how you look at the system.
Q. So then it would be involved in determining the proper dosage, correct?
A. Yes, it could, it could be.
Q. Well, if it affects intensity, intensity is a factor in calculating dosage, correct?
A. If what affects intensity?
Q. You just said, I thought, that the size of the quartz sleeve could affect intensity.
A. Could affect reactor volume. That's what I said.
Q. And intensity?
A. I didn't say that. I said reactor volume.
Q. Well, could it affect intensity?
A. I don't remember if it could affect intensity. I remember --
Q. Well, forget what you remember from that time.

Page 426

Sitting here now do you know?
A. I would say I'm not sure if it would affect the intensity calculation.
Q. Prior to issuing this report did you ever contact Ultra Tech to verify your figures?
A. I believe I already stated that I did not --
Q. Did you ever --
A. -- or did not recall.
Q. -- contact Ultra Tech to determine their response to the irregularities that you were noting?
A. I don't recall contacting Ultra Tech about the irregularities.
Q. Did you send a copy of this to Mike Elhoff?
A. I don't remember sending a copy to Mike Elhoff.
Q. Is it possible?
MR. SUTTON: Objection, calls for speculation.
THE WITNESS: I don't know if I did.
BY MR. BIALEK:
Q. Did you talk to Mike Elhoff about this quartz sleeve size?
A. I don't remember if I did.
Q. The nominal output of the UV lamps, you noted that there was an irregularity there as well, correct?
A. Yes.
Q. Would that affect dosage?

Page 427

A. Yes. The wattage would affect dosage.
Q. Prior to issuing this report noting the irregularities in Ultra Tech's calculations, did you contact Ultra Tech to get a response?
A. I believe I already said that I don't recall contacting them.
Q. Why didn't you check the facts with the vendor before issuing this report?
A. I don't remember why because I don't remember whether or not I contacted the vendor.
Q. Do you know what the true output was for an Ultra Tech lamp?
MR. SUTTON: Object to the form.
THE WITNESS: I'm not aware of it.
BY MR. BIALEK:
Q. Did you ever learn?
A. I don't know if I did.
Q. Did you ever check your facts regarding these irregularities before telling others that Ultra Tech didn't comply with the specs?
MR. SUTTON: Object to the form.
THE WITNESS: I don't recall whether or not I told others about -- I don't recall -- okay. This question is confusing.
BY MR. BIALEK:

Page 428

Q. Then I'll rephrase it.

Did you tell anyone else or did you express an opinion to anyone that you did not believe that Ultra Tech was able to meet the specifications?

A. Yes, based on the dosage calculations.

Q. Right. And those irregularities that we just talked about affected dosage, correct?

A. Yes.

Q. And prior to issuing your report and prior to telling other people that you didn't think that Ultra Tech could meet the specifications due to the dosage calculations, don't you think you should have contacted Ultra Tech --

MR. SUTTON: Object to the form.

MR. BIALEK: -- to check your facts?

MR. SUTTON: Object to the form.

THE WITNESS: Can you repeat -- can you rephrase the question?

BY MR. BIALEK:

Q. Sure. Why didn't you contact Ultra Tech to check your facts regarding your view about dosage?

A. I believe I already said that I don't recall checking or contacting Ultra Tech to check facts.

Q. Yeah, I know, but why?

MR. SUTTON: Same objection, badgering the witness.

THE WITNESS: I don't remember why.

Page 429

MR. BIALEK: I'm not badgering.

MR. SUTTON: If you ask it over and over and over again, that's badgering. Maybe it's different -- I don't know whether it's a wolverine in your language or some other type of animal you use, but it's badgering.

MR. SCHULMEISTER: It's a junkyard dog.

MR. SUTTON: It's dogging the witness.

BY MR. BIALEK:

Q. Would you at least agree with me that before advising other people that you did not believe that Ultra Tech would meet the specs because of dosage calculations you did not confirm whether your dosage calculations were going to be correct?

MR. SUTTON: Object to the form.

BY MR. BIALEK:

Q. Do you understand what I'm saying or asking?

A. No. Can you rephrase it, please.

Q. Absolutely. You issued an opinion to others that Ultra Tech did not meet the specifications or would not be able to meet the specifications, correct?

A. Yes.

Q. And you based that opinion on the fact that you did not believe that Ultra Tech met the dosage, correct?

A. In regards to the specification for dosage, yes.

Q. And the way that you came to that opinion was based

Page 430

upon certain assumptions you made regarding quartz sleeve size and output; isn't that correct?

MR. SUTTON: Well, let me object. You didn't include the third category.

THE WITNESS: What's the third category?

MR. ROSEHILL: He used Exhibit 7.

MR. SUTTON: The lamp length and not the arc length.

MR. BIALEK: Okay. Well, let's go with the first two.

Q. Those were two factors, correct?

A. Yes, those were two.

MR. SUTTON: Two factors supplied by your client, and you're saying why does my -- why does this guy not ask your client for figures he gave him were incorrect? Give me a break.

MR. BIALEK: No, no, no.

Q. I believe when you did your dosage calculations you didn't use the information that Ultra Tech supplied; isn't that correct, because there were irregularities? You used other information.

A. I remember looking at information from Ultra Tech.

Q. But you disregarded it because you thought that there were irregularities?

A. But I don't remember why they were irregularities.

Q. Ah. I think that the document that you wrote is

Page 431

fairly clear as to why you felt there were irregularities. Am I right?

A. But.

Q. You thought that were irregularities due to the size of the quartz sleeve, correct?

A. Yes, but this doesn't state where I got the information from.

Q. Where did you get the information from regarding the quartz sleeve?

A. I believe I got that information from information that was provided to me, I don't know from Ultra Tech, but on the Ultra Tech System.

Q. Well, Ultra Tech provided you information as to what their quartz sleeve was, correct? "The vendor used an outside diameter of 2.3 centimeters." You see that?

A. Yes, but --

Q. That was the information that Ultra Tech supplied, correct?

A. Yes, and I believe they also supplied .48 inches.

Q. Okay. Who supplied the 2.4384 centimeter number?

A. That looks like it was calculated.

Q. How was it calculated?

A. Converting inches to centimeters.

Q. Who calculated it?

A. Most likely me if I was doing this review.

Page 432

Q. Were you able to calculate the outside diameter of the quartz sleeve using the radius of the quartz sleeve without knowing the thickness of the quartz sleeve?

MR. SUTTON: It says "outside"

THE WITNESS: It says, "Outside radius of the quartz sleeve is .48 inches," so if you convert that --

BY MR. BIALEK:

Q. Did Mike Elhoff provide you with any of this information?

A. Not that I remember, no.

Q. Let's go to the second one where it says, "The vendor used an output of 27 watts."

MR. SUTTON: No -- okay. Go ahead.

BY MR. BIALEK:

Q. Right, see it says the vendor used an output of 27 watts?

A. Yes, it does.

Q. Where you get the information that the nominal output of the UV lamps is 26.7 watts?

A. I don't recall where I got that information from.

Q. Did it come from Mike Elhoff?

A. I don't remember if it came from Mike Elhoff.

Q. How come you used it?

A. I must have thought at the time that was the proper nominal output of the lamp.

Page 433

Q. But what was your basis for doing so? Ultra Tech claimed that it was 27 watts.

A. I already said I don't remember.

MR. SUTTON: Counsel, this document doesn't have Attachment 1 and 2 which are made reference here. I don't know where those are.

MR. SCHULMEISTER: Maybe you can provide them.

MR. SUTTON: Well, this came from the City and County and Bodell.

MR. BIALEK: Obviously it was a document created by GMP.

MR. SUTTON: Well, it says "C&C/Bodell"

MR. BIALEK: That's their designation.

MR. SUTTON: Okay. All I know is that it was provided by Mr. Schulmeister.

MR. BIALEK: No, actually it was provided by the City.

MR. SCHULMEISTER: Actually it came from the City.

MR. SUTTON: No, it was marked by Mr. Schulmeister.

MR. SCHULMEISTER: As an exhibit.

MR. SUTTON: Correct.

MR. SCHULMEISTER: But it was produced by the City.

MR. SUTTON: Okay. So we don't know whether you left off Attachment 1 and 2.

MR. BIALEK: Well, I'll do it this way. We'll

Page 434

request that GMP and the City both provide Attachment 1 and 2 and we'll reserve our rights to finish the exam on this document at that time, and then I'll move on.

MR. SUTTON: Well, you have those documents as well, Counsel.

MR. BIALEK: How do I have those documents?

MR. SUTTON: You have the City and County documents. They have been available.

MR. SCHULMEISTER: I don't want to pay for all this garbage on the record.

MR. BIALEK: You're assuming they are in there. They are not in there.

MR. SCHULMEISTER: Can we move on?

MR. SUTTON: Well, give me a break. It's been garbage up to this point, so I might as well put more on.

MR. SCHULMEISTER: We'll swear you in and you can give garbage under oath.

MR. SUTTON: Okay. I won't say any more if you don't.

BY MR. BIALEK:

Q. Can you increase intensity by having a higher output lamp?

A. Yes, you should be able to.

Q. Can you increase intensity by moving lamps closer?

A. I'm not sure of that.

Page 435

Q. Are you not sure now, or you weren't sure then?

A. I'm not sure now.

Q. Do you know if you knew then?

A. I might have known then.

Q. Do you know whether the City relied upon GMP's analysis of dosage to reject Ultra Tech?

A. No, I don't know that.

Q. Did anyone ever tell you that the City relied upon GMP's analysis of dosage to reject the Ultra Tech System?

A. I'm not aware of that.

Q. Do you know if there is a margin of error in bioassay tests?

A. I don't know if there is a margin of error.

Q. The UVDIS program that you acquired, did you have to pay for that?

A. I don't remember paying for it.

Q. Well, did GMP pay for it?

A. I don't know if GMP paid for it.

Q. Was it provided to you free of charge?

A. I don't remember if I paid for it, so I don't know if it was free or not.

Q. Did you ever ask Trojan for their program in order to run calculations?

A. I don't recall asking them that.

Q. Is there a reason you didn't?