Adrian Rosehill (3868)
STUBENBERG & DURRETT
Davies Pacific Center
841 Bishop Street, Suite 2115
Honolulu, Hawaii 96813
Attorneys for Engineered Systems, Inc.

James D. Boughey (HSB No. 6546)
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
525 Market Street
San Francisco, California 94105-2725
Attorneys for UltraTech Systems, Inc

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 1 2 2006

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>OHIO PACIFIC TECH, INC. f/k/a GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>Defendants.<br>-AND RELATED ACTIONS- | Civil No. 03-00706 (JMS/LEK)<br><br>**REPLY AFFIRMATION; CROSS-CLAIM DEFENDANT/CROSS-CLAIM PLAINTIFF ULTRA TECH SYSTEMS, INC., and THIRD PARTY DEFENDANT/CROSS-CLAIM PLAINTIFF ENGINEERED SYSTEMS, INC. AGAINST DEFENDANT CROSS-CLAIM PLAINTIFF/ DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE** |

The within affirmation is respectfully submitted in opposition to Defendant Cross-Claim Plaintiff/Defendant and Third-Party Plaintiff City and County of Honolulu's ("City") motion for summary judgment against Cross-Claim Plaintiff/Defendant UltraTech Systems, Inc. ("UTS") and Third-Party Defendant Counterclaim Plaintiff Engineered System, Inc. ("ESI"). The City's motion should be denied, and UTS' motion for summary judgment should be granted.

**PRELIMINARY STATEMENT**

The City seeks an order dismissing the claims brought against it by UTS and ESI, noting that the claims raised by UTS and ESI against the City are identical. The City's arguments,

1142806.1

however, are mere red herrings that fail when evaluated against not only the facts, but the theories of liability that exist. Simply stated, the City cannot hide behind Ohio Pacific Tech, Inc., f/k/a GMP ("GMP"), the engineer it retained to assist it in drafting the specifications. The City actively participated and ratified every fraudulent, improper and unethical act undertaken by GMP and the City employees when they participated in this coordinated plan to rid the Wahiwa Project of the UTS system. Moreover, it was the devious improper means that the City and GMP undertook to fulfill its plan that caused damage and are actionable.

The City confuses UTS' claim with a breach of contract claim and sets up straw men to strike down. We respectfully request that the Court see through these red herrings and grant judgment to UTS and ESI as it is clear that the City and GMP violated not only the public trust, but the laws of the State of Hawaii.

## ARGUMENT

### I. THE CITY TOOK AFFIRMATIVE IMPROPER ACTIONS TO RID THE WAHIAWA CONTRACT OF THE UTS U.V. EQUIPMENT AND THUS UTS/ESI'S CLAIMS FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE CITY SHOULD BE GRANTED

The City took intentional affirmative steps to discourage, impede and ultimately disapprove the use of UTS' U.V. equipment from the Wahiawa project. The actions of the City caused UTS and ESI to suffer damages in the form of lost profits, expenses, lost time, loss of proprietary information, and damage to their reputation.

**UTS/ESI Has Met Each and Every Requirement for Proving The Claim of Intentional Interference with Contractual Relations Against the City and County of Honolulu**

As set forth in UTS/ESI's motion for summary judgment, the Intermediate Court of Appeals of Hawaii has established a six-part test that a plaintiff must plead and prove to be

successful on a claim for intentional interference with a contract.[1]  See, Kutcher v. Zimmerman, 957 P2d 1076, 87 Haw. 394; (Haw. Ct. App. 1998).  The City and County of Honolulu, however, argue that UTS and ESI cannot meet each and every element of this six part test.  We respectfully submit that they not only can, but have met these elements as a matter of law.

**1.    A contractual relationship existed between UTS and Bodell**

The City attempts to argue that UTS/ESI's claim for intentional interference with a contract cannot succeed because a contract did not exist between Bodell and UTS.  Not only is this claim inaccurate, as a contract did exist between Bodell and UTS, but applying the City's rationale, all claims brought by the City against UTS and ESI must be dismissed.

After being awarded approval for its UV system, UTS submitted its proposal to various contractors bidding on the Wahiawa WWTP, including Bodell (the offer).  Bodell was successful in being awarded the bid, and the City was aware that Bodell intended to use the UTS system.  Moreover, when the City executed the contract with Bodell, they were clearly aware Bodell intended to use the UTS system as they had participated in numerous discussions about ways to eliminate the UTS system.  The City proceeded and entered into the agreement with Bodell without mention of changing the UV equipment.  Relying upon the City's contract, Bodell engaged UTS to start work on the project (the acceptance).  Bodell and UTS agreed that UTS would provide U.V. disinfection equipment, as offered when it submitted its approval letter, price and scope of supply to Bodell.

Work began immediately by both Bodell and UTS to prepare for the design and construction of the equipment to be used at Wahiawa (the consideration).  Bodell committed to UTS to purchase a system for this project.  Relying on this agreement, UTS engaged engineers to assist in preparing the equipment submittal and acted upon Bodell's commitment.  Both Bodell and UTS continued to work throughout the year 2000 to prepare for the construction of the project, to maintain compliance with the contract and the schedule.  Both UTS and ESI spent

---

[1] In order to be successful on a motion for summary judgment in support of a claim of intentional interference with prospective business relations, the movant must be able to plead and prove (1) that an agreement existed, (2) the defendant knew of this relationship, (3) the defendant intentionally interfered with the relationship, (4) the defendant had no justification, (5) the interference caused the third party to not consummate the contract, and (6) the defendant's interference caused the plaintiff damage.

countless hours and financial resources in trying to convince the City and GMP that it complied with the design specifications before ultimately being rejected by GMP and the City in January 2001 (the damage).

In sum, UTS and Bodell can show that there was an offer, acceptance (at the very least through detrimental reliance), and consideration. An agreement was in place. The City's argument that the written instrument was never fully executed is irrelevant and can be explained if necessary. It is not necessary, since the actions of Bodell and UTS prove there was an agreement. There must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract. The Uniform Commercial Code is in accord. Under Haw. Rev. Stat. § 490:1-201(11), (3), a contract is reached from the bargain of the parties in fact as found in their language *or by implication from their conduct and the surrounding relevant circumstances* (emphasis added). Earl M. Jorgensen Co. v. Mark Constr., 56 Haw. 466 (Haw. 1975). Here there was a meeting of the minds and both Bodell and UTS acted upon the expectation of delivering the UTS system.

2.  **Bodell's issuance of a performance bond effectively eradicates the City's argument with respect to the Consent Decree**

The City also calls into question part four of the test (i.e., "the defendant had no justification"), in support of its contention that the City acted with privilege in taking steps to reject the UTS System.[2] The City claims that its actions were justified, as it had a superior duty to protect its contract with Bodell and to ensure compliance with the Consent Decree.[3]

In making this argument, the City concedes that it was bound by the Consent Decree entered into with the State which called for stipulated penalties to be assessed against the City if it did not meet the deadline in making the required improvements to the Wahiawa WWTP.

This position was contrived by the City only in response to the claim presented. The protection of a performance schedule is a concern that is addressed prospectively in this and

---

[2] The City admits to rejecting the UTS system by way of its papers. See, City's Motion for Summary Judgment at page 13.
[3] The Wahiawa Project was mandated by a Consent Decree entered into between the City and the State of Hawaii as a result of a lawsuit filed by the State against the City.

1142806.1                                        4

many other construction contracts. In fact, a whole class of insurance has emerged to address these issues. Specifically, as delays are frequently a concern of a developer, and sometimes cannot be avoided by contractors, many projects now require sureties or performance bonds. One such security was required here.

The contract entered into by the City and Bodell called for Bodell to issue a performance bond, whereby Bodell agreed to be responsible for any fines assessed by the State if the contract was not performed in a timely matter as set forth in the Consent Decree. See, Executed Performance Bond of Bodell, annexed hereto as Exhibit "A". The issuance of the performance bond effectively eliminated any concern the City had with respect to the imposition of monetary fines, as it made Bodell or its insurer, the responsible party. Thus, the City's argument that it acted out of concern for remaining in compliance with the Consent Decree is baseless and without merit.

The City also relies on privilege in making the claim that it acted against UTS out of its underlying obligation to uphold its contract with Bodell. This argument is specious. Bodell diligently and consistently fought for the UTS system to be approved throughout the design and approval process, even going so far as to retain an expert to offer proof that the project could be completed within deadline, with the use of the UTS system. See, Affidavit of Armand Cote, annexed hereto as Exhibit "B".

### 3. The City is misapplying the Court's Application of the Term "Privilege"

The City has attempted to argue that its intentional actions against UTS are not actionable as the City acted with "privilege" in protecting its contract with Bodell, and its commitment under the Consent Decree. The City has misconstrued the term "privilege" as defined by the Courts. The City's actions in the case at bar were intentional, improper, unjustifiable and did not meet the courts' definition of privilege.

In Zimmerman, supra, the Court goes through an extensive analysis of the term "privilege" and its interpretation beginning with the First Restatement of Torts § 766 (1939) where a plaintiff could assert a "privilege" as an affirmative defense, through the Second Restatement of Torts which shifted the focus on the defendant's conduct from whether the conduct was "privileged" to whether the defendant acted "improperly". See, Zimmerman, supra at 1083-1087. The change in emphasis from "privilege" to "improper" was explained as a fact specific analysis which must be conducted on a case by case basis, as to whether the interference was improper or not under the circumstances. Zimmerman at 1085. Courts have interpreted the Second Restatement to mean that a plaintiff may show that the defendant acted by "improper means." Top Service Body Shop v. Allstate Ins. Co., 582 P.2d 1365, 1371, 283 Ore. 201 (Or. 1978). "Means may also be improper or wrongful because they violate "an established standard of a trade or profession". Leigh Furniture and Carpet Co. v. Isom, 657 P.2d 293, 308 (Utah 1982), citing Top Service, supra.

In the case at bar, the City acted improperly by way of objective interpretation. First and foremost, the interference was immediate—as soon as the bids were opened, the City began its campaign to rid the project of the UTS system. Days after the bid opening and the realization that UTS was to be the U.V. supplier, the City took affirmative actions after having met with UTS' competitor, Mike Elhoff of Hawaii Engineering Services, ("HES") to rid the contract of the UTS equipment and replace it with the Trojan Technologies, Inc's. ("Trojan") system.

On December 27, 1999, a meeting was held at the City with members of the design team and the City's Corporation Counsel. A decision was made by the City to delete the U.V. equipment from the contract, as explained in a December 30, 1999 post-meeting email from Guy Inouye. See, Exhibit 12 of MSJ.[4]

---

[4] The email explains the City's plan to exclude UTS and delete the U.V. disinfection units from the Basic Bid, and to then procure the system separately as "Government Furnished Equipment" (despite the prior inclination to avoid proprietary equipment).

The City took this action at the behest of HES and Trojan, as evidenced in minutes of a January 10, 2000 "Management Team Meeting" which confirmed that the decision to delete the UTS system was made because "another vendor complained." See, Exhibit 13 of MSJ. Furthermore, an email from Mike Elhoff to Trojan outlines how he met with the City "days after the bid opening". See, Exhibit 14 of MSJ. This correspondence also notes that Mr. Elhoff told Bodell prior to bid opening that UTS would not be approved.[5]

The City also relies on Wyatt v. Rick Construction 117 Ariz. 186, 571 P2d 683 (Ariz. 1977). In Wyatt, a claim for intentional interference was brought by a roofing sub-contractor against the City of Tucson, after the City directed the general contractor to cancel its contract with the roofing sub-contractor for its failure to use appropriate materials. The Court found that the contract specifications called for a certain grade of roofing product which the roofing sub-contractor was unable to use, as it was not an authorized installer of the product. Nor had the sub-contractor shown that its substitute product was equal to or superior to the product called for by the specifications. Thus, the court found that the City had acted with privilege in canceling the contract as it was acting to ensure that the specifications called for under the contract were met.

Unlike the Wyatt case, the contract in question in the case at bar had yet to begin in December of 1999. In Wyatt, the City sought to cancel a contract with a sub-contractor well into the performance of the contract, when it became clear that the sub was using inferior materials. In the case at bar, the City commenced its efforts to rid the project of the UTS system days after bid opening. No rationale basis could possibly exist in December 1999, for the City to object to the UTS equipment, and therefore the City cannot establish that is intentional actions against UTS/ESI were based on "privilege".

---

4(a) All future reference to Exhibits, where not specifically annexed hereto, refer to Exhibits served as part of UTS/ESI's Motion for Summary Judgment ("MSJ").

[5] It must be questioned how Mike Elhoff could state with such authority to Bodell that the UTS system would never be approved.

1142806.1                                        7

Moreover, the City cannot claim privilege for the manner in which it acted. It is not solely that the City interfered, but how they City did so. The City, contrary to Hawaii law, released UTS' confidential information to HES, UTS' prime competitor, and the vendor who was seeking to be used in place of UTS. The City cannot reasonably believe this was an appropriate act. The City did not engage an expert to evaluate the UTS system. The City did not engage a U.V. manufacturer who was not related to the project. Rather, the City worked directly with HES/Trojan to scrutinize the UTS proposal to find any reason to remove UTS from the job. They could not find any reasonable basis, so in bad faith they formulated a reason that had no merit. The fabricated reason does not stand on its own, but more importantly the conduct undertaken by the City was malicious, devious and in bad faith. This is not conduct that is privileged.

### UTS/ESI HAS MADE OUT ITS CLAIM FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST THE CITY

As the City points out in its papers, Robert's Hawaii School Bus v. Laupahoehoe Transportation Co. Inc., 91 Hawaii 224, 982 P.2d 853 (1999), stands for the proposition that the defendant must act with a purposeful intent to interfere with the advantage, and that such interference must also be "improper". The evidence of the City's intentional "improper" acts are explained in detail in the preceding arguments and illustrated in the emails and memorandum from the City attached in UTS/ESI's original motion.

The City also relies on Locricchio v. Legal Services Corp. 833 F.2d 1352, 1358 (9th Cir. 1987), which called for the plaintiff to prove that the defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact. It is abundantly clear that the City took calculated efforts to rid the contract of the UTS equipment. When that failed (for reasons unknown) the City allowed UTS to spend time and money working towards designing and implementing its equipment to conform to the project requirements, all the while knowing that they would never allow UTS to qualify. Even more egregious then the

unfounded attacks on UTS, was the purposeful dissemination of UTS' proprietary information to its chief competitor, Trojan.

In April of 2000, the City and GMP requested a pre-submittal package from ESI/UTS which they immediately shared with Mike Elhoff and HES. HES, in turn, forwarded the materials to Trojan, despite the fact that the pre-submittal contained a confidentiality provision describing its contents as proprietary (and despite the fact that Trojan was one of UTS's chief competitors). See, Exhibit 34 of MSJ.

In the engineering industry, it is understood that proprietary information, once received, is never to be released to any outside party, especially a competitor, without the express consent of the manufacturer. To do so implies collusion and a prior intent to damage.

The release of UTS' proprietary information was a clear violation of accepted standards in the engineering industry, and in violation of every canon of ethics relied on in the industry. See, Leigh Furniture, 657 P.2d 293, 308, citing Top Service, supra. The purpose for which the proprietary information was apparently released, i.e. to allow UTS' competitors to criticize the submittal, is reprehensible. It is a clear example of the "improper" conduct which the courts in Roberts Hawaii, Locricchio and Leigh Furniture described when explaining the standard which plaintiff must meet to make out a case for intentional interference with prospective relations.

Finally, additional evidence of the inappropriate relationship between HES, the City of Honolulu and GMP can be seen in a series of emails discussing how HES could assist in criticizing UTS's submission.

On June 5, 2000, an email from Guy Inouye (a City employee) to other employees of the City notes that a meeting was held at the request of Mr. Elhoff. The email states that "Mike" does not think an informal submittal is proper, that the UTS system does not meet the specifications called for; and that the approval was not proper. See, Exhibit 23 of MSJ.

The City and GMP impermissibly and inextricably released this confidential and proprietary information to the local representative of a competitor for the purpose of soliciting assistance in eliminating the UTS system. This was a blatant intent to interfere with UTS' business relations with Bodell. At the very least, it was grossly negligent. Basic tenets of an engineer's professional code of conduct forbid the sharing of proprietary and confidential information between competitors. Yet, the City and GMP freely and quickly exchanged the information they requested and received from UTS, with its chief competitor, Trojan.

**The City's Interpretation of Greg Ellner's Deposition Testimony Is Misleading**

The City attempts to rely on the deposition testimony of Greg Ellner, UTS' president, to bolster its argument that the City acted with privilege. The City's motion erroneously states that Mr. Ellner admitted that neither UTS' horizontal nor vertical systems satisfied the requirements of the UV specifications. Nowhere in Mr. Ellner's deposition testimony can this statement be found. See City's Exhibit "K" at pp. 135-138. In actuality, what the specifications called for is for the vendor to satisfy all of the performance requirements and fit in the allotted space. The UTS system did meet all of the performance requirements, and would have fit in the allotted space had it not been rejected a year into the project on baseless and picayune grounds (notably, the size of the system was not an issue raised by GMP and the City in rejecting UTS).

The City further misrepresents Mr. Ellner's testimony when it asserts that he stated that the UTS vertical system did not have California Title 22 certification as required by the specifications. At the time this project was being planned in 1999/2000, there was no testing and certification for Title 22. UTS, nor any other vendor for that matter, could have been certified at that time as the State of California had yet to test vertical systems. However, UTS was in possession of a letter stating that their equipment was Title 22 compliant.

It is clear that there were several interpretations of the specifications. One reading would indicate that vertical systems would be prohibited. Other readings would not. See, Affidavits of

Sid Ellner and Armand Cote, annexed hereto as Exhibits "B" and "C", respectively. Again, however, this is a red herring. UTS clearly ultimately met the specifications with its horizontal system.

## II. IN APPROVING THE UTS U.V. EQUIPMENT FOR BIDDING PURPOSES THE CITY MADE INTENTIONAL AND/OR NEGLIGENT STATEMENTS WHICH LEAD UTS/ESI AND ALL PROSPECTIVE CONTRACTORS TO BELIEVE THAT THE UTS' SYSTEM WAS QUALIFIED FOR USE AT THE WWTP PROJECT

The essence of UTS/ESI's claim against the City for misrepresentation, is the fact that the City by way of its December 9, 1999 approval letter represented to UTS, Bodell and all potential contractors bidding on the Wahiawa project, that UTS was a qualified bidder.

In support of its contention that UTS/ESI cannot substantiate this claim, the City argues that Greg Ellner admitted that he knew the December 9, 1999 letter was a conditional approval. This argument misconstrues "conditional approval."

Paul Scott of ESI submitted a pre-bid substitution request to the City for the purpose of having UTS' equipment qualified for the Wahiawa Project. The City referred this substitution request to GMP, who rejected it without analysis, on the basis that the request did not include enough information.

In response, the City, overriding GMP's objection, issued an approval letter to the City, granting approval for the UTS system, for "bidding purposes only". The interpretation of this term "bidding purposes only" is ambiguous at best. As explained at length by the expert declarations of Sid Ellner, this term can only be interpreted to mean that a contractor could rely upon the approval letter to utilize the UTS price in its bid. As Sid Ellner indicates, if that is not its meaning, then the entire pre-bid qualification procedure has no meaning, and could only serve to mislead them. See, Declaration of Sid Ellner attached hereto as Exhibit "B".

Sid Ellner goes on to state that the specification was a performance specification, and thus any equipment used would ultimately have to be designed and submitted in compliance with the drawings and available space to satisfy the performance requirements of the specification.

1142806.1                                    11

Thus, the City's actions in granting approval, and then seeking to withdraw it days later, and then allowing the approval to stand while intending never to approve the UTS system, is the misrepresentation upon which UTS and ESI move for summary judgment. Mr. Ellner stated that the December approval was conditional, because like any other performance specification, the equipment is always subject to the performance criteria once it has been designed and finally implemented to conform with the design of the system.

### III. THE CITY WAS NEGLIGENT IN ISSUING SPECIFICATIONS FOR THE WAHIAWA CONTRACT THAT WERE MISLEADING AND AMBIGUOUS

The City's argument that UTS and ESI have no standing to assert a claim of negligence against the City is once again a red herring designed to focus the Court's attention on an incorrect analysis of the law applicable to this case. The relevant cause of action brought by both UTS and ESI is one for negligence, and not for breach of contract. The City tries to divert attention away from this fact, by pointing out that HRS §103D-704 allows for an action to be brought only be a class of persons who fall under the category "person aggrieved".

In the case at bar, UTS and ESI are not moving for breach of contract. Clearly, no contract existed between UTS and the City or ESI and the City (although an argument could be advanced that they were third-party beneficiaries of the contract awarded to Bodell since the City executed the contract knowing of UTS' role in the project. The claim brought by UTS and ESI is one for the negligent drafting of the specifications contained in the bid proposal.

ESI and UTS communicated with representatives of the City concerning the specifications and determined that they could meet the performance specifications as drafted. After submitting its proposal, the UTS equipment was ultimately approved. A year later, after jumping through a plethora of hoops created by GMP and the City, the UTS equipment was arbitrarily rejected. It must be noted that one of the final reviews by GMP and the City of the UTS equipment, came up with 18 picayune points to reject UTS' equipment. Prior to being

rejected, UTS addressed each and every one of the points, unfortunately to no avail. The City and GMP opted to reject UTS and require Bodell to proceed with a Trojan system.

The City now argues that it can have no liability for the negligently drafted specifications as they retained GMP to draft the UV specifications. Regardless of whether GMP assisted the City in the technical drafting of the specifications, it was the City who issued the specifications when it put out the bid for the Wahiawa project. The City issued the bid and the specifications on City letterhead. To now say that it has no liability for the wording of the specifications is outlandish.

### The City is Liable For All Acts of GMP as GMP served as the City's Agent and All Actions Taken By GMP Were Approved and Ratified by the City

The City asserts that they cannot be held responsible for the actions of GMP, as GMP acted as an independent contractor for the City. Regardless of the designation of GMP as independent contractor, GMP was the City's agent for the Wahiawa WWTP. Every recommendation made by GMP was reviewed and qualified by the City and their cadre of engineers.

GMP was retained by the City for assistance in drafting the specifications. However, the engineers employed by the City, specifically Cyril Hamada, had significant experience with U.V. disinfection projects, after having recently overseen the projects at the wastewater treatment plants at Honoululi and Kailua. Each and every action recommended by the GMP, was subsequently ratified, or in certain instances, overruled by the City, confirming the City had the final word.

### The City's actions in overruling GMP's initial November 1999 rejection of the UTS system brought independent liability upon the City.

While the City on one hand tries to distance itself from GMP by claiming that GMP acted independently, the City admittedly ignored GMP's recommendations at certain times, choosing to act on its own.

For example, while GMP rejected the request submitted by ESI in November 1999 without so much as a review, the City through Cyril Hamada, chose to ignore GMP's recommendation and approved UTS. Significantly, the City admitted that its actions opened them up to liability.

As evidence by the City's Management Team Meeting Notes the City decided to delete the U.V. equipment. The notes indicate "we eliminated equipment from package and will procure equipment by itself—**this portion of bid based on our error.**"

### Cyril Hamada's Decision To Approve UTS Was Based on His Own Independent Review of the Relevant Documents

The City's engineer, Cyril Hamada, approved UTS over the objection of GMP. When asked to explain his decision, Mr. Hamada drafted correspondence outlining his multiple reasons for approving the UTS equipment. The email, dated October 30, 2000, lays out Mr. Hamada's thought process for approving the UTS system. He notes that after reviewing the specifications, he found the following:

1) the specification allowed for substitution;
2) both the Trojan medium pressure and the UltraTech low pressure system met Title 22 or Hawaii R-1 quality water.
3) he was assured that space limitations and experience requirements would not be a problem; and
4) the Honouliuli job had the Trojan model as a design, however in that case *the City approved the substitution request for low pressure units (because their engineer, Fischer & Porter repeatedly reiterated the benefits of a low pressure system).*

Therefore, Cyril Hamada concluded:

*Since the UTS system meets Title 22, and since we approved a LP (low pressure) system for Honouliuli, and since Ultratech was approved for Kailua WWTP, and since it purportedly fits in the allocated space, and since there might be some benefit to the City, it was my decision to approve the substitution request.*

Mr. Hamada listed numerous reasons why the UTS system was approved, as manifested in the December 9, 1999 letter. Yet, the City now seeks to ignore Mr. Hamada's well-outlined and substantiated rationale for approving the UTS system, to argue that the City had no control

over the drafting of the specifications or the fact that they negligently misrepresented that the UTS was approved as a qualified system to be relied on by contractors in bidding the Wahiawa project.

As evidenced by Cyril Hamada's email (Exhibit 35), he had good cause to approve UTS based on their experience at Kailua, the superiority of the low-pressure system, the bid materials submitted by UTS, and lastly, due to the fact that the **specification allowed for substitution**. The City's claims are therefore without merit and must be denied.

## V.   CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court deny the motion of the City in all respects, and in the alternative, to grant judgment to cross-claim plaintiffs UTS and ESI, against cross claim plaintiff defendant the City, and for such other, further and different relief as this Court deems just and proper.

Dated: Honolulu, Hawaii; April 12, 2006.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: _____
Adrian Rosehill
*Attorneys for Third-Party Defendant/Cross-Claim Plaintiff*
**ENGINEERED SYSTEMS, INC.**
*And Special Counsel to Third-Party Defendant/Cross-Claim Plaintiff UltraTech Systems, Inc.*
*For This Motion*
Stubenberg & Durrett
Davies Pacific Center
841 Bishop Street, Suite 2115
Honolulu, Hawaii  96813

Of Counsel:

Adam R. Bialek, Esq.
Kirsten Bennett-O'Rourke, Esq.