CADES SCHUTTE
A Limited Liability Law Partnership

DAVID SCHULMEISTER    2781-0
KRISTIN S. SHIGEMURA    6957-0
1000 Bishop Street, Suite 1200
Honolulu, Hawaii  96813-4216
Telephone:  (808) 521-9200
Facsimile:  (808) 521-9210
Email:       dschulmeister@cades.com
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>             Plaintiff,<br><br>      v.<br><br>OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>             Defendants. | CIVIL NO. 03-00706 (JMS/LEK) (Contract)<br><br>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT; DECLARATION OF DAVID SCHULMEISTER; EXHIBITS "65"-"72"; AFFIDAVIT OF GREG ELLNER; CERTIFICATE OF COMPLIANCE WITH L.R. 7.5; CERTIFICATE OF SERVICE<br><br>**Hearing:**<br>**Date:      May 1, 2006**<br>**Time:      9:00 a.m.**<br>**Judge:    Honorable J. Michael Seabright** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................2

II.  LEGAL STANDARD .........................................................................4

III. ARGUMENT......................................................................................5

A.   Bodell submits that the UTS UV equipment complies with a
     reasonable interpretation of the Specifications; it is therefore
     not "undisputed" that it does not, as argued by the City.....................5

     1.   The UTS system submitted by Bodell and rejected was
          horizontal – not vertical; UTS separately requested post
          bid substitution approval for its vertical system which
          Hamada recommended approving, but the City
          nonetheless rejected on the advice of GMP............................5

     2.   Neither Bodell nor UTS have admitted that UTS could
          not satisfy the experience requirement .....................................6

     3.   The "7-day moving median requirement" relates to
          performance of the system after installation – but the City
          rejected the UTS system prior to installation ...........................7

B.   The City's own interpretation of the meaning and effect of its
     December 9, 1999 approval letter over a six month period
     during which it consulted extensively with counsel belies its
     current argument that the approval letter unambiguously placed
     the entire risk of its later rejection of the UTS system on Bodell........8

     1.   Interpreted as A Whole, Giving Meaning To All of Its
          Provisions, And Considering the Conduct of the Parties,
          The Parties Agreed that Bodell Would Be Entitled To An
          Equitable Adjustment to the Contract If the UTS System
          Ultimately Did Not Meet the Specification ...............................8

# TABLE OF CONTENTS
## (continued)

**Page**

2.    The City itself, after a threatened protest by Trojan and GMP's advice that the approval letter should never have been issued, unilaterally decided to rebid the UV equipment separately ...............................................................10

C.    If the December 9, 1999 approval letter can, as the City argues, be reasonably construed to require Bodell to requalify UTS as a qualified manufacturer even after the City had done so, this leads to a latent ambiguity that must be construed against the City .....................................................................................14

1.    The City's Use of the Phrase, "For Bidding Purposes Only" contains a Latent Ambiguity .........................................14

2.    Because the Contract is Ambiguous, Bodell's Interpretation is Reasonable, and Bodell Actually Relied on its Interpretation, Bodell's Interpretation Controls............22

D.    The City's Conduct Is In Bad Faith and A Violation of the Procurement Code............................................................24

E.    Summary Judgment Should be Denied to the City Because The City Negligently Or Intentionally Misrepresented that the UTS System was Approved as an Equal to The Trojan System for Bidding Purposes...............................................................26

IV.    CONCLUSION ....................................................................30

# TABLE OF AUTHORITIES

## CASES

Addisu v. Fred Meyer, Inc., 198 F.3d 1130 (9th Cir. 2000)........................................4

Bishop Est. Trust v. Castle & Cooke, 45 Haw. 409, 368 P.2d 887 (1962).............14

Blair v. Ing, 21 P.3d 452 (2001) ..............................................................26

Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272
    (9th Cir. 1992)...............................................................................9

Bronster v. U.S. Steel Corp., 919 P.2d 294 (1996) ....................................30

Cho Mark Oriental Food, Ltd., v. K.K. International, 73 Haw. 509,
    836 P.2d 1057 (1992) .....................................................................14

Community Heating & Plumbing Co., Inc., 987 F.2d 1575 (Fed. Cir. 1993).........20

Edward R. Marden Corp. v. United States, 803 F.2d 701 (Fed. Cir. 1986)............23

Fortec Constructors v. United States, 760 F.2d 1288 (Fed. Cir. 1985).....................9

Foundation International, 102 Hawai`i 478, 78 P.3d 23 (S. Ct. 2003).......................
    ...........................................................................................16, 18, 22, 23

Fry Communications, Inc. v. U.S., 22 Cl. Ct. 497 (1991)...........................................
    ...............................................................................15, 16, 17, 18, 20, 21, 23

HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327 (Fed. Cir. 2004) ....................16, 18, 19

Hawaii's Thousand Friends v. Anderson, 786 P.2d 1293 (1989) ...........................27

Honda v. Board Of Trustees of the Employees' Retirement System of the
    State of Hawaii, 118 P.3d 1155 (2005) ................................................26

Jamsar, Inc. v. United States, 442 F.2d 930 (Ct. Cl. 1971)......................................15

# TABLE OF AUTHORITIES
### (continued)

Mingus Constructors, Inc. v. United States, 812 F.2d 1387
(Fed. Cir. 1987)................................................................5

Newsom v. U.S., 230 Ct. C 676 F.2d 647 (Ct. Cl. 1982)..................16, 20

Record Steel and Construction, Inc. v. United States, 62 Fed. Cl. 508
(Ct. Cl. 2004) ..........................................................9, 15, 19

Ring Construction Corp. v. United States, 162 F. Supp. 190
(Ct. Cl. 1958) ................................................................15

The Best Place, Inc. v. Penn America Insurance Co., 82 Hawai`i 120,
920 P.2d 334 (1996) .........................................................25

Triax Pac., Inc. v. West, 130 F.3d 1469 (Fed. Cir. 1998) ...........15, 16, 20

Zanakis-Pico v. Cutter Dodge Chrysler Plymouth Jeep Eagle,
47 P.3d 1222 (2002) .......................................................26, 30

## STATUTES

FRCP Rule 56(c)..............................................................4

Haw. Rev. Stat. § 103D-101 ...............................................24, 25

## MISCELLANEOUS

National Institute of Construction Law, Inc., Construction and Design Law
§ 13.1(g), at 7 (1989) ......................................................15

Restatement (Second) of Contracts, § 202 (1979)..........................13, 23

# TABLE OF AUTHORITIES
## (continued)

Restatement (Second) of Contracts, § 203 ................................................................9

Restatement (Second) of Torts § 531 ....................................................................27

CADES SCHUTTE
A Limited Liability Law Partnership

DAVID SCHULMEISTER    2781-0
KRISTIN S. SHIGEMURA    6957-0
1000 Bishop Street, Suite 1200
Honolulu, Hawaii 96813-4216
Telephone:  (808) 521-9200
Facsimile:  (808) 521-9210
Email:    dschulmeister@cades.com
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>Defendants. | CIVIL NO. 03-00706 (JMS/LEK) (Contract)<br><br>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT; DECLARATION OF DAVID SCHULMEISTER; EXHIBITS "65"-"72"; AFFIDAVIT OF GREG ELLNER; CERTIFICATE OF COMPLIANCE WITH L.R. 7.5; CERTIFICATE OF SERVICE<br><br>**Hearing:**<br>**Date:**    **May 1, 2006**<br>**Time:**    **9:00 a.m.**<br>**Judge:**    **Honorable J. Michael Seabright** |

Trial Date:

Date:      May 1, 2006
Time:      9:00 a.m.
Judge:     Honorable J. Michael Seabright

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Bodell Construction Company ("**Bodell**") hereby submits its memorandum in opposition to Defendant City and County of Honolulu's ("**City**") Motion for Summary Judgment, filed February 17, 2006 ("**Motion**").[1]

## I.    INTRODUCTION

The City's Motion depends upon the Court holding that the City's December 9, 1999 approval letter which purports to allow contractors to use price

---

[1]    Bodell incorporates herein by reference Plaintiff Bodell Construction Company's Motion For Summary Judgment Against Defendant City and County of Honolulu on Counts I and II of the First Amended Complaint filed February 13, 2004; Declaration of David Schulmeister; Declaration of Leroy Humke ("**Humke Decl.**"); Exhibits 1-36; Declaration of Sydney Ellner ("**S. Ellner Decl.**"); Exhibits 1-7; Declaration of Armand Cote ("**Cote Decl.**"); Exhibits 1-11, filed herein on January 9, 2006 ("**Bodell MSJ**") and the Concise Statement of Facts in support of Plaintiff Bodell Construction Company's Motion For Summary Judgment Against Defendant City and County of Honolulu on Counts I and II of the First Amended Complaint filed February 13, 2004 ("**Bodell CS**").
    Bodell also incorporates Plaintiff's Memorandum in Opposition To Defendant Ohio Pacific Tech Corporation, Inc. fka GMP Associates, Inc.'s Motion For Summary Judgment; Declaration of David Schulmeister; Exhibits "37"- "64", filed concurrently herewith.

quotes from UTS "for bidding purposes only" could not, in fact, be relied upon by contractors in the preparation their bids – which is nonsense.  If that were true, then the approval letter obviously should never have been issued.  The Motion further requires the Court to ignore the fact that the City itself, as evidenced by **six months of meeting notes and emails** among division and department heads and attorneys in the Department of Corporation Counsel, was so certain that it could **not** hold Bodell to the price it bid for the UTS system if Bodell was required to install the much more expensive Trojan system that the City decided to delete the UV equipment from Bodell's contract and rebid it separately.  Documents recently produced by the City show that this rebid project was stalled due to internal confusion as between the City and GMP over who was supposed to prepare the necessary paperwork until it became **too late** to do so because of the impending deadline in the Consent Decree between the City and the State Department of Health.  Only then did the City decide to ignore its prior attempts to correct its "error" in having issued the approval letter and claim that it had always clearly been Bodell's responsibility to supply the Trojan system without any adjustment to its contract price.

> The City's Motion also ignores the fact that if the Court were to accept the City's current argument that UTS was not a qualified manufacturer under the Project specifications because it could not use its prior installations of

vertically configured UV systems to satisfy the experience requirement, then the specification is a *de facto* sole source specification that was published and acted upon by the City in violation of the State of Hawaii Procurement Code. The City cannot have it both ways. If only Trojan could have met spec, then the City was in bad faith in conducting the bidding in such a manner as to mislead contractors, such as Bodell, into thinking that other suppliers, such as UTS, would be considered under the "or equal" language used to evade the sole source procurement rules that otherwise would have applied and would have prevented any misunderstanding on the part of bidders.

Accordingly, and as hereinafter more fully explained, the Motion should be denied.

## II.    LEGAL STANDARD

FRCP Rule 56(c) directs that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable differences

against the moving party.  Mingus Constructors, Inc. v. United States, 812 F.2d

1387, 1290-91 (Fed. Cir. 1987).

## III.  ARGUMENT

### A.  Bodell submits that the UTS UV equipment complies with a reasonable interpretation of the Specifications; it is therefore not "undisputed" that it does not, as argued by the City

The City argues at pp. 15-19 of its moving papers that it is

"undisputed" that the UTS equipment did not meet specifications in three respects:

1) that the UTS system was vertical which was prohibited by the specification; 2)

that the UTS system could not satisfy the experience requirement; and 3) that UTS

"did not submit any proof that its vertical or horizontal systems satisfied the 7-day

moving median requirement . . ."  These allegedly "undisputed" facts are in fact

disputed.

      1.      The UTS system submitted by Bodell and rejected was horizontal – not vertical; UTS separately requested post bid substitution approval for its vertical system which Hamada recommended approving, but the City nonetheless rejected on the advice of GMP

The UTS UV system that was submitted by Bodell and ultimately

rejected by the City was a horizontal system.  See Ex. 70.  While UTS later made a

separate post bid substitution request for approval of a vertically configured

system, which Hamada apparently recommended approval of but the City

nonetheless rejected on GMP's advice,[2] Bodell's claim herein does not depend on whether UTS' vertical system was in compliance with the specification.  While Bodell believes the specification's purported prohibition of vertical systems was an integral component of GMP and the City's strategy to disguise their *de facto* attempt to sole source the Trojan system as having been competitively bid, the fact remains that the system submitted by Bodell was horizontal.  See Ex. 70.

> 2.    Neither Bodell nor UTS have admitted that UTS could not satisfy the experience requirement.

As clearly laid out in Bodell's motion for partial summary judgment against the City and supporting papers, Bodell and UTS contend that UTS met the experience requirement.  In order to contend otherwise, the City is forced to advocate an unreasonably narrow construction of the experience requirement that only considers prior installations by UTS of its systems in a horizontally configured orientation.  But this is vigorously disputed by the testimony of Greg Ellner, the 2/17/06 Affidavit of Greg Ellner, the 4/13/06 Affidavit of Greg Ellner, and the 12/11/05 Declaration of Sidney Ellner.  Adopting the City's interpretation would, moreover, convert the specification into a *de facto* sole source specification in violation of the State of Hawaii Procurement Code, as argued in Bodell's motion.

---

[2]    See Ex. 69.

3.    The "7-day moving median requirement" relates to performance of the system *after* installation – but the City rejected the UTS system *prior* to installation.

Without any supporting declaration or testimony that the UTS system submitted by Bodell would not have been able to meet the performance requirements of the specifications, the City attempts to bootstrap an alleged admission that UTS did not "prove" that it would meet the so called "7-day moving median requirement" into an admission that, if installed and tested, the UTS system would have failed this requirement.  This argument makes no sense.

As explained in the 4/13/06 Affidavit of Greg Ellner, attached hereto, the system would need to be installed and operated on the effluent at the Project and then tested in order to determine compliance with the specified kill rates. Since the City never allowed the installation to proceed, the test could never be performed.  Importantly, however, Lee Mansfield testified that he did not have any problem with the UV dosage calculations submitted by UTS to demonstrate that the number and configuration of lamps in the UTS design was adequate to achieve the UV radiation dosage that corresponds with the desired kill rates in the specification's performance requirement.  See  Ex. 35 at p. 284.  The City's motion does not explain why, if GMP did not have a problem with the number or configuration of lamps in the UTS submittal, or the accompanying dosage calculations demonstrating that the required intensity of UV radiation would be

applied to the effluent, UTS needed to do anything more to "prove" that, upon installation, the required kill rates would actually be achieved.

**B.**     **The City's own interpretation of the meaning and effect of its December 9, 1999 approval letter over a six month period during which it consulted extensively with counsel belies its current argument that the approval letter unambiguously placed the entire risk of its later rejection of the UTS system on Bodell**

At pages 19-21 of its moving papers, the City argues that the December 9, 1999 approval letter is unambiguous in leaving the entire risk of Bodell using a quote from UTS "for bidding purposes" on Bodell. This flies in the face of the purpose of issuing the approval letter in the first instance and is belied by the City's own conduct in unilaterally deciding to rebid the UV equipment separately. It is clear that the City simply dropped the ball on preparing the necessary documents until it was perceived to be too late "given all the admin., procurement, and technical hoops that we have to jump through?" Ex. 23.

1.     Interpreted as A Whole, Giving Meaning To All of Its Provisions, And Considering the Conduct of the Parties, The Parties Agreed that Bodell Would Be Entitled To An Equitable Adjustment to the Contract If the UTS System Ultimately Did Not Meet the Specification.

The City's December 9, 1999 letter clearly provides a right to an equitable adjustment of the Contract if the UTS System which was approved for "bidding purposes only" was subsequently determined not to meet the Specification. This is because if the letter is interpreted as urged by the City—that

contractors who used the UTS System in their bid calculation were required to subsequently demonstrate that the UTS System was a qualified substitute, and if not, they took the risk of having to provide the more expensive Trojan System — then the City's December 9, 1999 letter was <u>meaningless</u>.

> RESTATEMENT (SECOND) OF CONTRACTS, § 203 provides:
>
> [i]n the interpretation of a promise or agreement or a term thereof… an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect.

<u>see also</u> <u>Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.</u>, 971 F.2d 272, 279 (9th Cir. 1992) (in reversing denial of motion for directed verdict, the Ninth Circuit held that proffered interpretation of contract would render language "useless", contrary to well settled rules of construction). Thus, "an interpretation that gives reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." <u>Fortec Constructors v. United States</u>, 760 F.2d 1288, 1292 (Fed. Cir. 1985); <u>see also</u> <u>Record Steel and Construction, Inc. v. United States</u>, 62 Fed. Cl. 508, 514 (Ct. Cl. 2004) ("the writing must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its provisions…an interpretation that gives meaning to all portions of the contract is favored over one that leaves a part of the contract meaningless").

The City's <u>pre bid</u> approval of UTS was issued, over GMP's objection, in response to a specific request made by UTS in accordance with the General Instructions to Bidders (<u>see</u> Bodell MSJ, Exs. 7,8, 9) and hence had ***no other purpose*** than to give comfort to general contractors to whom UTS quoted prices that the City had determined UTS to be "equal or better" to Trojan – the ***only*** brand listed in the specification. Had the City ***not*** issued this letter, the specification would have ended up being a *de facto* sole source specification even though sole source procurement procedures were not followed. Thus, the City's citation to <u>Premier Electrical Construction Co. v, City of Chigago</u> is wholly misplaced, as in that case, the contractor submitted a proposed list of substitute equipment <u>after</u> the contract was awarded. In this case, the City issued the pre-approval letter <u>before</u> the bid submission deadline which was for the purpose of allowing contractors to use the UTS system in their bid calculation.

> 2.    The City itself, after a threatened protest by Trojan and GMP's advice that the approval letter should never have been issued, unilaterally decided to rebid the UV equipment separately

On December 21, 1999, the City held an internal meeting to discuss Trojan's "threat of protest" regarding the City's prebid substitution approval for UTS. Ex. 65. Another meeting with Corporation Counsel was held on December 27, 1999. Exs 14, 33 at p. 93. By December 30, 1999, the City had decided to delete the UV equipment from Bodell's contract. Ex. 14. Between December 30,

1999 and June 28, 2000, there were numerous internal communications at the City, and discussions with attorneys from the Department of Corporation Counsel, regarding the fact that the City's pre-bid approval letter for UTS was an error and the City had decided to rebid the UV equipment separately.  See Ex. 33 at pp. 85-93 (involvement of Cynthia Nojima of Corporation Counsel in meeting on 12/27/99 over concern of Trojan protest); Exs. 71-72 (City privilege logs).

There was confusion within the City, however, until at least April 4, 2000 regarding whether the job of preparing the rebid specification for the UV equipment was to be done internally by Hamada or instead by the City's retained consultant, GMP.  See Exs. 15, 18, 47, 48.  The state of knowledge that Bodell was able to acquire as of the date of its motion for partial summary judgment as to why the rebid never took place was limited to the cryptic testimony of Guy Inouye that it was "a mystery to  me."  Ex. 33 at 133.  Recent documents produced by the City from the files of Hamada, however, indicate that on April 4, 2000, when he was questioned by his superiors regarding why the UV rebid specs had not yet been prepared, he responded:  "I recall in our meeting w/ Guy, that Guy said that UV specs for rebid would be prepared by GMP."

The City's confusion regarding who was to prepare the rebid spec and the resulting delay prompted concern regarding whether, in view of the impending deadline imposed by the Consent Decree, there was enough time to follow required

procurement procedures to obtain the UV equipment separately for Bodell to install. The last document produced by the City that refers to the rebid of the UV equipment is dated June 28, 2000 and questions whether it would still be realistic to rebid the UV equipment and "have the UV installed by March 1, given all the admin., procurement, and technical hoops that we have to jump through?" Ex. 23. This appears to explain why the City subsequently adopted the strategy of claiming that it was **already** Bodell's responsibility to purchase and install the Trojan system – notwithstanding the City's prior approval of Bodell's use of UTS's price quote "for bidding purposes only." If the City had attempted to proceed with the UV rebid, the resulting delays and failure to comply with the deadline in the Consent Decree would have clearly been the City's fault, and the City's only excuse would have been the "I got it – no you take it" confusion regarding whether it was Hamada or GMP who was supposed to have prepared the necessary paperwork.

Accordingly, the City's conduct—pre-bid, post-bid, and post contract execution—was clearly consistent with its belief that, "approved for bidding purposes only" meant that contractors bidding on the Project could use the UTS System price in their bid calculation, but if for some reason, the UTS System did not receive final approval, the contract could be modified—as either an increase in the total contract price or a reduction in the total price— to reflect the change in

the cost of the UV system actually approved and installed.  The conduct of the parties is the best evidence of the meaning and intent of the parties' agreement. RESTATEMENT (SECOND) OF CONTRACTS, § 202 (1979).

As discussed in Section IV.B of the Bodell MSJ, the parties' intentions in this case were demonstrated by their actions that indicate that both the City and Bodell believed that Bodell was entitled to an equitable adjustment of the contract price.  There is no dispute that Bodell calculated its bid price on the UTS System in reliance on the City's December 9, 1999 letter.  Bodell MSJ, Humke Decl. at ¶¶ 8-10.  Immediately after bid opening, the City asked Bodell whether it would delete bid item no. 81 and what credit Bodell would give the City for the deletion.  Bodell MSJ, Exs. 14, 15, 16; Humke Decl. at ¶¶ 11-12.  In fact, the City admitted that allowing Bodell to bid using the UTS System was "our error", and therefore the City planned to purchase the UV equipment itself.  Bodell MSJ, Exs. 15, 66, 67.  The City issued a formal memorandum confirming that the City would furnish the UV equipment by separate bid on January 12, 2000.  See Ex. 46.. Thus, even after the Contract was signed the City continued its plans to rebid the UV equipment (Bodell MSJ, Ex. 18), and to discuss where to secure additional funds if the City needed to purchase a compliant system (Bodell MSJ, Ex. 23).

It is disingenuous for the City, after having unilaterally acted for more than six months on the assumption that it could not reasonably hold Bodell to a bid

price based on UTS to suddenly change its position, **solely because it failed to**

**timely prepare the necessary paperwork to rebid the UV equipment**. If the

December 9, 1999 approval letter was truly "unambiguous" that this was solely

Bodell's risk, how could the City and its attorneys have completely ignored this

over the entire course of the **six months** in which numerous meetings were held

and memos prepared that were focused on fixing this "error" by the City?

    C.    <u>**If the December 9, 1999 approval letter can, as the City argues, be**
**reasonably construed to require Bodell to requalify UTS as a**
**qualified manufacturer even after the City had done so, this leads**
**to a latent ambiguity that must be construed against the City.**</u>

        1.    The City's Use of the Phrase, "For Bidding Purposes Only"
contains a Latent Ambiguity.

If the terms of the parties' agreement is unclear, it is because the

meaning of the phrase, "for bidding purposes only" is ambiguous. Whether a

contract is ambiguous is a question of law, and the Court can make such a

determination on a motion for summary judgment. <u>See Cho Mark Oriental Food,</u>

<u>Ltd., v. K.K. Int'l.</u>, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992). The test is

whether the particular words or phrases in the contract are uncertain or doubtful as

to meaning. <u>Bishop Est. Trust v. Castle & Cooke</u>, 45 Haw. 409, 421, 368 P.2d

887, 894 (1962).

Where a government contract is ambiguous, and the contractor's

interpretation of the ambiguity is reasonable, *contra proferentem* requires that the

ambiguity be resolved against the government as the drafter pursuant.  Record Steel and Construction, Inc. v. United States, 62 Fed. Cl. 508, 517 (Fed. Cl. 2004).  See also  National Institute of Construction Law, Inc., Construction and Design Law § 13.1(g), at 7 (1989).  Accord Jamsar, Inc. v. United States 442 F.2d 930, 934 (Ct. Cl. 1971) (referring to the "line of cases holding that if the government-drawn bid invitation is reasonably construed, that is the interpretation which will be adopted"); Ring Constr. Corp. v. United States 162 F. Supp. 190, 191 (Ct. Cl. 1958) ("The specifications are ambiguous; they were written by the Government; the plaintiff's interpretation of them is reasonable and should prevail").

> The doctrine of *contra proferentem* properly puts the risk of [latent] ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms[,] and it saves contractors from hidden traps not of their own making.

Fry Communications, Inc. v. United States, 22 Cl. Ct. 497, 503 (internal cites omitted).  See also Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1998) ("subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of *contra proferentem*.").

Not withstanding its own argument that the approval letter was "unambiguous," the City then does a complete about-face by citing Foundation International in support of its argument that, if the letter did contain an ambiguity, the ambiguity was "patent."  Under this narrowly-applied exception to the general

rule, the City argues that Bodell was required to inquire as to the true meaning of the Contract before submitting its bid.  The City's argument is without merit.

The patent ambiguity doctrine has not been given broad application by the federal courts.  Triax Pac., Inc., 130 F.3d at 1475.  "A patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used."  Foundation International, 102 Hawai`i at 499, 78 P.3d at 35.  "An ambiguity is patent where there is 'an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap.'"  Fry Communications, Inc., 22 Cl. Ct. at 504 (citing WPC Enterprises, Inc. v. United States, 232 F.2d 874, 163 Ct. Cl. 1, 6, (1963)).  Therefore, a patent ambiguity does not exist if the ambiguity is not "glaring" or "substantial" or "patently obvious."  Foundation International, 102 Hawaii at 499, 78 P.3d at 35 (citing Community Heating & Plumbing v. Kelso, 987 F.2d 1575, 1597 (Fed. Cir. 1993)).  In short, the ambiguity must be so conspicuous that it is "unreasonable" for the contractor not to discover and inquire about the ambiguity.  HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed. Cir. 2004).  See also Newsom v. U.S., 230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (Ct. Cl. 1982) (contractual language must be "so glaring as to raise a duty to inquire").  This is because "the contractor is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible

differences in interpretation." Fry Communications, 22 Cl. Ct. at 509 (internal quotes omitted).

The determination of whether an ambiguity is patent is determined on an *ad hoc* basis and by looking to what a reasonable man would find to be patent and glaring. Fry Communications, 22 Cl. Ct. at 509 (citing Max Drill, Inc. v. United States, 427 F.2d 1233 (1970)). "Thus, the inquiry into—whether an ambiguity is patent in a search through the eyes of a reasonable man, for *such* discrepancies, errors or gaps; if the court finds none, it can only conclude that the ambiguity is ***not* patent**." Id. (bold and italic emphasis in original).

Foundation International, cited by the City, concerned a State of Hawaii Department of Transportation contract that called for the construction of a basalt embedment for bridge supports. In one section the contract provided that the embedment was to be "at least" or a "minimum" of four feet into basalt. The contract also provided, however, that the actual length of the pile was to be determined by the State engineer. 102 Hawai`i at 495, 78 P.3d at 31. Thus, the contract wholly omitted the *actual length* of the pile and the depth needed to be excavated: it merely stated a minimum depth and left open the possibility of deeper excavation. Id.

The Foundation International court held that where a *material term* is left unstated, such as the actual depth of excavation required, a contractor has an

obligation to clarify the patent ambiguity before entering into the contract. Id. at

498, 78 P.3d at 34.  The court noted that the purpose of the patent ambiguity

exception is in part to prevent contractors from taking advantage of the

government by basing their bids on the narrowest scope of work, and then seeking

equitable adjustments for additional work that the government actually meant to be

included in the contract price. Id. at 499, 78 P.3d at 35.  The instant case, and

others applying the patent ambiguity doctrine, are distinguishable from Foundation

International both factually and because the policy underlying the "patent

ambiguity" exception is not implicated here.

> a.   The Contract Between Bodell and the City is Factually
>      Distinguishable From Cases Applying the Patent
>      Ambiguity Doctrine.

There is no ambiguity in the Contract documents arising from

"defective, obscure or insensible language" that it creates such "an obvious error in

drafting, a gross discrepancy, or an inadvertent but glaring gap" that it was patent

and therefore unreasonable for Bodell not to seek clarification of the ambiguity.

Foundation International, 102 Hawai`i at 499, 78 P.3d at 35; Fry Communications,

Inc., 22 Cl. Ct. at 504; HPI/GSA-3C, LLC, 364 F.3d at 1334.

The ambiguity at issue in this Case— whether the City's

representation that the UTS System was approved as an equal to the Trojan "for

bidding purposes only" meant that Bodell was still required to requalify UTS as

"qualified" manufacturer—is not contradicted by any other term in the Contract documents.  In fact, the pre-approval letter is *consistent* with the City's General Instructions to Bidders at § 1.13 (a), which provided that the bidder's bid "shall be based on either one of the specified brands, make or method, or on an alternate brand, make, or method, which has expressly been found to be equal or better by the Officer-in Charge."  See Bodell MSJ, Ex.2.

Unlike the contracts where patent ambiguity is found, the Contract documents here do not have a glaring material omission.  The ambiguity is subtle and therefore *latent*, because the confusion arises from the question of what "for bidding purposes only" means, not from the glaring omission of a material term. In Record Steel and Constr., Inc. v. U.S., 62 Fed. Cl. 508 (Fed. Cl. 2004) the United States Federal Court of Claims applied the general rule to ambiguities in government contracts and rejected the argument that the ambiguity was patent:

> The exception to that general rule is the patent ambiguity doctrine, which mandates resolving ambiguities against the contractor where the ambiguities are "'so "patent and glaring" that it is unreasonable for a contractor not to discover and inquire about them.'" The Federal Circuit "has not given the [patent ambiguity] doctrine broad application . . . [b]ecause the doctrine has the effect of relieving the government from the consequences of its own poorly drafted contracts." An ambiguity that is not so glaring as to trigger the patent ambiguity exception is considered latent, and the *contra proferentem* rule applies.

Id. at 517 (emphasis added and internal citations omitted).  See also HPI/GSA 3C,

LLC, 364 F.3d at 1335 (ambiguity held not sufficiently glaring as to trigger patent ambiguity doctrine); Fry Communications, Inc., 22 Cl. Ct. at 509 (ambiguity in invitation for bid was latent, rather than patent, being only minor discrepancies and esoteric gaps, thus, ambiguity was not so obvious and glaring that contractor should have noticed it and sought clarification).

      Other cases applying the "patent ambiguity" doctrine illustrate why the doctrine is not applicable here.  In each case where it was applied, the contract ambiguity was so glaring that the contractor's decision to proceed with signing of the contract and initiation of work without seeking clarification was not reasonable.  See e.g., Triax, 130 F.3d at 1474 (alternative interpretations of requirement in construction contract either required waiver of other key contract provisions or was inconsistent with the clear language of the contract, and thus the court found a patent ambiguity because "the contract terms cannot be reconciled with one another"); Newsom, 230 Ct. Cl. at 302, 676 F.2d at 648 (patent ambiguity found where contract called for renovation of three buildings each with two floors and referenced drawings for the first and second floors; however the drawings for the second floor indicated only one building); Community Heating & Plumbing Co., Inc., 987 F.2d at 1578-79 (contract calling for installation of conduit sleeves on manholes held patently ambiguous as it did not specify whether conduit sleeves were to be installed on new or existing manholes, or both; Navy also requested that

the contractor confirm its bid estimate because it was 5% lower than next lower bidder).

In this case, Bodell did not rush into signing the contract and initiating work without clarifying a glaring confusion in the contract documents.  To the contrary, prior to execution of the Contract the City **unilaterally** decided to delete bid item no. 81 and engaged in negotiations with Bodell regarding what credit the City would receive on the Contract price for the deletion.  Bodell MSJ, Exs. 14, 15, 16.  See also Exs. 46, 47, 48, 66, 67.  Under these circumstances, it was more than reasonable for Bodell to believe that if the City decided it did not want Bodell to install the UTS System, and instead would require the Trojan System, that Bodell would be entitled to an equitable adjustment.  "The contractor is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation."  Fry Communications, 22 Cl. Ct. at 509 (internal quotes omitted).  Thus, there was no reason for Bodell to make an inquiry into the meaning of "for bidding purposes only" because the City's actions subsequent to bid opening clearly indicated that Bodell would not be held to its bid price if there was a change to bid item no. 81.

> b.    The Policy Underlying the Patent Ambiguity Doctrine Is Not Implicated in this Case.

The policy of the patent ambiguity exception is to prevent a contractor from taking advantage of an obvious ambiguity in a government contract by under-

calculating its bid in order to secure the contract, and then seeking additional compensation for work that was included in the scope of the contract to begin with. Foundation International, 103 Hawai`i at 499, 78 P.3d at 35. In this case, the **City is attempting to take advantage of Bodell** via an ambiguity of its own making: holding Bodell to a lower contract price after having induced Bodell to believe it could base its bid price on the cheaper UTS System, but then requiring Bodell to purchase and install the substantially more expensive Trojan System without offering an equitable adjustment. Thus, the City has received the more expensive equipment while causing a loss on the part of the contractor who relied on the City's own words.

Because the policy of the patent ambiguity doctrine is not applicable to this case, the general rule of construing the ambiguity against the drafter of the contract documents should apply.

> 2. Because the Contract is Ambiguous, Bodell's Interpretation is Reasonable, and Bodell Actually Relied on its Interpretation, Bodell's Interpretation Controls.

As discussed above, if there is a latent ambiguity in a government contract, the only remaining question is whether the contractor's interpretation of the ambiguity is reasonable. Bodell's interpretation of the phrase "for bidding purposes only" is more than reasonable under the facts of this case. Significantly, in rejecting the argument that a patent ambiguity existed and in applying the *contra*

*proferentem* rule, the <u>Record Steel</u> Court noted that "there has been no suggestion that the parties' intentions appear elsewhere in the record" and the evidence showed that the contractor had "actually relied on its interpretation in submitting its price proposal." <u>Id.</u> at 517-18.

The best evidence of the meaning and intent of the parties is evidence of the parties' course of performance. RESTATEMENT (SECOND) OF CONTRACTS, § 202 (1979). Thus, "in constructing ambiguous contracts 'the courts will look to the construction the parties have given the instrument by their conduct <u>before a controversy arises.</u>'". <u>Fry Communications</u>, 22 Cl. Ct. at 503. (citing <u>Edward R. Marden Corp. v. United States</u>, 803 F.2d 701, 705 (Fed. Cir. 1986)) (emphasis added).

As discussed above, the parties' intentions in this case were demonstrated by their actions post-bid opening and post-contract execution, and indicate that both the City and Bodell believed that Bodell was entitled to an equitable adjustment of the contract price. <u>See</u> Bodell MSJ, Exs.14, 15, 16, 18, 23; Humke Decl. at ¶¶ 8-12. There is no dispute that Bodell actually relied on its interpretation of the Contract. Humke Decl. at ¶¶ 8-10. It is also clear that Bodell's interpretation of the December 9, 1999 letter is not only reasonable, but the City also acted consistently with Bodell's interpretation for many months after bid opening. <u>See</u> Bodell MSJ, Exs.18, 23; Humke Decl. at ¶¶ 11-12; <u>see also</u> Exs.

46, 47, 48, 66, 67.  The Court should grant Bodell summary judgment on its breach of contract claims because its interpretation of the ambiguous Contract provision is reasonable and the doctrine of *contra proferentem* applies.

**D.    The City's Conduct Is In Bad Faith and A Violation of the Procurement Code.**

Hawaii Revised Statutes § 103D-101, *Requirement of Good Faith*, provides that "[a]ll parties involved in the negotiation, performance, or administration of state contracts shall act in good faith."  The City's conduct and course of performance of the Contract has been inconsistent, conflicting, inequitable, and patently unfair to Bodell.

The City created the circumstances under which Bodell relied on the December 9, 1999 letter.  The City hired GMP to draft the Project Specifications.  The City knew that sole source procurement provisions would be required if GMP believed that there would be only one "qualified" supplier.  The City rejected GMP's initial recommendation to deny the UTS substitution request.  Bodell MSJ, Ex. 9.  The City thus issued a letter to HEI informing it that the UTS System was approved for bidding purposes only, knowing that HEI would convey this information to potential bidders on the Project.  Bodell MSJ, Ex. 10.  When Trojan and GMP insisted that UTS should not be deemed compliant with the specifications, the City accepted this at face value and determined that it was "our error" to have issued the approval letter.  Bodell MSJ, Ex. 15.  The City then

approached and engaged Bodell in negotiations regarding the credit to the City if

bid item no. 81 was deleted.  Bodell MSJ, Ex. 14, 15, 16.  The City continued to

act as if the UV system was going to be rebid after the Contract was signed in

February 2000.  Bodell MSJ, Ex. 18.  See also Exs. 46, 47, 48, 66, 67.  The City

continued to discuss obtaining additional funds to cover the cost of purchasing the

more expensive Trojan System.  Bodell MSJ, Exs. 23, 66.  Then, for no apparent

reason other than that **the ball got dropped as between the City and GMP**

**regarding who would prepare the rebid paperwork**, the City reversed itself, and

ordered Bodell to supply the more expensive Trojan System at no additional cost to

the City.  Bodell MSJ, Ex. 28 at C007410.

       The City's conduct as outlined above, and the City's current position

that, notwithstanding its own clear belief for more than six months that Bodell

could not be required to supply the Trojan system without a price adjustment, that

somehow the contrary proposition should always have been clear to Bodell, is in

bad faith, a violation of the Hawaii Procurement Code and a breach the implied

duty of good faith.  Haw. Rev. Stat. § 103D-101; The Best Place, Inc. v. Penn

America Insurance Co., 82 Hawai`i 120, 920 P.2d 334 (1996).  The Court should

deny the City summary judgment on Count II of the Complaint and grant Bodell's

MSJ.

**E.    Summary Judgment Should be Denied to the City Because The City Negligently Or Intentionally Misrepresented that the UTS System was Approved as an Equal to The Trojan System for Bidding Purposes**

The City induced Bodell to rely to its detriment on the City's representation that the UV specification was not a "sole sourcing" of the Trojan system, that UTS System was approved for purposes of bidding on the Contract, and therefore the City is liable for negligent or intentional misrepresentation. As discussed above, there was no purpose for the City's December 9, 1999 approval letter other than to provide comfort to potential bidders that they could use the UTS system in their bid submission for the Project. The City therefore knew or should have known that bidders such as Bodell would rely on the December 9, 1999 letter in calculating their bid submissions for the Project.

Under Hawaii law, a claim for negligent misrepresentation arises when:

> (1) false information [is] supplied as a result of the failure to exercise reasonable care or competence in communicating information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies on the information.

Honda v. Bd. Of Trustees of the Employees' Retirement System of the State of Hawaii, 118 P.3d 1155, 1165 (2005) (citing Blair v. Ing, 21 P.3d 452, 474 (2001)); see also Zanakis-Pico v. Cutter Dodge Chrysler Plymouth Jeep Eagle, 47 P.3d 1222, 1234 (2002).

A claim for intentional misrepresentation, also characterized as a

claim for fraud, deceit, or fraudulent misrepresentation[3] arises where:

> (1) false representations were made by defendants, (2)
> with knowledge of their falsity (or without knowledge of
> truth or falsity), (3) in contemplation of plaintiff's
> reliance on these false representations, and (4) plaintiff
> did rely upon them.

Hawaii's Thousand Friends v. Anderson, 786 P.2d 1293, 1301 (1989).

On November 18, 1999, Engineered Systems, Inc. sent a substitution

request to the City seeking to have the UTS system approved as a substitute

equivalent to the Trojan system specified in the Specifications. Bodell MSJ, Ex. 6.

Although GMP initially recommended denial of the substitution request (see

Bodell MSJ, Ex. 7), the City's Project Manager, Mr. Hamada, overruled GMP.

Bodell MSJ, Ex. 8. Mr. Hamada's decision was based on the fact that the UTS

system was a de facto approval because the it had already been installed at the

City's Kailua Wastewater Treatment Plant, met Title 22, and fit into the allocated

space for the UV disinfection system. Bodell MSJ, Exs. 8, 24, 34 (Hamada Depo.

at 180-84).

---

3    The Restatement (Second) of Torts § 531 states that "one who makes a
fraudulent misrepresentation is subject to liability to the persons or class of persons
whom he reasonably intends or has reason to expect to act or to refrain from action
in reliance upon the misrepresentation, for pecuniary loss suffered by them through
their justifiable reliance in the type of transaction in which he intends or has reason
to expect their conduct to be influenced."

Accordingly, on December 9, 1999, the City sent a letter to Engineered Systems, Inc., the local representative for UTS, confirming that the UTS system was approved as an "equal" "for bidding purposes". Bodell MSJ, Ex. 9. This letter was sent prior to the bid submission deadline in order to permit potential bidders to use the UTS system in their bid calculations. Thus, the City's confirmation that the UTS system was approved "for bidding purposes only" was indisputably for the benefit of contractors like Bodell who would be bidding on the Project.

Bodell relied on this information in its bid calculation, as did other contractors bidding on the project. Bodell MSJ, Exs. 10, 13. Bodell used UTS's system price of $267,000 in its $497,420.00 lump sum cost for UV system installation (line item 81) in its bid submission. Bodell MSJ, Exs. 13. Line item 81 for other contractors who did not use the UTS system in their bid calculation, was significantly higher. See Bodell MSJ, Ex. 13 ($1,200,000.00 bid of Hawaii Dredging Construction Co.).

The City and/or its engineer, clearly wanted the Trojan system installed, however, because immediately after bid opening, the City asked Bodell what credit the City would receive it Line Item 81 was deleted, and the City provided the Trojan system for installation. See Bodell MSJ, Exs. 14, 15, 16. Although Bodell was willing to credit the City for deletion of Line Item 81 (see

Ex. 16), the City never followed through on their request.  The City continued to internally discuss rebidding the UV equipment even after the Contract was signed on February 25, 2006.  See Bodell MSJ, Exs. 18, 23; see also Exs. 46, 47, 48, 66, 67.  Despite its conduct pre-and post contract award which reasonably led Bodell to believe that the contract would be adjusted if the UTS System was not ultimately approved, the City subsequently reversed its position as stated in the December 19, 1999 letter, and instructed Bodell to supply the more expensive Trojan system at its own expense.

When the City and GMP refused to allow Bodell to install the UTS system, required Bodell to purchase and install the more expensive Trojan system, and held Bodell to its original bid price which was based on the UTS system, Bodell suffered a significant financial loss.

As the Project owner soliciting bids, the City had the obligation to clearly and truthfully communicate the bid requirements to potential bidders. Because the City gave information to Engineered Systems, Inc. and, thereby to Bodell, that the UTS system was acceptable for purposes of bidding, the City had a duty to use reasonable care to ensure that this was in fact true.  However, because the City ultimately rejected the UTS system, the City's statement that the UTS system was approved "for bidding purposes", was false.  In fact, the City admitted

in its January 10, 2000 Meeting Minutes that allowing contractors to base their bids on the UTS System was "our error."  Bodell MSJ, Ex. 13.

The City's statement that the UTS System was approved for bidding purposes was either intentionally false in that the City did not ever intend to allow the UTS System to be used for the Project, or it was false due to the City's lack of reasonable care and competence in verifying the truth of the statement before communicating it to Engineered Systems, which in turn was disseminated to all bidders on the Project.  Under either circumstance, the City may be held liable to Bodell for either negligent misrepresentation or intentional misrepresentation and Bodell may recover all economic losses caused by the City's misrepresentation. Bronster v. U.S. Steel Corp., 919 P.2d 294, 306-07 (1996) (pecuniary losses are recoverable in a negligent misrepresentation claim); Zanakis-Pico, 47 P.3d at 1233 (actual out-of-pocket losses constitute "substantial pecuniary loss" for purposes of a fraud or deceit claim); see also Zanakis-Pico, concurring opinion (J. Acoba), 47 P.3d at 1244.

## IV.    CONCLUSION

For all of the foregoing reasons, Bodell Construction Company respectfully requests that the Motion be denied.

DATED:  Honolulu, Hawaii, April 13, 2006.

CADES SCHUTTE
A Limited Liability Law Partnership


_____
DAVID SCHULMEISTER
KRISTIN S. SHIGEMURA
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY