1  UNITED STATES DISTRICT COURT
   DISTRICT OF HAWAII

**CERTIFIED COPY**

2  - - - - - - - - - - - - - - - - - X

   BODELL CONSTRUCTION COMPANY, a Utah
3  Corporation,

4          Plaintiff,

5      -against-                    Case No.
                                    03-00706
6  OHIO PACIFIC TECH, INC. Fka
   GMP ASSOCIATES, INC., an Ohio    HG-LEK
7  corporation; CITY AND COUNTY
   OF HONOLULU; ULTRA TECH
8  SYSTEMS, INC., a foreign
   corporation,

9
           Defendants.
10
   - - - - - - - - - - - - - - - - - X
11

12 HELD AT:    Wilson, Elser, Moskowitz,
               Edelman & Dicker, LLP
13             3 Gannett Drive
               White Plains, New York  10604
14             September 1st, 2004
               10:30 a.m.

15

16         VOLUME I

17     Deposition of GREG ELLNER, a

18 non-party witness, held pursuant to Subpoena,

19 held at the above time and place before a

20 Notary Public of the State of New York.

21 ATKINSON-BAKER, INC.
     COURT REPORTERS
22   330 North Brand Boulevard, Suite 250
     Glendale, California 91203
23   (800) 288-3376

24         Lisa M. Prentice, Reporter

25 FILE NO.: 9E06DC4

Exhibit C

1

1

2    and if for some reason that is not passed, we can

3    offer the horizontal system, which already is

4    Title 22, which is a performance criteria

5    compliant.

6         Q.    This purports to be a fax to Leroy

7    Humpkey at Bodell Construction.  Looking at

8    that you know you spelled Leroy's name wrong,

9    do you know that?

10         A.    Yes, on this one.

11              MR. SCHULMEISTER:  I think, for

12         the record, when I refer to Leroy Humke,

13         the correct spelling is H-U-M-K-E,

14         although Exhibit 8 is spelled different.

15         Q.    Do you recall some issue having come

16    up at or around December the 16th that prompted

17    you to send that fax?

18         A.    Confirmation of the pricing.

19         Q.    That's Exhibit 8?

20         A.    Yes.

21         Q.    Exhibit 9, this is another one of the

22    documents that you produced that was

23    printed from the hard drive of your computer,

24    could you briefly identify Exhibit 9?

25         A.    This was follow up to a telephone

1

2   conversation with Bodell Construction.

3        Q.    In your last answer you made a

4   reference to Title 22; is that right?

5        A.    Yes.

6        Q.    I think you were going to explain

7   a little bit about what Title 22 is.  Why don't

8   you just go ahead and give a brief explanation of

9   what Title 22 is in the context of the

10  specification for the Wahiawa wastewater

11  treatment plant.

12       A.    The State of California has criteria

13  that a UV system has to meet to be Title 22

14  compliant, the regulations

15  administered by the California Department of

16  Health services.  Hawaii has a designation R-1,

17  which basically says whatever Title 22 is, that's

18  our 1.

19       Q.    Whatever California's Title 22 is

20  Hawaii's R-1?

21       A.    Correct.

22       Q.    Hawaii doesn't have its own?

23       A.    It has an R-1 that references

24  Title 22.

25       Q.    It incorporated by reference

1

2  California's Title 22?

3      A.   Correct.

4      Q.   If you put Exhibit 5, the

5  specification in front of you again, under 1.2A

6  quality assurance, the last sentence there I'm

7  going to read it out loud, it says, UV

8  disinfection system shall have been tested and

9  certified to meet California Title 22 or Hawaii

10  R-1 quality water; is that correct?

11      A.   That's what it says.

12      Q.   So, therefore, whether or not your

13  product would comply with California Title 22 was

14  obviously relevant?

15      A.   Yes, but this is not correct.

16      Q.   When you say this, what are you

17  referring to?

18      A.   That statement which you read is not

19  correct.

20      Q.   I didn't read it correctly?

21      A.   No.  The specification it refers

22  to systems that have been tested and certified.

23  California does not require testing and the

24  certification of all systems to meet Title 22. We

25  have here documentation indicating that our

1
2   systems have Title 22 compliance, but it is not

3   correct to say that all systems are certified

4   to meet Title 22.

5          Q.    The last one that I marked and handed

6   over, can you give me that one?

7          A.    9?

8          Q.    Yeah.  Exhibit 9 seems to discuss

9   that; is that right?

10         A.    Yes.

11         Q.    Again, Exhibit 9 is dated what?

12         A.    December 16th, 1999.

13         Q.    This is your letter to Mr. Humke; is

14  that right?

15         A.    Correct.

16         Q.    Does this letter sort of explain your

17  understanding of what the situation is

18  with regard to certification or approval of UV

19  systems under California Title 22?

20         A.    Somewhat.

21         Q.    Are there any particular salient

22  paragraphs in there that would succinctly

23  summarize it?

24         A.    Yes.

25         Q.    Do you want to point that out to us?

1

2          A.    Second paragraph, R-1 is Hawaii's

3    designation of California's Title 22 standard.

4    R-1 is based upon Title 22, which is why they are

5    jointly referenced.   The standards based upon the

6    National Water Research Institute guidelines.

7    Years ago it was standard

8    procedure to secure an approval letter from

9    California.  As there have been many low pressure

10   horizontal lamp UV systems which have proven

11   themselves in the field, this type of UV system

12   has been designated a, quote, conforming closed,

13   quote system, and approval letters are not

14   required nor are they being issued.  Ultra Tech

15   makes this type of horizontal UV system. Next

16   paragraph, in addition to conforming systems

17   there are nonconforming systems which can be

18   determined to be acceptable based on system

19   performance.  Both Ultra Tech's vertical and the

20   Trojan 4000 fall in to this

21   designation.  We are aware of some Trojan 4000

22   systems, one of which I believe is Riverside

23   California, where the UV system is installed

24   and not meeting Title 22 performance.  What, if

25   anything, this means in terms of future

1

2    acceptability of Trojan 4000 equipment, I do

3    not know.  As of today their system is accepted

4    by California.

5          Q.    Okay.  Now, earlier you said that the

6    last sentence of 1.2A of the specification was

7    incorrect?

8          A.    Yes.

9          Q.    Did you mean to say it's incorrect

10   because it assumes that UV disinfection systems

11   can be tested and certified to meet California

12   Title 22?

13               MR. SUTTON:  Objection.  Leading.

14               MR. BIALEK:  Objection as to form.

15         A.    It's incorrect in that it requires

16   certification.

17         Q.    In what sense is requiring

18   certification incorrect?

19         A.    Certification means that there's a

20   procedure, a standardized procedure testing,

21   and as a result you are certified, that's not

22   always the case.

23         Q.    So, it's the assumption that's

24   sort of implicit in this that's incorrect?

25         A.    Correct.

1

2      Q.   That assumption, again, is that

3  there's such a thing as a procedure for obtaining

4  a certification under California

5  Title 22?

6      A.   Correct.

7      Q.   So, are you saying there is no

8  such procedure for obtaining a certification

9  under California Title 22 for ultraviolet

10  disinfection systems?

11      A.   Yes, there is a method to

12  determine compliance.

13      Q.   How is that different from being

14  tested and certified?

15      A.   Tested and certified implies that

16  California performs testing and certification.

17      Q.   Does California ever perform testing

18  and certification?

19      A.   No.

20      Q.   On UV systems?

21      A.   No.

22      Q.   So, how does California qualify UV

23  systems for compliance with California Title

24  22?

25      A.   Based on recognized -- two-ways,

1

2    conforming system based on meeting the already

3    published criteria, nonconforming systems by

4    submitting independent data and asking that the

5    data is analyzed to verify compliance.  Instead

6    of me describing it, I believe there are

7    letters here issued from California

8    illustrating compliance of Ultra Tech's

9    horizontal and vertical UV systems.

10                    MR. SCHULMEISTER:  Why don't we

11          take a break.

12                    MR. BIALEK:  That's fine.

13                    (Whereupon, a recess was taken.)

14          Q.    Look at what's been marked Exhibit 9

15    to your deposition again, which talks about this

16    R-1 Title 22 issue.  There's a discussion here

17    about what is a, quote, conforming, closed quote,

18    system for purposes of California's

19    Title 22 standard, correct?

20          A.    Yes.

21          Q.    For the record, what is a conforming

22    system, what does that mean?  You have it here in

23    quotes.  To your understanding what's the

24    definition of a, quote, conforming system, closed

25    quote, for purposes of

1
2    California Title 22?
3         A.   A low pressure UV lamp system with
4    lamps parallel to flow, horizontal, low
5    pressure horizontal system.  Anything else is
6    nonconforming.
7         Q.   Is that all it needs to be to be
8    conforming?
9         A.   There's a series -- those lamps
10   and the basic design criteria in the published
11   NWRI guidelines.
12        Q.   That's the National Water Research
13   Institute guidelines that's referred to in the
14   third paragraph of Exhibit 9?
15        A.   Yes.
16        Q.   In terms of the relevance to the
17   specification for Wahiawa then, Trojan being a
18   medium pressure system would not be a, quote,
19   conforming system, closed quote, as you just
20   defined it?
21        A.   Correct.
22        Q.   And the Ultra Tech vertical
23   configuration would, also, not be, quote,
24   conforming as you've described it?
25        A.   Yes, that is correct.

1

2          Q.    But Ultra Tech's horizontal low

3    pressure system would be a conforming system;

4    is that right?

5          A.    Yes.

6          Q.    That's what you're explaining in this

7    letter?

8          A.    Yes.

9          Q.    We were talking a little bit earlier

10   about the specification to the extent

11   it called for the system to be, quote, tested and

12   certified, closed quote, to meet California Title

13   22.  To your understanding is the Trojan 4000

14   system that the spec was written and, quote,

15   tested and certified, closed quote, to meet

16   California Title 22?

17         A.    Not tested and certified.

18         Q.    What, if anything, did it have in the

19   way of an approval?

20         A.    It may be compliant conditionally.

21         Q.    When you say may be, what do you

22   mean?

23         A.    I believe I saw some documentation

24   from state of California listing the conditions

25   of the approval of that type of system.

1

2          Q.    Getting back to your earlier

3    testimony where you basically described the

4    last sentence of 1.2A of the specification as

5    incorrect, I'm going to try to paraphrase my

6    understanding of what you testified as to the

7    reason for that, you just tell me whether I'm

8    getting it or not.  The reason why you believe

9    it's incorrect is because it assumes that

10   California has a testing and certification

11   procedure that UV systems can be subjected to

12   whereas, in fact, California doesn't have a

13   testing and certification procedure; is that

14   correct?

15         A.    That is correct.

16              MR. BIALEK:  Objection as to form.

17              MR. SUTTON:  Objection to form.

18              MR. BIALEK:  Are you talking about

19         now or are you talking at this time?  You

20         might want to clarify that.

21         Q.    Has there been any change in whether

22   or not California tests and certifies

23   UV systems under Title 22 between 1999 and the

24   present?

25         A.    Yes.

1

2          A.    Yes.

3          Q.    I hand you what's been marked Exhibit

4    10.  Can you give me a brief

5    description of what Exhibit 10 is?

6               MR. BIALEK:  Can you say what it

7          is so we know we're looking at the same?

8          Q.    This is another document that was

9    produced in response to the subpoena printed from

10   the hard drive of your computer.  It purports to

11   be dated December 23rd, 1999 addressed to

12   California Department of Health Services, Richard

13   Sakaji.  Could you briefly explain what that is

14   in terms of, you know,

15   what the circumstances were?

16         A.    This is a letter from me to

17   California requesting an acceptance letter

18   because of the confusion which we were talking

19   about before.  Although a letter is not required,

20   because of the confusion we asked for one because

21   people were demanding the certification.

22         Q.    Who to your understanding was

23   demanding certification?

24         A.    GMP.

25         Q.    And you just referred to confusion on

1

2  this project, explain what you mean by confusion

3  on this project?

4       A.   I'm going to read the third paragraph

5  of this letter.

6       Q.   Okay.

7       A.   As you're well aware, California

8  is the leader regarding UV disinfection systems

9  for water reuse and other states have deferred to

10  your research expertise and experience and have

11  based their acceptance of UV systems upon

12  California's acceptance.  Within the UV reuse

13  marketplace much confusion exists as to what

14  systems are acceptable for Title 22 reuse

15  applications.  The confusion is fostered by

16  salesperson in the UV industry who have

17  successfully created the perception that a UV

18  system is only acceptable if the California

19  Department of Health Services has issued a letter

20  stating such.

21       Q.   Did you ever succeed in conveying the

22  point to where Title 22 certification was

23  no longer demanded of Ultra Tech?

24       A.   I thought so.

25            MR. SCHULMEISTER:  Why don't we

1
2    their ultimately were responses.

3         Q.   Now, with respect to the

4    horizontal system I think you indicated earlier

5    it was already, quote, a conforming system?

6         A.   Yes.

7         Q.   But you were asking Dr. Sakaji to

8    nonetheless confirm that?

9         A.   Yes.

10        Q.   With regard to the vertical system

11   you refer to their being pages that follow that

12   pertain to requested approval of the forty lamp

13   vertical module, so that was additional

14   information that was being provided?

15        A.   Yes.

16        Q.   I'm going to hand you what's been

17   marked Exhibit 23, which purports to be a July

18   27th, 2000 fax transmission cover sheet from

19   you to Gary Jeppson at Bodell.  Could you look at

20   Exhibit 23, please?  Here you appear to be

21   describing a scenario in which you're

22   submitting both the horizontal and the vertical

23   configurations for the Wahiawa project.  With

24   regard to the horizontal you believe that you

25   already have Title 22 approval or compliance

1   established, but you're still waiting for

2   approval for the vertical system; is that

3   right?

4          A.   Yes.

5          Q.   So, it was your intention that

6   once the vertical system was approved in

7   California then you wanted to pursue substituting

8   the vertical for the horizontal;

9   is that right?

10         A.   More or less.

11         Q.   Now, the second paragraph of the

12  letter you state, quote, going in to this project

13  it was obvious that submittal approval would be a

14  fight, the sentence goes on, do you see that

15  part?

16         A.   Yes.

17         Q.   What were you referring to there when

18  you said going in to the project it was obvious

19  that submittal approval would be a fight?

20         A.   Dealing with GMP.

21         Q.   What about dealing with GMP made

22  it obvious going in to the project that submittal

23  approval would be a fight?

24         A.   Our representative informed us

1

2  that GMP is not very reasonable to deal with

3  and will push their interpretation of the spec to

4  whatever they want as opposed to what it really

5  is.

6       Q.    That would have been Paul Scott?

7       A.    Yes.

8       Q.    Other than Paul Scott telling you

9  that, did you have any other reason to believe

10  that the submittal approval process would be a

11  fight?

12       A.    Some previous dealings with Lee

13  Mansfield.

14       Q.    Lee Mansfield was at that time

15  with GMP?

16       A.    I believe so.

17       Q.    And you had some prior dealings with

18  him which made you think that the

19  submittal approval process would be a fight?

20       A.    Yes.

21       Q.    Could you just briefly explain

22  what those were?

23       A.    Another project which we

24  delivered, Kailua, Lee Mansfield sat as a

25  review board and some of his comments we felt

1

2   were very unreasonable.

3        Q.   On the second page of Exhibit 23 the

4   second paragraph you refer apparently to a GMP

5   letter of June 29th, and below that I'm quoting

6   from your letter now, quote, we can provide a

7   list of installations, we assume that GMP will

8   hang their hats on 1.2.A, which requires five

9   installations using equipment of this type and

10  North America treating five MGD for one year, GMP

11  will attempt to shoot us down as not having five

12  horizontal system installations, do you see that

13  part of Exhibit 23?

14       A.   Yes.

15       Q.   Can you explain the context of

16  that comment?

17       A.   Going through the specifications

18  we so clearly met all other areas of the

19  specification, this is where we thought that

20  GMP would take a stand.

21       Q.   What was it that you were

22  anticipating that they would argue, could you tie

23  it back to the specification, explain what you

24  anticipated they would argue?

25       A.   That our installations don't meet

1

2    their interpretation of experience.

3         Q.    Because they weren't horizontal?

4         A.    Yes.

5         Q.    Could you look at what's been marked

6    Exhibit 33, it purports to be an August 31st,

7    2000 letter from you to Richard Sakaji of the

8    California Department of Health Services, have

9    you seen that letter before?

10        A.    Yes.

11        Q.    Is this a copy of a letter that

12   was actually sent by you?

13        A.    Yes.

14        Q.    What was the context and

15   circumstances that led to this letter being sent?

16        A.    After a face-to-face meeting with Dr.

17   Sakaji this was an information which he requested

18   so we could secure compliance

19   approval vis a vis Title 22.

20        Q.    For the vertical?

21        A.    Yes.   I want to clarify one thing,

22   the word interim is used in this because Title 22

23   was changing in the future, and it was

24   common knowledge to us that the Title 22 approval

25   would be for the regulations that were in force

1

2  Bodell's attorney, Mr. Schulmeister, were asked

3  to leave; is that correct?

4      A.   Yes.

5      Q.   That would have been late October of

6  2000; is that right?

7      A.   That's right.

8      Q.   I hand you now what's been marked

9  Exhibit 46.  Have you had a chance to look at

10  Exhibit 46?

11      A.   Yes.

12      Q.   Exhibit 46 purports to be a letter

13  from the Department of Health Services in

14  California to you dated October 23rd, 2000,

15  although it appears to be a document printed from

16  your computer and it's a signed copy; is that

17  correct?

18      A.   Yes

19      Q.   Exhibit 46 does, though, appear to

20  have on the first page the letterhead of the

21  California Department of Health Services; is that

22  right?

23      A.   That is correct.

24      Q.   How did it come about that you

25  were able to print this from your computer with

1

2  the California --

3       A.   It was sent to me as an e-mail.

4       Q.   As a PDF file?

5       A.   Don't recall.

6       Q.   You don't recall what format it

7  was sent?

8       A.   No.

9       Q.   What does Exhibit 46 represent in

10  terms of the purpose and function of this letter?

11       A.   Approval and compliance of the Ultra

12  Tech vertical system for Title 22.

13       Q.   I see there are some limitations

14  on it.

15       A.   One limitation.

16       Q.   What is the limitation?

17       A.   That Title 22 is in the process of

18  being rewritten, and this approval was for

19  Title 22 as it standed at that time and is not to

20  be construed as future approval for the evolving

21  Title 22.

22       Q.   I believe you testified earlier that

23  back in '99 you had the understanding that Trojan

24  had a conditional approval in

25  California; is that right?

1

2       A.    That is correct.

3       Q.    And how would the approval of the

4  Ultra Tech vertical system that is manifested

5  in Exhibit 46 compare to what you understood

6  Trojan's approval of its 4000 medium pressure

7  system to have been?

8       A.    The Ultra Tech approval, the only

9  condition is that it is fully approved per the

10 regs as they are today, and the condition was

11 just noting that they will be changing in the

12 near future.  I can't comment on what

13 conditions were applicable to the Trojan

14 system.  Also, this approval is based on actual

15 data, not theoretical calculations.

16      Q.    You're referring to Exhibit 46?

17      A.    Exhibit 46.

18      Q.    Was there actual sampling and testing

19 that was done using a vertical Ultra Tech system?

20      A.    Yes.

21      Q.    And this letter comments on what the

22 results of that test is?

23      A.    Yes.

24      Q.    And gives the conditional

25 approval; is that correct?

1

2          A.    Yes.   It, also, indicates, this is

3    from my memory, that the Ultra Tech system was

4    more efficient than previously approved

5    vertical systems of other manufacturers.

6              MR. SCHULMEISTER:   Let's go off

7         the record.

8              (Discussion off the record.)

9          MR. SCHULMEISTER:   Mark these.

10             (Whereupon, Plaintiff's Exhibits

11        58 and 59 were marked for Identi-

12        fication.)

13         Q.    Do you have Exhibit 58 in front of

14   you?

15         A.    Yes.

16         Q.    Exhibit 58 purports to be, the first

17   page is a transmittal sheet from GMP Associates

18   regarding a submittal 30C for ultraviolet

19   disinfection with a stamp on the first page

20   showing rejected, the stamp is dated December

21   19th, 2000; is that right?

22         A.    I see a date December 19th on the

23   cover sheet.   I see a date December 12th --

24         Q.    On the second page?

25         A.    Right.

1

2   to submitting the substitution request?

3            MR. BIALEK:   Objection as to form.

4      A.   Yes.

5      Q.   Did you, yourself, review Section

6   11376?

7      A.   Yes.

8      Q.   Now, in regards to Section 1.2B

9   you testified that that section specified that

10  the contract drawings and specifications were

11  based upon a Trojan medium pressure system,

12  correct?

13      A.   Correct.

14           MR. BIALEK:   Objection as to form.

15      Q.   You, also, indicated that you took a

16  look at Section 2.4, Subsection B3, I think Mr.

17  Schulmeister asked you about the language

18  to that section which specifies the horizontal

19  system, correct?

20      A.   Yes.

21      Q.   So, you understood that the

22  Section 2.4A3 specifically referenced a

23  horizontal system, correct?

24      A.   Yes.

25      Q.   And, in fact, the submittals

1

2   submitted in regards to the substitution

3   request by Ultra Tech and Bodell were all based

4   upon this horizontal system?

5          MR. BIALEK:  Objection.

6          MR. SCHULMEISTER:  I object to the

7      form.

8      A.   No.

9          MR. SCHULMEISTER:  Foundation.

10     Q.   So, your understanding is that in

11  submitting the submittals to GMP and the city

12  that both vertical and horizontal were submitted?

13     A.   Yes.

14         MR. BIALEK:  Objection as to form.

15     Q.   And how many submittals were

16  submitted in regards to the substitution request?

17         MR. SCHULMEISTER:  Let me object.

18         MR. BIALEK:  Object to the form.

19         MR. SCHULMEISTER:  When you say

20      substitution, there's a chance for

21      confusion.

22         MR. OGOMORI:  I'll clear it up.

23     Q.   Whenever I talk about substitution

24  requests, I'm going to refer to the

25  substitution requests in regards to the UV

1   
2   equipment that Ultra Tech and Bodell submitted,

3   okay?

4           MR. BIALEK:   Objection as to the

5           form.

6           MR. SCHULMEISTER:   I'm going to

7           object to that.   We've already got all

8           this testimony about the substitution

9           that was pre-bid, and I think that after

10          that it was submittal.   You're going to

11          creat an ambiguity in the record, and I'm

12          going to object to the form of all those

13          questions.

14          MR. OGOMORI:   I'll clear it up.

15      Q.   Would you agree that Section 2.4

16  requires that the UV lamps be horizontal and

17  parallel to the flow?

18      A.   No.

19      Q.   In looking at Section 2.4A3 would you

20  agree that it states that the major axis of the

21  UV lamp shall be horizontal and parallel to the

22  floor.

23          MR. BIALEK:   Objection as to form.

24          Are you asking him whether the words that

25          you just said are on that page?

1

2          MR. OGOMORI:  Yes.

3     A.   The words which you said are on

4  the page.

5     Q.   Would you agree that the words on the

6  page in regards to Section 2.4A3 states

7  that UV systems that operate with lamps placed

8  perpendicular to the floor are unacceptable,

9  would you agree that it states that?

10     A.   That it states that, would I agree

11  that it states that?

12     Q.   Yes.

13          MR. BIALEK:  That the words are on

14       the page.

15     A.   Yes.

16     Q.   I'm going to show you what has

17  previously been marked as Exhibit Number 3.

18  This is a letter that purports to be drafted by

19  Paul Scott, and it's dated November 18th, 1999.

20  In this letter Paul Scott requested approval to

21  substitute the Ultra Tech UV system for the

22  Trojan or specified system, correct?

23     A.   Yes.

24     Q.   Did you review this letter before

25  today?

172

1

2                        C E R T I F I C A T E

3

4        STATE OF NEW YORK      )
                                 )ss.:
5        COUNTY OF WESTCHESTER)

6

7            I, LISA M. PRENTICE, a Shorthand
   Reporter and Notary Public within and for the
8    State of New York, do hereby certify:

9

10           That GREG ELLNER, the witness
   whose deposition is hereinbefore set forth, was
11   duly sworn by me, and that such deposition is a
   true record of the testimony given by the
   witness.

12

13           I further certify that I am not
   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
   interested in the outcome of this matter.

15

16           IN WITNESS WHEREOF, I have
   hereunto set my hand this 13th day of September,
17   2004.

18

19

20           _____

21             LISA M. PRENTICE
               SHORTHAND REPORTER

22

23

24

25

1    UNITED STATES DISTRICT COURT
     DISTRICT OF HAWAII
2    - - - - - - - - - - - - - - - - - - - X
     BODELL CONSTRUCTION COMPANY, a Utah
3    Corporation,

4         Plaintiff,
                                    Case No.
5         -against-                 03-00706
     OHIO PACIFIC TECH, INC. Fka
6    GMP ASSOCIATES, INC., an Ohio
     HG-LEK corporation; CITY AND COUNTY
7    OF HONOLULU; ULTRA TECH
     SYSTEMS, INC., a foreign
8    corporation,
                                **CERTIFIED COPY**
9         Defendants.
     - - - - - - - - - - - - - - - - - - - X
10

11   HELD AT:      Wilson, Elser, Moskowitz,
                   Edelman & Dicker, LLP
12                 3 Gannett Drive
                   White Plains, New York  10604
13                 September 2nd, 2004
                   10:15 a.m.
14

15                 VOLUME II

16              Continued Deposition of GREG

17   ELLNER, a non-party witness, held pursuant to

18   Subpoena, held at the above time and place before

19   a Notary Public of the State of New York.

20              Lisa M. Prentice, Reporter

21

22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   330 North Brand Boulevard, Suite 250
     Glendale, California 91203
24   (800) 288-3376

25   FILE NO.: 9E07630

                                                     172

1

2    the Ultra Tech UV System?

3        A.    I really don't recall.

4        Q.    Take a look at what has been marked

5    as Exhibit 12, that is a memo from you to Bodell

6    Construction dated April 13th, 2000.

7        A.    These aren't in order.  Here's 12.

8        Q.    Do you recognize this memo dated

9    April 13th, 2000?

10       A.    Yes.

11       Q.    It's on Ultra Tech Systems

12    letterhead?

13       A.    Yes.

14       Q.    This was printed off your computer?

15       A.    Yes.

16       Q.    And you drafted this memo?

17       A.    Yes.

18       Q.    Now, in the second paragraph of

19    Exhibit 12 the first line states, the UV System

20    which we bid for Wahiawa at a not too exceed

21    price of $417,500 was a horizontal UV System

22    which will fit in the UV channel with minor

23    modification, do you see that?

24       A.    Yes.

25       Q.    What minor modification were you

1

2    talking about?

3         A.    Slight -- variations in channel depth

4    and width.

5         Q.    When you say a slight variation, are

6    you referring to a variation from the project's

7    plans?

8         A.    Yes.

9         Q.    In this first sentence of the second

10   paragraph of Exhibit 12 you state that UV System

11   which Ultra Tech bid, for Wahiawa project I take

12   it?

13        A.    Yes.

14        Q.    Was the horizontal UV System

15   manufactured by Ultra Tech?

16        A.    We did horizontal and vertical.

17        Q.    But this memorandum is referring to

18   the horizontal UV System, correct?

19             MR. BIALEK:   Objection.

20        A.    This paragraph refers to the

21   horizontal system.

22        Q.    And it provides a price of $417,500?

23        A.    Yes.

24        Q.    Did you ever review Bodell's bid

25   proposal?

1

2          A.   No.

3          Q.   Do you know if Bodell incorporated

4    this $417,500 price in to their bid proposal?

5          A.   I do not.

6          Q.   Now, take a look at Exhibit 12,

7    Paragraph Three, it reads, quote, it has been our

8    intention all along to substitute a vertical UV

9    System for the horizontal system and offer you a

10   substantial savings by doing so, do you see that?

11         A.   I see that.

12         Q.   What were you referring to as far as

13   your intention all along?

14         A.   The vertical product is a better

15   product, which will save the City and County of

16   Honolulu considerable funds while operating,

17   maintaining that product, so it was in the good

18   of public, it's in the good of the customer's

19   interest, which is one of the things we try to do

20   all the time, and at this particular time we did

21   not have the Title 22 approval, it was pending,

22   so once the Title 22 approval was received it's a

23   better situation for all parties to go with the

24   vertical system, that was what our intentions

25   were.

1

2          Q.    Prior to receiving this Title 22

3   certification Ultra Tech had been focusing upon

4   the horizontal UV System?

5          A.    No.

6          Q.    Well, at that point were you

7   focussing on both?

8          A.    Correct.

9          Q.    But you understood that without the

10  Title 22 certification the vertical UV System

11  would not be approved?

12               MR. SCHULMEISTER:  Objection as to

13          form.

14               MR. BIALEK:  I'll join.

15         A.    There is no such thing as a Title 22

16  certification.  What our understanding was was

17  that prior to commissioning of the equipment

18  Title 22 compliance had to be secured,

19  commissioning meaning delivery and start up of

20  the equipment.

21         Q.    You testified yesterday that you had

22  reviewed that Section 11376 of the

23  specifications, correct?

24         A.    Yes.

25         Q.    And in Section 2.4 of that Section

1

2    11376 there's a reference to a requirement that

3    the UV System be the type of horizontal type of a

4    system, correct?

5            MR. BIALEK:   Objection.

6        A.    Specification has alternate

7    provisions in Section 2.1B, which says to be

8    acceptable alternate UV systems must and we are

9    going to interject the word meet the following

10   requirements, capable of meeting the specified

11   performance requirements, operate in an open

12   channel, be of modular design, use lamps with

13   electronic ballasts and incorporate a cleaning

14   system, UV systems shall meet the hydraulic

15   profile shown in the contract drawings, any cost

16   resulting from changes due to the use of an

17   alternate system shall be borne by the

18   contractor, if structures and equipment need to

19   be modified to meet the hydraulic requirements of

20   the plan, all costs shall be borne by the

21   contractor, contractor shall submit design

22   calculations showing that the hydraulic profile

23   shown in the contract drawings will be met, both

24   of the Ultra Tech Systems offered for sale fully

25   comply with all the requirements in 2.1B whether

328

C E R T I F I C A T E

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF WESTCHESTER)


          I, LISA M. PRENTICE, a Shorthand
Reporter and Notary Public within and for the
State of New York, do hereby certify:


          That GREG ELLNER, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me, and that such deposition is a
true record of the testimony given by the
witness.


          I further certify that I am not
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.


          IN WITNESS WHEREOF, I have
hereunto set my hand this 13th day of September,
2004.



          LISA M. PRENTICE
          SHORTHAND REPORTER

329

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3      _____

4    BODELL CONSTRUCTION COMPANY,

5    a Utah corporation,

6                    Plaintiff,

7          vs.                    CIVIL NO. 03-00706(HG/LEK)

8    OHIO PACIFIC TECH, INC., fka GMP    (Contract)

9    ASSOCIATES, INC., an Ohio

10   corporation; CITY AND COUNTY OF

11   HONOLULU; ULTRA TECH SYSTEMS,

12   INC., a foreign corporation,

13                    Defendants.

14   _____

15   CITY AND COUNTY OF HONOLULU,

16          Defendant and

17          Third-Party Plaintiff,

18       vs.

19   ENGINEERED SYSTEMS, INC.,

20          Third-Party Defendant.

21   _____

22

23              DEPOSITION OF GREG ELLNER

24                   VOLUME III

25             Taken June 2nd, 2005

JUN 2 0 2005

473

BY MR. OGOMORI:

     Q.    Take a look at the next page on Exhibit 92, which is

U 0057.

     A.    (Witness complies.)

     Q.    In regards to your e-mail which is dated January

22nd, 2003, the paragraph that starts with, "Your system does

not meet specification and engineers should never have

accepted it.  The engineering firm and engineers who worked on

the project, in my opinion, are guilty of malfeasance and/or

malpractice and they should be included in any action that you

take, as now you have two insurance companies from whom you

could possibly collect from."

           You see that?

     A.    Yes.

     Q.    So you're talking about two different insurance

companies.

           Whose insurance companies are you talking about?

     A.    GMP's and the City's.

     Q.    So the reference to the engineers, that phrase "the

engineers," are you referring to somebody from the City?

     A.    GMP.

     Q.    What about the phrase "the engineering firm"?

     A.    GMP.

     Q.    Who at the City do you believe is guilty of

malfeasance?

474

1          MR. BIALEK:  Objection.

2   BY MR. OGOMORI:

3      Q.    In regards to this project?

4      A.    What I wrote here is the engineering firm and the

5   engineers who worked on the project, in my opinion, are guilty

6   of malfeasance.

7      Q.    Okay.

8      A.    This was not addressed to the City.

9      Q.    Okay.  Now, take a look at the next page of U 0058,

10  and it is an e-mail from you to Cyril dated January 22nd,

11  2003.  That second paragraph where it starts, "To my

12  knowledge, no UV system has been tested and recognized as

13  complying with the new NWRI Guideline which, as I understand,

14  is a bioassay measured dose of," it goes on.

15         Is it still true?

16     A.    No.

17     Q.    In fact, some of the later e-mails talk about your

18  competitor being tested?

19     A.    Yes.

20     Q.    Okay.  And that's I believe you indicated the

21  Livermore project.

22     A.    The following day, my e-mail from January 23rd

23  indicates two competitors have tested.

24     Q.    Okay.  And that's page U 0060?

25     A.    Yes.  Because you see the last part of that?

503

C E R T I F I C A T E

1

2  STATE OF HAWAII                    )

3                                     )ss.

4  City and County of Honolulu    )

5          I, B. KANOELANI COCKETT, CSR, Notary Public,

6  State of Hawai'i, do hereby certify;

7          That on June 2nd, 2005, at 8:21 a.m. appeared before

8  me GREG ELLNER, the witness whose deposition is contained

9  herein; that prior to being examined he was

10 by me duly sworn;

11         That the deposition was taken down by me in

12 machine shorthand and was thereafter reduced to

13 typewritten form under my supervision; that the foregoing

14 represents, to the best of my ability, a true and correct

15 transcript of the proceedings had in the foregoing matter.

16         I further certify that I am not an attorney for

17 any of the parties hereto, nor in any way concerned with

18 the cause.

19         Dated this 17th day of June 2005 in Honolulu,

20 Hawai'i.

21 _B. Kanoelani Cockett_____

22 B. KANOELANI COCKETT,

23 HI CSR NO. 379, CA CSR No. 7995

24 Notary Public, State of Hawai'i

25 My commission expires:  February 19th, 2009