CADES SCHUTTE
A Limited Liability Law Partnership

DAVID SCHULMEISTER    2781-0
KRISTIN S. SHIGEMURA    6957-0
1000 Bishop Street, Suite 1200
Honolulu, Hawaii  96813-4216
Telephone:  (808) 521-9200
Facsimile:  (808) 521-9210
Email:    dschulmeister@cades.com
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>Defendants. | CIVIL NO. 03-00706 (JMS/LEK) (Contract)<br><br>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT OHIO PACIFIC TECH CORPORATION, INC. fka GMP ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT; DECLARATION OF DAVID SCHULMEISTER; EXHIBITS "37"-"64"; CERTIFICATE OF COMPLIANCE WITH L.R. 7.5; CERTIFICATE OF SERVICE |

**Hearing:**
**Date:**    **May 1, 2006**
**Time:**    **9:00 a.m.**
**Judge:**    **Honorable J. Michael Seabright**

<u>Trial Date</u>:

Date:      October 17, 2006
Time:      9:00 a.m.
Judge:     Honorable J. Michael Seabright

ImanageDB:642562.2

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   UNDISPUTED FACTS........................................................................2

A.   The Project ................................................................................2

B.   HRS Chapter 103D discourages sole source procurement for government projects because it discourages competition....................3

C.   The Project UV specification is a "performance" specification – not a "design" specification and, at least facially, was not a sole source specification...............................................................................4

D.   Trojan's local representative successfully lobbied the City's designer, GMP, to list a Trojan system as the "basis of design" and to include language whose effect was to limit competition..........5

E.   Infilco Degremont's quotes seeking to be used for the Project were ignored by GMP after consultation with Trojan .........................7

F.   The City advised GMP that if no UV manufacturer other than Trojan could meet GMP's requirements, then the City needed to "sole source" the equipment ..........................................................8

G.   UTS' local representative requested pre bid approval for UTS as an equal to Trojan which the City granted over GMP's objection ...................................................................................8

H.   After the bid opening, Trojan's local representative complained and the City confirmed with Bodell that Bodell's price for bid item 81 was based on UTS and asked Bodell to determine the price reduction if bid item 81 were deleted from the Contract so that it could be rebid separately in order that the Trojan system could be installed in lieu of the UTS system ...................................10

I.    Even though the City decided internally to delete bid item 81 and rebid it separately in order to acquire the Trojan system, for reasons that the City can't explain no one followed through with the necessary paperwork ..........................................................11

J.    Trojan's local supplier successfully lobbied GMP and the City to reject Bodell's submittals of a UTS designed system notwithstanding the City's pre bid approval letter.............................12

# TABLE OF CONTENTS
### (continued)

Page

K.    Although GMP subjected the UTS disinfection calculations to rigorous scrutiny, GMP never required Trojan to prove it could meet the disinfection level required in the Specification ..................14

L.    The City and GMP's final rejection of the UTS submittals was based on UTS' purported failure to demonstrate that it met the experience requirement of the specification ......................................14

M.    The City and GMP's interpretation of the experience requirement is so narrow that no UV equipment manufacturer other than Trojan could have satisfied it ...........................................16

III.    LEGAL STANDARD ................................................................17

IV.    ARGUMENT..............................................................................18

    A.    Proof of tortious interference with contractual relations ..................18

    B.    Summary Judgment Should Be Denied Because There is a Genuine Dispute of Material Fact As To Whether GMP Acted With Legal Malice.......................................................................23

        1.    GMP, Trojan and HES Colluded to Prevent Any Competitor of Trojan From Being Approved for the WWTP .....................................................................23

        2.    After the Contract Was Awarded To Bodell GMP Solicited Material from Trojan and HES In Order To Support Their "Effort to Get Ultratech Rejected" ...................26

    C.    Summary Judgment Should Be Denied Because There is a Genuine Dispute of Material Fact As To Whether GMP's Rejection of The UTS UV System Was With "Proper Justification."....................................................................28

        1.    If GMP's interpretation of the experience requirement is correct, GMP drafted a defacto sole source specification that only the Trojan System could meet, in violation of HRS Ch. 103D and HAR section 3-122-81............................28

# TABLE OF CONTENTS
## (continued)

Page

2. GMP's efforts to reject the UTS System in favor of the more expensive Trojan system violated HRS § 103D-101, HAR § 3-122-10, and were not in the City's best interests, and were therefore without proper justification .......31

3. GMP utilized improper means by subjecting UTS and Trojan to different standards, and improperly releasing UTS's confidential information to Trojan, and therefore lacked proper justification in its efforts to reject the UTS System ...................................................................................32

D. Summary judgment is precluded because there is a genuine issue of material fact as to whether GMP actions were privileged..............................................................................34

E. FRCP Rule 56(f) continuance ..........................................36

V. CONCLUSION ..........................................................................38

**TABLE OF AUTHORITIES**
(continued)

Page

**CASES**

Addisu v. Fred Meyer, Inc., 198 F.3d 1130 (9th Cir. 2000) ......................... 17

Anderson v. Libby Lobby, Inc., 477 U.S. 242 (1986) ................................... 17

Burgess v. Arita, 5 Haw. App. 581 704 P.2d 930 (1985) ............................ 20

CCTW&M v. United States, 452 F. Supp. 69 (D. N.J. 1978)....................... 29

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)............................................. 17

Chow v. Alston, 2 Haw. App. 480, 634 P.2d 430 (1981) ....................... 20, 28

Christianson v. Colt Industrial Operating Corp., 766 F. Supp. 670
    (C.D. Ill. 1991) ..................................................................................... 23

E. Amanti & Sons. Inc. v. Town of Danvers, 758 N.E.2d 153 (Mass.
    App. Ct. 2001) ...................................................................................... 30

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451,
    (1992) .................................................................................................... 18

Ebasco Services Inc. v. Penn. Power and Light, 402 F. Supp. 421
    (E. D. Penn 1975) .............................................................................. 27, 34

Holmes Products Corp. v. Dana Lighting, Inc., 958 F. Supp 27 (D.
    Mass 1997) ............................................................................................ 22

Kutcher v. Zimmerman, 87 Hawaii 394, 957 P.2d 1076 (1998)......20, 21, 28,
    .....................................................................................30, 32, 33, 34, 38

Marc Development, Inc. v. Wolin, 904 F. Supp. 777 (N.D. Ill. 1995) ...23, 35

MCI Constructors, Inc. v. Hazen and Sawyer, P.C., 405 F.Supp.2d
    621 (N.D. N.C. 2005)........................................................................22, 34

## TABLE OF AUTHORITIES
### (continued)

**Page**

<u>Petrovski v. Federal Express Corporation</u>, 240 F.Supp.2d 685 (N.D. Ohio 2002)..........................................................................22, 27

<u>The Best Place, Inc. v. Penn America Insurance Co.</u>, 82 Hawaii 120, 920 P.2d 334 (1996) ...................................................................31

### STATUTES

Haw. Admin R. § 3-122-10 ....................................................3, 31, 32

Hawaii Revised Statutes § 103D-101 ...........................................31

Haw. Rev. Stat. § 103D-306.............................................................3

### RULES

Fed. R. Civ. P. 56..................................................................8, 17, 36

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT OHIO PACIFIC TECH CORPORATION, INC. fka
<u>GMP ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Bodell Construction Company ("**Bodell**") hereby submits its

memorandum in opposition to Defendant-Counterclaimant Ohio Pacific Tech

Corporation, Inc. fka GMP Associates, Inc's ("**GMP**") Motion for Summary

Judgment, filed January 9, 2006 ("**Motion**").[1]

## I.    <u>INTRODUCTION</u>

Based on a wholly superficial assessment of the facts in the record,

GMP brazenly seeks summary judgment on Count IV of Bodell's First Amended

Complaint, Intentional Interference With Contractual Relations.  The undisputed

facts, however, demonstrate that GMP's Motion is without merit and must be

denied because there is a genuine issue of material fact as to whether GMP acted

---

1    Bodell incorporates herein by reference Plaintiff Bodell Construction
Company's Motion For Summary Judgment Against Defendant City and County
of Honolulu on Counts I and II of the First Amended Complaint filed February 13,
2004; Declaration of David Schulmeister; Declaration of Leroy Humke; Exhibits
1-36; Declaration of Sydney Ellner ("**S. Ellner Decl.**"); Exhibits 1-7; Declaration
of Armand Cote ("**Cote Decl.**"); Exhibits 1-11, filed herein on January 9, 2006
("**Bodell MSJ**") and the Concise Statement of Facts in support of Plaintiff Bodell
Construction Company's Motion For Summary Judgment Against Defendant City
and County of Honolulu on Counts I and II of the First Amended Complaint filed
February 13, 2004 ("**Bodell CS**").
As additional support in opposition to the Motion, Bodell incorporates the
Concise Statement of Facts In Opposition To Defendant Ohio Pacific Tech, Inc.
fka GMP Associates, Inc.'s Motion For Summary Judgment ("**Bodell Opp. CS**"),
and Declaration of David Schulmeister; Exhibits 37-64, attached hereto.

with proper justification in rejecting Bodell's proposal to supply and install the UltraTech ("**UTS**") ultraviolet ("**UV**") disinfection System.

Because GMP's Motion rests solely on its argument that GMP's rejection of the UTS System was justified and privileged—and the evidence viewed in the light most favorable to Bodell demonstrates that there are genuine disputes of material fact as to whether GMP's actions were done with proper justification, summary judgment must be denied.

In fact, the evidence construed in the light most favorable to Bodell indicates that from the start of the Project, GMP was determined that a Trojan UV4000$^{TM}$ System (the "**Trojan System**") would be used for the City's Wahiawa Wastewater Treatment Plant ("**WWTP**") and that GMP illegally circumvented State procurement laws in order to ensure that the Trojan System was purchased and installed at the WWTP.

## II.   UNDISPUTED FACTS

### A.   The Project

GMP was hired as the City's engineer on City and County of Honolulu, Department of Design and Construction, Contract No. F-97110, Wahiawa Wastewater Treatment Plant—Effluent Reuse & Wahiawa Reservoir Outfall Adjustment, Job No. W10-99 for the construction and installation of an open channel, gravity flow, UV disinfection system at the WWTP located in the

- 2 -

City and County of Honolulu, State of Hawaii (the "**Project**"). GMP drafted the Project specifications that provided for upgrade and improvements to the WWTP, including drafting the UV system specifications.

### B.   HRS Chapter 103D discourages sole source procurement for government projects because it discourages competition.

The Procurement Code of the State of Hawaii, consistently with the public procurement regimes of most jurisdictions, discourages "sole source" procurement as patently anti-competitive and requires detailed written documentation to be prepared to support any determination that only one source exists for any product or service. Haw. Rev. Stat. § 103D-306; Haw. Admin R. §§ 3-122-81, -82. The City requires any department that seeks sole source procurement to obtain the prior approval of its Department of Budget and Fiscal Services. Prior to the Project, the Department of Budget and Fiscal Services had already denied one request to sole source UV disinfection equipment. Bodell MSJ, Ex. 33 at 22-26. Prior to the preparation of the bid specifications by GMP, the chief of the City's Division of Infrastructure Design and Engineering deliberately eschewed sole source procurement procedures for the UV equipment on the grounds that it would "cause bidding protests." Bodell MSJ, Ex. 1.

Two years before the WWTP Project, in April 1997, GMP sent the City information on UV disinfection systems for the City's prior Honouliuli wastewater treatment plant project, that showed that there were vertical and

- 3 -

horizontal low pressure UV disinfection systems that were Title 22 compliant.  Ex. 37.[2]  The capital costs and operations and management costs for low-pressure systems is significantly less than the Trojan System.  Ex. 37.  In addition, unlike the medium pressure Trojan System, horizontal and vertical low-pressure systems are not proprietary, therefore use of low pressure systems in government projects encourages competition by suppliers.  Ex. 37.

C.   **The Project UV specification is a "performance" specification – not a "design" specification and, at least facially, was not a sole source specification**

The  UV  equipment  specification  drafted  by  GMP  for  the  WWTP Project was a "performance specification" in the sense that neither the plans nor the  specifications  included  a  design  defining  the  number  of  UV  lamps,  the configuration  of  the  lamps  within  the  modules,  etc.   Instead,  the  specification included  a  UV  dosage  requirement  and  a  desired  kill  rate  for  various microorganisms and left it to the manufacturer to design a system that would meet these  standards.    Bodell  MSJ,  Exs.  3,  4;  Cote  Decl.;  S.  Ellner  Decl. Notwithstanding  the  absence  of  any  actual  design  in  the  specification,  the specification also states, somewhat ambiguously, that "the contract drawings and

---

[2]   Certain of Bodell's attached exhibits (Exhibits 37, 38, 44, 46, 47, 48, and 64) are documents that were only recently produced by the City on February 6, 2006. This production consisted of documents in the personal work file of City engineer, Cyril  Hamada,  and  was  made  after  Mr.  Hamada's  June  21,  2005  deposition. Bodell intends to question Mr. Hamada and other witnesses about these newly-produced documents in continued depositions in this matter.

specifications are based on System UV 4000™ medium pressure UV lamp technology manufactured by Trojan Technologies, Inc." and, "UV system shall be System UV 4000™, as manufactured by Trojan Technologies, Inc. **or equal.**"  On its face the specification was therefore not a "sole source" specification because it appeared to allow for the possibility of more than one manufacturer's product being acceptable.

GMP's specification, however, by stating that the design was based on a specific Trojan product, put the onus on all other UV equipment suppliers to hurriedly obtain pre bid approval in order for contractors to be allowed to use their prices.  See Bodell CS, Ex. 2.

**D.**    **Trojan's local representative successfully lobbied the City's designer, GMP, to list a Trojan system as the "basis of design" and to include language whose effect was to limit competition**

In a tale all too common but true, Trojan's local representative, Mike Elhoff ("**Elhoff**") of Hawaii Engineering Services ("**HES**"), lobbied GMP to draft the specification around Trojan to limit competition.  GMP complied and used a Trojan standard specification on a diskette supplied by HES to Jay Stone ("**Stone**") of GMP, who drafted the specification under the supervision of GMP's principal designer for the Project, Lee Mansfield ("**Mansfield**").  See Bodell CS No. 5; Ex. 5.  The most obvious wording from the Trojan specification designed to restrict competition was the inclusion of the following two sentences in section 2.4 A. 3:

ImanageDB:642562.2

> The major axis of the UV lamps shall be horizontal and parallel to flow. ***UV systems that operate with lamps placed perpendicular to the flow are unacceptable.***

Bodell MSJ, Ex. 3 (emphasis added). As explained in the Declaration of Sidney Ellner, Trojan has used this tactic of lobbying municipalities to exclude the vertically configured systems of its competitors since the 1980's. S. Ellner Decl. at ¶¶ 9-10.

There is no clear explanation why GMP drafted the Specifications based on the medium-pressure proprietary Trojan System, and prohibited the use of vertical systems when, since 1997, GMP was aware that low-pressure vertical systems were in use throughout the US and Hawaii and were Title 22 compliant. Ex. 37, 38. In fact, in a report by wastewater engineering firm, CH2M Hill, the company concluded that "both the process and equipment performance of the low-pressure horizontal and vertical lamp UV systems is shown to be satisfactory and reliable." Ex. 38 The CH2M Hill report was produced by the City as a part of Cyril Hamada's ("**Hamada**") file, next to a matrix for the Honouliuli WWTP UV evaluation. Presumably, if the City was aware of these conclusions, its engineer GMP was or should have been as well.

ImanageDB:642562.2

**E.**    **Infilco Degremont's quotes seeking to be used for the Project were ignored by GMP after consultation with Trojan.**

In August 1999, Inflico Degremont, Inc. ("**IDI**"), a manufacturer of primarily vertical low-pressure UV disinfection systems, provided GMP with a quote and information about its low-pressure UV system in order to be considered for the Project. Ex. 41. On August 18, 1999, Stone contacted Elhoff of HES, the Trojan representative, and asked him to verify that Trojan's low-pressure system was ineligible for the Project due to its size: "*Can you double check that the low-pressure system cannot fit within the boundaries that we sent you? Another vendor claims to fit in a low-pressure vertical system within the boundaries.*" Ex. 39.

The next day, Elhoff emailed several individuals at Trojan, forwarding Stone's email, and stating, "*Please review the file. IDI is knocking on the door. Between Kailua, Kona Airport, and this, they are a thorn in our side.*" Ex. 40. Elhoff subsequently forwarded the Trojan response to Stone and included his earlier comments about IDI being "a thorn in our side". Ex. 40. Clearly, HES and Trojan felt comfortable enough about their position with GMP and the Project to provide GMP with their internal discussions about competitors.

Despite IDI's follow-up request in September 1999 (Ex. 42), and despite the fact that the IDI quote was lower than the Trojan quote (Ex. 43 at p. 211) GMP never responded to IDI. Ex. 43 at p. 212.

ImanageDB:642562.2

**F.**    **The City advised GMP that if no UV manufacturer other than Trojan could meet GMP's requirements, then the City needed to "sole source" the equipment.**

On October 30, 1999, the City's Section Head for Plant Design, Dennis Kaneshiro ("**Kaneshiro**"), faxed a handwritten note to Mansfield at GMP, which referred to the Brown & Caldwell report. In the note, Kaneshiro advised GMP that if only one UV manufacturer met GMP's requirements, GMP needed to let the City know as soon as possible in order to get sole source approval. Ex. 44.

**G.**    **UTS' local representative requested pre bid approval for UTS as an equal to Trojan which the City granted over GMP's objection**

In November 1999, UTS, whose UV equipment had previously been approved for installation at another City project, the Kailua Wastewater Treatment Plant, through its local representative, Engineered Systems, requested pre bid approval for UTS pursuant to the General Instructions to Bidders. Bodell MSJ, Ex. 6. GMP immediately rejected UTS's request on the purported grounds of "insufficient information to determine suitability." Bodell MSJ, Ex. 7.

The City, however, granted UTS's substitution request over GMP's objection, on the grounds that it was a case of "defacto approval since there are the units that are being installed at Kailua WWTP." Bodell MSJ, Ex. 8. On December 9, 1999, the City issued a letter stating that the UTS was approved "for bidding purposes only" and "[f]inal approval is subject to review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract

documents."[3]  Bodell MSJ, Ex. 9.  This was standard language used by the City in other pre-bid substitution requests.  Ex. 64.  The fact that final approval would still be subject to review of UTS drawings and meeting "all the requirements of the contract documents" was expected inasmuch as the specification, as discussed above, was a "performance" specification rather than a "design" specification – it still being necessary that the approved manufacturer submit a proposed system design that would fit in the allotted space and meet the performance requirements of the specification.

The bid opening date (when bids were due) was December 16, 1999 -- only one week after the City's letter of the UTS System.  Bodell received the City's approval letter from Engineered Systems along with a price of $267,500 for the UTS UV system.  Bodell also received a price quote of $1,100,000 from HES on behalf of Trojan.  Even after adjusting for differences in the inclusions and exclusions of these two quotes, the UTS quote was substantially less than the Trojan quote.  Accordingly, in reliance upon the City's approval letter for UTS,

---

3     GMP erroneously argues that the pre-bid procedure used to approve the UTS system is not provided for by law.  Mot. at 4.  The procedure was, however, specifically provided for in the Instructions to Bidders, Section 1.13(b).  See Bodell MSJ, Exhibit 2.  In addition, the City followed this procedure numerous times for the Project and approved many other products "for bidding purposes only" prior to the bid submission deadline.  All were subject to the condition that "final approval is subject to review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract specifications.  See Ex. 64.  This appears to be the City's standard pre-bid approval language.

ImanageDB:642562.2

Bodell used the UTS price quote in its bid proposal to the City for the Project for "bid item 81," which included the "UV Disinfection Reactor Units . . . in place complete." Bodell CS. No. 7.

**H.**     **After the bid opening, Trojan's local representative complained and the City confirmed with Bodell that Bodell's price for bid item 81 was based on UTS and asked Bodell to determine the price reduction if bid item 81 were deleted from the Contract so that it could be rebid separately in order that the Trojan system could be installed in lieu of the UTS system**

GMP and Trojan were apparently unaware of the City's December 9, 1999 approval letter and when they found out, Elhoff of HES complained. Just one day after bid opening, GMP refaxed its November 23, 1999 rejection of the UTS Substitution Request to Guy Inouye ("**Inouye**") at the City, to remind him that GMP had already rejected the UTS System. Ex. 45.

In response, the City held a meeting and decided that the approval letter was "our error".[4] Inouye approached Bodell to determine if Bodell had used UTS's price and whether Bodell could supply Trojan without a price adjustment. When Bodell confirmed it had used UTS's price and that it could not supply the Trojan system without a price adjustment, Bodell was asked to provide a breakdown of Bodell's price for bid item 81 to evaluate how much of a price reduction the City would get if this item were to be deleted from Bodell's contract.

---

[4] See Bodell MSJ, Exhibit 15, paragraph 5.

ImanageDB:642562.2

The City's intent at that time was to rebid item 81 so that the desired Trojan system would be acquired in lieu of the UTS system.  See Bodell MSJ, Exs. 14, 15, 16.

On January 12, 2000, James K. Honke ("**Honke**"), Chief of the City's Division of Infrastructure Design and Engineering sent a memo to Mr. Silvestre L. Ulep, Chief of the City's Division of Environmental Quality, formally confirming that "the UV equipment is intended to be furnished by the City through a separate bid and installed by the contractor by the date stated above for the disinfection facility." Ex. 46.  Even after the Project Contract was executed, the City continued to proceed and act as if the UV equipment would be deleted from the Contract and rebid.  Bodell MSJ, Exhibit 18, 23.

I.    **Even though the City decided internally to delete bid item 81 and rebid it separately in order to acquire the Trojan system, for reasons that the City can't explain no one followed through with the necessary paperwork**

Even though the City decided internally to delete bid item 81 and rebid it separately, and funds were identified as being available for this purpose, for reasons the City has been completely unable to explain, this never happened. The task was assigned to Hamada, the City's staff engineer assigned to the Project, who was the individual who had originally recommended that the UTS pre bid approval be granted.  He claims not to recall having been asked to do this, and his superior, Inouye testified, "[i]t's a mystery to me."  Bodell MSJ, Ex. 33 at 133; Bodell CS No. 9.

ImanageDB:642562.2

Discovery recently produced by the City on February 6, 2006, however, may solve at least part of the "mystery." These documents from Hamada's personal working file indicate that <u>the City instructed GMP to draft the UV rebid documents</u>. Exs. 47, 48. GMP, however, either failed to draft them or the City failed to follow through and ensure they were drafted.

On a February 28, 2000 email that was in Hamada's personal file, someone (presumably Hamada) wrote, "UV procurement GMP to handle." Ex. 47. In a later April 3, 2000 email, which was forwarded to Hamada, Inouye asked Kaneshiro how the UV rebid issue was going. Ex. 48. Hamada wrote on the email, "I recall in our meeting w/Guy that Guy said that UV specs for rebid would be prepared by GMP." Ex. 48. Kaneshiro responds that the UV bid issue was the City's but that they had the option of using GMP. Ex. 48.

Until Bodell can conduct further discovery about what happened after the rebid specifications were assigned to GMP, Bodell has no further information as to why the rebid specifications were not drafted.

**J.    <u>Trojan's local supplier successfully lobbied GMP and the City to reject Bodell's submittals of a UTS designed system notwithstanding the City's pre bid approval letter</u>**

When the City and/or GMP failed to follow through with its plan to delete and rebid item 81 so that the Trojan system could be acquired in lieu of the UTS system, Elhoff aggressively and successfully lobbied GMP and the City to

- 12 -

reject the UTS submittals so that Trojan could still get the sale.  Bodell CS No. 10.

Ex. 54.

On April 27, 2000, the UTS System was discussed in a meeting

between the City, Bodell and GMP.  Upon Bodell's statement that it intended to

use the UTS system, GMP asked that the UTS proposal be sent to it "*so that their*

*sub-consultant could come up with knowledgeable questions.*"  Ex. 49.

The sub-consultant was none other than Trojan and HES.  Throughout

May and June 2000, GMP requested information from Trojan and HES, which was

supplied and used as the basis to reject the UTS System.  Exs. 50-53, 55, 57, 58.

In May 2000, Elhoff informed Trojan that its "*assistance has been great in our*

*effort to get Ultratech rejected.*"  Ex. 50.  Elhoff requested additional information

that Stone of GMP requested and for help "*with any ammunition regarding*

*Ultratech, with respect to a data base of Ultratech installations, 16-lamp module,*

*and any competitive information you can provide from London.*"  Ex. 50.

Clearly,  for  any  information  from  Trojan  to  be  useful  as

"ammunition" to reject the UTS system it would have to be given from Elhoff

and/or Trojan to GMP and/or the City.  GMP requested the needed information

about a 16-lamp system and HES and Trojan provided it to GMP.  Exs. 50-53, 55,

57, 58.  In addition, Elhoff of HES provided information which he claimed showed

the UTS system did not meet the Specification directly to the City in an June 2,

2000 meeting. Ex. 54. Elhoff was obviously attempting to get the City to follow GMP's recommendation to reject the UTS System, for which he had provided the "ammunition." Ex. 50.

**K.** **Although GMP subjected the UTS disinfection calculations to rigorous scrutiny, GMP never required Trojan to prove it could meet the disinfection level required in the Specification**

On June 2000, Stone of GMP wrote two memos to Mansfield itemizing reasons why he believed the UTS System should be rejected, including that UTS had not demonstrated it could meet the disinfection requirements of the Specification. Exs. 56 (item #15), 59.

Despite his detailed critique of UTS's calculations, Stone did not have any program to attempt to recreate or validate the dosage calculations that Trojan supplied to GMP, and he did not recall Trojan ever submitting a submittal to GMP, sharing its calculations with GMP, or supplying GMP with test data. Ex. 43 at p. 151-58. Stone does not know why. Ex. 43 at 158. It is apparent that Trojan was simply not subjected to the same standards UTS was in demonstrating ability to meet the specifications.

**L.** **The City and GMP's final rejection of the UTS submittals was based on UTS' purported failure to demonstrate that it met the experience requirement of the specification**

In December of 2000, after a number of failed attempts by Bodell to get a submittal of the UTS system approved, GMP verbally indicated that,

regardless of whether UTS could meet the performance requirements of the specification, it could not satisfy the experience requirement and therefore its submittal would be rejected.   This prompted a letter from counsel for Bodell to GMP challenging the use of the experience requirement in this manner as "unduly restrictive" in violation of HAR § 3-122-10.   Bodell MSJ, Ex. 25.

The experience requirement consists of the following two sentences in Section 1.2 A. of the Specification under the heading, "Qualification Requirements":

> To be acceptable, the manufacturer shall be able to demonstrate to the satisfaction of the Engineer successful performance of the **proposed system** at a minimum of five (5) other wastewater locations in the United States.
>
> The manufacturer shall submit at least five (5) permanent wastewater installations using **this equipment type**, in North America, disinfecting a peak flow of 5 MGD or greater for at least one (1) years.

Bodell MSJ, Exhibit 3 (emphasis added).

In order to use the experience requirement to disqualify UTS, the City and its engineer, GMP, interpreted the phrase, "this equipment type" to mean only **horizontal** systems previously installed by UTS – which is the configuration of the system its submittal was based upon.   An alternative interpretation of "this equipment type" would be any system that utilizes the same basic components, viz., low pressure UV lamps, ballasts, and circuitry.   UTS has many "successful"

- 15 -

installations of both its horizontal and vertical systems, but does not have 5 prior *horizontal* systems at plants disinfecting a peak flow of 5 MGD or greater.   It has many such vertical systems.

According to an "Ultra Tech Submittal Time Line" on GMP letterhead produced from the City's records, on January 17, 2001:

> A meeting [was held] between GMP and the City's corporation council (sic) to review the status of the Ultra tech submittal and rejection by GMP.  The City decided to reject the submittal by Ultra tech and proceed with the original specified equipment by Trojan.

Bodell MSJ, Ex. 28.

The City's reliance upon UTS' alleged failure to satisfy the experience requirement is evident in the City's May 19, 2003 letter rejecting Bodell's claim.  Bodell MSJ, Ex. 29; Bodell CS No. 11.

### M.    __The City and GMP's interpretation of the experience requirement is so narrow that no UV equipment manufacturer other than Trojan could have satisfied it__

The language of the experience requirement in the Project Specifications originated with the Trojan System UV4000™ Standard Specification that was drafted to limit competition.  Bodell MSJ, Ex. 5.  Not surprisingly, if the City and GMP's interpretation of the Specification is accepted, only the Trojan System could have met the Specification, resulting in the

Specification being a sole source procurement in violation of HRS Ch. 103D-306 and HAR §§ 3-122-81, -82.

As confirmed in the Declaration of Sidney Ellner, if GMP and the City's interpretation of the Specification meant that the experience requirement was limited to horizontal installations, only the Trojan System could have satisfied the requirement. S. Ellner Decl. at ¶¶ 25-27. This means that the Specification was therefore a de facto sole source procurement in violation of HRS Ch. 103D-306 and §§ 3-122-81, -82.

## III.    **LEGAL STANDARD**

FRCP Rule 56(c) directs that summary judgment shall only be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (emphasis added); see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party always bears the initial responsibility of informing the court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party who must set forth specific facts showing there is a genuine issue for trial. Anderson v. Libby Lobby, Inc., 477 U.S. 242, 250 (1986).

ImanageDB:642562.2

In deciding a motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).

## IV.    ARGUMENT

### A.    Proof of tortious interference with contractual relations

In Count IV of the First Amended Complaint ("**FAC**") Bodell alleges a claim against GMP for intentional interference with contractual relations. Specifically, Bodell alleges that:

> 77.    GMP was the Project engineer that designed the Specifications around the Trojan System, and despite the inclusion of the possibility of use of an "equal" system, GMP intended that only the Trojan System be used for the Project.

> 78.    GMP was aware that prior to the deadline for bid submissions the City had approved the Ultra Tech UV system for bidding purposes.

> 79.    After bid opening, GMP was aware that bidding contractors, including Bodell had relied on the City's approval and included the Ultra Tech price in their bid submissions.

> 80.    After the Contract was awarded, GMP was aware that Bodell's bid price was based on the Ultra Tech equipment price and that the City had at one time offered

ImanageDB:642562.2

to credit Bodell the price of the Ultra Tech UV system if it was removed from the bid.

81.    Despite knowing that the City and Bodell had a valid and binding contract for the Project which utilized the Ultra Tech UV system, GMP continued to refuse to approve the Ultra Tech UV system.

82.    GMP failed to perform an objective, good faith review of Bodell's submittals of the Ultra Tech UV system and, contrary to Bodell's obligations under the Contract with the City, advised the City that the Ultra Tech UV system did not meet Specifications.

83.    GMP directed Bodell to instead supply the Trojan System.

84.    GMP knew or should have known that its actions were certain or substantially certain to cause the City to breach its Contract with Bodell, by rejecting the Ultra Tech UV system.

85.    GMP's insistence on the utilization of a Trojan System, despite knowledge that the City had already approved of the Ultra Tech UV system as an "equal" for bidding purposes, was without proper justification.

86.    GMP's actions were intentional, not necessary to protect the City's interest, not in furtherance of the City's best interests, and were instead designed to further GMP's personal goals and/or injure Bodell.

87.    GMP's actions resulted in the City refusing to accept the Ultra Tech UV system and therefore required Bodell to purchase a more expensive Trojan system (despite the fact that The New Trojan System did not comply with GMP's own Specifications).

88.    GMP's actions constitute intentional interference with contractual relations and as a result Bodell has been damaged in an amount to be proven at trial.

ImanageDB:642562.2

See FAC at ¶¶ 77-88.

Under Hawaii law, a claim for interference with contractual relations is proven by demonstrating: (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract;   (3) the defendant's intentional inducement of the third party to breach the contract; (4) absence of justification on the  defendant's part; (5) subsequent breach of the contract by the third party; and (6) damages to the plaintiff.  Burgess v. Arita, 5 Haw. App. 581, 594, 704 P.2d 930, 939, recon. denied, 5 Haw. App. 682, 753 P.2d 253 (1985).  See also Kutcher v. Zimmerman, 87 Hawai'i 394, 405-06, 406, 957 P.2d 1076, 1087-88 (1998) (establishing tort of intentional interference with *prospective* contractual relations and noting that the tort "has run parallel to that for interference with existing contracts").

Intentional inducement has been described by the ICA as acting "with intent and legal malice, i.e., the intentional doing of a harmful act without legal or social justification or excuse, or, in other words, the willful violation of a known right.  Chow v. Alston, 2 Haw. App. 480, 484, 634 P.2d 430, 434 (1981) (internal cites omitted).  See also Kutcher, 87 Hawai'i at 405-06, 957 P.2d at 1087-88. "[I]ntent denotes purposefully *improper* interference," thus, the plaintiff can show intent by evidence that the defendant "either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact." Meridian

ImanageDB:642562.2

Mortgage, Inc. v. First Hawaiian Bank, 109 Hawai`i 35, 48, 122 P.2d 1133, 1146 (2005) (emphasis in original) (quoting Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.2d 1157, 1166 (9th Cir. 1997)).  See also Ebasco Services Inc. v. Penn. Power and Light, 402 F. Supp. 421, 454 (E. D. Penn 1975) ("[t]he defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it.").

> Similarly, a defendant acts without proper justification if :
>
> **the interference was tortious, illegal, or unconstitutional, and/or involved violations of statutes, regulations, or recognized common law rules, or established standards of a trade or profession.**
> (emphasis added)

Kutcher, 87 Hawai`i at 407, 957 P.2d at 1089 (internal cites and quotation marks omitted).  Again, the impropriety of the interference can be demonstrated by proof of either an improper *purpose* or an improper *means*.  Id. at fn. 20 (absence of justification "could conceivably involve an improper purpose and/or an improper means").

GMP's Motion is based *solely* on an argument that that Bodell will not be able to establish at trial the required elements of "malice" and acting "without proper justification."  GMP Mot. at 7-8.  Thus, GMP does not contest in its Motion that: (1) a contractual relationship existed between the Bodell and the City; (2) that GMP knew of this relationship; (3) that GMP's conduct that

interfered with Bodell's contract with the City was intentional; (4) that GMP's conduct caused the City to fail to consummate the contract with Bodell by prohibiting Bodell from installing the UTS System on which its bid was based on and denying Bodell an equitable adjustment of the contract; and (5) that the City's breach caused damages to Bodell.

Accordingly, all Bodell need do in order to defeat GMP's Motion is merely show that when construing the evidence in the light most favorable to Bodell, with all reasonable inferences therefrom, a reasonable jury could find that GMP acted with malice and without proper justification in rejecting the UTS System. Where the plaintiff demonstrates the existence of a genuine issue of material fact as to whether the defendant acted with proper justification in interfering with another party's prospective contractual relationship, summary judgment must be denied. See MCI Constructors, Inc. v. Hazen and Sawyer, P.C., 405 F.Supp.2d 621 (N.D. N.C. 2005) (question of fact as to whether engineer's recommendation to terminate contract was for improper motive or legal malice precluded summary judgment on interference with contract claim); Petrovski v. Federal Express Corporation, 240 F.Supp.2d 685 (N.D. Ohio 2002) (evidence of wrongful means and motive of interference with contract held to create question of fact precluding summary judgment); Holmes Products Corp. v. Dana Lighting, Inc., 958 F. Supp 27 (D. Mass 1997) (large volume customer's use of leverage to

- 22 -

create a breach of contract found not to be permissible means or motive for interference and genuine issue of material fact existed as to claim of intentional interference with contract); <u>Marc Development, Inc. v. Wolin</u>, 904 F. Supp. 777 (N.D. Ill. 1995) (evidence of attorney's independent interest in causing a breach of contract by client created question of fact precluding summary judgment); <u>Christianson v. Colt Indus. Operating Corp.</u>, 766 F. Supp. 670 (C.D. Ill. 1991) (evidence sufficient to create question of fact as to whether defendant's actions were justified precluding summary judgment on interference with contract claim).

Unfortunately for GMP, there is more than adequate evidence in the record that demonstrates a genuine dispute of material fact on these issues and the Court must deny the Motion.

B.     **Summary Judgment Should Be Denied Because There is a Genuine Dispute of Material Fact As To Whether GMP Acted With Legal Malice.**

1.     GMP, Trojan and HES Colluded to Prevent Any Competitor of Trojan From Being Approved for the WWTP.

There is substantial evidence that GMP acted with legal malice in rejecting the UTS System. In fact, the record demonstrates a pattern of actions by GMP, HES and Trojan to reject *any* competitor of Trojan from being used for the Project. GMP's actions demonstrate both improper motive and an improper means in its pursuit to get the City to reject the UTS system.

GMP was intent on using the Trojan system from the beginning. Although GMP was aware as early as 1997 that vertical and horizontal low-pressure UV systems were Title 22 compliant, and non-proprietary, GMP's lead engineer on the project admitted that every UV disinfection specification he has ever drafted was based on the Trojan System. Exs. 37, 62 (Mansfield Depo. at p.159). In May 1999, GMP received a diskette of engineering specifications directly from Elhoff for the WWTP Project. <u>See</u> Bodell MSJ, Ex. 9. The specifications were entitled, "Trojan System UV4000$^{TM}$ Standard Specification, Wahiawa, HI, Ultraviolet Disinfection Equipment." Bodell MSJ, Ex. 9 at OPT-02417. Thus, GMP took Trojan's specifications and used them virtually verbatim (except for section numbering) in the Project Specifications. Bodell MSJ, Exs. 2 and 9.

The Trojan specifications called for the UV lamps to be in a horizontal orientation and specifically stated that vertical lamps were unacceptable. Bodell MSJ, Ex. 9 at OPT-02421. Sidney Ellner has testified that this has been Trojan's standard modus operandi: to provide specifications to plant designer based on Trojan's horizontal system and explicitly provide that vertical systems are unacceptable in order to exclude vertical system manufacturers from being able to bid. <u>See</u> S. Ellner Decl. at ¶ 8.

In August 1999, IDI, a manufacturer of low-pressure UV disinfection equipment, sought approval from GMP for the WWTP Project. GMP sought confirmation from HEI that Trojan's low-pressure system would not fit in the Project channel. Ex. 39. In response, Elhoff forwarded Stone's email to Trojan with a complaint that "IDI is knocking on the door" and that they were a "thorn in our side". Ex. 40. This same email was eventually forwarded back to Stone with a request to schedule a telephone conference. Ex. 40. It is thus clear that HES and Trojan felt totally comfortable with sharing with GMP their intent to prevent other competitors from bidding the Project.

Although IDI attempted to follow up on their quote for the Project (Exs. 41, 42), Mr. Stone never responded to IDI. Ex. 43 at pp. 211-12.

GMP's conduct raises multiple questions:

- Why would GMP draft the UV Specification based on the Trojan UV4000™, a proprietary medium-pressure horizontal system, when it knew that there were multiple vertical and horizontal low pressure system manufacturers, the low-pressure systems were Title 22 compliant, had been installed in Hawaii and the U.S., cost less, and would therefore encourage competitive bidding if used? Ex. 37.

- Why would GMP insert a provision in the Specification that vertical systems (with lamps perpendicular to flow) were not acceptable, unless it was to disqualify an entire class of vertical manufacturers?

- Why would GMP ask HES for verification that Trojan's low pressure system could not fit within the boundaries, unless GMP, HES, and Trojan were already intent on drafting the Specification around a Trojan product? Ex. 39.

- Why, if IDI represented that its vertical low-pressure system could fit in the effluent channel, and IDI's product cost less, would GMP simply ignore IDI's request for follow up on its proposal, and draft the specification around the medium pressure Trojan System? Exs. 41, 42, 43 at pp. 211-12.

These questions raise at least a reasonable inference that GMP had improper motives early on in the Project and the intent that no manufacturer other than Trojan would be used for the Project. This is evidence sufficient to impute malice to GMP's subsequent rejection of the UTS System.

2. After the Contract Was Awarded To Bodell GMP Solicited Material from Trojan and HES In Order To Support Their "Effort to Get Ultratech Rejected"

Despite the fact that the City had overruled GMP's rejection of UTS's pre-bid substitution request, and Bodell executed the Contract with bid item 81 included, GMP continued to try to get the City to reject the UTS System. See Ex. 45 (12/17/99 GMP fax to Inouye re GMP prior rejection of the UTS proposal). From April and through June 2000, there was a substantial communication between GMP and HES (and Trojan through HES), in which Stone of GMP requested information to reject the UTS UV system, and HES and Trojan provided it to UTS. Exs. 49-53, 55, 57, 58. The information apparently proved to be helpful "ammunition" in Trojan's "effort (sic) get Ultratech rejected." Ex. 50. Each time GMP requested information, HES and Trojan provided it. Exs. 49-53, 55, 57, 58.

Where the evidence creates an inference that the defendant intended to interfere with the contract, courts will find there is sufficient evidence for a prima facie case of legal malice. See Petrovski v. Federal Express Corporation, 240 F. Supp. 2d 685, 689 (N.D. Ohio, 2002) (evidence that defendant stated that the plaintiff, who was fired, "got what he deserved" and used inflammatory language in communications with plaintiff's employer, was sufficient to create question of fact as to defendant's malice precluding summary judgment). Because a tortious intermeddler will rarely, if ever, explicitly memorialize his intent, it is sufficient on a motion for summary judgment that a jury could merely infer an improper motivation from the evidence. See Ebasco Services Inc., 402 F. Supp. At 454 (summary judgment denied due to question of fact on tortious interference claim).

GMP's actions post-bid opening again raise numerous questions and create the inference that GMP intended that no other UV manufacturer would be used for the Project, and that it intended to get the UTS System rejected even though it knew Bodell's contract was based on the UTS System:

- Why did GMP fax Guy Inouye a copy of its rejection of the UTS System on December 17, 1999—one day after bid opening and it was clear that Bodell had used the UTS System in its bid? Ex. 45.

- Why did GMP ask for the submittal information on UTS purportedly for a "sub-consultant" and then share the confidential proprietary information with UTS's competitors, HES and Trojan, who ultimately had their product installed? Exs. 49, 62 at p. 300.

ImanageDB:642562.2

There is ample evidence that GMP's actions in advising the City to reject the UTS system were done for the improper purpose of favoring the Trojan system to the detriment of UTS and Bodell's rights under the contract with the City. This is sufficient evidence of legal malice as it evidences a willful violation of a known right. Chow, 2 Haw. App. at 484, 634 P.2d at 434. A reasonable jury, construing the foregoing evidence in the light most favorable to Bodell, could easily find that GMP acted with legal malice in soliciting the City to reject the UTS system which was the basis of Bodell's bid.

**C.**      **Summary Judgment Should Be Denied Because There is a Genuine Dispute of Material Fact As To Whether GMP's Rejection of The UTS UV System Was With "Proper Justification."**

GMP's actions in advising the City to reject the UTS system were clearly without proper justification because it involved violations of statutes, regulations, recognized common law rules and established standards of the trade. Kutcher, 87 Hawai`i at 407, 957 P.2d at 1089.

> 1.      If GMP's interpretation of the experience requirement is correct, GMP drafted a defacto sole source specification that only the Trojan System could meet, in violation of HRS Ch. 103D and HAR section 3-122-81.

GMP drafted the Specification based on language contained in a diskette it obtained from Trojan. Bodell MSJ, Ex. 5. The language in the diskette and the language that made it into the Specification are identical in all material

- 28 -

respects.  Compare Bodell MSJ, Exs. 3, 5.  There was no valid reason to exclude vertical systems which had been proven to be Title 22 compliant, cheaper, and non-proprietary, unless the purpose was to reduce competition for the specified proprietary Trojan System.  Exs. 37, 38.

GMP and the City insist that the Specification language means that UTS had to have demonstrated that its horizontal UV system had been installed at five plants in North America with a peak flow rate of 5 MGD or greater.  On this basis, GMP advised the City to reject the UTS System for failure to meet the experience requirement and to direct Bodell to furnish the Trojan System.

Bodell and UTS maintain that the language, "this equipment type", in experience requirement does not relate to the orientation of the UV lamps, but means the equipment generally.  However, Trojan was the only manufacturer in existence at the time of the bid submissions that had installed five horizontal UV systems at plants in North America with a peak flow rate of 5 MGD or greater.  S. Ellner Decl. at ¶¶ 25-27.  Thus, if GMP's interpretation of "this equipment type" is used, the Specification is a de facto sole source procurement.  Id.

Where an experience requirement is written so that only one manufacturer can meet it, and it is a de facto sole source specification, it violates public procurement regulations as anticompetitive.  See CCTW&M v. United States, 452 F. Supp. 69, 78, (D. N.J. 1978) (affirming EPA decision to rewrite

specification and rebid contract for wastewater treatment plant because the experience requirement was written so only one manufacturer could meet it, and thus was anticompetitive and violative of the spirit of EPA Regulations); E. Amanti & Sons. Inc. v. Town of Danvers, 758 N.E.2d 153 (Mass. App. Ct. 2001) (court found that specifications were de facto sole source and government had a duty to disclose to bidders that product was [a] sole source and having failed in that duty, was liable to plaintiff for lost profits).

The City strongly discouraged the use of proprietary equipment. Bodell MSJ, Ex. 1.  As early as October 1999, however, the City advised GMP that if it needed to sole source the UV system, the City would need to obtain sole source approval.  Ex. 44.  GMP did not obtain sole source approval, however, and instead GMP attempted to side step the rigorous requirements by narrowly drafting the Specifications around the Trojan System and narrowly interpreting them so that no manufacturer other than Trojan could meet it.

GMP thus effectively created a sole source procurement in violation of HRS § 103D-306 and HAR § 3-122-81, -82, and its actions were anti-competitive and unfair to contractors such as Bodell who should have been notified that only one product would be accepted.  This was a clear violation of law that is sufficient evidence of lack of justification for a claim of tortious interference with contractual relations.  Kutcher, 87 Hawai`i at 407, 957 P.2d at 1089.

- 30 -

2.  GMP's efforts to reject the UTS System in favor of the more expensive Trojan system violated HRS § 103D-101, HAR § 3-122-10, and were not in the City's best interests, and were therefore without proper justification.

One purpose of public contracting competitive bidding provisions is to promote competition and thereby secure the best price and product for the City and its taxpayers. The State of Hawaii Procurement Policy Board Rules provides:

> § 3-122-10 Purpose. A specification is the basis for procuring a good, service or construction item adequate and suitable for the State's needs in a cost effective manner. Purchasing agencies shall seek to procure standard commercial products, if practicable, and obtain the most advantageous process. <u>All specifications shall seek to promote overall competition, shall not be unduly restrictive, and provide a fair and equal opportunity for every supplier that is able to meet the State's needs.</u>

Haw. Admin R. § 3-122-10 (emphasis added). Moreover, Hawaii Revised Statutes § 103D-101, Requirement of Good Faith, provides that "[a]ll parties involved in the negotiation, performance, or administration of state contracts shall act in good faith." This is consistent with the common law implied duty of good faith in the performance of all contracts. <u>See</u> <u>The Best Place, Inc. v. Penn America Insurance Co.</u>, 82 Hawai`i 120, 920 P.2d 334 (1996).

GMP's pattern of efforts to reject all competitors of the Trojan System is inconsistent with public policy as expressed in HRS § 103D-101 and HAR § 3-122-10 and was patently anti-competitive. Such conduct which had previously been shown to cause bidding protests was not in the City's interest of "procuring a

- 31 -

good, service or construction item adequate and suitable for the State's needs in a cost effective manner." Haw. Admin. R. § 3-122-10. Thus, GMP's actions constituted an unjustified interference that was in violation of "statutes, regulations, or recognized common law rules." Kutcher, 87 Hawai`i at 407, 957 P.2d at 1089.

> 3. GMP utilized improper means by subjecting UTS and Trojan to different standards, and improperly releasing UTS's confidential information to Trojan, and therefore lacked proper justification in its efforts to reject the UTS System.

GMP did not subject UTS and Trojan to the same standards of review in determining whether their UV systems actually met the standards established in the Specification. Ex. 43 at p. 151-58. Stone admitted that Trojan should have at least supplied GMP with calculations verifying the UV disinfection dose, but that this was not done. Ex. 43 at 153. There is no reasonable explanation for GMP's disparate treatment of UTS and Trojan.

Additionally, GMP gave UTS's proposal and confidential information to its "sub-consultant" HES, the representative of UTS's competitor, Trojan. Ex. 49. GMP admits that it may have shared the confidential information with HES. Ex. 62 at p. 300. Mansfield testified that when he received UTS's package of proprietary information he did not object to UTS's restriction on its use or dissemination. Ex. 62 at p. 300. Despite the fact that on the cover of the UTS submittal it stated that

> the contents and drawings contained in this submittal
> package relate to proprietary subject matter.  Any party
> assuming custody does so with the express understanding
> and agreement that neither receipt nor possession thereof
> confers or transfers any right to use, reproduce, or
> disclose its contents or any part thereof, in any manner or
> for any purpose whatsoever,

Mansfield claimed he did not think it was improper for him to share it with HES.

Ex. 62 at p. 300.  Bodell respectfully submits that a reasonable jury might find

differently, however, and conclude that to share UTS's proprietary information

with competitors such as HES and Trojan constituted interference without proper

justification that was in violation of standards of the trade or profession.

In fact, Mr. Greg Ellner, who has been in the UV disinfection

manufacturing business for over 10 years, testified that he never expected the City

or GMP would release its proprietary information to its competitor, Trojan, or

Trojan's representative, HES. Ex. 63, Greg Ellner Decl. at ¶ 16. GMP's release of

UTS's confidential proprietary information to HES and Trojan, that was done in

order to obtain their critiques of the UTS System which were in turn used to reject

the UTS System, was therefore interference via an improper means because it was

not consistent with "established standards of a trade or profession." Kutcher, 87

Hawai`i at 407, 957 P.2d at 1089.  GMP's employment of improper means in its

actions in rejecting the UTS system and interfering with Bodell's contract

precludes summary judgment.

ImanageDB:642562.2

**D.    Summary judgment is precluded because there is a genuine issue of material fact as to whether GMP actions were privileged.**

Privilege is an affirmative defense to a claim of intentional interference with contractual relations. Kutcher, 87 Hawai`i at 408, 957 P.2d at 1090. GMP implies, without specifically arguing,[5] that its actions were privileged (Mot. at 10-13) because it was "carrying out the affirmative duties and obligations it owed to the City." Mot. at 10. GMP cites a legal treatise for the proposition that privilege applies to a design professional's honest advice to an owner. Mot. at 10.

The question of whether an action is subject to a qualified privilege is for the factfinder, and has been described as "the opposite side of the coin from the 'intent to harm' requirement." Ebasco Services Inc., 402 F. Supp. at 455. Thus, where there is evidence that the defendant acted with legal malice, Courts have found that the defendants' actions may fall outside the bounds of legal justification and therefore summary judgment on the basis of privilege must be denied. See Id. (because question of fact existed as to whether defendant acted with malice, question of fact also existed as to whether defendants' actions were privileged); MCI Constructors, Inc. v. Hazen and Sawyer, P.C., 405 F. Supp.2d 621, 629-30 (M.D. N.C., 2005) (summary judgment on grounds of privilege denied to engineering firm hired as consultant to municipality for construction of wastewater

---

5    GMP likely refrains from making this argument explicitly because the defense of privilege only becomes relevant if the plaintiff has already established a prima facie case. Kutcher, 87 Hawai`i at 408, 957 P.2d at 1090.

ImanageDB:642562.2

treatment plant where evidence could be construed to show firm deliberately withheld information from contractor and provided false information to the city to induce termination of contract). Therefore, where the evidence indicated that a defendant had independent interests in interfering with a contract, even if the client incidentally benefited from the actions, summary judgment on the basis of privilege has been held to be inappropriate. See Marc Development, Inc., 904 F. Supp. at 784-85.

In the instant case, even if it could be argued that GMP's efforts were facially for the benefit of the City, because there is evidence that GMP was improperly colluding with HEI and Trojan in their effort to get the UTS system rejected and using improper means to reject the UTS system, such evidence precludes summary judgment on Bodell's intentional interference with contract claim.

GMP attempts to imply that because UTS submitted several rejected submissions, the City and GMP simply ran out of time to verify whether the UTS System met the specifications, given the Consent Decree deadline of March 2001, and Bodell therefore had to supply the Trojan System. See GMP Concise Statement, No. 3; Mot. p. 5. This is a red herring. First, the Consent Decree deadline was amended from March 2001, to August 31, 2001. See City Concise Statement of Facts, filed 2/17/06, Ex."A". Bodell had ample time to qualify the

- 35 -

UTS system, purchase and install it, and meet the Consent Decree Deadline. Bodell MSJ, Cote Decl.

Second, By the time the notice to proceed ("**NTP**") was issued to Bodell on May 10, 2000, the City already knew it would need to obtain an extension of the Consent Decree deadline. <u>See</u> Bodell MSJ, Ex. 23 (6/29/00 Inouye email); Ex. 68 (3/24/00 email). The City believed that the delay in progress was due to the City's own late issuance of the NTP to Bodell, not the UTS submittals. Despite the fact that a continuance of the deadline was obtained to August 31, 2001, the City ordered Bodell to supply the Trojan System in December 2000. Bodell MSJ, Ex. 25.

GMP's continued attempts to create reasons why the UTS System could not be approved and why it directed Bodell to provide the Trojan System illustrate the plain existence of issues of fact precluding summary judgment.

### E.    **FRCP Rule 56(f) continuance**

Bodell does not believe GMP has met its burden of proof that it is entitled to summary judgment as a matter of law. However, in the event that the Court is inclined to grant summary judgment based on the current submissions of the parties, Bodell requests a continuance pursuant to FRPC Rule 56(f). <u>See</u> 4/13/06 Declaration of David Schulmeister at ¶¶ 30-32.

ImanageDB:642562.2

The City recently produced over 2700 new documents that were located in the personal working files of Mr. Hamada. These documents were produced *after* Bodell had taken (or started) the depositions of Hamada, Inouye, Stone and Mansfield. Many of these documents provide new information on the UV rebid, GMP's involvement in the rebid, and the City's internal communications on the UV submittals that Bodell has not had the opportunity to conduct discovery around. In addition, several lay witness depositions have yet to be taken, including the depositions of the senior City managers and HES employees.

The parties have tentatively scheduled additional depositions for late April in this case. Bodell would like to depose and re-depose, among others, Hamada, Inouye, Kaneshiro, Honke, Eldon Frankin, and Elhoff. Bodell believes that further deposition testimony will result in the discovery of evidence relating to GMP's collusion with HES and Trojan to reject the UTS System, GMP's pattern of interference, GMP's failure to follow sole source procurement regulations, and GMP's bogus rationales for rejecting the UTS System in favor of the Trojan System.

Accordingly, if required, Bodell requests a Rule 56(f) continuance of the hearing on this Motion to permit Bodell to conduct further discovery necessary to oppose the Motion.

ImanageDB:642562.2

## V.    **CONCLUSION**

For all of the foregoing reasons, Bodell respectfully requests that the Motion be denied as to the Bodell's claims against GMP for interference with contractual relations.

DATED:  Honolulu, Hawaii, April 13, 2006.

CADES SCHUTTE
A Limited Liability Law Partnership


DAVID SCHULMEISTER
KRISTIN S. SHIGEMURA
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY

ImanageDB:642562.2