CERTIFIED COPY

1    UNITED STATES DISTRICT COURT
     DISTRICT OF HAWAII
2    - - - - - - - - - - - - - - - - - - - - X

     BODELL CONSTRUCTION COMPANY, a Utah
3    Corporation,

4              Plaintiff,

5        -against-                    Case No.
                                      03-00706
6    OHIO PACIFIC TECH, INC. Fka
     GMP ASSOCIATES, INC., an Ohio    HG-LEK
7    corporation; CITY AND COUNTY
     OF HONOLULU; ULTRA TECH
8    SYSTEMS, INC., a foreign
     corporation,
9
               Defendants.
10
     - - - - - - - - - - - - - - - - - - - - X
11

12   HELD AT:    Wilson, Elser, Moskowitz,
                   Edelman & Dicker, LLP
13                 3 Gannett Drive
                   White Plains, New York  10604
14                 September 1st, 2004
                   10:30 a.m.
15

16             VOLUME I

17        Deposition of GREG ELLNER, a

18   non-party witness, held pursuant to Subpoena,

19   held at the above time and place before a

20   Notary Public of the State of New York.

21   ATKINSON-BAKER, INC.
       COURT REPORTERS
22     330 North Brand Boulevard, Suite 250
       Glendale, California 91203
23     (800) 288-3376

24             Lisa M. Prentice, Reporter

25   FILE NO.: 9E06DC4

Exhibit B

1

1

2    conversation with Bodell Construction.

3        Q.    In your last answer you made a

4    reference to Title 22; is that right?

5        A.    Yes.

6        Q.    I think you were going to explain

7    a little bit about what Title 22 is.  Why don't

8    you just go ahead and give a brief explanation of

9    what Title 22 is in the context of the

10   specification for the Wahiawa wastewater

11   treatment plant.

12       A.    The State of California has criteria

13   that a UV system has to meet to be Title 22

14   compliant, the regulations

15   administered by the California Department of

16   Health services.  Hawaii has a designation R-1,

17   which basically says whatever Title 22 is, that's

18   our 1.

19       Q.    Whatever California's Title 22 is

20   Hawaii's R-1?

21       A.    Correct.

22       Q.    Hawaii doesn't have its own?

23       A.    It has an R-1 that references

24   Title 22.

25       Q.    It incorporated by reference

1

2  California's Title 22?

3      A.    Correct.

4      Q.    If you put Exhibit 5, the

5  specification in front of you again, under 1.2A

6  quality assurance, the last sentence there I'm

7  going to read it out loud, it says, UV

8  disinfection system shall have been tested and

9  certified to meet California Title 22 or Hawaii

10  R-1 quality water; is that correct?

11      A.    That's what it says.

12      Q.    So, therefore, whether or not your

13  product would comply with California Title 22 was

14  obviously relevant?

15      A.    Yes, but this is not correct.

16      Q.    When you say this, what are you

17  referring to?

18      A.    That statement which you read is not

19  correct.

20      Q.    I didn't read it correctly?

21      A.    No.   The specification it refers

22  to systems that have been tested and certified.

23  California does not require testing and the

24  certification of all systems to meet Title 22. We

25  have here documentation indicating that our

1

2   systems have Title 22 compliance, but it is not

3   correct to say that all systems are certified

4   to meet Title 22.

5          Q.   The last one that I marked and handed

6   over, can you give me that one?

7          A.   9?

8          Q.   Yeah.   Exhibit 9 seems to discuss

9   that; is that right?

10         A.   Yes.

11         Q.   Again, Exhibit 9 is dated what?

12         A.   December 16th, 1999.

13         Q.   This is your letter to Mr. Humke; is

14  that right?

15         A.   Correct.

16         Q.   Does this letter sort of explain your

17  understanding of what the situation is

18  with regard to certification or approval of UV

19  systems under California Title 22?

20         A.   Somewhat.

21         Q.   Are there any particular salient

22  paragraphs in there that would succinctly

23  summarize it?

24         A.   Yes.

25         Q.   Do you want to point that out to us?

1
2          A.     Second paragraph, R-1 is Hawaii's
3     designation of California's Title 22 standard.
4     R-1 is based upon Title 22, which is why they are
5     jointly referenced.   The standards based upon the
6     National Water Research Institute guidelines.
7     Years ago it was standard
8     procedure to secure an approval letter from
9     California.   As there have been many low pressure
10    horizontal lamp UV systems which have proven
11    themselves in the field, this type of UV system
12    has been designated a, quote, conforming closed,
13    quote system, and approval letters are not
14    required nor are they being issued.   Ultra Tech
15    makes this type of horizontal UV system. Next
16    paragraph, in addition to conforming systems
17    there are nonconforming systems which can be
18    determined to be acceptable based on system
19    performance.   Both Ultra Tech's vertical and the
20    Trojan 4000 fall in to this
21    designation.   We are aware of some Trojan 4000
22    systems, one of which I believe is Riverside
23    California, where the UV system is installed
24    and not meeting Title 22 performance.   What, if
25    anything, this means in terms of future

1

2   acceptability of Trojan 4000 equipment, I do

3   not know.  As of today their system is accepted

4   by California.

5       Q.    Okay.  Now, earlier you said that the

6   last sentence of 1.2A of the specification was

7   incorrect?

8       A.    Yes.

9       Q.    Did you mean to say it's incorrect

10  because it assumes that UV disinfection systems

11  can be tested and certified to meet California

12  Title 22?

13          MR. SUTTON:  Objection.  Leading.

14          MR. BIALEK:  Objection as to form.

15      A.    It's incorrect in that it requires

16  certification.

17      Q.    In what sense is requiring

18  certification incorrect?

19      A.    Certification means that there's a

20  procedure, a standardized procedure testing,

21  and as a result you are certified, that's not

22  always the case.

23      Q.    So, it's the assumption that's

24  sort of implicit in this that's incorrect?

25      A.    Correct.

1

2          Q.    That assumption, again, is that

3    there's such a thing as a procedure for obtaining

4    a certification under California

5    Title 22?

6          A.    Correct.

7          Q.    So, are you saying there is no

8    such procedure for obtaining a certification

9    under California Title 22 for ultraviolet

10   disinfection systems?

11         A.    Yes, there is a method to

12   determine compliance.

13         Q.    How is that different from being

14   tested and certified?

15         A.    Tested and certified implies that

16   California performs testing and certification.

17         Q.    Does California ever perform testing

18   and certification?

19         A.    No.

20         Q.    On UV systems?

21         A.    No.

22         Q.    So, how does California qualify UV

23   systems for compliance with California Title

24   22?

25         A.    Based on recognized -- two-ways,

1

2   conforming system based on meeting the already

3   published criteria, nonconforming systems by

4   submitting independent data and asking that the

5   data is analyzed to verify compliance.  Instead

6   of me describing it, I believe there are

7   letters here issued from California

8   illustrating compliance of Ultra Tech's

9   horizontal and vertical UV systems.

10              MR. SCHULMEISTER:  Why don't we

11         take a break.

12              MR. BIALEK:  That's fine.

13              (Whereupon, a recess was taken.)

14         Q.   Look at what's been marked Exhibit 9

15   to your deposition again, which talks about this

16   R-1 Title 22 issue.  There's a discussion here

17   about what is a, quote, conforming, closed quote,

18   system for purposes of California's

19   Title 22 standard, correct?

20         A.   Yes.

21         Q.   For the record, what is a conforming

22   system, what does that mean?  You have it here in

23   quotes.  To your understanding what's the

24   definition of a, quote, conforming system, closed

25   quote, for purposes of

1

2      California Title 22?

3            A.    A low pressure UV lamp system with

4      lamps parallel to flow, horizontal, low

5      pressure horizontal system.    Anything else is

6      nonconforming.

7            Q.    Is that all it needs to be to be

8      conforming?

9            A.    There's a series -- those lamps

10     and the basic design criteria in the published

11     NWRI guidelines.

12           Q.    That's the National Water Research

13     Institute guidelines that's referred to in the

14     third paragraph of Exhibit 9?

15           A.    Yes.

16           Q.    In terms of the relevance to the

17     specification for Wahiawa then, Trojan being a

18     medium pressure system would not be a, quote,

19     conforming system, closed quote, as you just

20     defined it?

21           A.    Correct.

22           Q.    And the Ultra Tech vertical

23     configuration would, also, not be, quote,

24     conforming as you've described it?

25           A.    Yes, that is correct.

1

2          Q.    But Ultra Tech's horizontal low

3    pressure system would be a conforming system;

4    is that right?

5          A.    Yes.

6          Q.    That's what you're explaining in this

7    letter?

8          A.    Yes.

9          Q.    We were talking a little bit earlier

10   about the specification to the extent

11   it called for the system to be, quote, tested and

12   certified, closed quote, to meet California Title

13   22.  To your understanding is the Trojan 4000

14   system that the spec was written and, quote,

15   tested and certified, closed quote, to meet

16   California Title 22?

17         A.    Not tested and certified.

18         Q.    What, if anything, did it have in the

19   way of an approval?

20         A.    It may be compliant conditionally.

21         Q.    When you say may be, what do you

22   mean?

23         A.    I believe I saw some documentation

24   from state of California listing the conditions

25   of the approval of that type of system.

1

2          Q.   Getting back to your earlier

3    testimony where you basically described the

4    last sentence of 1.2A of the specification as

5    incorrect, I'm going to try to paraphrase my

6    understanding of what you testified as to the

7    reason for that, you just tell me whether I'm

8    getting it or not.  The reason why you believe

9    it's incorrect is because it assumes that

10   California has a testing and certification

11   procedure that UV systems can be subjected to

12   whereas, in fact, California doesn't have a

13   testing and certification procedure; is that

14   correct?

15          A.   That is correct.

16               MR. BIALEK:  Objection as to form.

17               MR. SUTTON:  Objection to form.

18               MR. BIALEK:  Are you talking about

19          now or are you talking at this time?  You

20          might want to clarify that.

21          Q.   Has there been any change in whether

22   or not California tests and certifies

23   UV systems under Title 22 between 1999 and the

24   present?

25          A.   Yes.

1
2    their ultimately were responses.

3          Q.   Now, with respect to the

4    horizontal system I think you indicated earlier

5    it was already, quote, a conforming system?

6          A.   Yes.

7          Q.   But you were asking Dr. Sakaji to

8    nonetheless confirm that?

9          A.   Yes.

10         Q.   With regard to the vertical system

11   you refer to their being pages that follow that

12   pertain to requested approval of the forty lamp

13   vertical module, so that was additional

14   information that was being provided?

15         A.   Yes.

16         Q.   I'm going to hand you what's been

17   marked Exhibit 23, which purports to be a July

18   27th, 2000 fax transmission cover sheet from

19   you to Gary Jeppson at Bodell.  Could you look at

20   Exhibit 23, please?  Here you appear to be

21   describing a scenario in which you're

22   submitting both the horizontal and the vertical

23   configurations for the Wahiawa project.  With

24   regard to the horizontal you believe that you

25   already have Title 22 approval or compliance

1

2  established, but you're still waiting for

3  approval for the vertical system; is that

4  right?

5        A.    Yes.

6        Q.    So, it was your intention that

7  once the vertical system was approved in

8  California then you wanted to pursue substituting

9  the vertical for the horizontal;

10  is that right?

11        A.    More or less.

12        Q.    Now, the second paragraph of the

13  letter you state, quote, going in to this project

14  it was obvious that submittal approval would be a

15  fight, the sentence goes on, do you see that

16  part?

17        A.    Yes.

18        Q.    What were you referring to there when

19  you said going in to the project it was obvious

20  that submittal approval would be a fight?

21        A.    Dealing with GMP.

22        Q.    What about dealing with GMP made

23  it obvious going in to the project that submittal

24  approval would be a fight?

25        A.    Our representative informed us

1

2  that GMP is not very reasonable to deal with

3  and will push their interpretation of the spec to

4  whatever they want as opposed to what it really

5  is.

6          Q.    That would have been Paul Scott?

7          A.    Yes.

8          Q.    Other than Paul Scott telling you

9  that, did you have any other reason to believe

10  that the submittal approval process would be a

11  fight?

12          A.    Some previous dealings with Lee

13  Mansfield.

14          Q.    Lee Mansfield was at that time

15  with GMP?

16          A.    I believe so.

17          Q.    And you had some prior dealings with

18  him which made you think that the

19  submittal approval process would be a fight?

20          A.    Yes.

21          Q.    Could you just briefly explain

22  what those were?

23          A.    Another project which we

24  delivered, Kailua, Lee Mansfield sat as a

25  review board and some of his comments we felt

1

2    were very unreasonable.

3         Q.    On the second page of Exhibit 23 the

4    second paragraph you refer apparently to a GMP

5    letter of June 29th, and below that I'm quoting

6    from your letter now, quote, we can provide a

7    list of installations, we assume that GMP will

8    hang their hats on 1.2.A, which requires five

9    installations using equipment of this type and

10   North America treating five MGD for one year, GMP

11   will attempt to shoot us down as not having five

12   horizontal system installations, do you see that

13   part of Exhibit 23?

14        A.    Yes.

15        Q.    Can you explain the context of

16   that comment?

17        A.    Going through the specifications

18   we so clearly met all other areas of the

19   specification, this is where we thought that

20   GMP would take a stand.

21        Q.    What was it that you were

22   anticipating that they would argue, could you tie

23   it back to the specification, explain what you

24   anticipated they would argue?

25        A.    That our installations don't meet

1

2    their interpretation of experience.

3         Q.    Because they weren't horizontal?

4         A.    Yes.

5         Q.    Could you look at what's been marked

6    Exhibit 33, it purports to be an August 31st,

7    2000 letter from you to Richard Sakaji of the

8    California Department of Health Services, have

9    you seen that letter before?

10        A.    Yes.

11        Q.    Is this a copy of a letter that

12   was actually sent by you?

13        A.    Yes.

14        Q.    What was the context and

15   circumstances that led to this letter being sent?

16        A.    After a face-to-face meeting with Dr.

17   Sakaji this was an information which he requested

18   so we could secure compliance

19   approval vis a vis Title 22.

20        Q.    For the vertical?

21        A.    Yes.   I want to clarify one thing,

22   the word interim is used in this because Title 22

23   was changing in the future, and it was

24   common knowledge to us that the Title 22 approval

25   would be for the regulations that were in force

172

1

2                       C E R T I F I C A T E

3

4        STATE OF NEW YORK      )
                                )ss.:
5        COUNTY OF WESTCHESTER)

6

7                   I, LISA M. PRENTICE, a Shorthand
         Reporter and Notary Public within and for the
8        State of New York, do hereby certify:

9

10                  That GREG ELLNER, the witness
         whose deposition is hereinbefore set forth, was
         duly sworn by me, and that such deposition is a
11       true record of the testimony given by the
         witness.

12

13                  I further certify that I am not
         related to any of the parties to this action by
14       blood or marriage, and that I am in no way
         interested in the outcome of this matter.

15

16                  IN WITNESS WHEREOF, I have
         hereunto set my hand this 13th day of September,
17       2004.

18

19

20       _____

21              LISA M. PRENTICE
                SHORTHAND REPORTER

22

23

24

25

1   UNITED STATES DISTRICT COURT
    DISTRICT OF HAWAII

2   - - - - - - - - - - - - - - - - - - - - X

    BODELL CONSTRUCTION COMPANY, a Utah
3   Corporation,

4           Plaintiff,

                                Case No.
5       -against-               03-00706
    OHIO PACIFIC TECH, INC. Fka
6   GMP ASSOCIATES, INC., an Ohio
    HG-LEK corporation; CITY AND COUNTY
7   OF HONOLULU; ULTRA TECH
    SYSTEMS, INC., a foreign
8   corporation,

                            **CERTIFIED COPY**
9       Defendants.
    - - - - - - - - - - - - - - - - - - - - X

10

11  HELD AT:    Wilson, Elser, Moskowitz,
                Edelman & Dicker, LLP
12              3 Gannett Drive
                White Plains, New York  10604
13              September 2nd, 2004
                10:15 a.m.

14

15              VOLUME II

16          Continued Deposition of GREG

17  ELLNER, a non-party witness, held pursuant to

18  Subpoena, held at the above time and place before

19  a Notary Public of the State of New York.

20          Lisa M. Prentice, Reporter

21

22  ATKINSON-BAKER, INC.
    COURT REPORTERS
23  330 North Brand Boulevard, Suite 250
    Glendale, California 91203
24  (800) 288-3376

25  FILE NO.: 9E07630

                                            172

1

2    the Ultra Tech UV System?

3              A.    I really don't recall.

4              Q.    Take a look at what has been marked

5    as Exhibit 12, that is a memo from you to Bodell

6    Construction dated April 13th, 2000.

7              A.    These aren't in order.  Here's 12.

8              Q.    Do you recognize this memo dated

9    April 13th, 2000?

10             A.    Yes.

11             Q.    It's on Ultra Tech Systems

12   letterhead?

13             A.    Yes.

14             Q.    This was printed off your computer?

15             A.    Yes.

16             Q.    And you drafted this memo?

17             A.    Yes.

18             Q.    Now, in the second paragraph of

19   Exhibit 12 the first line states, the UV System

20   which we bid for Wahiawa at a not too exceed

21   price of $417,500 was a horizontal UV System

22   which will fit in the UV channel with minor

23   modification, do you see that?

24             A.    Yes.

25             Q.    What minor modification were you

1

2    talking about?

3          A.    Slight -- variations in channel depth

4    and width.

5          Q.    When you say a slight variation, are

6    you referring to a variation from the project's

7    plans?

8          A.    Yes.

9          Q.    In this first sentence of the second

10   paragraph of Exhibit 12 you state that UV System

11   which Ultra Tech bid, for Wahiawa project I take

12   it?

13         A.    Yes.

14         Q.    Was the horizontal UV System

15   manufactured by Ultra Tech?

16         A.    We did horizontal and vertical.

17         Q.    But this memorandum is referring to

18   the horizontal UV System, correct?

19              MR. BIALEK:   Objection.

20         A.    This paragraph refers to the

21   horizontal system.

22         Q.    And it provides a price of $417,500?

23         A.    Yes.

24         Q.    Did you ever review Bodell's bid

25   proposal?

1

2          A.   No.

3          Q.   Do you know if Bodell incorporated

4    this $417,500 price in to their bid proposal?

5          A.   I do not.

6          Q.   Now, take a look at Exhibit 12,

7    Paragraph Three, it reads, quote, it has been our

8    intention all along to substitute a vertical UV

9    System for the horizontal system and offer you a

10   substantial savings by doing so, do you see that?

11         A.   I see that.

12         Q.   What were you referring to as far as

13   your intention all along?

14         A.   The vertical product is a better

15   product, which will save the City and County of

16   Honolulu considerable funds while operating,

17   maintaining that product, so it was in the good

18   of public, it's in the good of the customer's

19   interest, which is one of the things we try to do

20   all the time, and at this particular time we did

21   not have the Title 22 approval, it was pending,

22   so once the Title 22 approval was received it's a

23   better situation for all parties to go with the

24   vertical system, that was what our intentions

25   were.

1

2          Q.    Prior to receiving this Title 22

3    certification Ultra Tech had been focusing upon

4    the horizontal UV System?

5          A.    No.

6          Q.    Well, at that point were you

7    focussing on both?

8          A.    Correct.

9          Q.    But you understood that without the

10   Title 22 certification the vertical UV System

11   would not be approved?

12            MR. SCHULMEISTER:  Objection as to

13        form.

14            MR. BIALEK:  I'll join.

15        A.    There is no such thing as a Title 22

16   certification.  What our understanding was was

17   that prior to commissioning of the equipment

18   Title 22 compliance had to be secured,

19   commissioning meaning delivery and start up of

20   the equipment.

21        Q.    You testified yesterday that you had

22   reviewed that Section 11376 of the

23   specifications, correct?

24        A.    Yes.

25        Q.    And in Section 2.4 of that Section

1
2    11376 there's a reference to a requirement that
3    the UV System be the type of horizontal type of a
4    system, correct?
5              MR. BIALEK:  Objection.
6         A.    Specification has alternate
7    provisions in Section 2.1B, which says to be
8    acceptable alternate UV systems must and we are
9    going to interject the word meet the following
10   requirements, capable of meeting the specified
11   performance requirements, operate in an open
12   channel, be of modular design, use lamps with
13   electronic ballasts and incorporate a cleaning
14   system, UV systems shall meet the hydraulic
15   profile shown in the contract drawings, any cost
16   resulting from changes due to the use of an
17   alternate system shall be borne by the
18   contractor, if structures and equipment need to
19   be modified to meet the hydraulic requirements of
20   the plan, all costs shall be borne by the
21   contractor, contractor shall submit design
22   calculations showing that the hydraulic profile
23   shown in the contract drawings will be met, both
24   of the Ultra Tech Systems offered for sale fully
25   comply with all the requirements in 2.1B whether

328

1

2                    C E R T I F I C A T E

3

4       STATE OF NEW YORK      )
                                )ss.:
5       COUNTY OF WESTCHESTER)

6

7              I, LISA M. PRENTICE, a Shorthand
    Reporter and Notary Public within and for the
8       State of New York, do hereby certify:

9

10             That GREG ELLNER, the witness
    whose deposition is hereinbefore set forth, was
    duly sworn by me, and that such deposition is a
11       true record of the testimony given by the
    witness.

12

13             I further certify that I am not
    related to any of the parties to this action by
14       blood or marriage, and that I am in no way
    interested in the outcome of this matter.

15

16             IN WITNESS WHEREOF, I have
    hereunto set my hand this 13th day of September,
17       2004.

18

19

20       _____

21             LISA M. PRENTICE
             SHORTHAND REPORTER

22

23

24

25

329

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3    _____

4    BODELL CONSTRUCTION COMPANY,

5    a Utah corporation,

6                      Plaintiff,

7          vs.                    CIVIL NO. 03-00706(HG/LEK)

8    OHIO PACIFIC TECH, INC., fka GMP    (Contract)

9    ASSOCIATES, INC., an Ohio

10   corporation; CITY AND COUNTY OF

11   HONOLULU; ULTRA TECH SYSTEMS,

12   INC., a foreign corporation,

13                      Defendants.

14   _____

15   CITY AND COUNTY OF HONOLULU,

16          Defendant and

17          Third-Party Plaintiff,

18       vs.

19   ENGINEERED SYSTEMS, INC.,

20          Third-Party Defendant.

21   _____

22

23             DEPOSITION OF GREG ELLNER

24                 VOLUME III

25             Taken June 2nd, 2005

JUN 2 0 2005

359

1        MR. BIALEK:  Objection.

2        THE WITNESS:  Do I answer the question?

3   BY MR. SUTTON:

4        Q.    Yes.

5        MR. BIALEK:  You're asking him to look at a document

6   without giving him all the documents, and if you would look at

7   the complete document production you'd see that it wasn't.  So

8   I think that your question is either purposely misleading or I

9   don't know what it's designed to --

10       MR. SUTTON:  I think you're violating the federal

11   rules under Rule 30 by making an objection that didn't

12   say either wasn't limited to either a nonargumentative one as

13   to form -- or you're starting to violate the Rule, Mr. Bialek,

14   and I wanted to note that on the record if it continues, we'll

15   ask for sanctions.

16       Q.    My question to you, Mr. Ellner, is what's your

17   recollection of the first date that you had an e-mail

18   communication with Mr. Hamada?

19       A.    I have no recollection of the first date I had an

20   e-mail communication with Mr. Hamada.

21       Q.    Was it before July of 2000?

22       A.    I have no recollection.

23       Q.    Okay.  What is your recollection of when you started

24   to have e-mail communication with Mr. Hamada, what topics you

25   discussed with him?

360

1    A.    Ultraviolet.

2    Q.    In addition to ultraviolet, what were other topics

3  that you discussed?

4    A.    Over the years?

5    Q.    Yes.

6    A.    There were many things.  Primarily ultraviolet

7  because that's our business which, you know, which was

8  discussed, technical, technical issues.

9    Q.    Did you also discuss sports?

10   A.    Yes.

11   Q.    Did you discuss gambling?

12   A.    Yes, gaming, yes.

13   Q.    And did you discuss attending conferences or trade

14  shows?

15   A.    Yes.

16   Q.    And let's see, as far as your communications with

17  Mr. Hamada, what's been the most recent e-mail communication

18  you've had with him?

19   A.    I do not recall the date.

20   Q.    Well, did you have any in 2005?

21   A.    I'm not sure.

22   Q.    Well, what is your recollection about as far as

23  communication; did it stop at some point?

24   A.    Yes.

25   Q.    And why did it stop?

361

1    A.    Litigation.

2    Q.    And, I mean, were you instructed by someone to

3  stop --

4    A.    No.

5    Q.    -- the communication?

6         MR. BIALEK:  Objection as to form, also objection as

7  to attorney/client privilege.

8  BY MR. SUTTON:

9    Q.    Did Mr. Hamada ever advise you that he was

10  instructed not to communicate with you further?

11    A.    No.

12    Q.    When was it that you last physically saw Mr. Hamada?

13    A.    September, October of 2004.

14    Q.    And what was that in connection with?

15    A.    Trade show.

16    Q.    Where was that?

17    A.    New Orleans.

18    Q.    And what was the -- strike that.

19         Did you talk with Mr. Hamada at that trade show?

20    A.    Yes.

21    Q.    And what did you talk about?

22    A.    Pleasantries, trade show, how lousy the Mets are

23  doing without Benny Agbayani.

24    Q.    So at that trade show, well, what was your function?

25    A.    At that trade show?

362

1      Q.    Yeah.

2            MR. BIALEK:   Objection as to form.

3    BY MR. SUTTON:

4      Q.    What were you there for?

5      A.    To see what was going on in the industry, visit with

6    our representative, visit with customers.

7      Q.    Did you have a booth there?

8      A.    No.

9      Q.    And what was your understanding of Mr. Hamada's role

10   at that trade show?

11     A.    I have no understanding of his role.

12     Q.    I mean, was it your understanding that he was there

13   on behalf of the City and County of Honolulu?

14     A.    I have no understanding.

15     Q.    When you talked with him did he say anything about

16   the litigation?

17     A.    No.

18     Q.    Did he say anything to you about what he was doing

19   currently at the time as far as his job?

20     A.    No.  We ran into him is a better way to understand.

21     Q.    How was that?  Was he wandering around the trade

22   show as well?

23     A.    We were going to dinner with a bunch of other

24   Hawaiian current and potential future customers, so there is a

25   bunch of Hawaiian people there, and Cyril happened to be with

363

1    them.

2        Q.    And who were these other people?

3        A.    Aqua Engineers personnel.

4        Q.    And what business are they in?

5        A.    They design and operate water, wastewater treatment

6    plants.

7        Q.    And could you give me the names of anybody from that

8    company who were there?

9        A.    Hystrom, Ian, I forget his last name, and his wife.

10   John, I think it's Nagamura.

11       Q.    Had you had dealings with these people before that

12   trade show?

13       A.    Oh, yes.

14       Q.    And what was the nature of that dealing?

15       A.    They operate an UltraTech System on Lana'i.

16       Q.    Anything else that they do out here?

17       A.    They operate a number of wastewater treatment plants

18   out here.

19       Q.    Are those private systems?

20       A.    Both private and public.

21       Q.    And is UltraTech a supplier to any of those other

22   projects or plants?

23       A.    No.  We were trying to be.

24       Q.    And were they also --

25       A.    But as a result of all these things that were

364

1  happening here, they were scared off from us and we were

2  trying to recement our relationship so we can continue to do

3  business.

4      Q.   Have you done any further businesses with them since

5  that meeting at the trade show?

6      A.   We've -- yes, we've sold some parts.  We sold some

7  parts and we're attempting to sell some systems.

8      Q.   And where are these systems located that you will

9  be -- that they may have or may be in the process of

10 developing?

11     A.   Our existing system on Lana'i, and we were

12 unsuccessful for the one over here at Kaneohe.

13     Q.   Any others that are in the works?

14     A.   Schofield.

15     Q.   And are you actively seeking to be involved in that

16 Schofield project?

17     A.   Yes.

18     Q.   Through -- what's the name of that company, Aqua?

19     A.   Engineers.

20     Q.   Engineers.  And what is the current status of that

21 project?

22     A.   My understanding is that they have received a

23 contract to upgrade and operate that entire facility.  They

24 may actually have purchased the facility and they are going

25 to -- I don't have all the details, but sometimes what they do

365

1    is they actually purchase the facility and operate it and

2    get paid by the owner on a per gallon basis of operation.

3    so they privatize.  I guess that's the best word.  They

4    privatize existing wastewater plants is some of the things

5    they do.

6        Q.    And have they already picked an ultraviolet

7    disinfection system?

8        A.    For?

9        Q.    For that upgrade.

10       A.    Which one?

11       Q.    At Schofield.

12       A.    No.

13       Q.    So you're still in the running, to your

14   understanding?

15       A.    Yes.

16       Q.    Okay.  Back to page 1 here of Exhibit 92, the way we

17   understand these work is Cyril's message to you at the bottom

18   is dated first, so that came first and then your response is

19   at top.

20             Is that generally how that works?

21       A.    Yes.

22       Q.    Now, this has to do with what's called a tulip.

23             What is tulip?

24       A.    It's an intensity calculation within a UVDIS

25   software package.

366

1    Q.    And is that something that is applicable to

2   UltraTech systems?

3    A.    It's a very complex answer I'm going to try and

4   simplify this.

5         Tulip is a tool that is used on most ultraviolet

6   systems to approximate an intensity of a UV lamp.  It's

7   something that has been abandoned because more and more of its

8   inaccuracies are showing up.  It's a method which any

9   ultraviolet system could be plugged into.  It's a mathematical

10  aid.

11         I hope I've been able to get that across.

12   Q.    And, I mean, how does that system or that type of --

13  strike that.

14         Is that some kind of computer software?

15   A.    It's a component within a software package.

16   Q.    And how does someone get a copy of that or get

17  access to that?

18         MR. BIALEK:  Objection as to form.  (Indicating.)

19         THE WITNESS:  Do I answer?

20         MR. BIALEK:  Yeah.

21         THE WITNESS:  Okay.  Years ago it was distributed by

22  the EPA and through some other outlets, I dare say over a

23  decade ago.

24  BY MR. SUTTON:

25   Q.    Okay.  Now, in this e-mail Cyril Hamada apparently

367

1   is making reference to tulip.

2        Did you have an understanding that at some point --

3   do you have an understanding that he had access to that

4   software?

5        A.   That's not my understanding.

6        Q.   Okay.  He mentions there, it says, "I did

7   handwritten dosage calculation for your system based on

8   tulip."

9        A.   Um-hum.

10       Q.   I guess what I'm trying to understand is:  Is that,

11   to your understanding, something not done by tulip but

12   something separate?

13            MR. BIALEK:  Objection as to form.

14            THE WITNESS:  Tulip can assist in coming up with an

15   intensity proximation for an ultraviolet lamp.  Thus, the

16   value of 6,000 microwatts per centimeter squared in this

17   e-mail.  So if Mr. Hamada had a printout of a UV system with

18   the similar lamp to the ones we use, he has an intensity value

19   which is indicated here of 6,000.  That's a component of the

20   dosage calculation, that 6,000 value.

21            Then to complete what dosage is, which really is

22   dosage is equal to the intensity of the UV lamps multiplied by

23   the contact time, and this is a theoretical calculated dose,

24   not an actual dose, so in theory the intensity available

25   multiplied by the contact time, and then you can choose to add

368

1    a correction factor for dirt on the fouling, scaling, dirt,

2    all synonymous terms on a quartz jacket, and a reduced amount

3    of output of the lamp, thus the FP and FT variable.

4        Q.    And so, I mean, was Mr. Hamada here discussing the

5    dosage concerning how many banks would be necessary for

6    Wahiawa?  Is that your understanding?

7        A.    No.

8        Q.    Okay.  What, to your understanding, is he talking

9    about here?

10       A.    I think it's pretty clear.  He did some mathematical

11   check, and what he's saying is that based on numbers which

12   only he knows, because it doesn't say over here, he obtained a

13   contact time of 9.6 seconds at a flow of 6.5 MGD for each of

14   the UV banks and with 3 banks of however many lamps he was

15   working with, he got a dosage of 173 millijoules.

16       Q.    Okay.  But what he's saying there, it says, "I did a

17   handwritten dosage calculation for your system," which means

18   UltraTech's system?

19       A.    Um-hum.

20       Q.    Your understanding; is that correct?

21             So what Mr. Hamada is doing is a calculation of the

22   dosage, and he's saying he says three banks and he also talks

23   about two banks.

24             Did you have an understanding that the banks, the

25   number of banks of bulbs in this system was a criteria that

369

1   had been established in the specifications?

2        A.   Please reask that question.

3             MR. SCHULMEISTER:  I'll just object to the form.

4             MR. BIALEK:  I'll object as well.

5   BY MR. SUTTON:

6        Q.   Did you understand that there was a requirement for

7   a certain number of banks?

8        A.   All Title 22 and, thus, R-1 UV systems at the time

9   of Wahiawa required a minimum of three operational UV banks

10  with a fourth standby redundant bank.

11       Q.   Okay.  And was the requirement of the three banks so

12  it could meet a certain minimum dosage requirement?

13       A.   No.

14       Q.   What was your understanding of the requirement for

15  the banks?

16       A.   My understanding is that --

17            MR. BIALEK:  Objection as to form.

18            Go ahead.

19            THE WITNESS:  My understanding is that for Title 22

20  R-1 installations, in order to ensure that you had good

21  hydraulics, good flow through the system so that no particle

22  of effluent would take a short circuit, a short minimal path,

23  you had to have a minimum of three banks in series because

24  this forces the channel to be longer and wider.  That's my

25  understanding.

370

1    BY MR. SUTTON:

2        Q.    Okay.  But as far as what Mr. Hamada says in this

3    letter, he says, he says "Theoretically, two banks can achieve

4    the specified dosages requirements of 100,00," that

5    "millijoules"?

6        A.    (Witness nods head.)  Yes, millijoules.

7        Q.    What's your understanding of his reference to a

8    specified dosage requirement?

9            MR. BIALEK:  Objection as to form.

10           THE WITNESS:  What I read here is that whatever

11   system he was calculating, and there were many variations of

12   systems, that with two of the banks in operation, the system

13   yielded a specified dose of a hundred thousand.

14           Now, remember the specifications always say a

15   minimum dose.  That's the lowest acceptable level, but in

16   Title 22, thus at Wahiawa, the UV system, to follow the

17   guidelines, has to have three banks on.

18   BY MR. SUTTON:

19       Q.    And does it also have to have a certain specified

20   dosage requirement?

21       A.    A minimum of a hundred thousand with three.  I mean,

22   one could say, "Well, hey, we have enough dosage here with two

23   banks on, so obviously we're going to have the dosage when the

24   third bank is on in addition."

25       Q.    Okay.  And as far as that type of calculation of the

371

1    dosage that you get from the number of banks, was that

2    something that would have been part of your calculations in

3    your submittals?

4        A.    The dosage for the systems is a component of the

5    submittals.

6        Q.    Okay.  Why was Mr. Hamada doing this type of

7    calculation and sending you this information?

8            MR. BIALEK:  Objection.

9            THE WITNESS:  You have to ask Mr. Hamada why he was

10   doing that.  I can't answer for him.

11           What I can answer is that he obviously is checking

12   on some of the information that we have submitted as a project

13   manager would, for verification.

14   BY MR. SUTTON:

15       Q.    Had you submitted that information by that date in

16   July 3rd, 2000?

17       A.    There were lots of submissions, and even prior to

18   this job bidding, we had given a proposal with descriptive

19   information, and enough descriptive information that you could

20   make dosage determinations.  So that's why I don't know

21   exactly what he's doing on which generation of system.

22       Q.    Okay.  Your response on July 5th, which is at the

23   top there?

24       A.    Uh-huh.

25       Q.    You respond to his calculation and you actually

372

1    correct or point out some aspects of his calculation, and you

2    come out with a --

3         A.    Lower.

4         Q.    -- a lower amount.

5         A.    Yes.  Dick, I'm a technical expert with UV, and one

6    of the things that I'll do is if someone asks me a question,

7    I'm going to provide them with correct information, which is

8    what I did here.

9         Q.    That's why I'm asking you, because you're more

10   expert than me.

11             MR. BIALEK:  Objection.

12             MR. SUTTON:  Let's go ahead and take a short break.

13             (Brief recess was taken from 9:24 to 9:31 a.m.)

14             MR. SUTTON:  Okay.  Let's go back on the record.

15   Okay.  Let's turn next to --

16             MR. BIALEK:  Off the record one sec.

17                 (Off-the-record discussion was held.)

18             MR. SUTTON:  Okay.  Back on the record.

19        Q.    Exhibit 92, page 3, this is e-mails, July 5th, from

20   Cyril to you and then the response back on the same date.

21   This also addresses the issue that we looked at on the prior

22   e-mail having to do with the number of banks and the

23   calculations.

24             If you take a look on the bottom of that page 3

25   there, it says, "For your information, the meeting with GMP,"

373

1    this is Cyril Hamada saying this, said, "I told Jay Stone that

2    the calculations done by UVDIS are not worth the paper they

3    were printed on since the real world results vary greatly from

4    what is predicted.  I didn't tell him that the NWRI standards

5    have a built-in safety factor for inactivation."

6              As far as this calculation by UVDIS, is that also a

7    reference to this tulip, to your understanding?

8         A.    Tulip --

9              MR. BIALEK:  Objection as to form.

10   BY MR. SUTTON:

11        Q.    Well, I mean, I'm just trying to understand.

12        A.    Tulip is a component of the UVDIS software.

13        Q.    Okay.  And what is that NWRI reference to?  What do

14   those letters reference?

15        A.    National Water Research Institute.

16        Q.    And does the NWRI set the standards for certain

17   quality of wastewater?

18        A.    No.

19        Q.    What do they set?  What are those standards?

20        A.    They have a published guideline for reuse

21   applications of water and wastewater which has become the

22   basis for Title 22 and R-1.

23        Q.    And is it your understanding that from what Mr.

24   Hamada says about NWRI, is it also your understanding that

25   they have a built-in safety factor for inactivation?

374

1      A.    Yes.

2      Q.    And what does that refer to?  I mean, what is

3   inactivation?

4      A.    That's a technical term for killing choliforms.

5      Q.    But you mean does inactivation refer to the system

6   being shut off, or I'm not quite sure what that refers to, to

7   your understanding?

8      A.    It refers --

9            MR. BIALEK:  Objection as to form.

10           THE WITNESS:  To my understanding in this case,

11   inactivation refers to destruction of choliform or other

12   microorganisms.

13   BY MR. SUTTON:

14     Q.    Okay.  So it's inactivating the choliform?

15     A.    Correct.

16     Q.    Not the system?

17     A.    Correct.

18     Q.    Okay.  Up at the top, your response, you indicate,

19   it says, "The reason why three banks are needed is to

20   compensate in case of poor hydraulics, longer and thinner

21   channels provide better disinfection than short fat ones."

22           (Off-the-record discussion was held.)

23   BY MR. SUTTON:

24     Q.    And what are you referring to as far as hydraulics?

25   What does that refer to?  Is that the flow of water through a

375

1    channel?

2        A.    Correct.

3        Q.    And is it your understanding, or at least from what

4    you're just saying here, that the three banks would be one in

5    front of another, I mean in a series is what it's called?

6        A.    Correct.

7        Q.    Okay.  Then if you turn to page U 10, which is the

8    next page there --

9            MR. BIALEK:  Next document?

10           MR. SUTTON:  It's the same, Exhibit 92.

11           THE WITNESS:  Did you say page 10?

12   BY MR. SUTTON:

13       Q.    Yes.

14       A.    Okay.

15       Q.    Page 10 is an e-mail from you to Cyril Hamada of

16   August 8th, 2001.

17           Is that what you understand is this document?

18       A.    Yes.

19       Q.    And you make reference there in the first paragraph,

20   it says, "I, too, am only a recreational 'player'.  My budget

21   was set at a hundred dollars, yet Donald Trump was only able

22   to receive a 90-dollar entertainment contribution from me

23   after about three hours of playing craps."

24           Is this a discussion having to do with gaming?

25       A.    Yes.

376

1    Q.    Did you ever go to a gaming facility where you saw

2  Cyril Hamada?

3    A.    No.

4    Q.    Did you guys ever go to Las Vegas?  I mean, strike

5  that.

6          Do they ever have any of your trade meetings in Las

7  Vegas?

8    A.    There have been.  Not one when I attended.

9    Q.    And when you're talking about the reference here

10  where Trump was able to only get $90 from you after three

11  hours, was that in Atlantic City?

12    A.    Yes, it was.

13    Q.    Okay.  The next page then, let's go to U 11.  This

14  consists of two pages, U 11 and U 12, and at the bottom it has

15  an e-mail from Cyril to you dated August 8th, 2001.

16          And is this a discussion by him of gaming, to your

17  understanding?

18    A.    Yes.

19    Q.    And then your response on August 8th at the top

20  there, is that also a discussion of gaming?

21    A.    Yes.

22    Q.    Okay.  Then let's turn to the next one, which is U

23  13 and U 14, and U 13 at the bottom there has an e-mail from

24  Cyril Hamada to you of July 6th, 2000.

25          Do you see that?

377

1     A.    Yes.

2     Q.    Let's see.   There is reference in Mr. Hamada's

3  e-mail regarding Chuck Eckman.

4         Do you know who that is?

5     A.    Yes.

6     Q.    Who is that?

7     A.    It was a Bodell employee.

8     Q.    And then at the top there, or the first part of his

9  e-mail to you it says, "Thanks for your quick response.   Just

10  to satisfy my curiosity, can you meet the experience clause of

11  the specifications?"

12         Did you answer that in your response of July 7th at

13  the top?   Take a look at the second paragraph.

14     A.    What was the question?

15     Q.    Let me ask you this.

16         In your response of July 7th, 2000 at the top there,

17  is this your response to Cyril Hamada's e-mail that's at the

18  bottom of the page?

19     A.    Yes.

20     Q.    And did you state in the second paragraph regarding

21  the experience clause, "We do not have the sufficient number

22  of horizontal UV systems of the minimum size specified"?   Is

23  that what's stated there?

24     A.    As part of that paragraph, yes.

25     Q.    Okay.   So was that in response to his question to

378

1   you about whether you can meet the experience clause of the

2   specifications?

3           MR. BIALEK:  Objection as to form.

4           THE WITNESS:  (Indicating.)

5           MR. SUTTON:  You can answer.

6           MR. BIALEK:  You can answer.

7           THE WITNESS:  Yes.

8   BY MR. SUTTON:

9       Q.   Now, so you go on in that second paragraph, it says,

10  "We do, however, have many vertical UV systems."

11          Do you see that?

12      A.   Um-hum.

13      Q.   Your answer is "yes"?

14      A.   Yes.

15      Q.   Sorry about that.

16          You go on to say, "Being that both your horizontal

17  and vertical systems use the same components, it can be argued

18  that we do meet the experience clause."

19          Is that what's stated there?

20      A.   That's stated there.

21      Q.   Okay.  Now, at the bottom there it says, "Five

22  versus four banks is causing a problem for us in that we

23  stopped your submittal on the five-bank system and started on

24  the four-bank system."

25          What does that reference to?

379

1      A.   My recollection is that Jay Stone made a comment

2  that in order to meet Title 22 and, thus, his specification,

3  the system had to be four banks, which is not correct and has

4  been proven to be not correct.  So trying to comply with GMP's

5  wishes at that time, we had our engineering department start

6  working on the four-bank system.

7      Q.   Did you make a submittal on the four-bank system?

8      A.   Yes, we did.

9      Q.   Was that for the horizontal?

10     A.   Yes.  Subsequently it was revised and we submitted

11  on a five-bank system.

12     Q.   Well, which came first, did you submit the five

13  first?

14     A.   I believe four first.

15     Q.   And what was the problem on doing it as referenced

16  in your e-mail?

17     A.   I'm sorry, Dick, I don't follow your question.

18     Q.   I guess what I'm trying to figure out is what's the

19  problem with, you know, changing the number of banks?

20          MR. BIALEK:  Objection as to form.

21          THE WITNESS:  Significant engineering time.

22  Everybody's pushing this, you know, get this.  So the

23  engineers have to lay out, create new drawings, check their

24  drawings.  Everything from the drawings, the drawings depended

25  on the equipment description.  Everything changes.

473

1  BY MR. OGOMORI:

2      Q.    Take a look at the next page on Exhibit 92, which is

3  U 0057.

4      A.    (Witness complies.)

5      Q.    In regards to your e-mail which is dated January

6  22nd, 2003, the paragraph that starts with, "Your system does

7  not meet specification and engineers should never have

8  accepted it.  The engineering firm and engineers who worked on

9  the project, in my opinion, are guilty of malfeasance and/or

10 malpractice and they should be included in any action that you

11 take, as now you have two insurance companies from whom you

12 could possibly collect from."

13          You see that?

14     A.    Yes.

15     Q.    So you're talking about two different insurance

16 companies.

17          Whose insurance companies are you talking about?

18     A.    GMP's and the City's.

19     Q.    So the reference to the engineers, that phrase "the

20 engineers," are you referring to somebody from the City?

21     A.    GMP.

22     Q.    What about the phrase "the engineering firm"?

23     A.    GMP.

24     Q.    Who at the City do you believe is guilty of

25 malfeasance?

474

1      MR. BIALEK:  Objection.

2  BY MR. OGOMORI:

3      Q.    In regards to this project?

4      A.    What I wrote here is the engineering firm and the

5  engineers who worked on the project, in my opinion, are guilty

6  of malfeasance.

7      Q.    Okay.

8      A.    This was not addressed to the City.

9      Q.    Okay.  Now, take a look at the next page of U 0058,

10 and it is an e-mail from you to Cyril dated January 22nd,

11 2003.  That second paragraph where it starts, "To my

12 knowledge, no UV system has been tested and recognized as

13 complying with the new NWRI Guideline which, as I understand,

14 is a bioassay measured dose of," it goes on.

15      Is it still true?

16      A.    No.

17      Q.    In fact, some of the later e-mails talk about your

18 competitor being tested?

19      A.    Yes.

20      Q.    Okay.  And that's I believe you indicated the

21 Livermore project.

22      A.    The following day, my e-mail from January 23rd

23 indicates two competitors have tested.

24      Q.    Okay.  And that's page U 0060?

25      A.    Yes.  Because you see the last part of that?

503

1                    C E R T I F I C A T E

2    STATE OF HAWAII                )

3                                   )ss.

4    City and County of Honolulu    )

5              I, B. KANOELANI COCKETT, CSR, Notary Public,

6    State of Hawai'i, do hereby certify;

7              That on June 2nd, 2005, at 8:21 a.m. appeared before

8    me GREG ELLNER, the witness whose deposition is contained

9    herein; that prior to being examined he was

10   by me duly sworn;

11             That the deposition was taken down by me in

12   machine shorthand and was thereafter reduced to

13   typewritten form under my supervision; that the foregoing

14   represents, to the best of my ability, a true and correct

15   transcript of the proceedings had in the foregoing matter.

16             I further certify that I am not an attorney for

17   any of the parties hereto, nor in any way concerned with

18   the cause.

19             Dated this 17th day of June 2005 in Honolulu,

20   Hawai'i.

21   _B. Kanoelani Cockett_____

22   B. KANOELANI COCKETT,

23   HI CSR NO. 379, CA CSR No. 7995

24   Notary Public, State of Hawai'i

25   My commission expires:  February 19th, 2009