1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF HAWAII

3    _____

4    BODELL CONSTRUCTION COMPANY,

5    a Utah corporation,

6              Plaintiff,

7        vs.                              CIVIL NO. 03-00706(HG/LEK)

8    OHIO PACIFIC TECH, INC., fka GMP    (Contract)

9    ASSOCIATES, INC., an Ohio

10   corporation; CITY AND COUNTY OF

11   HONOLULU; ULTRA TECH SYSTEMS,

12   INC., a foreign corporation,

13              Defendants.

14   _____

15   CITY AND COUNTY OF HONOLULU,

16        Defendant and

17        Third-Party Plaintiff,

18      vs.

19   ENGINEERED SYSTEMS, INC.,

20        Third-Party Defendant.

21   _____

22

23        DEPOSITION OF GUY M. INOUYE

24        Taken June 14th, 2005

25

Exhibit C

107

1      A.    I don't know.  It wasn't very long.

2      Q.    And who did most of the talking?

3      A.    I believe it was Elhoff, probably.

4      Q.    And what was he saying?

5      A.    The gist of it was UltraTech doesn't meet.  They

6   should not be allowed.

7      Q.    Was he agitated?

8      A.    I don't recall him being agitated, no.

9      Q.    Was he -- what's the word?  Well, did he try to make

10  a case, in other words, a case that UltraTech should not have

11  been approved prebid?

12     A.    I believe, yes, he did.

13     Q.    Did he show -- did he have documents or did he bring

14  any documents to share to try to support or make his point?

15     A.    I don't recall any documents.

16     Q.    Did he cite to any sources of information that he

17  might have as to how it is that he would know whether or not

18  UltraTech would have met the spec or not?

19     A.    I don't recall any citation of sources or...

20     Q.    I mean, did he have some sort of special credibility

21  with Mr. Honke or Mr. Franklin or with you as to -- well, on

22  issues like this?

23     A.    No, no special credibility.

24     Q.    Did you believe him?

25     A.    I would say we would typically not believe anybody

108

1    totally.   We would consider what he's saying and we would look

2    into it.

3         Q.    And at the time of the meeting had a decision

4    already been made the UV equipment was going to be deleted

5    from Bodell's contract?

6         A.    I don't know.

7         Q.    Did he suggest that it be deleted from Bodell's

8    contract as a way of curing this blunder?

9         A.    Don't recall.   I don't believe he did.

10        Q.    Did anyone in the meeting give him any assurances

11   that not to worry, the City will make this right?

12              MR. OGOMORI:   Objection as to form.

13              THE WITNESS:   I don't think anybody would have made

14   assurances.

15   BY MR. SCHULMEISTER:

16        Q.    Well, how was it left?

17        A.    I don't recall specifically, but probably we'd look

18   into it.

19        Q.    Okay.   Going back to this item No. 5 in Exhibit 5 to

20   Mr. Mansfield's deposition, right after the last thing that I

21   quoted, which was written information was not submitted, only

22   verbal, and another vendor complained, it goes on to say, "We

23   eliminated equipment from package and will procure equipment

24   by itself.   This portion of bid based on our error."

25              You see that?

114

1    A.    I don't believe so.  It had nothing to do with it.

2         MR. SCHULMEISTER:  All right.  We'll mark next this

3    will be Exhibit 3, Bates stamped C 027424.

4                        (Plaintiff's Exhibit No. 3

5                        was marked for identification.)

6    BY MR. SCHULMEISTER:

7    Q.    Okay.  Have you had a chance to look at what's been

8    marked Exhibit 3 to your deposition?

9    A.    Yes, I've looked at it.

10   Q.    All right.  This purports to be an e-mail from you

11   to Dennis Kaneshiro dated April 3rd, 2000; is that right?

12   A.    Correct.

13   Q.    And it says, "Do you know how the UV rebid issue is

14   going?  I got a call from Lee Mansfield asking about status.

15   I previously spoke to Lee.  I've also seen Scotty in the

16   office.  I'm wondering what approach is being taken if GMP is

17   not assisting."

18        Did I read that correctly?

19   A.    Correct.

20   Q.    Do you recall this?

21   A.    Yes.

22   Q.    So it looks like -- so you got the information from

23   Mark Bodell on January 19th, and then between then and April

24   3rd, basically you don't know what's going on?

25   A.    Correct.

115

1    Q.    And so you're asking Dennis if he knows what's going

2  on?

3    A.    Yes.

4    Q.    And did he know what was going on?

5    A.    I believe not because he's asking Cyril provide

6  status.

7    Q.    All right.  Now, the handwriting in the upper right

8  corner is Dennis Kaneshiro's handwriting?

9    A.    Yes.

10   Q.    Now, you mention that "I got a call from Lee

11 Mansfield asking about status."

12   A.    Um-hum.

13   Q.    You remember anything about that call?

14   A.    Can't say that I recall specifically, but it was

15 probably something from Lee saying, "Hey, what's up?"  I

16 guess, "Nobody's asked us to assist in this rebid."  That's

17 what I would be guessing.

18   Q.    All right.  And then you say, "I've also seen Scotty

19 in the office."

20   A.    Um-hum.

21   Q.    Who is Scotty?

22   A.    Scotty is probably Paul Scott.

23   Q.    Do you know Paul Scott?

24   A.    Yes.

25   Q.    How long have you known Paul Scott?

116

1    A.    For several years.

2    Q.    And did you have an understanding in spring of 2000

3  that he was the manufacturer's representative for UltraTech

4  Systems?

5    A.    Yes.

6    Q.    And had you seen him in the office?

7    A.    I apparently did.

8    Q.    What office are we talking about here?

9    A.    That would be the City offices.

10    Q.    So having seen him in the office piqued your

11  curiosity about this?

12    A.    Probably did.

13    Q.    And how so?

14    A.    I don't know for sure, but it was probably seeing

15  Scotty talking with Cyril or in their section.

16    Q.    Okay.  Now, in the spring of 2000 was it your belief

17  that -- well, strike that.

18        You knew that Jimmy Honke, James Honke had signed

19  the letter approving the prebid substitution of UltraTech as

20  an equal for Wahiawa, right?

21    A.    A conditional, yes.

22    Q.    Right.  And did you also know that Cyril Hamada is

23  the one who drafted that letter?

24    A.    Yes.

25    Q.    And then -- but as a result of these discussions

206

C E R T I F I C A T E

1

2   STATE OF HAWAII                    )

3                                      ) ss.

4   City and County OF HONOLULU    )

5           I, B. KANOELANI COCKETT, CSR, Notary Public,

6   State of Hawai'i, do hereby certify;

7           That on June 14th, 2005, at 9:12 a.m. appeared

8   before me GUY M. INOUYE, the witness whose deposition is

9   contained herein; that prior to being examined he was

10  by me duly sworn;

11          That the deposition was taken down by me in

12  machine shorthand and was thereafter reduced to

13  typewritten form under my supervision; that the foregoing

14  represents, to the best of my ability, a true and correct

15  transcript of the proceedings had in the foregoing matter.

16          I further certify that I am not an attorney for

17  any of the parties hereto, nor in any way concerned with

18  the cause.

19          Dated this 28th day of June 2005 in Honolulu,

20  Hawai'i.

21  _____

22  B. KANOELANI COCKETT,

23  HI CSR NO. 379, CA CSR No. 7995

24  Notary Public, State of Hawai'i

25  My commission expires:  February 19th, 2009