CADES SCHUTTE
A Limited Liability Law Partnership

DAVID SCHULMEISTER    2781-0
KRISTIN S. SHIGEMURA    6957-0
1000 Bishop Street, Suite 1200
Honolulu, Hawaii 96813-4216
Telephone:  (808) 521-9200
Facsimile:  (808) 540-5022
Email:        dschulmeister@cades.com
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>        Defendants. | CIVIL NO. 03-00706 (JMS/LEK)<br>(Contract)<br><br>PLAINTIFF BODELL CONSTRUCTION COMPANY'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT CITY AND COUNTY OF HONOLULU ON COUNTS I AND II OF THE FIRST AMENDED COMPLAINT FILED FEBRUARY 13, 2004; DECLARATION OF DAVID SCHULMEISTER; EXHIBITS "73" – "74"; DECLARATION OF LEROY HUMKE; CERTIFICATE OF COMPLIANCE WITH L.R. 7.5; CERTIFICATE OF SERVICE |

ImanageDB:645683.3

**<u>Hearing</u>:**

**Date:**     **May 1, 2006**
**Time:**    **9:00 a.m.**
**Judge:**   **Honorable J. Michael**
                   **Seabright**

<u>Trial Date</u>:

Date:     April 12, 2005
Time:    9:00 a.m.
Judge:   Honorable J. Michael Seabright

# TABLE OF CONTENTS

**Page**

I.    THE CITY'S ARGUMENT THAT ITS PRE BID APPROVAL LETTER STILL REQUIRED BODELL TO RE-QUALIFY UTS AS AN ACCEPTABLE UV SYSTEM MANUFACTURER IS UNREASONABLE AS A MATTER OF LAW .............................................. 1

II.    ASSUMING, ARGUENDO, THAT THE CITY'S INTERPRETATION OF THE UTS PRE BID APPROVAL LETTER IS REASONABLE, BODELL'S INTERPRETATION IS ALSO REASONABLE .............................................................................. 2

III.    THE CITY'S COURSE OF CONDUCT BEFORE AND AFTER THE CONTRACT WAS SIGNED AND ITS FAILURE TO OFFER ANY ADMISSIBLE EVIDENCE REGARDING THE CITY'S OWN INTENDED MEANING OF THE UTS APPROVAL LETTER ARE ENOUGH TO ESTABLISH, AS A MATTER OF LAW, THAT ANY AMBIGUITY IN THE UTS APPROVAL LETTER WAS LATENT AND MUST BE CONSTRUED IN BODELL'S FAVOR .......................................................... 4

    A.    THE CITY HAS OFFERED NO ADMISSIBLE EVIDENCE TO DEMONSTRATE A GENUINE ISSUE OF MATERIAL FACT AS TO THE CITY'S ACTUAL INTENT .................................... 4

    B.    THE CHANG DECLARATION PROVES THAT THE APPROVAL LETTER WAS NOT "PATENTLY AMBIGUOUS." ...................................................................................... 5

    C.    THE CITY'S ACTIONS IN THE SIX MONTHS BEFORE AND AFTER THE CONTRACT WAS SIGNED DEMONSTRATE THAT THE CITY BELIEVED IT WAS REQUIRED TO PAY FOR THE DIFFERENCE IN PRICE BETWEEN THE UTS SYSTEM AND THE TROJAN SYSTEM ...................................................................................... 6

## TABLE OF CONTENTS
(continued)

Page

D.    IT WAS THE CITY THAT WAS OBLIGATED TO
CLARIFY ITS ALLEGED INTENT  TO BODELL
BEFORE THE CONTRACT WAS SIGNED – NOT
BODELL WHO WAS OBLIGATED TO REQUEST
CLARIFICATION -- BECAUSE THE CITY KNEW PRIOR
TO THE EXECUTION OF THE CONTRACT THAT
BODELL EXPECTED TO BE COMPENSATED IF THE
CITY INSISTED ON THE TROJAN EQUIPMENT
RATHER THAN THE UTS EQUIPMENT ........................................... 12

IV.    ALTERNATIVELY, IF THE EXPERIENCE REQUIREMENT IS
CONSTRUED TO PROHIBIT UTS'S RELIANCE ON ITS
PREVIOUSLY INSTALLED VERTICAL SYSTEMS, THE
SPECIFICATION IS THEREBY CONVERTED INTO AN
ILLEGAL DE FACTO "SOLE SOURCE" OF TROJAN .............................. 14

A.    GMP PRINCIPAL LEE MANSFIELD HAS ALREADY
CONFIRMED THAT ONLY INSTALLATIONS
SUPPLIED BY THE MANUFACTURER ITSELF COUNT
TOWARDS THE SATISFACTION OF THE EXPERIENCE
REQUIREMENT ................................................................................... 14

B.    THE DECLARATION OF BRUCE BELL LACKS
SUFFICIENT FOUNDATION AND INDICIA OF
RELIABILITY TO BE ADMITTED INTO EVIDENCE ....................... 16

C.    BELL'S TESTIMONY IS PATENTLY ABSURD AND
DIRECTLY CONTRADICTS GMP'S AND THE CITY'S
ACTUAL INTERPRETATION OF THE SPECIFICATION ................. 17

V.    CONCLUSION ............................................................................................ 19

# TABLE OF AUTHORITIES

**Page**

## CASES

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)............................................................4

Cho Mark Oriental Food, Ltd., v. K.K. Int'l., 73 Haw. 509,  836 P.2d 1057,
        1064 (1992) ..........................................................................................3

Union Building Materials, Corp. v. Hass and Haynie Corporation, 577 F.2d
        568 (9th Cir. 1978) ............................................................................ 13

## MISCELLANEOUS

J. McBride & J. Wachtel, Government Contracts § 2.10 [3] (1996)..........................2

Restatement (2d) Contracts § 212 ............................................................................2

**PLAINTIFF BODELL CONSTRUCTION COMPANY'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AGAINST DEFENDANT CITY AND COUNTY
OF HONOLULU ON COUNTS I AND II OF THE
FIRST AMENDED COMPLAINT FILED FEBRUARY 13, 2004**

I.    **THE CITY'S ARGUMENT THAT ITS PRE BID APPROVAL
LETTER STILL REQUIRED BODELL TO RE-QUALIFY UTS AS AN
ACCEPTABLE UV SYSTEM MANUFACTURER IS
UNREASONABLE AS A MATTER OF LAW**

The issue that is at the crux of Bodell's motion is whether the City's

pre-bid approval of UTS as a qualified manufacturer of the UV equipment for the

Project allowed Bodell to utilize UTS's bid price without having to worry about

having to re-qualify UTS as a qualified manufacturer.  Bodell's position is that the

letter indicated that the City was satisfied that UTS was qualified to supply the

specified equipment.  This left contractors free to bid based upon a price quote from

UTS so long as the proffered UTS system ultimately complied with the criteria in

the specifications for "alternate systems" (Sec. 2.1 B) – which criteria ***do not***

***include a repeat*** of the manufacturer "qualification" requirement (Sec. 1.2 A).  As

argued in Bodell's Motion, unless this is what the approval letter means, it is

illusory and misleading.

Importantly, the City has utterly failed to explain what possible

purpose the approval letter served in the procurement process if not to prequalify

UTS as an "equal" to the only brand listed in the specification.  Indeed, the City has

ImanageDB:645683.3

not even submitted a declaration of any City agent or employee to support its own interpretation of the approval letter. On this basis alone, Bodell's Motion should be granted.

**II.   ASSUMING, ARGUENDO, THAT THE CITY'S INTERPRETATION OF THE UTS PRE BID APPROVAL LETTER IS REASONABLE, BODELL'S INTERPRETATION IS ALSO REASONABLE**

Even if the Court were to conclude, notwithstanding the complete absence from the City's opposition papers of any explanation by way of either argument or testimony of what *meaningful purpose* the UTS approval letter could possibly have served if contractors were still required to run the risk that the City would later determine that UTS was not a qualified UV system manufacturer, that the approval letter can reasonably be so read, Bodell's interpretation is also reasonable for all of the reasons previously argued and supported in Bodell's motion. Importantly, as pointed out at pp. 15-16 of Bodell's Motion, the Court must consider, before making a determination of whether a contract term is ambiguous, extrinsic evidence relating to "the meaning to be attached to it by a reasonably intelligent person conversant with the subject covered by the specifications or document." J. McBride & J. Wachtel, Government Contracts § 2.10 [3] (1996) (emphasis added). See also: Restatement (2d) Contracts § 212 cmt. b ("Any determination of meaning or ambiguity should only be made in light of the

ImanageDB:645683.3                                    2

relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.") (emphasis added).

The available extrinsic evidence on this point includes the Declarations of Sidney Ellner, Armand Cote and Leroy Humke as well as the City's six-month course of conduct and written statements indicating that, if the City were to decide that only Trojan would be acceptable, the City would have to pay the price difference. Bodell submits that this is more than enough to establish that Bodell's interpretation was reasonable. If the City's and Bodell's interpretations are both reasonable, then the approval letter is "ambiguous" as a matter of law. The City's proffered declaration of Wesley Chang does not change this. Mr. Chang simply states how he claims to have interpreted the letter when bidding on behalf of Hawaiian Dredging Construction Company. This does not rebut the reasonableness of the way that both Bodell (the low bidder) and Kiewit Pacific Co. (the second low bidder) interpreted it. See Cote Declaration and Ex. 9. Instead, it confirms that the approval letter was ambiguous, i.e., it was susceptive of at least two differing interpretations, both of which may have been reasonable. Cho Mark Oriental Food, Ltd., v. K.K. Int'l., 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992).

III.    **THE CITY'S COURSE OF CONDUCT BEFORE AND AFTER THE CONTRACT WAS SIGNED AND ITS FAILURE TO OFFER ANY ADMISSIBLE EVIDENCE REGARDING THE CITY'S OWN INTENDED MEANING OF THE UTS APPROVAL LETTER ARE ENOUGH TO ESTABLISH, AS A MATTER OF LAW, THAT ANY AMBIGUITY IN THE UTS APPROVAL LETTER WAS LATENT AND MUST BE CONSTRUED IN BODELL'S FAVOR**

Once the Court determines that the approval letter was ambiguous, the next question for the Court is whether the intention of the parties can be determined from the available evidence as a matter of law. Bodell submits that the only evidence in the record of the parties' actual intent supports Bodell's interpretation of the meaning of the approval letter.

A.    **The City has offered no admissible evidence to demonstrate a genuine issue of material fact as to the City's actual intent**

In order to defeat Bodell's Motion, City cannot merely argue what the City's intent was, it must produce admissible evidence of its *actual intent* regarding the contract provisions sufficient to demonstrate that there is a genuine issue of fact that should proceed to trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The City has submitted *no evidence* regarding *what the City believed or intended* the words "approved for bidding purposes only" to mean: not a single declaration of any City employee, no deposition testimony, nothing.[1] In fact, the only evidence of the City's intent is the evidence submitted by Bodell regarding the City's course of conduct—and

---

[1]    In contrast, Leroy Humke has testified about his interpretation of "approved for bidding purposes only." See Motion, 1/9/00 Humke Decl. at ¶¶ 8-10.

ImanageDB:645683.3

4

this supports Bodell's interpretation. The fact that the City could not elicit a single person to testify as to what the City's intent was, is telling.[2] Instead, the City has merely offered *argument* and the declaration of Wesley Chang.

The Chang declaration is not probative, however, of the City's actual intent. Only an employee or agent of the City would have the competence to so testify but, as noted above, no such witness or testimony has been offered by the City in opposition to Bodell's motion.

**B.    The Chang Declaration proves that the approval letter was not "patently ambiguous."**

What is additionally significant about the Chang Declaration is what it does <u>not</u> say: that Hawaiian Dredging sought clarification pre-bid, regarding the meaning of "approved for bidding purposes only." According to the City, if the approval letter was ambiguous (although the City does not ever identify the ambiguity), the ambiguity was "patent," i.e., was so blatant that any contractor bidding on the project would have been unreasonable in not seeking clarification from the City before bidding. Mem. Opp. at 16; <u>see also</u> City MSJ filed 2/17/00.

Chang does <u>not</u> say, however, that the approval letter was ambiguous in any respect – indeed he claims the opposite. This refutes the City's alternative

---

[2]    The absence of any City testimony is no doubt because such testimony would be impeached by countless City emails and memos between 12/16/99 and 6/29/00 indicating an intent to rebid the UV system.

argument that, if ambiguous, the approval letter was so "patently" ambiguous that any reasonable contractor would have immediately requested clarification. Chang not only does not state that he requested clarification – his testimony flatly contradicts the City's argument that the approval letter was "patently" ambiguous, if ambiguous at all.

C.    **The City's actions in the six months before and after the contract was signed demonstrate that the City believed it was required to pay for the difference in price between the UTS System and the Trojan System**

The chronology of events in the six months between bid opening and the last mention of a UV rebid—from December 16, 1999 to June 29, 2000—show that the City <u>consistently and without objection</u> acted as though if the City wanted the Trojan System installed, the City—not Bodell—would have to pay the price difference. system. Indeed, the very idea of the UV equipment deletion and rebid to accomplish this came from the City—not Bodell—and was approved by Corporation Counsel. The chronology is as follows:

On December 9, 1999, the City issued a letter approving the UTS System for bidding purposes only. Ex. 9.

On December 16, 1999 bids were opened. Exs. 46, 66.

On December 20, 1999, Guy Inouye ("Inouye') sent Hamada an email asking him to get an "**assessment of Ultratech substitution action (whether Trojan threat of protest has merit)**" for a December 21 meeting. Ex. 65 (emphasis added).

On December 30, 1999, Inouye sent an email to Hamada, several department heads and chiefs and Corporation Counsel, Cynthia Nojima,[3] confirming the discussion of a meeting "at the higher levels within the City"[4] on December 27, 1999. Ex. 14. In the email, Inouye said:

> For information. The following actions are being taken relative to the project award:
>
> * * * *
>
> **The approach is as follows: 1) the <u>UV Disinfection Reactor Units to be procured separately and provided to the contractor as Government Furnished Equipment</u> and; 2) by change order, the contractor to install.**
>
> * * * *
>
> I spoke with Leroy Humke, Bodell (low bidder). **He confirmed that his Basic Bid was based on Ultra Tech equipment. He could not provide and install the specified equipment at the bid price. <u>He is agreeable to the item deletion; receiving the equipment as Government Furnished and; installing as a change order</u>.**

Ex. 14 (emphasis added).

On December 30, 1999, the Department of Design and Construction sent a memo to the Department of Budget and Fiscal Services re "Wahiawa WWTP Conversion and Effluent Disposal" and requested "an allotment voucher for $580,000

---

[3]    See Ex. 33 at p. 92, ll. 4-6.
[4]    See Ex. 33 at p. 93, ll. 7-14 (12/27/99 meeting with Honke, Fukunaga, Houghton, Nojima, Hiu).

using the FY99 Facility Replacement Reserve" noting that "[b]id opening was on December 16, 1999, for $10,798,513.90 and contingency of $1,079,851.00…. **The additional funding required to procure project equipment.**" Ex. 66 (emphasis added).

> City's management meeting notes for January 10, 2000 state:
>
> **Per Honke, we are going ahead with award including options to include clarifier and deleting UV disinfection equipment because approval to vendor through pre-qualifications.  <u>Corporation Counsel said we could go that route.  Need to come up with expenses for equipment and rebid.</u>  Written information was not submitted; only verbal and another vendor complained. <u>We eliminated equipment from package and will procure equipment by itself—this portion of bid based on our error.  Will work with ENV to purchase equipment.</u>**

Ex. 15 (emphasis added).

That same day, Dennis Kaneshiro wrote an email to Leslie Toyota stating that **"the UV equipment will be furnished by the City through a separate bid and installed by the contractor…"** Ex. 67 (emphasis added).  Two days later on January 12, 2000, Kaneshiro wrote another email to Toyota stating, **"the UV equipment must still be purchased by the City.  We had some problems with the bidding on the equipment and had to take it out."** Ex. 67 (emphasis added).

The same day, January 12, 2000, Honke, the Chief of Division of Infrastructure Design and Engineering, sent a memo to the Department of Environmental Services stating, **"The UV equipment is intended <u>to be furnished by the City through a separate bid</u> and installed by the contractor..."** Ex. 46 (emphasis added).

On January 19, 2000, Inouye <u>called Bodell</u> and asked for information on the breakdown of bid items impacted by a deletion of bid item no. 81. Ex. 16. Bodell provided Inouye with the information and confirmed that:

> the contract will be awarded in the amount of our submitted bid....Following which, we will be open to negotiation to credit the Owner for the cost of the applicable equipment portion, and related direct cost items, of bid item no. 81 currently in our bid. This will permit the Owner, through Bodell Construction Company, to re-bid the UV equipment to the desired specifications and secure competitive pricing....

Ex. 16. The City did not object to Bodell's confirmation of the agreement regarding bid item no. 81 as stated in the January 19, 2000 letter, nor did the City inform Bodell that its understanding was in error.

Bodell signed the Contract on February 25, 2000. Ex. 17. At no time between January 19, 2000 and February 25, 2000, did the City inform Bodell that its intentions had changed—i.e. that the City would not procure the UV equipment separately and that Bodell would have to supply a Trojan System while being held to

9

the original bid price. Thus, at the time that Bodell signed the Contract, the City knew, and in fact, had *induced* Bodell to reasonably believe that Bodell would not be held to its bid price if City elected to have the Trojan System installed.[5]

The City continued to act as if it would rebid the UV system after Bodell signed the Contract. Three days after the Contract signing, on February 28, 2000, Inouye sent Hamada an email regarding a need to discuss the UV equipment. Hamada wrote on the email "UV procurement, GMP to handle." Ex. 47.

On March 24, 2000, Bill Liu wrote an email to several City employees asking of Hamada, **"Status of Government Furnished Equipment (GFE) UV?"** Ex. 68 (emphasis added). Inouye replied to the email and asks Hamada to **"please provide status to Bill of the ROE, Dam Alteration and UV rebid."** Ex. 68 (emphasis added).

On April 3, 2000, Inouye sent Dennis Kaneshiro an email asking, **"do you know how the UV rebid issue is going?"** Exs. 18, 48 (emphasis added). Kaneshiro forwarded the email to Hamada, with a note, **"Cyril, please provide status of what you are doing for the rebid.** Also, what are your plans to complete the work. Include a schedule." Exs. 18, 48 (emphasis added). Hamada wrote on the email, "I recall in our meeting with Guy that **Guy said that UV specs for rebid would be prepared by**

---

[5]    In fact, Bodell detrimentally relied on the City's conduct when it signed the Contract including bid item no. 81.

**GMP.**" Ex. 48 (emphasis added). Kaneshiro responded to Hamada with a note, "**UV bid issue is ours.** We need to execute on schedule. We have option to use GMP, up to us." Ex. 48 (emphasis added).

A week later on April 11, 2000, Eldon Franklin explained to multiple people at the City that it should issue the notice to proceed to Bodell because "if we start now, **the City can finalize the specifications for the Ultra Violet disinfection system** and the contractor can place the order in time to make delivery in time to meet the installation schedule." Ex. 19 at C005154 (emphasis added).

Finally, on June 28, 2000, more than six months after bid opening, Jack Pobuck emailed Franklin and others at the City, asking "**what is the status of the UV procurement, do we need additional money for this? If so, how much? What is the schedule for the UV procurement? Could we realistically have UV installed by March 1, given all the admin., procurement, and technical hoops that we have to jump through?**" Ex. 23 (emphasis added).

Inouye responded to Pobuck on June 29, 2000 stating that "**We are expecting a formal submittal from the Contractor on the UV equipment. It is not determined whether the equipment will meet or not. IF it does not meet and IF it does cost additional to provide a compliant system, I believe we have approximately $500K in unencumbered FY00 funds. If may or may not be**

**enough it was the most we could get authorized from FY99."** Ex. 23 (emphasis added).

This is the last record mentioning a UV rebid, and it shows that even at the end of June 2000, the City believed that if the Trojan System was going to be purchased, <u>it was the City that would have to come up with the additional funds, not Bodell.</u> The City's argument now, six years after the fact, that the Contract meant that Bodell took the risk of loss when it bid using the UTS System, is clearly a contrived after-the-fact pretext – which also explains why the City has been unable to submit any corroborating testimony by any agent or employee of the City.

> **D.** **It was the City that was obligated to clarify its alleged intent to Bodell before the contract was signed – not Bodell who was obligated to request clarification -- because the City *knew prior to the execution of the contract* that Bodell expected to be compensated if the City insisted on the Trojan equipment rather than the UTS equipment**

Prior to the contract signing on February 25, 2000, the City affirmatively led Bodell to believe that it was going to adjust the contract if the City rejected the UTS System in favor of Trojan and even solicited from Bodell the specific dollar amount of that adjustment. See Section II C. 3, *supra.* It is therefore undisputed that, as of January 19, 2000, the City *knew* that Bodell expected not to be held to the contract price if the City deleted the UTS System from the contract and procured the

UV system on its own. Ex. 18. There is no evidence to show that Bodell's expectation or understanding ever changed.

The City now maintains, albeit without proffering any City witness to so testify, that it *believed all along* that Bodell assumed the risk of the City deciding to reject UTS as a qualified manufacturer of the UV equipment for the Project. As factually spurious as this contention may be, even if this were true, *the City knew of and encouraged Bodell's contrary belief prior to signing the contract.* Consequently, when the contract was signed, it was formed according to the meaning that the City knew Bodell had assigned to the UTS approval letter. See Union Building Materials, Corp. v. Hass and Haynie Corporation, 577 F.2d 568, 573 (9th Cir. 1978) (in case applying Hawaii law, where prime contractor had reason to know of meaning ascribed to contract term by subcontractor, even though subcontractor's belief was inconsistent with trade usage of which it did not know, prime contractor held to subcontractor's interpretation). "If only one party knows or has reason to know of the conflict in meaning, the contract will be interpreted in favor of the party who does not know of the conflict." Id. (citing Restatement (Second) of Contracts, §§ 21A(2), 227(2) and 238). Therefore, because the City knew of the meaning ascribed to the Contract by Bodell, but Bodell had no reason to know of the City's meaning as it argues here, the Contract must be interpreted according to Bodell's interpretation. Id.

## IV.  ALTERNATIVELY, IF THE EXPERIENCE REQUIREMENT IS CONSTRUED TO PROHIBIT UTS'S RELIANCE ON ITS PREVIOUSLY INSTALLED VERTICAL SYSTEMS, THE SPECIFICATION IS THEREBY CONVERTED INTO AN ILLEGAL *DE FACTO* "SOLE SOURCE" OF TROJAN

### A.  GMP principal Lee Mansfield has already confirmed that only installations supplied by the manufacturer itself count towards the satisfaction of the experience requirement

Lee Mansfield, GMP's Principal-In-Charge of Design for the Project,[6] testified that under his interpretation of the Specifications, a UV manufacturer could not meet the experience requirement in Section 2.1A if the manufacturer simply purchased the patent for UV systems that were previously installed by a prior owner of the patent.  Ex. 35 at pp. 243, l. 13-p. 246, l. 21.  Mansfield testified that his interpretation of the intent of the experience requirement in Section 2.1A was that *the manufacturer of the proposed system shall have, itself, manufactured and installed the proposed system at a minimum of five other wastewater locations in the United States, not simply acquired the right to sell or install the proposed system from somebody else who previously installed it five times.*  Ex. 35 at p. 246, ll. 8-21.

Mansfield testified that at the time GMP reviewed UTS's submittals, he asked Infilco Degremont ("IDI"), another low-pressure UV system manufacturer, whether it could have met the experience requirement.  Ex. 35 at p. 239, l. 4- p. 240, l.

---

[6]    See Declaration of Lee Mansfield In Support of Separate and Concise Statement Filed On April 13, 2006, filed herein on April 17, 2006 ("Mansfield Decl.") at ¶ 11.

ImanageDB:645683.3

14

13. Art Shapiro of IDI replied with a list of six installations on January 4, 2001. Ex. 26. However, it is undisputed that five of these six horizontal installations were systems that were not manufactured and installed by IDI, but instead were manufactured and installed by Ultra Violet Purification Systems, Inc. ("UVPS"). See Mot., Declaration of Sydney Ellner ("S. Ellner Decl.") at ¶¶ 3, 4, 11, 26, 27. Prior to 1992, IDI was not involved in UV disinfection of wastewater. Id. All of the installations except one that Mr. Shapiro provided were put into service before 1992. See Ex. 26 (only installation listed that was installed after 1992 was in 1998 in Ashland, Virginia). Thus, in 1999, the only UV manufacturer who actually manufactured and installed more than five horizontal UV low pressure wastewater installations in North America with peak flow of 5 MGD or greater for at least one year, was Trojan. S. Ellner Decl. at ¶¶ 23, 25, 26, 27. Thus, under GMP's own interpretation of the Specifications drafted by GMP, no UV manufacturer other than Trojan could meet the experience requirement, and the Specification is a *de facto* sole source in violation of HRS Ch. 103D.

**B.**    **The Declaration of Bruce Bell lacks sufficient foundation and indicia of reliability to be admitted into evidence**

Despite Mansfield's concession, the City desperately attempts to create a question of fact by the submission of testimony of Bruce Bell as purported evidence that the Specification was not a sole source because, in Bell's opinion, IDI should have been permitted to use the experience of *other manufacturers* whose designs it later acquired to satisfy the experience requirement.7   Bell's Declaration is without an adequate evidentiary foundation and is therefore not admissible expert testimony. F.R.E. 703.

For example, at paragraph 6, Bell states, "IDI had installations of horizontal UV systems that met the experience requirement of the specifications." Bell does not state on what basis he knows that IDI had installations of horizontal systems, whether he reviewed the system specifications for the IDI installations, and how he verified that these installations had the requisite volume of wastewater at peak flow.

Bell's lack of even a cursory foundation of relevant knowledge is further demonstrated wherein he states, "the equipment *offered by IDI*" complied with the specifications.  Bell Decl. at ¶ 6.  IDI did *not* offer any horizontal equipment for the

---

7     The City has been a moving target on the experience requirement.  For example, in Lui-Kwan's October 10, 2003 letter rejecting Bodell's claim (Ex. 30), he contended that the prior installations not only had to be horizontal, but must have also had performance requirements comparable to those in the Project specifications.  Mansfield subsequently clarified, however, that the specification contained no such requirement and contrary statements in his comment letter rejecting UTS' submittal must have been a "typo."  See Ex. 74.

project.[8]  See 4/19/00 Declaration of Leroy Humke, attached hereto, at ¶¶ 2-3.  The

only UV suppliers who provided quotes to bidders on the Project were UTS and

Trojan.  Id. at ¶ 2.

C.    **Bell's testimony is patently absurd and directly contradicts GMP's and the City's actual interpretation of the Specification.**

Bell claims that under his interpretation of GMP's Specifications, IDI met

the experience requirement even if it had only purchased the rights to equipment

designs that had been installed by others.  Bell Decl. at ¶ 6.  Bell's testimony, taken to

its logical conclusion, means that a shell corporation, with no assets, no manufacturing

plant, no record of ever manufacturing a product, and not a single employee, could

purchase the rights to UV equipment designs from another and, based solely on its

ownership of intellectual property rights, could meet the experience requirements of

the Specification.  See Bell Decl. at ¶ 6.  Clearly, this is absurd, and would mean that a

true "fly-by-night" company could meet the experience requirement—a situation that

the City's engineer testified an experience requirement is purposefully designed to

---

[8]    IDI did attempt to offer a vertical low pressure system for the Project.  Exs. 41, 42.  However, GMP prohibited vertical systems (Ex. 3) and according to GMP, no low pressure horizontal system could fit in the boundaries.  See Ex. 73. Therefore, even if Bell is correct and IDI did meet the experience requirement, according to GMP, the IDI horizontal system was too large for the boundaries and would have been ineligible for the Project.
    It should also be noted that GMP represented that no low pressure vertical system could fit in the boundaries (Ex. 73), but this was clearly not true because IDI informed GMP that its vertical system could fit.  Exs. 39, 40, 41, 42.  Yet, GMP still prohibited vertical systems.  The only logical reason to eliminate vertical systems, would be to eliminate IDI from eligibility for the Project.

avoid. See Ex. 34 (Hamada Depo.) at p. 179. Not even Mansfield agrees with this interpretation. See Ex. 35 at 246. ll. 8-21.

Moreover, it is the City and GMP's interpretation in 1999 and 2000, not Bell's interpretation in 2006, that matters for purposes of this Motion. The UTS System was rejected based on the City and GMP's overly strict interpretation of the experience requirement as it was applied to UTS. Under that interpretation, the UTS horizontal system was found not to have the requisite experience. However, if Bell's interpretation is applied—and UTS could satisfy the experience requirement by merely pointing to another manufacturer's installations of comparable equipment—then UTS easily met the experience requirement. UTS could point to the same horizontal UV low pressure installations manufactured and installed by UVDS contained in the list of alleged IDI installations. See Affidavit of Greg Ellner dated and filed April 20, 2006.

Ironically, Trojan and Hawaii Engineering Systems ("HES") were concerned that UTS might attempt to argue the exact interpretation advocated by Bell in order to demonstrate that it met the experience requirement. Thus, a Trojan email to HES states:

> Ultratech does not have 5 installation in the US using the horizontal system. They may refer to older systems sold by UVPS, Katadyn or IDI as some employees are from this company. Ultratech did not supply this equipment.

Ex. 61. Thus, if Bell's opinion is accepted, then the City has merely proven that experience requirement could have been satisfied by UTS with the identical list of installations the Bell attributes to IDI.

Accordingly, whether Mansfield's interpretation is applied or Bell's interpretation is applied, the City has breached the Contract by its rejection of the UTS System. Either the UTS System met the experience requirements of the Specification (under Bell's interpretation) or it was a *de facto* sole source because no one but Trojan could meet it (under Mansfield's).

## V.    **CONCLUSION**

Accordingly, for all of the foregoing reasons, Bodell respectfully requests that the Motion be granted.

DATED:  Honolulu, Hawaii, April 20, 2006.

> CADES SCHUTTE
> A Limited Liability Law Partnership
>
>
> DAVID SCHULMEISTER
> KRISTIN S. SHIGEMURA
> Attorneys for Plaintiff
> BODELL CONSTRUCTION COMPANY