CADES SCHUTTE
A Limited Liability Law Partnership

DAVID SCHULMEISTER       2781-0
KRISTIN S. SHIGEMURA     6957-0
1000 Bishop Street, Suite 1200
Honolulu, Hawaii 96813-4216
Telephone: (808) 521-9200
Facsimile: (808) 521-9210
Email:      dschulmeister@cades.com
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BODELL CONSTRUCTION COMPANY, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>OHIO PACIFIC TECH, INC., fka GMP ASSOCIATES, INC., an Ohio corporation; CITY AND COUNTY OF HONOLULU; ULTRA TECH SYSTEMS, INC., a foreign corporation,<br><br>Defendants. | CIVIL NO. 03-00706 (JMS/LEK)<br>(Contract)<br><br>PLAINTIFF'S SECOND SUPPLEMENTAL MEMORANDUM RE MOTIONS FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE<br><br><br>**Hearing:**<br>Date:    May 1, 2006<br>Time:    9:00 a.m.<br>Judge:   **Honorable J. Michael Seabright** |

**PLAINTIFF'S SECOND SUPPLEMENTAL MEMORANDUM
RE MOTIONS FOR SUMMARY JUDGMENT**

ImanageDB:655872.2

I.  **THE FEBRUARY 25, 2001 CONTRACT IS NOT INTEGRATED**

An agreement is integrated if "the parties thereto adopt the writing or writings as the *final and complete* expression of the agreement and an 'integration' is the writing or writings so adopted." Pancakes of Hawaii, Inc. v. Pomare Properties, Corp., 85 Haw. 300, 310, n. 6, 944 P.2d 97, 107, n. 6 (Ct. App. 1997) (citing BLACK'S LAW DICTIONARY 809 (6th Ed. 1990))(emphasis added).

Whether a writing was intended to be final, and therefore an integrated expression of the parties' agreement, is to be determined by the court as a question preliminary to application of the parol evidence rule. In re O.W. Limited Partnership, 4 Haw. App. 487, 491, 668 P.2d 56, 60 (1983) (citing Restatement (Second) Contracts §§ 209, 210, 213). "All relevant evidence bearing on the threshold question of whether the agreement is an 'integrated' one is admissible." Id.; see also 6 Arthur L. Corbin, *Corbin on Contracts* (Interim Edition 2002) § 573 at p. 75. (in determining whether an agreement is integrated, there is no "parol evidence rule" to be applied, and all relevant evidence, parol or otherwise, is admissible.). Accordingly, the evidence of integration may be *in the written provisions of the contract itself* or the *conduct of the parties*. See also Restatement (Second) Contracts § 209, cmt. c ("all relevant evidence, including evidence extrinsic to the document in question, is admissible on the issue whether the parties intended the document to be integrated."); Pancakes of Hawaii, 85 Haw.

at 311, 944 P.2d at 108 (citing Restatement Section 209(3) and noting that even where a contract appears complete on its face, contrary evidence may be used to establish that the writing did not constitute a final expression).

> A. **The language of the Contract itself evidences it is not integrated**

The Contract does not contain a written integration clause. A "garden variety" integration clause is express as to its completeness. For example:

> It is understood that there are no oral or written agreement or representations between the parties hereto affecting this [agreement] and this [agreement] supersedes and cancels any and all previous negotiations, arrangements, representation, brochures, agreements, applications and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter hereof, and none thereof shall be used to interpret or construe this Lease.[1]

Hawaii courts have also held the following language proof of complete integration:

> This Agreement constitutes the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties and there are no warranties, representations or other agreements among the parties in connection with the subject matter hereof except as specifically set forth herein.[2]

Unlike these provisions, the Contract states in Part I, paragraph 2 that:

> The Contractor will construct and perform said work in

---

[1]   Id. at 311, 944 P.2d at 108 (citing footnote 3 of the opinion).

[2]   Touche Ross Ltd. v. Filipek, 7 Haw. App. 473, 476, 778 P.2d 721, 724 (Ct. App. 1989).

> accordance with the true intent and meaning of the invitation for bids….said invitation for bids and any and all alterations, amendments, additions and deductions in connection therewith being specifically referred to and incorporated herein by reference and made a part hereof as though fully set forth herein.

Bodell Exhibit 17. Significantly, this provision does not include words of *exclusivity* such as "this agreement supersedes and cancels all prior and contemporaneous agreements." To the contrary, this provision is *inclusive*, sweeping into the Contract any and all post-bid "alternations, amendments, additions and deductions," without purporting to specifically identify them, but nonetheless treating them as being incorporated into the terms of the Contract.

As previously noted, Section 1.6 of the General Instructions to Bidders and Section 2.2 of the General Conditions of Construction Contracts of the City and County of Honolulu, are not integration clauses. They are specific warranties relating to the Contractor's non-reliance on informal oral and written representations by City employees in the preparation of its *bid* submission. The Contractor's warranties regarding prebid representations do not address *post bid* statements or negotiations before the Contract is signed.

At most, Section 1.6 of the General Instructions and Section 2.2 of the General Conditions merely integrate the parties' agreement up to the date of the

bid submission.³ Even if so construed, these provisions do not preclude post-bid modifications and agreements or either party's reasonable reliance thereupon — including the City and Bodell's negotiations post-bid regarding the deletion of the UV equipment from the Contract. Thus, even if the Contract could somehow be construed has having been integrated up to the date of bid submission, the parol evidence rule "does not prevent parties from subsequently making another different agreement or from modifying, changing, or altering the original written agreement. Parol evidence of the subsequent agreement or the changes is admissible." In re O.W. Limited Partnership, 4 Haw. App. at 491, 668 P.2d at 60 (affirming admission of evidence showing parties did not intend agreement to be final, that the agreement was replaced by a new agreement and that the terms of the agreement were modified).

### B. The conduct of the parties evidences the fact that the Contract was not integrated

Apart from the absence of an integration clause, the conduct of the parties evidences the fact that the Contract was not integrated. Specifically, it would have been a meaningless exercise for the City to have contacted Bodell post

---

³ This is conceptually problematic because Bodell's bid, standing alone, is not a contract. It is merely an offer. It does not really make sense, therefore, to treat the bid as "integrated." Instead, Bodell made warranties in connection with its bid regarding Bodell's nonreliance, at the time of bid submission, on oral communications with the City.

bid (Ex. 14) to determine the credit that would accrue to the City if the UV reactors were to be deleted from the Contract if the City could not later *rely upon* the letter it subsequently obtained from Bodell to this effect. (Ex. 16).

## II. BODELL'S POSITION REGARDING THE DOCUMENTS AND ORAL AGREEMENTS THAT DEFINE THE SCOPE OF THE PARTIES' AGREEMENT AS IT RELATES TO THE UV DISINFECTION EQUIPMENT

Bodell's position is that the parties' agreement, as of the February 25, execution of the Contract (Ex. 17), was that Bodell would supply and install the UTS equipment without seeking any adjustment to the Contract price, but that if the City elected to instead require the Trojan system (or any other system), that the City would have to pay the price differential, if any. The documents and oral agreements that comprise this agreement are as follows.

### A. The UV disinfection specification (Ex. 3)

The UV specification states at 2.1 A. that the UV system "shall be System UV 4000™, as manufactured by Trojan Technologies, Inc. or equal."

### B. The General Instructions to Bidders (Ex. 2) regarding prequalification for alternative brands

The General Instructions to Bidders at 1.13 tells bidders that, where the bid invitation "specifies one or more manufacturer's brand names or makes of . . . equipment . . ., the bidder's *bid* shall be based on either one of the specified brands . . . or on an alternate brand . . . which has *expressly been found to be equal or better* by the Officer-in-Charge." (Emphasis added).

### C. The City's pre-bid approval letter for UTS (Ex. 9)

The City approved UTS as an equal "for bidding purposes only" in its December 9, 1999 approval letter to UTS' local representative, Engineered Systems. According to the last paragraph of 1.13 (a) of the General Instructions to Bidders, it was up to bidders, such as Bodell, "to confirm with their subcontractors or suppliers that alternate brands, makes, or methods offered by the subcontractors or suppliers have been approved by the Officer-in-Charge." Importantly, what bidders were to confirm was approval *by the Officer-in-Charge* – not whether the alternate brands were *in fact* equal or better (as opposed to the Officer-in Charge having issued the approval in "error"). This approval letter was the City's *agreement* to allow bidders to *base their bids* for the UV reactors on the UTS system (regardless of whether the approval had been issued in "error").

### D. Guy Inouye's post bid conversation (Ex. 14) with Leroy Humke regarding Bodell's use of UTS in its bid and its willingness to delete the UV reactors from Bodell's contract should the City choose not to go with UTS

After bid opening, the City concluded it had issued the approval letter in "error" (Ex. 15) and that only the Trojan system would be acceptable. Guy Inouye thus called Leroy Humke of Bodell to inquire as to whether Bodell could supply the Trojan system without a price adjustment and, if not, if Bodell would be agreeable to deleting the UV reactors from the ultimate contract, if awarded to Bodell, and crediting the City the amount of Bodell's bid price that was based on

supplying the UTS system. Humke stated that this was agreeable to Bodell. At this point it was mutually agreed by Bodell and the City that Bodell had been justified in using UTS as its basis of bid for the UV reactors and that Bodell could not be expected to supply the more expensive Trojan system without a price adjustment. It is also a material and noteworthy point that Mr. Inouye did not tell Mr. Humke that the City believed it had issued the approval letter in "error." For all Bodell knew, the City simply preferred the Trojan system over the UTS system and was willing to pay the added cost in order to procure its preferred system.

      **E.**    **Bodell's January 19, 2000 letter to the City (Ex. 16) confirming Bodell's agreement to credit the City the price Bodell bid for UTS if the City were to delete and rebid the UV portion of Contract**

Bodell's January 19, 2000 letter to the City followed a further telephone call from Guy Inouye requesting specific pricing information with regard to the credit the City could expect if the UV reactors were to be deleted from the Contract and rebid separately. Bodell provided the City the requested assurance that Bodell would "cooperate in working with you, on a fair basis, to both the Owner and Contractor, to develop a strategy to obtain the UV equipment at a competitive price, that meets with the required approvals."

The enclosure to this letter provided a breakdown of the extent to which Bodell's bid was based on the UTS system. By this letter, Bodell agreed that it would credit the City with the amounts in the bid amount breakdown column

if the UV reactors were deleted and rebid. The fact that this letter was solicited by the City and sent by Bodell demonstrates that the parties were, at that time, in ***mutual agreement*** that Bodell was justified in basing its bid on the UTS system and that the City could not require Bodell to supply a different system without a contract adjustment to account for the price difference.

    F.    <u>The February 25, 2000 Contract (Ex. 17)</u>

It was against the immediate backdrop of Bodell's commitment to cooperate with the City should it decide not to proceed with the UTS system that it had previously approved as an "equal" for "bidding purposes" that the Contract was signed on February 25, 2000. Clearly, Bodell's January 19, 2000 letter was an "amendment" to its bid to the extent it provided a price breakdown showing the precise dollar amounts that Bodell had included in its bid for UTS – which is not evident from the Bid Proposal itself (Ex. 12). The City had requested this prior to signing the Contract, which had the effect of nailing Bodell down regarding the credit the City could expect if the UV reactors were deleted from the Contract and rebid separately. Bodell's position is that, as of February 25, 2000, the parties were in mutual agreement that the Contract price was based on Bodell having justifiably relied upon the City's approval letter regarding UTS and that if the City were to elect not to proceed with UTS, that Bodell would credit the City the amounts it had included in its bid for UTS, and would be separately compensated

for the cost of the replacement system.

### III. IT IS UNDISPUTED THAT THE CITY DID NOT BELIEVE, AS OF FEBRUARY 25, 2000, THAT IT HAD BARGAINED FOR THE RIGHT TO RECEIVE THE TROJAN SYSTEM FOR THE PRICE OF THE UTS SYSTEM

The evidentiary record before the Court on these cross motions is clear regarding the fact that the City did not believe, as of the February 25, 2000 formation of the Contract, that it had bargained for the right to require Bodell to supply the Trojan system for the price of the UTS system. To the contrary, it is undisputed that the City fully expected to have to pay the price differential between the two systems if it elected to proceed with the Trojan system because the City had "erred" in the issuance of the approval letter. See Exs. 14, 15, 16, 18, 19 (at C005154), 23, 46, 47, 48, 66, 67, and 68. This reflects the City's recognition that, if the approval letter had indeed been issued in "error," it was the City, not Bodell, that bore the risk of that error under the terms of the Bid Invitation and the Contract. This stands to reason given that Bodell was not involved in the review of the substitution request or the issuance of the approval letter. This was handled solely by the City, the vendor, and the City's design consultant, GMP – without any participation by Bodell. Bodell's sole responsibility under the General Instructions to Bidders was to confirm with the vendor that the "Officer-in-Charge" had approved UTS for bidding purposes – which Bodell did. Bodell was

not required to independently validate that the UTS equipment was, indeed, "equal or better" than the Trojan system, nor would there have been any *time* to do so in the week between the issuance of the approval letter on December 9, 1999 and bid opening on December 16, 1999.  See Dec. of Armand Cote at ¶23.

Had the City disclosed to Bodell that it believed it had "erred" in prequalifying the UTS system, Bodell could have taken steps to protect itself, such as by withdrawing or modifying its bid pursuant to HAR § 3-122-31, "Mistakes in bids."  Instead, the City advised Bodell that it intended to rebid the UV equipment and solicited commitments from Bodell regarding a price credit.  Thus, not only did *the City expect to pay* for any price difference, the City *knew* that this is what *Bodell expected* as of the date the Contract was signed.  These were the "justified expectations" of the parties against which the good faith of the City's subsequent performance must be measured under Hawaii Leasing v. Klein, 5 Haw. App. 450, 456; 698 P.2d 309, 313-314 (1985).

DATED:  Honolulu, Hawaii, June 23, 2006.

CADES SCHUTTE
A Limited Liability Law Partnership

/s/ David Schulmeister
DAVID SCHULMEISTER
KRISTIN S. SHIGEMURA
Attorneys for Plaintiff
BODELL CONSTRUCTION COMPANY