UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
300 ALA MOANA BLVD., C-338
HONOLULU, HAWAII 96850-0338
CLERK

OFFICIAL BUSINESS

RETURN SERVICE REQUESTED

PRESORTED
FIRST CLASS

HONOLULU
OCT 04 '06
MI

PB METER
7050426

≈ 1.75 ≈
U.S. POSTAGE

Alan J. Ma
Gerson & Hieneman
Pacific Tower

GERS001    T968133019 1806 91 10/10/06
:GERSON    RETURN TO SENDER
           AND HIENEMAN
           TEMPORARILY AWAY

           RETURN TO SENDER

CV-03-00706 JMS-LEK

RECEIVED
CLERK, U.S. DISTRICT COURT
OCT 1 1 2006
DISTRICT OF HAWAII

Alan J. Ma
Gerson & Hieneman
Pacific Tower
1001 Bishop St Ste 780
Honolulu, HI 96813

CV 03-00706 JMS-LEK

Owen Matsunaga
Gerson & Hieneman
Pacific Tower
1001 Bishop St Ste 780
Honolulu, HI 96813

CV 03-00706 JMS-LEK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BODELL CONSTRUCTION
COMPANY, a Utah corporation,

       Plaintiff,

       vs.

OHIO PACIFIC TECH, INC., fka
GMP ASSOCIATES, INC., an Ohio
corporation; CITY AND COUNTY
OF HONOLULU; ULTRA TECH
SYSTEMS, INC., a foreign
corporation,

       Defendants.

_____

CITY AND COUNTY OF
HONOLULU,

       Defendant, Third-
       Party Plaintiff, and
       Counterclaim
       Defendant,

       vs.

ENGINEERED SYSTEMS, INC.,

       Third-Party
       Defendant,
       Counterclaim
       Plaintiff and Cross-
       Claim Plaintiff.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO.  03-00706 JMS/LEK


ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS FOR
SUMMARY JUDGMENT

CITY AND COUNTY OF
HONOLULU,

   Defendant, Cross-
   Claim Plaintiff/
   Cross-Claim
   Defendant,

  vs.

ULTRA TECH SYSTEMS, INC., a
foreign corporation,

   Defendant, Cross-
   Claim Defendant/
   Cross-Claim
   Plaintiff and Cross-
   Claim Plaintiff/
   Defendant,

  vs.

OHIO PACIFIC TECH, INC., fka
GMP ASSOCIATES, INC., an Ohio
corporation,

   Cross-Claim
   Defendant/Plaintiff

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Before the court are five separate motions for summary judgment, all flowing from disputes arising during a construction project at the Wahiawa

wastewater treatment plant. In short, the court rules as follows: the court DENIES

AS MOOT the Motion for Summary Judgment brought by Bodell Construction

Company ("Bodell") against the City and County of Honolulu ("the City"); the

court DENIES AS MOOT the Motion for Summary Judgment brought by the City

against Bodell; the court DENIES AS MOOT the Motion for Summary Judgment

brought by the City against Ultratech Systems, Inc. ("Ultratech") and Engineered

Systems, Inc. ("ESI"); the court GRANTS IN PART and DENIES IN PART the

Motion for Summary Judgment brought by Ohio Pacific Tech Corporation, Inc.,

formerly known as GMP Associates, Inc. ("GMP"), against Ultratech, ESI, and

Bodell; and the court GRANTS IN PART and DENIES IN PART the Motion for

Summary Judgment brought by Ultratech and ESI against GMP and the City.

## II. BACKGROUND

A.    Factual Background

    **1.    Introduction**

       This case involves a dispute over the suitability of a piece of

equipment -- specifically, an ultraviolet disinfection system -- to be used in a

construction project at the Wahiawa wastewater treatment plant ("Wahiawa

WWTP"). This piece of equipment should have cost somewhere between

$267,500 and $1.1 million, depending on the manufacturer and the equipment type.

Ultratech's MSJ[1] at 25; GMP's Concise, Ex. E; Bodell's MSJ at 8. The question of

which piece of equipment was required at the Wahiawa WWTP has led the parties

-- and their several thousand pages of pleadings and exhibits -- here.

---

[1] For ease of reference, the court will refer to the parties' pleadings and exhibits throughout this order as follows:

| | |
|---|---|
| Bodell's MSJ: | Bodell's motion for summary judgment against the City |
| Ultratech's MSJ: | Ultratech's and ESI's motion for summary judgment against the City and Ohio Pacific Tech Corporation, Inc., formerly known as GMP Associates ("GMP") |
| GMP's MSJ: | GMP's motion for summary judgment against Ultratech and ESI |
| GMP's Reply: | GMP's reply to Bodell's memorandum in opposition to GMP's MSJ |
| GMP's Concise: | GMP's concise statement of facts in opposition to Ultratech's MSJ |
| City's Concise #1: | the City's concise statement of facts in support of the motion for summary judgment brought by the City against Bodell |
| City's Concise #2: | the City's concise statement of facts in opposition to Ultratech's MSJ |
| Bodell's Concise #1: | the exhibits attached to Bodell's MSJ |
| Bodell's Concise #2: | the exhibits attached to Bodell's opposition to GMP's MSJ |
| Ultratech's Concise #1: | Ultratech's and ESI's concise statement in support of Ultratech's MSJ |
| Ultratech's Concise #2: | the exhibits attached to Ultratech's and ESI's reply memorandum in support of Ultratech's MSJ |

**2.    Consent Decree**

In 1998, the City entered into a Consent Decree with the State of Hawaii ("the State").  The State had sued the City for having violated Hawaii Revised Statutes ("HRS") chapter 342D ("Water Pollution"), and the State and the City entered into the Consent Decree "to provide a long-term reliable solution for effluent disposal from the Wahiawa Wastewater Treatment Plant, to improve reservoir water quality, and to promote resource conservation through wastewater reclamation."  City's Concise #1, Ex. A at 1-4.  Pursuant to the Consent Decree (and a subsequent modification to the Consent Decree), the City had until August 31, 2001 to complete construction and begin operation of a system to reclaim all wastewater from the Wahiawa WWTP.  City's Concise #1, Ex. A at 8, 14, Modification #1 at 2.  The City faced a series of stipulated penalties, including a $600,000 one time lump sum penalty, if it failed to meet this deadline.  City's Concise #1, Ex. A at 14.

\\

\\

\\

\\

\\

5

3.    **Project Specifications**

In March of 1999, the City retained GMP[2] to provide engineering and design services for the Wahiawa WWTP project.[3] City's Concise #1, Ex. B at 1. GMP prepared the construction documents for the Wahiawa WWTP project; that is, GMP wrote the specifications for the project, and various contractors used these specifications in preparing their bids.[4] City's Concise #1, Ex. B at 2; Record ("R.") at 45 ("[The City] admits that GMP wrote the Specifications."). In December of 1999, the City and GMP signed an Agreement for Professional Services; among other things, the Agreement provided that GMP "is an independent contractor and shall not be deemed to be an agent, servant, representative or employee of the City." City's Concise #2, Ex. G.

The relevant part of those specifications is Section 11376, which set out the requirements for the ultraviolet ("UV") disinfection equipment. Paragraph 1.2 contains the following "experience requirement" for UV manufacturers:

---

[2] GMP is now known as Ohio Pacific Tech, Inc. Because all the relevant documents in this case refer to GMP rather than Ohio Pacific Tech, Inc., the court will continue to refer to this entity as GMP.

[3] The City had actually retained GMP as early as December 1996 for help with Wahiawa effluent reuse. GMP's Concise, Ex. B.

[4] Another engineering firm, Brown and Caldwell, prepared a report in March of 1999 recommending that the City install a medium-pressure ultraviolet ("UV") disinfection system. That report indicated, however, that "[a] final decision on the type of UV system should be determined by the design engineer," *i.e.*, by GMP. GMP's Concise, Ex. A.

6

> To be acceptable, the manufacturer shall be able to demonstrate
> . . . successful performance of the proposed system at a
> minimum of five (5) other wastewater locations in the United
> States.
>
> The manufacturer shall submit at least five (5) permanent
> wastewater installations using this equipment type, in North
> America, disinfecting a peak flow of 5 MGD [million gallons a
> day] or greater for at least one (1) years. [sic]
>
> UV disinfection system shall have been tested and certified to
> meet California Title 22 or Hawaii R-1 quality water.

Bodell's Concise #1, Ex. 3 at 1.

Section 11376 also stated that "UV system shall be System UV

4000™, as manufactured by Trojan Technologies, Inc., or equal." GMP's Concise,

Ex. C at 3 (¶ 2.1 A). Section 11376 listed all the specific design and performance

requirements (along with the experience requirement set forth *supra*) that an

alternative manufacturer would have to meet. In particular, Section 11376 required

the following: "The major axis of the UV lamps shall be horizontal and parallel to

flow. UV systems that operate with lamps placed perpendicular to the flow are

unacceptable." GMP's Concise, Ex. C at 5 (¶ 2.4 A. 3.).

Although GMP was responsible for writing the specifications, it

appears as though Trojan provided GMP with the specifications for the Trojan UV

system and GMP turned around and labeled those specifications as the project

requirements. *Compare* Ultratech's Concise #1, Ex. 3 (Trojan's Specifications)

7

*with* GMP's Concise, Ex. C at 1 (Section 11376); *see also* GMP's Concise, Ex. H (e-mail from Cyril Hamada, a Project Engineer for the City, to Ultratech in which Hamada states, "In my opinion [GMP] relied solely on Trojan to provide them with specs and drawings."); Ultratech's Concise #1, Ex. 36 at 159 (deposition of Lee Mansfield (GMP's Principal Designer for the Wahiawa project) in which Mansfield agrees that all the UV systems were based on the Trojan 4000 UV system).[5] GMP concedes that "[t]he diskette supplied by Trojan was a starting point," but argues that "there were substantial modifications." GMP's Reply at 4.

The City advertised the Wahiawa WWTP project on November 15, 1999, and the bid opening date was December 16, 1999. Bodell Concise #2, Ex. 46. Naturally, Trojan's competitors were unhappy with the way the specifications

---

[5] GMP did contact at least one other UV supplier. Bodell's Concise #2, Ex. 41 (letter from Infilco Degremont Inc., stating "[w]e are pleased to respond to your recent inquiry for ultraviolet disinfection equipment for the above referenced project").

8

were written.[6]  Specifically, Ultratech, another UV system manufacturer, wanted a

chance to supply the Wahiawa WWTP with its UV disinfection equipment.

### 4.    The Ultratech substitution request and the City's response

On November 18, 1999, Ultratech's local supplier, ESI, submitted a

pre-bid substitution request[7] to the City.  The request stated that the Ultratech UV

system varied from the Trojan system in that the Ultratech system was a low

pressure system; the request also stated "I [Paul Scott, of ESI] further certify that

this request for substitution has no other variant features."  Bodell's Concise #1 at

6.

On November 23, 1999, GMP recommended that the City deny ESI's

request.  Lee Mansfield, GMP's Principal Designer for the Wahiawa WWTP

---

[6] Ultratech and ESI contend that the specifications were written in such a way that Trojan
was the only company capable of providing the requested equipment.  As such, Ultratech and
ESI argue that these specifications violated HRS § 103D-306 (entitled "Sole source
procurement"), which provides that all equipment must be competitively bid unless "the head of
a purchasing agency determines in writing that there is only one source for the required good."
Indeed, the record reflects that the City had, at the very least, considered getting "sole source"
approval for the Trojan system.  Bodell's Concise #2, Ex. 44 (fax from Dennis Kaneshiro to Lee
Mansfield (GMP's Principal Designer for the Wahiawa WWTP project), dated 10/30/99, stating
that if the UV systems recommended by the Brown and Caldwell engineering report "do not
meet your requirements and we only have one qualifier, please call us soon to get a 'sole source'
approval").

[7] A "pre-bid substitution request" is exactly that:  a request, submitted by a general
contractor to the entity advertising the project *before* the deadline for submitting bids; the
general contractor is essentially asking for permission to use a different piece of equipment than
the one specified in the bid documents.  (The extent to which the City "approved" Bodell's pre-
bid substitution request was at the core of the dispute between the City and Bodell.)

project, stated that there was "[i]nsufficient information to determine suitability." Mansfield indicated that ESI "has only provided sales brochures" and that ESI should submit additional engineering information to show that the Ultratech unit "meets or exceeds each major requirement" of the specifications.  Ultratech's Concise #1, Ex. 10.

The City rejected GMP's recommendation.  In a December 1, 1999 memorandum to "The Record," Cyril Hamada (a Project Engineer for the City) recognized that GMP recommended denying the Ultratech system based on a lack of information on meeting the specifications.  Nevertheless, Hamada stated that he would "allow[] [Ultratech] to bid the project provided that they meet all requirements of the specifications."  Bodell's Concise #1 at 8.  Consequently, in a letter to ESI dated December 9, 1999, the City stated:

Based on the material submitted your request to:

1.    Substitute Ultratech UV disinfection system for the specified Trojan is approved for bidding purposes only;

Final approval is subject to review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract documents.

Bodell's Concise #1, Ex. 9.[8]  Hamada subsequently explained his rationale for

overruling GMP.  In late October of 2000, Hamada stated that because the

Ultratech low pressure UV system "meets Title 22, and since we approved a [low

pressure] system for Honouliuli [a different wastewater facility on Oahu], and

since Ultratech was approved for Kailua WWTP (a wastewater facility) and since it

purportedly fits into the allocated space, and since there might be an economic

benefit to the City, it was my decision to approve the substitution request."

Ultratech Concise #1, Ex. 35.

Within days of receiving the above-referenced letter from the City,

ESI forwarded this letter to Bodell Construction Company ("Bodell"), a general

contractor preparing a bid for the Wahiawa WWTP project.  ESI also included its

own letter, in which it stated:  "UltraTech Systems is pleased to offer our UV

---

[8] This was not the only conditional approval letter the City issued with respect to the Wahiawa WWTP project.  The City issued at least five other letters regarding material substitution requests, all of which stated that the materials were "approved for bidding purposes only" or "conditionally approved for bidding purposes only" but that "[f]inal approval is subject to review of the fabrication drawings, shop drawings, and meeting all the requirements of the contract specifications."  Bodell's Concise #2, Ex. 64.

Within these five letters, however, the City also denied several requests.  In one of the letters, also to Paul Scott of ESI, James Honke (Chief of the City's Division of Infrastructure Design and Engineering) stated that one particular substitution request "is not the best technology for this application.  Therefore, your substitution request cannot be considered an equal."  Bodell's Concise #2, Ex. 64 at CH 01330.  This suggests that, in general, the City only issued pre-approval letters where a proposed substitution could be considered an equal to the specified item.

11

equipment which is in conformance with this project's plans and specifications."
Bodell's Concise #1, Ex. 10.

### 5.    Bid submission, contract, and post-bid discussions between Ultratech, Trojan, GMP, and Bodell

Bodell submitted its bid on December 16, 1999; this bid was based on the Ultratech UV system and included a $487,420.00 lump sum charge for "UV Disinfection Reactor Units." Bodell's Concise #1, Ex. 12. Bodell was the low bidder (with a total bid of $11,297,825.00) and was awarded the project. *See* Bodell's Concise #1, Ex. 17; Bodell's Concise #2, Ex. 46. Bodell signed the contract on February 25, 2000. Bodell's Concise #1, Ex. 17.

The Ultratech system did not meet the project specifications because it did not meet the experience requirement described in the bid specifications. In July of 2000, Greg Ellner, President of Ultratech, stated: "Regarding the experience clause, we do not have the sufficient number of horizontal UV systems of the minimum size specified." GMP's Concise, Ex. H. Ellner then goes on to state that because Ultratech has many vertical lamp systems, "it can be argued that we do meet the experience clause." *Id.* In other words, although Ultratech had installed many UV systems with the lamps oriented perpendicular to effluent flow and could meet the experience requirement with its vertical UV system, these systems did not meet the horizontal lamp requirement of the project specifications.

12

And although Ultratech had a horizontal lamp system that had been used successfully on several small projects, Ultratech did not have five horizontal UV systems disinfecting a peak flow of five million gallons a day. In sum, Ultratech had at least one UV system that could meet the experience requirement and at least one UV system that could meet the perpendicular lamp array requirement, but Ultratech did not have a system that could meet both requirements. The City's Project Engineer, Cyril Hamada, did not seem too troubled by this dilemma; in an e-mail dated July 7, 2000, Hamada told Ellner (Ultratech's President) that "[t]he main purpose of the experience clause is to prevent bidding by fly-by-night operations. The [argument] would be that although you do not meet the arbitrary minimum of 5, 5.0 mgd [million gallons a day] peak flow installations, you do have ample, successful horizontal installations (some large but mostly small) and are more than capable of doing a good job." Ultratech's Concise #2, Ex. C. Hamada also stated, however, that "I am convinced that GMP will reject your submittal based on the experience clause." Ultratech's Concise #2, Ex. C.

Trojan's representatives, on the other hand, were troubled by the inclusion of Ultratech's UV system in Bodell's winning bid. On June 5, 2000, Guy Inouye, Wastewater Branch Engineer for the City, sent an e-mail to Cyril Hamada and Dennis Kaneshiro stating that he (Inouye) had met with Mike Elhoff (Trojan's

13

local sales representative).  According to Inouye, Elhoff "continues to believe that the [Ultratech] substitution does not meet [the specifications] and that the approval was not proper."  Ultratech Concise #1, Ex. 23.  Furthermore, e-mails between Trojan and its local sales representative indicate that Trojan was vigorously fighting for business, including meeting with City officials to discredit the Ultratech system.  Ultratech Concise #1, Ex. 19; Bodell's Concise #2, Ex. 40.

According to Ultratech, Trojan's representatives were not the only ones making life difficult for Ultratech and ESI.  As part of its attempt to have its UV system approved for the Wahiawa WWTP, Ultratech provided proprietary information to GMP in May of 2000.  Ultratech and ESI allege that GMP took Ultratech's proprietary information and gave that information to Trojan, and Lee Mansfield (from GMP) admitted that he "may have" released this information to Mike Elhoff, Trojan's local sales representative.  Bodell's Concise #2, Ex. 62 at 300; Ultratech's Concise #1, Ex. 31 at 299-300, Ex. 34.

On October 23, 2000, California's Department of Health Services sent Ultratech a letter stating that Ultratech's vertical lamp system was approved under California's Title 22.  City's Concise #2, Ex. E.  On December 21, 2000 (well after the contract was signed), Ultratech submitted a request for permission to submit an after bid substitution (*i.e.*, Ultratech asked the City for permission to submit a post-

14

bid request to substitute the Ultratech UV system for the Trojan UV system in

Bodell's contract).  Greg Ellner (Ultratech's President) explained that "[n]ormally

we would have attempted to substitute prior to bid opening but[] we received . . .

certification (Title 22) for our vertical lamp low pressure UV system recently."

Ultratech Concise #2, Ex. A.  On January 11, 2001, Lee Mansfield (GMP's

Principal Designer for the Wahiawa WWTP project) wrote a memo to James

Honke (Chief of Wastewater Design and Engineering for the City) recommending

that this request be denied.  Mansfield recommended denial for two reasons:  first,

the request was submitted by Ultratech, rather than Bodell; second, according to

Mansfield, even if Bodell had submitted the request itself, Bodell would not be

entitled to the substitution (pursuant to section 1.13(c) of the "instructions to

bidders").  Ultratech's Concise #2, Ex. A.  Nevertheless, it appears as though Gary

Q. L. Yee, Director of the City's Department of Design and Construction, granted

Ultratech's request; in an undated letter, Yee wrote the following to Greg Ellner

(Ultratech's President):

> Although the specifications contain a provision against a
> vertical UV disinfection system, we feel that this is not
> enforceable as California Department of Health Services Title
> 22 allow[s] for a vertical low pressure UV disinfection system
> as a non-conforming system.  The specified Trojan 4000 system
> is also a non-conforming system.

> Therefore, we believe that the vertical low pressure UV disinfection system is equal or better tha[n] the one specified or prequalified, and thus prior written approval is granted to submit an after bid opening substitution request.

Ultratech Concise #2, Ex. B.

The City eventually rejected the Ultratech UV system and required Bodell to install a Trojan system.  *See* Ultratech's Concise #1, Exs. 24, 33.  From the Record, whether Bodell installed the Trojan 4000 system specified in Section 11376 or a different Trojan system is unclear; at the May 1, 2006 hearing, however, counsel for Bodell stated that Bodell installed a different Trojan system than the one specified in the City's bid request.[9]  On October 11, 2000, LeRoy Humke (Bodell's General Manager, Industrial Division) sent a fax to Trojan requesting a price quote for the Trojan UV 4000 medium pressure UV system.  Humke indicated that "the base bid equipment will no longer be considered" and that time was of the essence.  Ultratech's Concise #1, Ex. 33.  Bodell installed the Trojan system; from the record, the court could not discern the exact price difference between the Trojan system and the Ultratech system.

---

[9] In its First Amended Complaint, Bodell alleges that it did not install the Trojan 4000 system described in Section 11376, but rather installed a new Trojan system (a slightly smaller system with a shallower effluent channel) that did not meet the experience requirement.  First Amended Complaint at 10.  Thus, according to Bodell, Ultratech, and ESI, the experience requirement was a sham designed to disqualify other potential suppliers.

B.    Procedural Background

On December 24, 2003, Bodell filed its Complaint against GMP, the City, and Ultratech[10] pursuant to 28 U.S.C. § 1332 (diversity jurisdiction); Bodell filed its First Amended Complaint on February 13, 2004. R. at 1, 9. GMP and the City filed cross-claims against Ultratech, and Ultratech filed a cross-complaint against GMP and the City. R. at 17, 45, 61. The City filed a third-party complaint against ESI, and ESI responded with a counterclaim against the City and a cross-claim against GMP. R. at 46, 89. Ultratech and ESI brought identical claims against the City; likewise, Ultratech and ESI brought identical claims against GMP.

Beginning in January of 2006, the parties filed a total of five motions for summary judgment. In September 2006, the City settled all claims brought against it by Bodell, Ultratech, and ESI, and Bodell assigned its claim against GMP to the City. Remaining, then, are the following motions: (1) GMP's motion for summary judgment as to all the claims brought against it by Bodell, Ultratech, and ESI ("GMP's MSJ");[11] and (2) Ultratech's and ESI's motion for summary

_____

[10] On October 19, 2004, Bodell dismissed its claims against Ultratech.

[11] GMP's cross-claim against Ultratech merely states that if Bodell was damaged as alleged in its (Bodell's) First Amended Complaint, those damages were caused by Ultratech's negligence. GMP did not move for summary judgment as to its cross-claim against Ultratech,

(continued...)

17

judgment as to their claims against GMP and as to GMP's cross-claim against Ultratech ("Ultratech's MSJ"). For the reasons discussed below, the court rules as follows as to the five motions pending before the court:

1.      GMP's motion as to the claims brought by Ultratech and ESI is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Ultratech's and ESI's claims for negligence and interference with contractual relations. The motion is DENIED with respect to Ultratech's and ESI's claim for tortious interference with prospective contractual relations because there are genuine issues of material fact. The motion is likewise DENIED as to Bodell's claim for interference with contractual relations because of genuine issues of material fact;

2.      Ultratech's and ESI's motion is DENIED AS MOOT with respect to their claims against the City. Ultratech's and ESI's motion is DENIED with respect to their tortious interference with prospective contractual relations claim against GMP because there are genuine

_____

[11](...continued)
but Ultratech moved for summary judgment as to GMP's cross-claim. At the hearing on May 1, 2006, counsel for GMP stated that GMP's cross-claim was no longer relevant and that GMP would file a stipulation to dismiss this claim. GMP never filed such a stipulation; as such, the court grants summary judgment in Ultratech's favor as to GMP's cross-claim.

issues of material fact.  The motion is GRANTED with respect to
GMP's cross-claim for contribution;[12] and

3.    The remaining motions (the City's motions for summary judgment,
Bodell's motion for summary judgment, and Ultratech's and ESI's
motion for summary judgment as to its claims against the City)  are
DENIED AS MOOT.[13]

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"One of the principal purposes of the summary judgment rule is to
isolate and dispose of factually unsupported claims or defenses[.]"  *Celotex Corp.
v. Catrett*, 477 U.S. 317, 323-324 (1986).  The burden initially lies with the
moving party to show that there is no genuine issue of material fact.  *T.W. Elec.
Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).

---

[12] *See* note 11, *supra.*

[13] The court is aware that the settlement must be approved by the Honolulu City Council
and that this process may take some time.  In the event that the settlement is rejected by the City
Council or otherwise falls apart, the court will issue a ruling as to the City's motions, Bodell's
motion, and the remainder of Ultratech's and ESI's motion.

Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting *Celotex*, 477 U.S. at 322).

The court has jurisdiction over this matter based on diversity of citizenship; as such, the court applies Hawaii state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).[14]

## IV. ANALYSIS

A.    Ultratech's and ESI's claims against GMP:  Ultratech's MSJ and GMP's MSJ

Ultratech and ESI have brought two claims for relief against GMP: (1) Interference with Contractual Relations and Prospective Contractual Relations;[15] and (2) Negligence.  GMP brought a cross-claim for contribution

---

[14] Although the February 25, 2000 contract does not contain an explicit choice of law clause, the contract does seem to contemplate application of Hawaii law:

> IT IS MUTUALLY COVENANTED AND AGREED by and between the parties . . . [t]hat if any term . . . of this contract . . . is held by any court to be invalid under the laws of the State of Hawaii or the United States of America, such part of the contract . . . shall not affect the validity of this contract as a whole[.]

Bodell's Concise #1, Ex. 17 at 2-3.  The court sees no reason to apply another state's law to the instant case.

[15] Ultratech's and ESI's claim is actually for "Interference with . . . Prospective Economic
(continued...)

against Ultratech.  Ultratech/ESI and GMP have moved for summary judgment as to the claim for interference with contractual relations and prospective contractual relations; GMP has moved for summary judgment as to the claim for negligence; and Ultratech has moved for summary judgment as to GMP's cross-claim for contribution.  The court concludes as follows:  (1) GMP is entitled to summary judgment as to Ultratech's and ESI's claim for interference with contractual relations; (2) neither GMP nor Ultratech/ESI is entitled to summary judgment as to the claim for interference with prospective contractual relations; (3) GMP is entitled to summary judgment as to the negligence claim; (4) Ultratech is entitled to summary judgment as to GMP's cross-claim for contribution.  The court considers each of these issues in turn.

## 1. Interference with contractual relations and interference with prospective contractual relations

### a. Interference with contractual relations

The Hawaii Supreme Court has set forth the elements of a claim for interference with contractual relations as follows:

> The requisite elements of tortious interference with contractual relations [are as follows]:  1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract;

---

[15](...continued)
Advantage."  R. at 61, 89.  This issue is discussed more fully *infra*.

21

> 3) the defendant's intentional inducement of the third party to
> breach the contract; 4) the absence of justification on the
> defendant's part; 5) the subsequent breach of the contract by the
> third party; and 6) damages to the plaintiff.

*Weinberg v. Mauch*, 78 Haw. 40, 50, 890 P.2d 277, 287 (1995).

GMP argues that there was never actually a contract between Bodell and Ultratech, such that GMP cannot be liable for interference with contractual relations. The court agrees. Although there may have been an agreement between Bodell and Ultratech, that agreement was conditioned on the City's acceptance of the Ultratech system as a substitute for the Trojan system. Taken another way, if Ultratech had brought a breach of contract claim against Bodell, that claim would have failed: both Bodell and Ultratech knew that the UV system was for the Wahiawa WWTP and that the City's approval of the Ultratech system was a prerequisite to execution of the contract between Bodell and Ultratech. Bodell was clearly not interested in purchasing an Ultratech UV system to keep in a warehouse for some possible future use -- the system was specifically intended for the Wahiawa WWTP. Indeed, the First Amended Complaint does not even allege that a contract existed between Bodell and Ultratech or ESI. Because Bodell did not breach a contract with Ultratech, the claim for interference with contractual relations necessarily fails. Instead, as discussed in the following subsection,

Ultratech and ESI may pursue their claim for interference with prospective

contractual relations.

        b.    <u>Intentional (or tortious) interference with prospective economic</u>
                <u>advantage; intentional (or tortious) interference with</u>
                <u>prospective contractual relations</u>

      As an initial matter, the exact nature of Ultratech's and ESI's

interference claim is not entirely clear.[16]  Ultratech's and ESI's cross-complaints

against GMP set out claims for "Interference with . . . Prospective Economic

Advantage," R. at 61, 89, whereas Ultratech's and ESI's briefing on the various

motions for summary judgment refers to "Intentional Interference with Prospective

Contractual Relations" and "intentional interference with prospective business

relations."  Ultratech's and ESI's Opposition to GMP's MSJ at 5 & n.1.

Nevertheless, regardless of how Ultratech and ESI formulate this claim, it survives

GMP's motion for summary judgment.

      The elements of a claim for prospective economic advantage are as

follows:

> [T]he following elements have evolved into the tort of
> intentional or tortious interference with prospective business
> advantage:  (1) the existence of a valid business relationship or
> a prospective advantage or expectancy sufficiently definite,

---

[16] The first claim for relief set forth in both Ultratech's and ESI's cross-complaints
against GMP is "Inteference with Contractual Relations and Prospective Economic Advantage."
R. at 61, 89.

specific, and capable of acceptance in the sense that there is a
reasonable probability of it maturing into a future economic
benefit to the plaintiff; (2) knowledge of the relationship,
advantage, or expectancy by the defendant; (3) a purposeful
intent to interfere with the relationship, advantage, or
expectancy; (4) legal causation between the act of interference
and the impairment of the relationship, advantage, or
expectancy; and (5) actual damages.

*Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co.*, Inc., 91 Haw. 224,

258, 982 P.2d 853, 887 (1999) (footnote omitted). "[T]he tort of interference with

prospective contractual relations is a sub-species of the broader tort of interference

with prospective economic advantage." *Kutcher v. Zimmerman*, 87 Haw. 394, 405

n.15, 957 P.2d 1076, 1087 n.15 (App. 1998). "In addition to the elements required

to establish a claim for tortious interference with prospective business advantage, a

plaintiff asserting a claim for tortious interference with prospective contractual

relations must also prove that 'the defendant acted without proper justification.'"

*Whitey's Boat Cruises, Inc. v. Napali-Kauai Boat Charters, Inc.*, 110 Haw. 302,

317, 132 P.3d 1213, 1228 (2006) (quoting *Kutcher*, 87 Haw. at 406, 957 P.2d at

1088).[17]

---

[17] In other words, *Whitey's Boat Cruises* and *Robert's Hawaii* hold that a plaintiff must
prove absence of justification in a prospective contractual relations case but need not prove this
factor in a prospective economic advantage case. Thus, while interference with prospective
contractual relations is a sub-species of interference with prospective economic relations, a claim
for the sub-species (interference with prospective contractual relations) is *more* difficult to
establish than the more general claim (interference with prospective economic relations). *But*
(continued...)

Ultratech and ESI devote significant amounts of their briefs to the

issue of whether GMP lacked justification for its actions, and Ultratech and ESI

appear to believe that the absence of justification is a required element of their

claim against GMP. *See* Ultratech's MSJ at 18, 24-25. Consequently, the court

will proceed as though Ultratech and ESI are bringing a claim for tortious

interference with prospective contractual relations, though this Order is equally

applicable to both theories.[18] That said, Ultratech and ESI must prove the

---

[17](...continued)
*see Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1006 n.9 (9th Cir. 2004) (citing *Kutcher* for the proposition that a plaintiff must establish the absence of justification to succeed with a claim for intentional interference with prospective economic advantage); *Kutcher*, 87 Haw. at 399 n.8, 957 P.2d at 1081 n.8 (stating that "[t]he tort of interference with prospective economic advantage, or prospective contractual relations, apparently has been recognized by Hawai'i courts," thus suggesting that interference with prospective economic advantage and interference with prospective contractual relations are two different names for the same tort).

The court is unclear as to why a plaintiff would ever set forth a claim for relief for interference with prospective contractual relations when a claim for interference with prospective economic relations is easier to establish. The court is also unclear as to whether a claim for "intentional (or tortious) interference with prospective business advantage" is distinct from a claim for "intentional (or tortious) interference with prospective business relations" or "intentional (or tortious) interference with prospective economic advantage." Nevertheless, the court need not resolve any of these issues at this time. As discussed more fully *infra*, the court merely concludes that, to the extent that Ultratech and ESI are required to prove intent and absence of justification as elements of their claim, GMP is not entitled to summary judgment.

[18] To be clear, the court is *not* preventing Ultratech and ESI from proceeding with a claim for interference with prospective economic advantage as alleged in their cross-complaints; instead, the court is merely basing its ruling on Ultratech's and ESI's assumption that they must prove absence of justification. Whether in fact Ultratech and ESI have presented a claim for interference with prospective economic advantage or a claim for interference with prospective contractual relations is not presently before the court. As to the instant motion, GMP is not entitled to summary judgment on a claim for tortious interference with prospective contractual relations, and the court's reasoning applies equally to a claim for interference with prospective
(continued...)

25

following elements to succeed on a claim for intentional (or tortious) interference with prospective contractual relations:

> (1) a prospective contractual relationship existed between the plaintiff and a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally interfered with the relationship; (4) the defendant acted without proper justification; (5) the defendant's interference caused the third party to fail to consummate the prospective contract with the plaintiff; and (6) the defendant's interference caused damages to the plaintiff.

*Kutcher*, 87 Haw. at 395, 957 P.2d at 1077.

GMP argues that Ultratech and ESI have not and cannot prove the third and fourth factors:  that GMP intentionally interfered with the relationship or that GMP acted without proper justification.  The court finds that there is a genuine issue of material fact as to each of these factors, such that neither side is entitled to summary judgment.  The court addresses each of these two prongs in turn.[19]

---

[18](...continued)
economic advantage.

[19] None of the parties has moved for summary judgment as to the remaining factors (whether a prospective contractual relationship existed; whether GMP knew of the relationship; whether GMP's interference caused Bodell to fail to consummate the prospective contract with Ultratech and ESI; and whether GMP's interference caused damages to Ultratech and ESI); as such, the court does not address them.  By no means is the court suggesting that any of these factors should be taken away from the jury.

26

i.      **Intentional interference**

In *Meridian Mortgage, Inc. v. First Hawaiian Bank*, 109 Haw. 35, 48,

122 P.3d 1133, 1146 (App. 2005), the Hawaii Intermediate Court of Appeals

("ICA") quoted the following passage from *Omega Environmental, Inc. v.*

*Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir. 1997), with approval:[20]

> The third element, intent, denotes purposefully improper
> interference. The plaintiff must prove that the defendant either
> pursued an improper objective of harming the plaintiff or used
> wrongful means that caused injury in fact. Asserting one's
> rights to maximize economic interests does not create an
> inference of ill will or improper purpose.

The ICA went on to hold that the defendant was entitled to summary judgment

because the plaintiff had failed to produce any evidence that the defendant

"'pursued an improper objective of harming'" the defendant or "'used wrongful

means that caused injury in fact.'" *Meridian Mortgage*, 109 Haw. at 48, 122 P.3d

at 1146 (quoting *Omega Envtl.*, 127 F.3d at 1166).

In the instant case, Ultratech and ESI have produced sufficient

evidence of improper objective to withstand summary judgment. Specifically,

there are two pieces of evidence suggesting that GMP was attempting to harm

---

[20] The ICA stated that "the Hawai'i Supreme Court in *Robert's Hawaii* did not expand
further on the individual elements of the tort, particularly the intent element." *Meridian
Mortgage, Inc.*, 109 Haw. at 48, 122 P.3d at 1146. Because the Supreme Court had referred to
*Omega Environmental* in *Robert's Hawaii*, however, the ICA adopted the test for intent from
*Omega Environmental. See Meridian Mortgage*, 109 Haw. at 48, 122 P.3d at 1146.

Ultratech and ESI: first, there is evidence that GMP wrote the project specifications in such a way to exclude all suppliers but Trojan; second, Lee Mansfield (from GMP) admitted that he "may have" released confidential proprietary information to Mike Elhoff, Trojan's local sales representative. Given that GMP is not in the business of manufacturing ultraviolet disinfection systems, GMP cannot reasonably claim that it was attempting to maximize its economic interests in rejecting the Ultratech UV system. A reasonable finder of fact could find that GMP intended to cause Ultratech and ESI harm, such that GMP is not entitled to summary judgment on this basis. That said, the evidence is not so overwhelming as to justify summary judgment in Ultratech's and ESI's favor.

### ii.    Proper justification

*Kutcher* clarified the "justification" prong as follows: "[A] plaintiff may show that interference was without proper justification where the interference was tortious, illegal, or unconstitutional, and/or involved violations of statutes, regulations, or recognized common-law rules[] or established standards of a trade or profession." *Kutcher*, 87 Haw. at 407, 957 P.2d at 1089 (footnote, citations, brackets, and internal quotation signals omitted).[21]

---

[21] In *Kutcher*, the ICA explained that the plaintiff must prove, as part of its prima facie case, that the defendant acted without proper justification. *Kutcher*, 87 Haw. at 406, 957 P.2d at 1088. In other words, the plaintiff has the burden of proving lack of justification, and the

(continued...)

GMP argues that it is entitled to summary judgment because its actions were justified.  Specifically, GMP contends that, because it was acting pursuant to its contract with the City and because it was providing truthful information and honest advice to the City, its actions were privileged and therefore justified.  As the ICA stated in *Kutcher*:

> [T]he privilege of communicating truthful information, set forth in [the Restatement (Second) of Torts] section 772(a), is of particular significance to this case:
>
>> One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another *does not interfere improperly* with the other's contractual relation, *by giving the third person*
>>
>> (a) *truthful information*, or
>>
>> (b) honest advice within the scope of a request for advice.

*Kutcher*, 87 Haw. at 408-09, 957 P.2d 1090-91.

While a jury may ultimately agree with GMP that it did nothing more than provide truthful advice and information, Ultratech and ESI have provided sufficient evidence that GMP's actions were not justified.  A reasonable jury could find that GMP wrote the specifications to favor Trojan and that GMP did so for the

---

[21](...continued)
defendant does not have any burden to prove that its actions were justified.

29

purpose of harming Ultratech and ESI (rather than for the purpose of providing the City with the most beneficial sewage treatment system). Furthermore, a reasonable jury could find that GMP recommended that the City reject the Ultratech system because GMP wanted to harm Ultratech and ESI (rather than because the Ultratech UV system failed to meet the legitimate specifications). Whether Ultratech and ESI will ultimately prevail on these issues is unclear; there is a genuine issue of material fact, and the court DENIES summary judgment as to both GMP and Ultratech/ESI.

### 2.    Negligence

Ultratech and ESI also allege that GMP is liable for negligence. GMP is entitled to summary judgment as to this claim.

"A necessary element in a negligence action is '[a] duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks.'" *Johnston v. KFC Nat'l Mgmt. Co.*, 71 Haw. 229, 232, 788 P.2d 159, 161 (quoting *Ono v. Applegate*, 62 Haw. 131, 137, 612 P.2d 533, 538 (1980)) (alteration in original). "The existence of a duty, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other

. . . is entirely a question of law." *Birmingham v. Fodor's Travel Publ'ns, Inc.*, 73 Haw. 359, 366, 833 P.2d 70, 74 (1992).

Ultratech and ESI have failed to demonstrate that GMP owed any duty to them: no contract existed between them and there is nothing to suggest any other type of relationship that would impose a duty on GMP. Although Ultratech's and ESI's briefs discuss, at length, the ways in which GMP's conduct was negligent, Ultratech and ESI fail to raise any arguments as to why GMP owed them a duty (and consequently why it is that their negligence claim should survive summary judgment). As a result, the court GRANTS summary judgment in favor of GMP as to this claim.

### 3.   GMP's cross-claim for contribution

At the May 1, 2006 hearing, counsel for GMP stated that GMP's cross-claim against Ultratech for contribution was no longer relevant and that GMP would file a stipulation to dismiss this claim. No stipulation was filed. The court GRANTS summary judgment in favor of Ultratech as to GMP's cross-claim for contribution.

31

B.    GMP's motion for summary judgment as to the claim brought by Bodell

GMP has moved for summary judgment as to Bodell's claim for intentional interference with contractual relations.[22]  GMP argues that its actions were justified and that Bodell cannot prove that GMP acted with the requisite intent.

As with Ultratech's and ESI's claim against GMP for intentional interference with prospective contractual relations, the court finds that there are genuine issues of material fact as to whether GMP intended to harm Bodell and whether GMP's actions were justified.  Consequently, the court DENIES GMP's request for summary judgment.

V.  CONCLUSION

For the foregoing reasons, the court rules as follows:  (1) the court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment brought by Ultratech and ESI against the City and GMP:  Ultratech's and ESI's claims against the City are moot and are therefore denied, there is a genuine issue of material fact as to Ultratech's and ESI's claim against GMP for tortious interference with prospective contractual relations, and GMP's cross-claim for

---

[22] Pursuant to the settlement agreement between Bodell and the City, Bodell has assigned this claim to the City.

contribution is dismissed; (2) the court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment brought by GMP against Bodell, Ultratech, and ESI: the court grants summary judgment in favor of GMP as to Ultratech's and ESI's negligence claim, but denies summary judgment as to Ultratech's and ESI's claim for tortious interference with prospective contractual relations and Bodell's claim for intentional interference with contractual relations; and (3) the court DENIES AS MOOT the following:  (a) the Motion for Summary Judgment brought by the City against Ultratech and ESI; (b) the Motion for Summary Judgment brought by the City against Bodell; and (c) the Motion for Summary Judgment brought by Bodell against the City.

The following claims remain:  (1) Bodell's claim against GMP for intentional interference with contractual relations; and (2) Ultratech's and ESI's claim against GMP for tortious interference with prospective contractual relations.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 26, 2006.

J. Michael Seabright
United States District Judge

*Bodell Construction Co. v. City & County of Honolulu et al.*, Civ. No. 03-00706 JMS/LEK,
Order Granting in Part and Denying in Part Motions for Summary Judgment

CM/ECF-DC V2.5 (11/05) **LIVE**                              https://ecf.hid.circ9.dcn/cgi-bin/Dispatch.pl?973885756241352

## Orders on Motions
1:03-cv-00706-JMS-LEK Bodell Construction v. GMP Hawaii, Inc., et al

### U.S. District Court

### District of Hawaii - CM/ECF V2.5 (11/05)

Notice of Electronic Filing

The following transaction was received from emt, entered on 9/26/2006 at 2:42 PM HST and filed on 9/26/2006

**Case Name:**       Bodell Construction v. GMP Hawaii, Inc., et al
**Case Number:**     1:03-cv-706
**Filer:**
**Document Number:** 225

**Docket Text:**
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT [111], [113], [127], [128], [131] - Signed by Judge J. MICHAEL SEABRIGHT on 9/26/06. [For the foregoing reasons, the court rules as following: (1) the court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment brought by Ultratech and ESI against the City and GMP; (2) the court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment brought by GMP against Bodell, Utratech, and ESI; (3) the court DENIES AS MOOT the following: (a) the Motion for Summary Judgment brought by the City against Ultratech and ESI; (b) the Motion for Summary Judgment brought by the City against Bodell; (c) the Motion for Summary Judgment brought by Bodell against the City. **The following claims remain: (1) Bodell's claim against GMP for intentional interference with contractual relations; and (2) Ultratech's and ESI's claim against GMP for tortious interference with prospective contractual relations.**] (emt, )

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1095854936 [Date=9/26/2006] [FileNumber=157497-0] [69d318850ab97da029b45e751dc965fe9385c02045f1ae7464f3f5eade99d55c9025 c1542405c160b8838d57e0d974af3e4487dc17b45cada18690d38fc05340]]

**1:03-cv-706 Notice will be electronically mailed to:**

Adam Bialek    Adam.Bialek@wilsonelser.com

Maile R. Chun    mchun@honolulu.gov

Ronald T. Ogomori    rto@ksglaw.com, sham@ksglaw.com

·ian W. Rosehill    arosehill@stubenbergdurrett.com

David Schulmeister    dschulmeister@cades.com, gvance@cades.com

Kristin S. Shigemura    kshigemura@cades.com

Richard C. Sutton , Jr    rsutton@silawgroup.com

Gary Y. Takeuchi    gtakeuchi@honolulu.gov

Nathan H. Yoshimoto    nhy@ksglaw.com, amb@ksglaw.com; jfuchigami@ksglaw.com

**1:03-cv-706 Notice will be delivered by other means to:**

Keith Hunter
1001 Bishop Strett, Ste 115
Honolulu, Hi 96813

Bert T. Kobayashi , Jr
Kobayashi Sugita & Goda
First Hawaiian Center
999 Bishop St Ste 2600
Honolulu, HI 96813-3889

Alan J. Ma
Gerson & Hieneman
Pacific Tower
1001 Bishop St Ste 780
Honolulu, HI 96813

Owen Matsunaga
Gerson & Hieneman
Pacific Tower
1001 Bishop St Ste 780
Honolulu, HI 96813

Jeffrey Tachiki
Wilson Elser Moskowitz Edelman & Dicker LLP
525 Market St 17th Flr
San Francisco, CA 94105-2725